**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Plumbers' Local Union No. 690 Industry Funds, et al.,<br>Plaintiffs,<br><br>v.<br><br>Purdue Pharma, L.P., et al.,<br><br>Defendants. | CIVIL NO. ____________________<br><br>**NOTICE OF REMOVAL**<br>[Removal from Philadelphia County Court of Common Pleas, Case No. 260703065] |

Pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, Defendants Express Scripts, Inc. (**Express Scripts PBM**), and Express Scripts Pharmacy, Inc., and ESI Mail Pharmacy Service, Inc. (together, **ESI Mail Pharmacy**) (collectively with Express Scripts PBM, **Express Scripts**) remove the civil action titled *Plumbers' Local Union No. 690 Industry Funds et al. v. Purdue Pharma L.P.*, *et al.*, Case No. 260703065, pending in the Philadelphia County Court of Common Pleas (the **State Court Action**), to the United States District Court for the Eastern District of Pennsylvania. A copy of the operative complaint in the State Court Action (**Complaint** or **Compl.**) is attached as **Exhibit A**, and all other process, pleadings, and orders served upon Express Scripts or that Express Scripts obtained from the case docket for the State Court Action are collectively attached as **Exhibit B**, and together constitute all pleadings filed with respect to this Action to date. Express Scripts states that removal is proper for the reasons set forth in the following paragraphs.

## INTRODUCTION

1. This case is one of many filed nationwide seeking to recoup costs allegedly incurred in response to third parties' misuse of lawful medications: prescription opioids approved by the U.S. Food & Drug Administration (**FDA**) for the treatment of pain. Most of those cases were filed in, or removed to, federal court and then centralized in a federal multi-district litigation in the

Northern District of Ohio (**Prescription Opioid MDL**). In April 2022, the Judicial Panel on Multidistrict Litigation closed the Prescription Opioid MDL to new cases, so prescription opioid cases filed since then may proceed in federal court without being transferred to the MDL. *See In re Nat'l Prescription Opiate Litig.*, 2022 U.S. Dist. Lexis 65760, at *2–3 (J.P.M.L. Apr. 8, 2022); *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (J.P.M.L. Aug. 8, 2026), ECF No. 9673, at 1–2 (reaffirming MDL's closure to new cases).

2. The 71 Plaintiffs in this case have sued 49 Defendants in a sprawling complaint with 1315 paragraphs. Plaintiffs allege that they are third-party payors that purchased prescription opioids or reimbursed the cost of prescription opioids that were manufactured, distributed, marketed, and sold by Defendants. Compl. ¶10. Plaintiffs claim that Defendants, including Express Scripts, created an "opioid public nuisance" in Pennsylvania, Delaware, Maryland, Massachusetts, New Jersey, New York, Ohio, and Florida. *Id.* ¶¶ 13, 390. With respect to Express Scripts, Plaintiffs allege that it did so by "colluding" with "manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees." *Id.* ¶ 1072. Plaintiffs claim that Defendants created an "oversupply" of prescription opioids, which harmed "Plaintiffs' communities," and in turn led to "significant costs to the Plaintiffs in order to treat the victims of opioid abuse and addiction." *Id.* ¶¶1068, 1072, 1293, 1307.

3. Removal is proper here under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because Plaintiffs' claims relate to actions that Express Scripts performed under the color of federal office, including rebate contracting with manufacturers and formulary development. Express Scripts PBM is a pharmacy benefit manager (**PBM**), and ESI Mail Pharmacy is a mail order pharmacy. They contract with health plan sponsors—including federal agencies—to administer prescription-drug benefits and provide mail-order pharmacy services to

plan members. In particular, Express Scripts is hired to assist (1) the U.S. Department of Defense (**DoD**) to provide pharmacy benefits and services to active-duty military service members through the TRICARE program; (2) the Office of Personnel Management (**OPM**) to provide pharmacy benefits and services to federal employee health plans governed by the Federal Employees Health Benefits Act (**FEHBA**); and (3) the Centers for Medicare & Medicaid Services (**CMS**) to provide pharmacy benefits and services to the elderly members of Medicare Part D plans.

4. Courts across the country—including the Second, Fourth, Sixth, and Eighth Circuits, and the federal district court overseeing the Prescription Opioid MDL—have held that Express Scripts is entitled to remove to federal court under the federal officer removal statute prescription opioid cases like this one that involve challenges to rebate agreements with manufacturers. *Kentucky v. Express Scripts, Inc.*, --- F.4th ---, 2026 WL 2796078, at *2–5 (6th Cir. Sept. 18, 2026); *County of Westchester v. Express Scripts, Inc.*, --- F.4th ---, 2026 WL 2589574, at *8–10 (2d Cir. Sept. 2, 2026); *Griffin v. Optum, Inc.*, 175 F.4th 897, 901–03, 905 (8th Cir. 2026); *County Bd. of Arlington County v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251–57 (4th Cir. 2021); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, a *4–8 (N.D. Ohio Jan. 12, 2023). Courts have held the same in non-opioid cases that involve challenges to rebate negotiations. *Ohio ex rel. Yost v. Ascent Health Servs.*, 165 F.4th 999, 1004–1012 (6th Cir. 2026); *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 197–99 (4th Cir. 2025); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 188–90 (1st Cir. 2024). Last year, the District of New Jersey likewise held, under Third Circuit law, that Express Scripts properly removed a case under the federal officer removal statute that challenged its rebate practices. *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *7–15 (D.N.J. June 4, 2025). The reasoning of all those decisions applies with equal force here.

5. Plaintiffs purport to disclaim any connection to Express Scripts' work for the federal government. *See* Compl. ¶¶ 42–54. But "no disclaimer, however worded," can defeat federal-officer removal here, both because the rebate practices that Plaintiffs challenge were conducted indivisibly for federal and non-federal clients, *Griffin*, 175 F.4th at 904–05 (citation omitted), and because Plaintiffs' alleged "community-wide harm" from an alleged oversupply of prescription opioids necessarily implicates the hundreds of thousands of prescription opioid claims that Express Scripts processed for federal plan members in Pennsylvania and other states, *Westchester*, 2026 WL 2589574, at *8. That is why the First, Second, Fourth, Sixth, and Eighth Circuits, and the District of New Jersey, have each held that disclaimers like the one at issue here are ineffective to defeat removal by Express Scripts and other PBMs under the federal officer removal statute. *Kentucky,* 2026 WL 2796078, at *4–5; *Westchester,* 2026 WL 2589574, at *5–8; *Griffin,* 175 F.4th at 904–05; *Yost*, 165 F.4th at 1008–09; *West Virginia*, 140 F.4th at 194–96; *Puerto Rico*, 119 F.4th at 188–94; *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *3–6. Plaintiffs' disclaimer therefore does not defeat removal here.

## BACKGROUND

### A. Procedural History

6. On June 30, 2026, Plaintiffs filed the State Court Action against Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., o/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., o/k/a Janssen Pharmaceuticals, Inc., Allergan, PLC, f/k/a Actavis, PLC, Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis, LLC, Actavis Pharma, Inc., f/k/a/ Watson Pharma, Inc., Abbott Laboratories, Inc., Assertio Therapeutics f/k/a Depomed, Inc., Collegium Pharmaceuticals, Inc., Mylan Laboratories, Inc., o/k/a Mylan, Inc., Novartis AG o/k/a/

Novartis, Inc. and Novartis Pharmaceuticals Corporation, Sun Pharmaceutical Industries, Inc., Zydus Pharmaceuticals (USA), Inc., Amerisourcebergen Drug Corporation, McKesson Corporation, Cardinal Health, Inc., Curascript, Inc., Curascript SD, CVS Pharmacy, Inc., CVS RX Services, Inc., Pennsylvania CVS Pharmacy, LLC, Walgreens Boot Alliance, Walgreen Co., Walgreen Eastern Co. Inc., Walmart Inc. f/k/a Wal-Mart Stores, Inc., Walmart Stores East, L.P., Target Corporation, Wegmans Food Markets, Inc., Costco Wholesale Corporation, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Spivak Inc. d/b/a Veree Pharmacy, Express Scripts Holding Company (now known as EverNorth Health, Inc.)., Express Scripts, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., Michell Spivak, Todd Goodman, Eric W. Pestrack, and Lee B. Kamp.

7. The Complaint asserts seven counts against all Defendants: (1) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, (2) statutory consumer fraud, (3) negligence per se, (4) aiding and abetting, (5) conspiracy, (6) public nuisance, and (7) unjust enrichment. *See* Compl. ¶¶ 1121–1315.

## B. PBM Defendants

8. Express Scripts PBM is a pharmacy benefit manager or PBM. *See* Compl. ¶ 494. PBMs are very different from the manufacturers, distributors, and retail pharmacies named as defendants in most other opioid lawsuits. Unlike manufacturers, PBMs do not manufacture, market, or advertise medications. Unlike distributors, PBMs do not distribute medications. And unlike retail pharmacies, PBMs do not dispense any medications. Nor do PBMs ever take physical possession or control of medications. As the federal district court overseeing the Prescription Opioid MDL has explained, “PBM Defendants do not manufacture, market, or prescribe opioid

medications." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio Jul. 15, 2019), Dkt. No. 1848 at 2 (attached as **Exhibit C**).

9. PBMs enter into service agreements with their clients—sponsors of health insurance plans—to administer their prescription-drug benefits and process insurance claims for medications approved by the FDA. "Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* at 84. "After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Id.*

10. Express Scripts PBM offers options to assist its clients with managing prescription-drug benefits, but it is up to plan sponsors to choose what benefits to provide to their plan beneficiaries and how to structure those benefits. In particular, plan sponsors select which medications their plans will cover (*i.e.*, what medications are on a plan's formulary) and under what circumstances (*i.e.*, what utilization management and clinical programs, if any, are in place).

11. Like most PBMs, Express Scripts PBM develops formularies, utilization management tools, and clinical programs that it offers to its clients. Some plan sponsors choose to adopt a PBM's offering, while others choose to customize a PBM offering or create their own. Either way, the plan sponsor controls the formulary, utilization management, and clinical programs applicable to each plan it sponsors. The PBM's role is to implement the plan sponsor's choices and administer the plan sponsor's prescription benefit design for the plan beneficiaries.

12. As the federal district court overseeing the Prescription Opioid MDL has explained:

> As part of their nationwide offerings available to all commercial clients, each PBM Defendant offers programs or utilization-management criteria to its clients that are intended to help combat opioid abuse and addiction, and to encourage safe prescribing practices in alignment with the CDC Guideline. . . . [P]lan sponsors decide whether to adopt the programs that the PBM Defendants offer. The Court encourages plan sponsors—as part of their own efforts to combat opioid abuse—to consider and adopt for their members, where appropriate, the opioid programs that the PBM Defendants offer.

Exhibit C at 1–2.

13. Express Scripts PBM also negotiates rebates (discounts) from pharmaceutical manufacturers on prescription medications. Rebate negotiations with pharmaceutical manufacturers are an important part of delivering value to the health plans that PBMs serve. Because medications that are excluded from a health plan's formulary typically "must be purchased out-of-pocket by consumers," manufacturers generally hope to have their drugs included on formularies. *Puerto Rico,* 119 F.4th at 180. Although a medication's inclusion on a formulary is determined by independent, clinically driven evaluations, manufacturers commonly offer rebates that reduce the net cost to clients if the clients select a formulary that includes the medication. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 965–66 (10th Cir. 2022). "After negotiating rebates with drug manufacturers, PBMs develop national formularies that health plans can adopt or customize in response to a particular plan's needs." *Id.* at 966. The PBMs' clients can and do negotiate to receive some or all of those rebates, which allow the PBMs' clients to lower their prescription-drug costs.

## GROUNDS FOR FEDERAL OFFICER REMOVAL

14. The federal officer removal statute permits any federal officer or "any person acting under that officer" who is sued "for or relating to any act under color of such office" to remove the case to federal court. 28 U.S.C. § 1442(a)(1).

15. The statute—which Congress has consistently broadened, most recently in 2011—is an "incident of federal supremacy." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). Its "basic purpose" is "to protect the Federal Government from the interference with its operations that would ensue" if federal officers and those acting under them could be subject to trial and liability in potentially hostile state courts based on actions "within the scope of their authority." *Watson v. Philip Morris Cos*., 551 U.S. 142, 150 (2007) (cleaned up).

16. The Supreme Court has thus instructed that the federal officer removal statute is to be "liberally construed," *id.* at 147 (citation omitted), and it has "rejected a 'narrow, grudging interpretation' of the statute," *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407).

17. In assessing whether federal-officer removal is proper, courts must "credit the [removing party]'s theory of the case." *Acker*, 527 U.S. at 432.

18. In addition, normal pleading rules do not apply. *Id.* at 431. The federal officer removal statute displaces "the 'well-pleaded complaint' rule" inasmuch as it "allows 'suits against federal officers [to] be removed despite the nonfederal cast of the complaint.'" *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (quoting *Acker*, 527 U.S. at 431) (alteration in original). The right of removal is therefore "absolute . . . regardless of whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406.

19. A defendant may remove under § 1442(a) if it satisfies "three requirements":

> First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. Second, the suit must be "for or relating to any act under color of such office." Third, the removing defendant must assert "a colorable federal defense."

*Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 6 (2026) (citations omitted); *see also In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 467 (3d Cir. 2015).

20. Express Scripts satisfies all three elements here.

### A. Removing Defendants Are Persons Acting Under Federal Officers.

21. Each removing defendant is a corporation or a company, so each is a "person" under the federal officer removal statute. *See Def. Ass'n of Phila.*, 790 F.3d at 467–68.

22. In evaluating the "acting under" requirement, the central question is whether the private entity is helping a federal officer "fulfill other basic governmental tasks" that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson,* 551 U.S. at 153–54.

#### 1. Express Scripts Acts Under a Federal Officer for TRICARE.

23. Here, as multiple courts have found, Express Scripts' provision of PBM and mail-order pharmacy services to TRICARE members helps the DoD fulfill basic governmental tasks that it would have to perform itself if it had not contracted with Express Scripts. *See Westchester*, 2026 WL 2589574, at *9 ("Here, [Express Scripts] performed work that, otherwise, the DoD . . . would have to perform on [its] own in fulfilling [its] . . . agency mission[]."); *Arlington County*, 996 F.3d at 253 ("[T]he ESI Defendants are assisting DOD in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." (quoting *Watson*, 551 U.S. at 153–54)); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006,

at *5 ("[P]roviding prescription drug benefits to military members and veterans is a 'basic governmental task' assigned to the DoD by statute. The DoD would have to administer the TRICARE program itself if the task was not delegated to [Express Scripts] Defendants; this fact also strongly favors removal." (citing 10 U.S.C. § 1073a)).

24. The DoD is required by law to enter into contracts to provide healthcare services to TRICARE members. *See* 10 U.S.C. § 1073a(a). The DoD is also statutorily required to establish an "effective, efficient, integrated pharmacy benefits program" for TRICARE. 10 U.S.C. § 1074g(a)(1).

25. To satisfy these statutory mandates, the DoD contracted with Express Scripts to provide pharmacy benefits and to administer the TRICARE Home Delivery/Mail Order Pharmacy for members of TRICARE across the country, including in Pennsylvania. "The contract between the DoD and ESI is substantial." *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *2. It "is memorialized in a lengthy 174-page Statement of Work ('SOW')." *Id.* at *3. A copy of the publicly available contract between DoD and Express Scripts, Contract No. HT9402-14-D-0002 (**TRICARE Contract**), with certain redactions consistent with the Freedom of Information Act, is attached as **Exhibit D**. Section C of the TRICARE Contract is the Statement of Work (**SOW**), which specifies in comprehensive detail the services Express Scripts must provide the government.

26. Through the TRICARE Contract, the DoD dictates nearly every aspect of Express Scripts' responsibilities in supporting TRICARE. "Of particular importance here, the SOW requires exclusive use of the DOD Uniform Formulary when acquiring drugs for federal government employees." *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3; *see* Ex. D, SOW §§ C.1.4, C.8.1. The DoD formulary is "managed by the DoD Pharmacy and Therapeutics (P&T) Committee." SOW § C.1.4. "The DoD formulary specifies which drugs are authorized for

TRICARE members and sets requirements for prior authorization and utilization reviews, to assure 'medical necessity, clinical appropriateness and/or cost-effectiveness.'" *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3 (quoting SOW § C.1.4).

27. "The SOW also contains a 'Prescription Restriction Program' that requires [Express Scripts, Inc.] to submit quarterly lists of patients for potential pharmacy benefit restrictions 'based upon the number of controlled medications filled, the number of physicians prescribing controlled medications and the number of pharmacies that fill these prescriptions.'" *Id.* (citation omitted). "Once these lists are submitted, another entity determines if a restriction is appropriate and only then can the Express Scripts Defendants restrict a beneficiary's prescription benefits." *Id.*

28. The TRICARE Contract also requires the use of "a tiered cost sharing structure, and a preference for generic over branded products." SOW § C.1.4. When it serves as a pharmacy benefit manager administering benefits at retail pharmacies, Express Scripts PBM serves in a capacity as a "fiscal intermediary on behalf of DoD to pay for all authorized pharmaceuticals and supplies dispensed for eligible beneficiaries at retail pharmacies." *Id.* § C.1.6. In other words, "the Government will be acquiring covered drugs with Government funds for use by the Government" when a TRICARE prescription is dispensed at retail network pharmacies. *Id.* When Express Scripts causes any copayment to be charged to any TRICARE beneficiary for any medication, including prescription opioids, it does so in the manner and according to the directions carefully specified by the DoD. *See id.* § C.8.1.1 ("The Contractor shall comply with the provisions of the DoD Uniform Formulary and its copayment structure.").

29. Similarly, the TRICARE Contract dictates every aspect of the TRICARE Home Delivery/Mail Order Pharmacy (**TMOP**) that ESI Mail Pharmacy operates on behalf of the DoD. *See* SOW § C.7; *Arlington County*, 996 F.3d at 252 ("[T]he SOW dictates how the ESI Defendants

must operate the TMOP."); *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *3 ("The [SOW] contract also requires ESI to operate the TRICARE Mail-Order Pharmacy.").

30. "[W]hile the [ESI Mail Pharmacy entities] were not signatories to the DOD contract, they performed the day-to-day management of the TMOP under the terms of the contract and were subject to extensive oversight by the federal government." *Arlington County*, 996 F.3d at 252. ESI Mail Pharmacy is therefore "essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the TMOP program." *Id.* at 253–54 (citing 10 U.S.C. § 1073a).

31. Simply put, the services Express Scripts provides to TRICARE are under the guidance and control of the DoD. As the district court overseeing the Prescription Opioid MDL aptly explained:

> By requiring exclusive use of its own Uniform Formulary—which is created and updated by the DoD Pharmacy and Therapeutics Committee—the DoD exercises guidance and control over the Express Scripts Defendants' performance. The formulary determines which pharmaceuticals are covered by TRICARE prescription benefit plans, and it contains cost-sharing tiers that determine the reimbursement amounts for various medications, including prescription opioids. Furthermore, the Uniform Formulary dictates which drugs are subject to prior authorization or utilization review requirements. All prescription claims handled by the Express Scripts Defendants must be "processed according to the benefit design" and the restrictions contained in the Uniform Formulary.
>
> In addition, effectuating the Prescription Restriction Program requires ongoing, close coordination between the Express Scripts Defendants and the DoD. To prevent prescription drug abuse, the Express Scripts Defendants are required to use claims data to create a list of patients for potential prescription restriction, based on the number of controlled medications filled by the patient, the number of physicians prescribing these medications, and the number of pharmacies filling the prescriptions. However, the Express Scripts Defendants do not themselves have any authority to restrict a TRICARE member's prescriptions based on the lists they compile. Instead, the Defendants must send this data to a Military Treatment Facility or a Managed Care Support Contractor, who alone can determine whether restricting a patient's prescription benefits is appropriate. If these entities decide to impose a restriction, ESI must then

> take one of only two available restrictive actions delineated in the DoD contract.
>
> These contract terms leave the Express Scripts Defendants little, if any, room for discretion as they administer the TRICARE program. Indeed, the contract states that Defendants are to be paid fees for "performing administrative services under the contract." A review of the contract reveals that this characterization is correct—the Defendants perform largely administrative tasks as they carry out the directives of the government. . . .
>
> In sum, the Express Scripts Defendants' relationship with the DoD is accurately described as one involving "subjection, guidance, or control" by the federal government, as outlined by the Supreme Court in *Watson*.

*In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *4–5 (citations omitted).

32. Thus, Express Scripts is "acting under" a federal officer when providing services for the TRICARE program. *See Kentucky*, 2026 WL 2796078, at *2–3; *Westchester*, 2026 WL 2589574, at *9; *Arlington County*, 996 F.3d at 251–54; *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *11; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *4–5.

**2. Express Scripts PBM Acts Under a Federal Officer for FEHBA Plans.**

33. Express Scripts PBM acts under a federal officer when it provides services for federal employees enrolled in plans governed by FEHBA.

34. In FEHBA, Congress empowered OPM "to contract with private carriers for federal employees' health insurance." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 90 (2017).

35. When administering pharmacy benefits for FEHBA plans, Express Scripts PBM is subject to OPM's requirements, oversight, and control, including specific regulations OPM established to govern PBM providers, as set forth in 48 C.F.R. §§ 1602.170-16(a), 1604.7201(a)-7202, 1646.201, 1652.204-74(a), 1652.204-70, and 1652.246-70, and specific guidelines OPM issued to govern pharmacy benefits, including guidelines on formulary management, utilization management, and prescription opioids, among other topics. *See, e.g.*, FEHB Program Carrier Letter 2019-10, https://www.opm.gov/healthcare-insurance/healthcare/carriers/2019/2019-10.pdf.

36. For example, "OPM's standard form contracts assume that PBMs will contract with FEHBA carriers and receive rebates." *Puerto Rico*, 119 F.4th at 182 (citing Fed. Emps. Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers at I-18–I-20 (2019) (**FEHB Standard Contract**) (attached as **Exhibit E)).** The FEHB Standard Contract includes provisions requiring FEHBA carriers to impose certain controls on PBMs regarding rebates, including (i) quarterly and annual reporting on negotiated rebates, (ii) requirements that PBMs use "pass-through transparent pricing" to pass on the value of any rebates to plans, (iii) requirements that the value of all rebates be credited to plan carriers, and (iv) information sharing with OPM on request, including the sharing of PBM contracts with pharmacies and manufacturers. *Puerto Rico*, 119 F.4th at 182–83; Ex. E at I-17–I-19.

37. FEHBA clients control what medications are on their formularies. They expect their PBM to negotiate with manufacturers to obtain rebates or other discounts to lower the net cost of those medications.

38. Many FEHBA plans select one of the national formularies that Express Scripts PBM offers to all its clients, especially the National Preferred Formulary. *See, e.g.*, American Postal Workers Union, *APWU Health Plan* (2018), https://www.opm.gov/healthcare-insurance/healthcare/plan-information/plans/pdf/2018/brochures/71-004.pdf, at 62 ("Our formulary is the National Preferred Formulary through Express Scripts."); Special Agents Mutual Benefit Association, *SAMBA Health Benefit Plan* (2018), https://www.opm.gov/healthcare-insurance/healthcare/plan-information/plans/pdf/2018/brochures/71-015.pdf, at 73 ("Our formulary is the National Preferred Formulary through Express Scripts."). Many of Express Scripts' non-federal health-plan clients, like Villanova University, have also adopted the National

Preferred Formulary. *See, e.g.*, Villanova University, Your Prescription Benefits, https://www.villanovabenefits.com/prescription-plan (last visited Oct. 14, 2026).

39. The formularies a FEHBA plan uses are subject to OPM reporting requirements. *See* Ex. E at I-18, § 1.28(a)(5).

40. During many of the years at issue in the Complaint, Express Scripts PBM conducted uniform rebate negotiations for its entire commercial book of business, including both FEHBA and non-FEHBA plans, and none of the discounts or rebates that Express Scripts PBM negotiated were exclusive to FEHBA plans.

41. Rebate agreements that Express Scripts PBM negotiated with manufacturers are structured to cover a range of different formulary possibilities, including standard and custom formularies. The manufacturer-PBM contracts that governed rebates paid by manufacturers in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans.

42. OPM closely monitors Express Scripts PBM's performance of its contractual tasks by auditing Express Scripts PBM's work. These audits include reviews of quarterly rebate guarantees, annual reconciliation and payments, actual billing and allocation of rebates, administrative fees, claim payments, fraud and abuse standards, performance guarantees, pharmacy rebates, and site visits.

43. Thus, Express Scripts PBM is "acting under" a federal officer when providing services to FEHBA plans. *See Kentucky*, 2026 WL 2796078, at *2–3; *Westchester*, 2026 WL 2589574, at *9; *Griffin*, 175 F.4th at 902–03; *Yost*, 165 F.4th at 1004–09; *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *8–11; *see also St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 935 F.3d 352, 354–55 (5th Cir. 2019) (collecting cases holding that administrators of benefits for FEHBA plans "act under" OPM for purposes of federal officer removal).

**3. Express Scripts PBM Acts Under a Federal Officer for Medicare Plans.**

44. Express Scripts PBM acts under a federal officer when providing services for Medicare Part D plans.

45. "Through Medicare Part D, the Government . . . offers prescription-drug coverage to beneficiaries." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 744 (2023) (citing 42 U.S.C. § 1395w-101 *et seq.*; 42 C.F.R. pt. 423). "To administer that coverage, CMS awards contracts to private plan sponsors." *Id.* (citing 42 U.S.C. § 1395w-115; 42 C.F.R. §§ 423.315, 423.329). Those plan sponsors, in turn, contract with Express Scripts PBM and other PBMs to administer the pharmacy benefit for Medicare Part D plans. CMS expressly requires that it must review and approve formularies and utilization management programs, 42 C.F.R. § 423.272(b), and that it be allowed to inspect and audit the records of PBMs that plan sponsors contract with to administer benefits for Medicare plan members. 42 C.F.R. § 425.505(b)(10).

46. CMS exercises complete control over Express Scripts PBM's work for Medicare Part D plans. CMS provides detailed guidance and requirements to plan sponsors and PBMs through periodic call letters, memos, and rules (some weekly, some quarterly, some annual) that dictate the content of plan coverage, including formularies and utilization management.

47. CMS then reviews and approves, on at least an annual basis, formularies, utilization management rules, communications with plan members, and other materials that Express Scripts PBM develops for Medicare Part D plans before they can be implemented. After implementation, CMS audits Medicare plan sponsors and their PBMs, typically annually, and at a minimum of once every three years, to ensure that the PBM is in compliance with CMS's requirements.

48. Express Scripts PBM thus helps CMS carry out its duties by processing insurance claims and administering benefits that CMS would otherwise have been required to provide. In

this role, Express Scripts PBM is subject to detailed regulation, monitoring, supervision, and oversight by CMS.

49. Express Scripts PBM is thus "acting under" a federal officer when providing services to Medicare plans. *See Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 347–48 (5th Cir. 2024) (upholding federal-officer removal by Medicare plan sponsor).

### B. Plaintiffs' Claims Are "For or Relating To" Removing Defendants' Actions Under Color of Federal Office.

50. The second requirement for federal officer removal is that plaintiff's claims must be "for or relating to any act under color" of the federal office. 28 U.S.C. § 1442(a)(1).

51. Before 2011, the statute allowed removal only when the plaintiff's claims were "for any act under color" of the federal office. 28 U.S.C. § 1442(a)(1) (2010).

52. In 2011, Congress passed the Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2, 125 Stat. 545. The Act added the words "or relating to" to § 1442(a)(1). *Id.* at § 2(b)(2). A defendant may therefore now remove when the plaintiff's claims are "for *or relating to* any act under color" of federal office.

53. Earlier this year, the Supreme Court ruled that the 2011 amendment "broadened" the federal officer removal statute and thereby abrogated the stricter "causal connection" or "nexus" test that the Court had adopted in construing the pre-2011 version of the statute. *Plaquemines*, 608 U.S. at 11 n.3 (citation omitted). *Plaquemines* clarified that the now operative "relating to" requirement for federal officer removal "sweeps broadly." *Id.* at 11 (majority opinion). "It means to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with." *Id.* (cleaned up). "One thing can relate to another even if the connection is 'indirect,'" and even absent a "'strict causal relationship.'" *Id.* (citations omitted).

While "relating to" is not limitless, it is satisfied as long as the asserted connection is not "'tenuous, remote, or peripheral.'" *Id.* at 12 (citation omitted).

54. When determining whether this "relating to" requirement is met, courts "credit plausible factual allegations by the removing party." *Id.* (citation omitted); *see also Acker*, 527 U.S. at 432 (courts "credit [defendants'] theory of the case" at this stage).

55. Express Scripts easily satisfies the "relating to" requirement.

56. Plaintiffs allege that Express Scripts' "fingerprints are on nearly every opioid prescription filled," Compl. ¶1113, that it "acted as the gatekeeper[] of prescription drugs, including opioids," *id.* ¶¶494, 1085, and that it "had a central role in facilitating the oversupply of opioids," *id.* ¶1068, because it colluded with opioid manufacturers in "exchange for rebates and fees," *id.* ¶1072, and "abdicat[ed]" its "gatekeeper duties," *id.* ¶1307. Plaintiffs further allege that Express Scripts and other Defendants caused harm to the "entire community" of each Plaintiff, as the alleged "oversupply . . . directly contributed to the fueling of an illegal secondary market," and "[e]ven those residents of Plaintiffs' communities who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gatekeeper duties and fraudulent promotions." *Id.* ¶¶1089, 1307; *see also id.* ¶¶1276, 1284, 1293 (claiming various harms to "Plaintiffs' communities"). Plaintiffs seek "to abate the nuisance caused thereby in Pennsylvania and Plaintiff States," which include "Delaware, Maryland, Massachusetts, New Jersey, New York, Ohio, and Florida." *Id.* ¶13. Those sweeping and diffuse allegations of community-wide harms stemming from an oversupply of prescription opioids and from an abdication of gatekeeping duties necessarily encompass the hundreds of thousands of prescription opioids dispensed to members of TRICARE, FEHBA, and Medicare plans in Pennsylvania and the other states.

57. Such allegations satisfy the "relating to" requirement.

58. For instance, the Fourth Circuit held that a similar complaint against ESI Mail Pharmacy satisfied the "for or relating to" requirement for federal officer removal:

> Arlington's claim that the ESI Defendants "did nothing to stem the flow of excess opioids into Arlington County" necessarily includes activity that is directly connected to the DOD contract, as the ESI Defendants were required to act in conformity with that contract. In other words, Arlington faults the ESI Defendants for filling certain opioid prescriptions and causing a public nuisance, but the ESI Defendants were required to fill those prescriptions to comply with their duties under the DOD contract because they had no ability to modify the contract. That does not mean that the ESI Defendants will prevail in the case. But it does mean that Arlington's claims "relate to" the ESI Defendants' governmentally-directed conduct. That is sufficient to satisfy the federal officer removal statute.

*Arlington County*, 996 F.3d at 257 (citations omitted). Plaintiffs' allegations here are equally as broad as those in *Arlington County* and effectively put the full scope of PBMs' services provided to the federal government at issue.

59. Likewise, the district court overseeing the Prescription Opioid MDL concluded that similar allegations in an MDL case against Express Scripts satisfied the "for or relating to" test:

> Plaintiffs themselves allege the Defendants flooded their community with opioids from 2014 to 2019 and opioid use increased by 160% during the period covered by the complaints. Plaintiffs' own theory of the case depends on the allegation that a significant number of the prescriptions dispensed by the Express Scripts Defendants were in fact for opioids and were filled in Plaintiffs' jurisdictions. Therefore, the Court finds that the Express Scripts Defendants have demonstrated a causal nexus between actions performed pursuant to the DoD contract and Plaintiffs' lawsuits.

*In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *6.

60. In an effort to evade those holdings, Plaintiffs' Complaint includes a purported disclaimer of Express Scripts' work for federal agencies. The disclaimer states in relevant part:

> No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract, or the terms of an ERISA plan. To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law,

> or a claim for recovery of benefits under an ERISA plan, such claim is expressly and undeniably disavowed and disclaimed by the Plaintiffs.
>
> This Complaint does not challenge the creation of custom formularies for a federal officer, such as for any Federal Employees Health Benefits Act or TRICARE governed health benefits plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek the recovery of federally mandated copays that were paid by such plans' patients. To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery of benefits under any such federal law, such claim is expressly and undeniably disavowed and disclaimed by the Plaintiffs.
>
> In addition, under no circumstances are the Plaintiffs bringing this action against, or bringing an action or claim of any kind directed to, any federal officer or person acting under any office of the United States for or relating to any act under color of such office. Nothing in this Complaint raises such an action, and to the extent that anything stated herein could be interpreted as potentially bringing an action against or directed to any federal officer or person acting under any office of the United States for or relating to any act under color of such office, then all such claims, actions, or liability, in law or in equity, are denied and disavowed in their entirety.

Compl. ¶¶ 47–49; *see also id.* ¶¶ 42–54.

61. Plaintiffs' disclaimer does not defeat federal officer removal jurisdiction for at least three reasons.

62. ***First***, the disclaimer fails to sever the connection between Plaintiffs' claims and Express Scripts' federal work because the claims challenge conduct that Express Scripts performed indivisibly for federal and non-federal clients. Claims that target "PBM services performed holistically for federal and non-federal clients necessarily target[] federal conduct," rendering ineffective any purported disclaimer of the PBM's federal work. *Kentucky*, 2026 WL 2796078, at *4.

63. Here, Plaintiffs allege that Express Scripts "collude[s] with manufacturers who pay fees in the form of rebates, administrative fees and other incentives in order to maximize utilization to the financial benefit of the PBMs and manufacturers." *Id.* ¶ 1071. Specifically, Plaintiffs contend

that Express Scripts is "colluding" with "opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees." *Id.* ¶ 1072.

64. As explained above, the commercial rebate agreements that Express Scripts negotiated and entered with manufacturers covered both FEHBA and non-FEHBA plans indivisibly. Express Scripts conducted rebate negotiations for both FEHBA and non-FEHBA plans in one fell swoop. There were no FEHBA-only rebates. Conducting negotiations jointly for FEHBA and private clients benefited the federal government: it enabled Express Scripts to leverage economies of scale to negotiate greater discounts for FEHBA plans than would have been possible if it had negotiated piecemeal.

65. The indivisible nature of PBM rebate practices has led the First, Second, Fourth, Sixth, and Eighth Circuits, as well as the District of New Jersey, to uphold federal officer removal in cases challenging PBM rebates, notwithstanding a purported disclaimer by plaintiffs of the PBMs' work for federal officers. *See Kentucky*, 2026 WL 2796078, at *4–5; *Westchester*, 2026 WL 2589574, at *5–8; *Griffin*, 175 F.4th at 904–05; *Yost*, 165 F.4th at 1008–09; *West Virginia*, 140 F.4th at 195–96; *Puerto Rico*, 119 F.4th at 190–94; *In re Insulin Pricing Litig.*, 2025 WL 1576940, at *3–6. As the Eighth Circuit explained:

> The district court concluded that the disclaimers defeated removal because the complaint "unambiguously disclaims any claims or relief upon which federal-officer removal could be based."
>
> We respectfully disagree, because "no disclaimer, however worded, can help [the State] avoid a causal nexus between [Express Scripts, Inc.'s] conduct on behalf of the federal government and [the State's] claims." Under the defendants' theory of the case, Express Scripts conducts rebate negotiations indivisibly for both plans under the FEHBA and plans outside of the FEHBA. Express Scripts does not have separate rebate agreements with drug manufacturers for FEHBA and non-FEHBA plans, and none of the resulting discounts or rebates from the negotiations are exclusive to either FEBHA or non-FEHBA plans. If Express Scripts "were liable for negotiating rebates on behalf of private clients, it would necessarily also be liable for negotiating rebates on behalf of the federal government—because

> it is the same negotiation." Therefore, the State's disclaimers do not, and could not, waive claims based on Express Scripts's rebate negotiations undertaken on behalf of both the federal government and private clients.

*Griffin*, 175 F.4th at 904–05 (citations omitted).

66. Because Express Scripts performed many of the challenged services indivisibly across its book of business that included both federal and non-federal clients, Plaintiffs' disclaimer is ineffective to defeat removal.

67. ***Second***, there is no way to disaggregate the portion of the alleged community-wide harm that is attributable to Express Scripts' services for TRICARE, FEHBA, and Medicare plans. Plaintiffs allege Express Scripts "had a central role in facilitating the oversupply of opioids," and that "[t]his oversupply . . . directly contributed to the fueling of an illegal secondary market." Compl. ¶¶1068, 1072, 1089. Express Scripts processed hundreds of thousands of insurance claims for prescription opioids in Pennsylvania and the other Plaintiff States at the federal government's direction. It would be impossible to determine which of the prescription opioids that allegedly facilitated the oversupply and were allegedly diverted into these "illegal secondary market[s]" derived from the hundreds of thousands of prescription opioids dispensed through TRICARE, FEHBA, and Medicare plans, and which derived from non-federal plans. As the Second Circuit held in *Westchester*, "the diffuse nature of Plaintiffs' public nuisance claims in the cases before us and the alleged community-wide harm underscores the ineffectiveness of the disclaimers." 2026 WL 2589874, at *8.

68. The relief Plaintiffs seek further confirms the point. Among other remedies, Plaintiffs seek monetary relief including "(1) costs for providing medical care, additional therapeutic care, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths (including the cost of naloxone or Narcan and similar emergency medications); (2) costs for providing treatment, counseling, and

rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation." *Id.* ¶ 394. Plaintiffs do not—and cannot—carve out social services costs, health systems costs, law enforcement costs, judicial costs, treatment facilities costs, and other costs attributable to prescription opioids dispensed to members of federal plans from those costs attributable to prescription opioids dispensed to members of non-federal plans. The "difficult factual questions" of disaggregating which costs arise from federal opioid prescriptions and which arise from non-federal opioid prescriptions "should be decided by a federal, not state, court." *Westchester*, 2026 WL 2589874, at *8. "The need to unravel" the source of Plaintiffs' alleged harm "establishes that [Express Scripts'] federal work is inextricably related to the charged conduct." *Maryland v. 3M Co.*, 130 F.4th 380, 391 (4th Cir. 2025); *see also Maine v. 3M Co., Inc.*, 159 F.4th 129, 130–31 (1st Cir. 2025).

69. This conclusion is also consistent with *Arlington County*, 996 F.3d 243, and *In re National Prescription Opiate Litigation*, 2023 WL 166006. Just like Plaintiffs here, the plaintiffs in those cases argued that their public nuisance claims did not implicate Express Scripts' work for TRICARE. The Fourth Circuit and the district court overseeing the Opioid MDL rightly rejected that argument because the plaintiffs made sweeping allegations—just like Plaintiffs do here—of an "oversupply" of opioids in their jurisdictions that necessarily included prescriptions dispensed to TRICARE members. *Arlington County*, 996 F.3d at 256–57; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *5–6.

70. ***Third***, even if Plaintiffs' disclaimer were valid, removal would still be proper because Plaintiffs' claims "relat[e] to" Express Scripts' work under the color of federal office,

which suffices to support removal following Congress's 2011 amendments to the federal-officer removal statute. 28 U.S.C. § 1442(a)(1). As the Supreme Court recently explained, the federal officer removal statute "contemplates removal of suits against officers or their agents for acts that were *not* done under color of their offices, so long as the suits 'relat[e] to' such acts." *Plaquemines*, 608 U.S. at 15.

71. Thus, even assuming Plaintiffs validly disclaimed any challenge to the services Express Scripts provided to federal health plans, they cannot plausibly dispute that the services Express Scripts performed for non-federal plans—including formulary and rebate services—are at least *related to* the same services Express Scripts performed for federal clients. "If Express Scripts 'were liable for negotiating rebates on behalf of private clients, it would necessarily also be liable for negotiating rebates on behalf of the federal government—because it is the same negotiation.'" *Griffin*, 175 F.4th at 905 (quoting *California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *2 (9th Cir. Aug. 13, 2024) (Ikuta, J., concurring in the judgment)). "That 'means there is necessarily a . . . connection between [the PBM's] negotiations for the federal government and [Plaintiffs'] claims.'" *West Virginia*, 140 F.4th at 199 (quoting *CaremarkPCS Health*, 2024 WL 3770326, at *2 (Ikuta, J., concurring in the judgment)).

## C. Removing Defendants Have Colorable Federal Defenses.

72. A party seeking removal must allege at least one "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 129 (1989). A colorable federal defense is not required for "all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017). "One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407. "In construing the colorable federal

defense requirement," the Supreme Court has "rejected a 'narrow, grudging interpretation' of the statute." *Acker*, 527 U.S. at 431 (citation omitted). "A federal defense is colorable if it is plausible, not if it is certain to succeed." *West v. 3M Co.*, 2026 WL 383792, at *2 (E.D. Pa. Feb. 11, 2026).

73. Express Scripts has several colorable federal defenses that can be grouped in two categories: (1) preemption defenses and (2) government contractor defenses. Any one of these defense alone is enough to support removal. Express Scripts also reserves the right to assert additional defenses, including those not stated in this Notice of Removal.

**1. Preemption**

74. Express Scripts has colorable preemption defenses under the TRICARE, FEHBA, Medicare Part D, and ERISA statutes.

75. The TRICARE statute provides the statutory authorization for the Secretary of Defense to enter into group health-insurance contracts. *See* 10 U.S.C. §§ 1071, 1072(7), 1073(a), 1074g. The statute expressly preempts any state laws to the extent that the Secretary of Defense determines that those laws are "inconsistent with a specific provision of the contract" or that "preemption . . . is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest." 10 U.S.C. § 1103(a). The Secretary has determined that such preemption is necessary. *See* 32 C.F.R. §§ 199.17(a)(7), 199.21(o).

76. Plaintiffs' theory of liability against Express Scripts is that it allegedly failed to implement specific formulary positioning for prescription opioids, specific utilization management rules for prescription opioids, specific controls on dispensing by the ESI Mail Pharmacy, and other restrictions on prescription opioids that differ from those that DoD mandated for the TRICARE program. *See, e.g.*, Compl. ¶1072. In other words, the conduct complained of is conduct that Express Scripts was required to carry out to comply with the language of the TRICARE Contract as well as the TRICARE statute, regulations, and policies.

77. Multiple courts have previously concluded that those factual assertions are sufficient for Express Scripts to state a colorable TRICARE preemption defense to support removal under the federal officer removal statute. *See Kentucky*, 2026 WL 2796078, at *4; *Westchester*, 2026 WL 2589574, at *10; *Yost*, 165 F.4th at 1012; *Arlington County*, 996 F.3d at 256; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *8; *see also In re Insulin Pricing Litig.,* 2025 WL 1576940, at *14–15.

78. FEHBA also supports a preemption defense for Express Scripts PBM. It contains an express preemption provision displacing any state laws relating to coverage or benefits afforded by FEHBA plans. 5 U.S.C. § 8902(m)(1).

79. Here, FEHBA preempts Plaintiffs' claims against Express Scripts PBM because Plaintiffs seek to interfere with uniform FEHBA plan administration by trying to dictate the terms of FEHBA plans with respect to coverage of, and benefits afforded for, prescription opioids. Multiple courts have found Express Scripts PBM's FEHBA preemption defense colorable in cases like this one. *See Kentucky*, 2026 WL 2796078, at *4; *Westchester*, 2026 WL 2589574, at *10; *see also Yost*, 165 F.4th at 1011; *West Virginia*, 140 F.4th at 198–99; *Puerto Rico*, 119 F.4th at 190.

80. Medicare Part D also supports a preemption defense for Express Scripts PBM. The Medicare Part D statute incorporates the express preemption clause in the Medicare Part C statute. 42 U.S.C. § 1395w-112(g) (incorporating by reference 42 U.S.C. § 1395w-26(b)(3)).

81. That preemption clause provides that "[t]he standards established under [Part D] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D] plans which are offered by [Plan D plan sponsors] under [Part D]." 42 U.S.C. § 1395w-26(b)(3); *see* 42 C.F.R. § 423.440(a). This clause "is 'akin to field preemption' and precludes States from regulating Part D plans except for licensing and plan

solvency." *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1206 (10th Cir. 2023) (citation omitted); *see also Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148–53 (9th Cir. 2010).

82. Express Scripts PBM's Medicare preemption defense is colorable. *See Kentucky*, 2026 WL 2796078, at *4 (finding PBM's Medicare preemption defense colorable); *see also Caris*, 108 F.4th at 347 (Medicare preemption argument sufficiently colorable to support federal officer removal by Medicare plan sponsor). Indeed, at least one court has found it dispositive. *Alaska v. Express Scripts, Inc.*, 2024 WL 2321210, at *9–11 (D. Alaska May 22, 2024) (holding that Medicare Part D statute preempts State of Alaska's opioid claims against Express Scripts with respect to Medicare Part D plans).

83. The ERISA statute, 29 U.S.C. §§ 1001 *et seq.*, also supports a preemption defense for Express Scripts PBM. ERISA regulates employee benefit plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Congress intended ERISA to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law" by "establish[ing] the regulation of employee welfare benefit plans as exclusively a federal concern." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (quotations omitted). To that end, ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This provision is "expansive," *Travelers*, 514 U.S. at 655, and it preempts any state law that "relates to an ERISA plan" by having "a connection with or a reference to such a plan." *Rutledge*, 592 U.S. at 86 (cleaned up). This includes common law causes of action. *See Phoenix Mut. Life Ins. Co v. Adams*, 30 F.3d 554, 558–60 (4th Cir. 1994).

84. Plaintiffs' state-law claims unquestionably have a connection with an ERISA plan because they seek to govern "a central matter of plan administration" and "interfere[] with nationally uniform plan administration." *Rutledge*, 592 U.S. at 87. As explained above, Plaintiffs'

theory of liability against Express Scripts is that it allegedly failed to implement specific formulary positioning for prescription opioids, specific utilization management rules for prescription opioids, specific controls on dispensing by the ESI Mail Pharmacy, and other restrictions on prescription opioids that differ from those that ERISA plans chose to implement. *See, e.g.*, Compl. ¶ 1072. Plaintiffs seek to dictate ERISA plans' choices regarding the coverage of prescription drugs through monetary and injunctive relief, including relief that would mandate changes to formulary offerings and utilization management tools. ERISA preempts laws that "mandate" that PBMs use particular "benefit structures" or that limit structural options because the structuring of prescription drug benefits are "key benefit designs for an ERISA plan." *Mulready*, 78 F.4th at 1197–98. Plaintiffs' state-law claims are therefore preempted as to ERISA plans because they seek to impose "a certain scheme of substantive coverage." *Rutledge*, 592 U.S. at 87. The Sixth Circuit held in a similar opioid case that a PBM's ERISA preemption defense is colorable and supports federal officer removal. *Kentucky*, 2026 WL 2796078, at *4.

**2. Government Contractor Defense**

85. The federal government contractor defense applies when (1) "the United States approved reasonably precise specifications"; (2) the contractor's work product "conformed to those specifications"; and (3) "the supplier warned the United States about" the risks or exposures "in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). The defense protects government contractors from state tort liability that may befall them should they carry out a federal contract. In other words, the defense "applies if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both." *Arlington County*, 996 F.3d at 255 (citation omitted).

86. Here, the government contractor defense is available to Express Scripts.

87. Express Scripts assisted the federal government by providing healthcare services pursuant to highly precise directives contained in the lengthy TRICARE Contract with the DoD and pursuant to contracts with FEHBA plans under OPM's specific requirements and supervision. Express Scripts' performance conformed to the specifications in the TRICARE Contract and FEHBA plan contracts. And Express Scripts did not have any greater awareness than the federal government did of the dangers of prescription opioids.

88. Among other things, the TRICARE Contract required exclusive use of the DoD formulary and implementation of the government's Prescription Restriction Program, both of which conflict with the core state-law duties asserted by Plaintiffs to use different formularies and implement different restrictions and utilization management on prescription opioids. There is a similar conflict between the asserted state-law duties and Express Scripts' obligations under its contracts with FEHBA plans under OPM supervision. Those conflicts make it impossible for Express Scripts to comply with the duties alleged by Plaintiffs while also fulfilling its obligations under its federal contracts.

89. Multiple courts have held in similar cases that Express Scripts has a colorable government contractor defense that supports removal under the federal officer removal statute. *See Kentucky*, 2026 WL 2796078, at *4–5; *Westchester*, 2026 WL 2589574, *10; *Arlington County*, 996 F.3d at 255; *In re Nat'l Prescription Opiate Litig.*, 2023 WL 166006, at *7.

**VENUE**

90. This Court is the proper venue for removal under 28 U.S.C. § 1442(a) because it sits in the federal judicial district and division embracing the Philadelphia County Court of Common Pleas, the court from which this case is removed. *See* 28 U.S.C. § 1442(a).

## COMPLIANCE WITH REMOVAL PROCEDURES

### A. Notice of Removal Is Timely.

91. A notice of removal is timely if filed within 30 days of the date the removing defendant was served with process. 28 U.S.C. § 1446(b)(1); *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 356 (1999).

92. As of the date of this notice of removal, Express Scripts has yet to be served.

93. This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b)(1).

### B. Consent Not Required.

94. Express Scripts removes this action under 28 U.S.C. § 1442. Unlike other types of removal, federal officer removal does not require the consent of the other defendants. *See Huntingdon Valley Club Condo. Ass'n v. Pa. Hous. Fin. Agency*, 2005 WL 44524, at *2 (E.D. Pa. Jan. 10, 2005).

### C. Written Notice of Removal.

95. A copy of the Complaint and all process, pleadings, and orders served upon Express Scripts or that Express Scripts obtained from the case docket for the State Court Action is attached to this Notice. *See* **Ex. A and Ex. B**.

96. In accordance with 28 U.S.C. § 1446(d), Express Scripts will give written notice of the filing of this Joint Notice of Removal to all adverse parties of record in this matter and will file a copy of this Joint Notice of Removal with the clerk of the Philadelphia County Court of Common Pleas.

## NO WAIVER

97. Nothing in this Joint Notice of Removal should be interpreted as a waiver or relinquishment of any of Express Scripts' rights to assert any and all defenses or objections.

98. If there are any questions that arise as to the propriety of removal, Express Scripts respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal.

99. Express Scripts reserves the right to amend or supplement this Joint Notice of Removal.

**CONCLUSION**

For these reasons, Express Scripts gives notice of removal of this case from the Philadelphia County Court of Common Pleas to the United States District Court for the Eastern District of Pennsylvania.

Dated: October 19, 2026

/s/ Joseph P. Walsh
Joseph P. Walsh (PA 64352)
WALSH PANCIO, LLC
2326 North Broad Street, Suite 200
Colmar, PA 18915
Phone: (215) 368-8660
joe@walshpancio.com

Elisabeth Miller (PA335455)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
(212) 849-7000
elisabethmiller@quinnemanuel.com

*Attorneys for Defendants Express Scripts, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc.*