# EXHIBIT A

Court of Common Pleas of Philadelphia County

Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

Filed and Attested by the Office of Judicial Records 27 JUL 2026 12:02 pm L. BREWINGTON

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Plumbers Local No. 690 Health Fund | PURDUE PHARMA L.P. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 2791 Southampton Road<br>Philadelphia, PA 19154 | One Stamford Forum, 201 Tresser Boulevard<br>Stamford, Connecticut 06901 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| IUOE WELFARE FUND | PURDUE PHARMA INC. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 1375 Virginia Dr., Suite 245<br>Fort Washington, PA 19034-3217 | One Stamford Forum, 201 Tresser Boulevard<br>Stamford, Connecticut 06901 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| IUPAT DISTRICT COUNCIL 21 | THE PURDUE FREDERICK COMPANY, INC. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 2980 Southampton Road<br>Philadelphia, PA 19154 | One Stamford Forum, 201 Tresser Boulevard<br>Stamford, Connecticut 06901 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 71 | 49 | ☒ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Writ of Summons ☐ Transfer From Other Jurisdictions |

**AMOUNT IN CONTROVERSY**

- ☐ $50,000.00 or less
- ☒ More than $50,000.00

**COURT PROGRAMS**

- ☐ Arbitration
- ☒ Jury
- ☐ Non-Jury
- ☐ Other:
- ☐ Mass Tort
- ☐ Savings Action
- ☐ Petition
- ☐ Minor Court Appeal
- ☐ Statutory Appeals
- ☒ Commerce (Completion of Addendum Required)
- ☐ Settlement
- ☐ Minors
- ☐ W/D/Survival

**CASE TYPE AND CODE (SEE INSTRUCTIONS)**

Tort, Other: Pennsylvania Unfair Trade Practices and Consumer Protection Laws, Consumer Fraud, Negligence Per Se, Aiding and Abetting, Conspiracy

**STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)**

73 P.S. § 201-1 – 201-9.3, et seq.

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**

**IS CASE SUBJECT TO COORDINATION ORDER?**

| Yes | No |
|---|---|
| ☐ | ☒ |
| ☐ | ☐ |
| ☐ | ☐ |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff Plumbers Local Union No. 690 Health Plan

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | | ADDRESS (SEE INSTRUCTIONS) |
|---|---|---|
| Donald E. Haviland, Jr. | | Haviland Hughes<br>123 South Maple St., Suite 220<br>Ambler, PA 19002 |
| **PHONE NUMBER** | **FAX NUMBER** | |
| 215-609-4661 | N/A | |
| **SUPREME COURT IDENTIFICATION NO.** | | **E-MAIL ADDRESS** |
| 66615 | | haviland@havilandhughes.com |
| **SIGNATURE** | | **DATE** |
| | | July 24, 2026 |



Case ID: 260703065

EXHIBIT A

**COMMERCE PROGRAM ADDENDUM**
**TO CIVIL COVER SHEET**

This case ***is*** subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;
2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:
   a. Uniform Commercial Code transactions;
   b. Purchases or sales of business or the assets of businesses;
   c. Sales of goods or services by or to business enterprises;
   d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;
   e. Surety bonds;
   f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and
   g. Franchisor/franchisee relationships.
3. Actions relating to trade secret or non-compete agreements;
4. ✔ "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;
5. Actions relating to intellectual property disputes;
6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;
7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;
8. Actions relating to corporate trust affairs;
9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Commercial General Liability policy;
10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

# Instructions for Completing Civil Cover Sheet

Rules of Court require that a Civil Cover Sheet be attached to any document commencing an action (whether the action is commenced by Complaint, Writ of Summons, Notice of Appeal, or by Petition). The information requested is necessary to allow the Court to properly monitor, control and dispose cases filed. A copy of the Civil Cover Sheet must be attached to service copies of the document commencing an action. The attorney or non-represented party filing a case shall complete the form as follows:

**A. Parties**

i. *Plaintiffs/Defendants*
Enter names (last, first, middle initial) of plaintiff, petitioner or appellant ("plaintiff") and defendant. If the plaintiff or defendant is a government agency or corporation, use the full name of the agency or corporation. In the event there are more than three plaintiffs and/or three defendants, list the additional parties on the Supplemental Parties Form. Husband and wife are to be listed as separate parties.

ii. *Parties' Addresses*
Enter the address of the parties at the time of filing of the action. If any party is a corporation, enter the address of the registered office of the corporation.

iii. *Number of Plaintiffs/Defendants:* Indicate the total number of plaintiffs and total number of defendants in the action.

**B. Commencement Type:** Indicate type of document filed to commence the action.

**C. Amount in Controversy:** Check the appropriate box.

**D. Court Program:** Check the appropriate box.

**E. Case Types:** Insert the code number and type of action by consulting the list set forth hereunder. To perfect a jury trial, the appropriate fees must be paid as provided by rules of court.

**Proceedings Commenced by Appeal**

Minor Court
- 5M Money Judgment
- 5L Landlord and Tenant
- 5D Denial Open Default Judgment
- 5E Code Enforcement
- Other:

Local Agency
- 5B Motor Vehicle Suspension - Breathalizer
- 5V Motor Vehicle Licenses, Inspections, Insurance
- 5C Civil Service
- 5K Philadelphia Parking Authority
- 5Q Liquor Control Board
- 5R Board of Revision of Taxes
- 5X Tax Assessment Boards
- 5Z Zoning Board
- 52 Board of View
- 51 Other:

Other:

**Proceedings Commenced by Petition**
- 8P Appointment of Arbitrators
- 8C Name Change - Adult
- 8L Compel Medical Examination
- 8D Eminent Domain
- 8E Election Matters
- 8F Forfeiture
- 8S Leave to Issue Subpoena
- 8M Mental Health Proceedings
- 8G Civil Tax Case - Petition
- Other:

***Actions Commenced by Writ of Summons or Complaint***

Contract
- 1C Contract
- 1T Construction
- 1O Other:

Tort
- 2B Assault and Battery
- 2L Libel and Slander
- 4F Fraud
- 1J Bad Faith
- 2E Wrongful Use of Civil Process
- Other:

Negligence
- 2V Motor Vehicle Accident
- 2H Other Traffic Accident
- 1F No Fault Benefits
- 4M Motor Vehicle Property Damage
- 2F Personal Injury - FELA
- 2O Other Personal Injury
- 2S Premises Liability - Slip & Fall
- 2P Product Liability
- 2T Toxic Tort
  - *T1 Asbestos*
  - *TZ DES*
  - *T2 Implant*
- 3E Toxic Waste
- Other:

Professional Malpractice
- 2D Dental
- 4L Legal
- 2M Medical
- 4Y Other:

1G Subrogation

Equity
- E1 No Real Estate
- E2 Real Estate
- 1D Declaratory Judgment
- M1 Mandamus

Real Property
- 3R Rent, Lease, Ejectment
- Q1 Quiet Title
- 3D Mortgage Foreclosure - Residential Owner Occupied
- 3F Mortgage Foreclosure - Not Residential Not Owner Occupied
- 1L Mechanics Lien
- P1 Partition
- Prevent Waste
- 1V Replevin

1H Civil Tax Case - Complaint
- Other:

**F. Commerce Program**
Commencing January 3, 2000 the First Judicial District instituted a Commerce Program for cases involving corporations and corporate law issues, in general. If the action involves corporations as litigants or is deemed a Commerce Program case for other reasons, please check this block AND complete the information on the "Commerce Program Addendum". For further instructions, see Civil Trial Division Administrative Docket 01 of 2000.

**G. Statutory Basis for Cause of Action**
If the action is commenced pursuant to statutory authority ("Petition Action"), the specific statute must be identified.

**H. Related Pending Cases**
All previously filed related cases, regardless of whether consolidated by Order of Court or Stipulation, must be identified.

**I. Plaintiff's Attorney**
The name of plaintiff's attorney must be inserted herein together with other required information. In the event the filer is not represented by an attorney, the name of the filer, address, the phone number and signature is required.

**The current version of the Civil Cover Sheet may be downloaded from the FJD's website http://courts.phila.gov**

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

JULY 2026 03065

E-Filing Number: 2607057298

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| PLUMBERS UNION LOCAL NO 690 | PURDUE PHARMA L.P. |
| PLAINTIFF'S ADDRESS<br>2791 SOUTHAMPTON ROAD<br>PHILADELPHIA PA 19154 | DEFENDANT'S ADDRESS<br>ONE STAMFORD FORUM 201 TRESSER BLVD<br>STAMFORD CT 06901 |
| PLAINTIFF'S NAME<br>IUOE WELFARE FUND | DEFENDANT'S NAME<br>PURDUE PHARMA INC. |
| PLAINTIFF'S ADDRESS<br>1375 VIRGINIA DR., SUITE 245<br>FORT WASHINGTON PA 19034-3217 | DEFENDANT'S ADDRESS<br>ONE STAMFORD FORUM 201 TRESSER BLVD<br>STAMFORD CT 06901 |
| PLAINTIFF'S NAME<br>IUPAT DISTRICT COUNCIL 21 | DEFENDANT'S NAME<br>THE PURDUE FREDERICK COMPANY INC. |
| PLAINTIFF'S ADDRESS<br>2980 SOUTHAMPTON ROAD<br>PHILADELPHIA PA 19154 | DEFENDANT'S ADDRESS<br>ONE STAMFORD FORUM 201 TRESSER BLVD<br>STAMFORD PA 06901 |

TOTAL NUMBER OF PLAINTIFFS: 71

TOTAL NUMBER OF DEFENDANTS: 49

COMMENCEMENT OF ACTION
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition Action
- [ ] Transfer From Other Jurisdictions
- [ ] Notice of Appeal

AMOUNT IN CONTROVERSY
- [ ] $50,000.00 or less
- [x] More than $50,000.00

COURT PROGRAMS
- [ ] Arbitration
- [ ] Jury
- [ ] Non-Jury
- [ ] Other:
- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition
- [x] Commerce
- [ ] Minor Court Appeal
- [ ] Statutory Appeals
- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

CASE TYPE AND CODE

KT - DISPUTE RE: BUSINESS TORT

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

FILED
PRO PROTHY
JUL 27 2026
L. BREWINGTON

IS CASE SUBJECT TO COORDINATION ORDER?
YES NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: PLUMBERS UNION LOCAL NO 690 , IUOE WELFARE FUND , IUPAT DISTRICT COUNC

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| WILLIAM H. PLATT | 124 S MAPLE WAY<br>SUITE 220<br>AMBLER PA 19002 |
| PHONE NUMBER: (215)609-4661<br>FAX NUMBER: (215)392-4400 | |
| SUPREME COURT IDENTIFICATION NO.<br>83585 | E-MAIL ADDRESS<br>platt@havilandhughes.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*WILLIAM PLATT* | DATE SUBMITTED<br>Monday, July 27, 2026, 12:02 pm |

**COMPLETE LIST OF PLAINTIFFS:**

1. TEAMSTERS INDUSTRIAL EMPLOYEES WELFARE FUND
   303 MOLNAR AVE
   ELMWOOD PARK NJ 07407
2. AFSCME DISTRICT COUNCIL 47 HEALTH & WELFARE FUND
   1606 WALNUT ST.
   PHILADELPHIA PA 19103
3. GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND
   60 BOULEVARD OF THE ALLIES 5TH FLOOR
   PITTSBURGH PA 15222
4. TEAMSTERS HEALTH AND WELFARE FUND OF PHILADELPHIA
   12298 TOWNSEND ROAD,
   PHILADELPHI PA 19154
5. ROOFERS LOCAL 30 COMBINED HEALTH AND WELFARE FUND
   1 BATTERY MARCH PARK SUITE 317
   QUINCY MA 02169
6. AFSCME LOCAL 54
   425 EAGLE ROCK AVE., SUITE 105
   ROSELAND NJ 07068
7. AFSCME LOCAL 590 HEALTH AND WELFARE FUND
   425 EAGLE ROCK AVE., SUITE 105
   ROSELAND NJ 07068
8. TEAMSTERS LOCAL 641 WELFARE FUND
   714 RAHWAY AVE., 2ND FLOOR
   UNION NJ 07083
9. STEAMFITTERS LOCAL UNION NO 420
   6630 LINDBERGH
   PHILADELPHIA PA 19142
10. KENNETT CONSOLIDATED SCHOOL DISTRICT
    300 EAST SOUTH ST.
    KENNETT SQUARE PA 19348
11. OCTORARA AREA SCHOOL DISTRICT
    228 HIGHLAND ROAD
    ATGLEN PA 19310
12. IBEW 81 HEALTH AND WELFARE FUND
    425 EAGLE ROCK AVE., SUITE 105
    ROSELAND PA 07068
13. OHIO LABORERS DISTRICT COUNCIL- OHIO CONTRACTORS
    800 HILLSDOWNE ROAD
    WESTERVILLE OH 43081
14. LOWER MORELAND TOWNSHIP SCHOOL DISTRICT
    2551 MURRAY AVE.
    HUNTINGDON VALLEY PA 19006
15. PHOENIXVILLE AREA SCHOOL DISTRICT
    836 CITY LINE AVE.
    PHOENIXVILLE PA 19460
16. NECA LOCAL UNION 313 IBEW WELFARE FUND
    501 CARR RD., SUITE 220
    WILMINGTON DE 19809
17. IAM DISTRICT 15 HEALTH FUND
    140 SYLVAN AVE., SUITE 106
    ENGLEWOOD CLIFFS NJ 07632
18. IRONWORKERS LOCAL 11 WELFARE FUND
    12 EDISON PLACE
    SPRINGFIELD NJ 07081
19. OPERATING ENGINEERS LOCAL 66
    111 ZETA DR.
    PITTSBURGH PA 15238
20. WEST VIRGINIA PIPE TRADES HEALTH AND WELFARE FUND
    6500 BROOKTREE RD., SUITE 205
    WEXFORD PA 15090
21. SPRING-FORD AREA SCHOOL DISTRICT
    857 SOUTH LEWIS RD.
    ROYERSFORD PA 19468

22. SCHOOL CAFETERIA EMPLOYEES UNION 634
    911 RIDGEBROOK RD.
    SPARKS MD 21152
23. TEAMSTERS HEALTH AND WELFARE OF PHILADELPHIA AND VICINITY
    2500 MCCLELLAN AVE., SUITE 140
    PENNSAUKEN NJ 08109
24. TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND
    303 MOLNAR DR.
    ELMWOOD PARK NJ 07407
25. UFCW TRI-STATE HEALTH AND WELFARE FUND
    3120 FIRE RD., SUITE 201
    EGG HARBOR TOWNSHIP NJ 08234
26. UNITED INDEPENDENT UNION WELFARE FUND
    22 W. CHURCH ST.
    BLACKWOOD NJ 08012
27. CEMENT MASONS UNION LOCAL 593 WELFARE PLAN
    7821 BARTRAM AVE., SUITE 102
    PHILADELPHIA PA 19610
28. IBEW 654 HEALTH AND WELFARE FUND
    3729 CHICHESTER AVE
    BOOTHWYN PA 19061
29. AVON GROVE SCHOOL DISTRICT
    375 S. JENNERSVILLE RD.
    WEST GROVE PA 19390
30. DOWNINGTOWN AREA SCHOOL DISTRICT
    540 TRESTLE PLACE
    DOWNINGTOWN PA 19335
31. TREDYFFRIN-EASTTOWN SCHOOL DISTRICT
    940 WEST VALLEY RD. SUITE 1700
    WAYNE PA 19087
32. UFCW LOCAL 152 HEALTH AND WELFARE FUND
    3120 FIRE RD., SUITE 201
    EGG HARBOR TOWNSHIP PA 08234
33. PLUMBERS UNION LOCAL NO 690
    2791 SOUTHAMPTON ROAD
    PHILADELPHIA PA 19154
34. SHEET METALS LOCAL 19
    1301 SOUTH COLUMBUS BOULEVARD
    PHILADELPHIA PA 19147
35. WEST CHESTER AREA SCHOOL DISTRICT
    782 SPRINGDALE DR.
    EXTON PA 19341
36. HEALTH FUND NO. 917
    22 NORTH TYSON AVE., 1ST FLOOR
    FLORAL PARK NY 11001
37. IUPAT DISTRICT COUNCIL 21
    2980 SOUTHAMPTON ROAD
    PHILADELPHIA PA 19154
38. LAW ENFORCEMENT HEALTH BENEFITS INC
    1237 SPRING GARDEN ST
    PHILADELPHIA PA 19123
39. USW LOCAL 10-00086 MERCK EMPLOYEES HEALTH AND WELFARE PLAN
    601 DRESHER ROAD
    HORSHAM PA 19044
40. QUAKERTOWN COMMUNITY SCHOOL DISTRICT
    100 COMMERCE DR.
    QUAKERTOWN PA 18951
41. UFCW LOCAL 360 HEALTH FUND
    400 COMMERCE LANE
    WEST BERLIN NJ 08091
42. TEAMSTERS LOCAL 830 HEALTH & WELFARE FUND
    12298 TOWNSEND ROAD
    PHILADELPHIA PA 19154
43. PHILADELPHIA FIREFIGHTERS AND PARAMEDICS HEALTH PLAN LOCAL 2
    415 N. 15TH ST.

PHILADELPHIA PA 19123

44. UPPER DARBY SCHOOL DISTRICT
8201 LANSDOWNE AVE.
UPPER DARBY PA 19032
45. DUNMORE BOROUGH
400 S. BLAKELY ST.
DUNMORE PA 18512
46. SERVICE EMPLOYEES INTERNATIONAL UNION 32 BJ
1515 MARKET STREET SUITE 2010
PHILADELPHIA PA 19102
47. TOLEDO ELECTRICAL WELFARE FUND
727 LIME CITY RD., SUITE 200
ROSSFORD OH 43460
48. STEAMFITTERS LOCAL NO. 420
14420 TOWNSEND ROAD
PHILADELPHIA PA 19154
49. CHESTER COUNTY INTERMEDIATE UNIT
455 BOOT RD.
DOWNINGTOWN PA 19335
50. UFCW UNION-EMPLOYER HEALTH AND WELFARE FUND LOCAL 880 AND PF
9199 MARKET PLACE, SUITE 1
BROADVIEW HEIGHTS OH 44147
51. IUOE WELFARE FUND
1375 VIRGINIA DR., SUITE 245
FORT WASHINGTON PA 19034-3217
52. CHESTER WATER AUTHORITY
415 WELSH ST.
CHESTER PA 19013
53. IBEW 126 HEALTH AND WELFARE FUND
3455 GERMANTOWN PIKE
COLLEGEVILLE PA 19426
54. MARPLE NEWTOWN SCHOOL DISTRICT
40 MEDIA LINE ROAD
NEWTOWN SQUARE PA 19073
55. PENN DELCO SCHOOL DISTRICT
2821 CONCORD ROAD
ASTON PA 19014
56. TEAMSTERS JOINT COUNCIL NO. 53 HEALTH AND WELFARE FUND
2500 MCCLELLAN AVE. SUITE 1400
PENNSAUKEN NJ 08109
57. AFSCME HEALTH AND WELFARE FUND
AND WELFARE FUND 150 S. 143RD
HARRISBURG PA 17111
58. ASBESTOS WORKERS PHILADELPHIA WELFARE FUND
2014 HORNIG RD.
PHILADELPHIA PA 19116
59. IBEW 607 HEALTH AND WELFARE FUND
425 EAGLE ROCK AVE., SUITE 105
ROSELAND NJ 07068
60. LABORERS DISTRICT COUNCIL
665 N BROAD ST
PHILADELPHIA PA 19123
61. OWEN J. ROBERTS SCHOOL DISTRICT
901 RIDGE RD.
POTTSTOWN PA 19465
62. UPPER DUBLIN SCHOOL DISTRICT
1580 FORT WASHINGTON AVE.
MAPLE GLEN PA 19083
63. UAW LOCAL 259N AND LOCAL 365 WELFARE FUND
140 SYLVAN AVE., SUITE 106
ENGLEWOOD CLIFFS NJ 07632
64. CEMENT MASONS LOCAL 526
1900 ANDREW ST.
MUNHALL PA 15120

65. PSSU LOCAL UNIT HEALTH AND WELFARE FUND
2589 INTERSTATE DRIVE
HARRISBURG PA 17110
66. COATESVILLE AREA SCHOOL DISTRICT
3030 C.G. ZINN RD.
THORNDALE PA 19372
67. GREAT VALLEY SCHOOL DISTRICT
100 LINDENWOOD DRIVE
MALVERN PA 19335
68. UAW LOCAL 259 SOCIAL SECURITY
140 SYLVAN AVE., SUITE 106
ENGLEWOOD CLIFFS NJ 07632
69. CENTRAL PENNSYLVANIA TEAMSTERS
1055 SPRING STREET
WYOMISSING PA 19335
70. LOCAL 274 HEALTH AND WELFARE FUND
22 S. 22ND ST.
PHILADELPHIA PA 19103
71. AFSCME CARE PLAN OF OHIO
1603 EAST 27TH ST
CLEVELAND OH 44114

**COMPLETE LIST OF DEFENDANTS:**

1. EXPRESS SCRIPTS, INC.
ONE EXPRESS WAY
ST. LOUIS MO 63121
2. THE PURDUE FREDERICK COMPANY INC.
ONE STAMFORD FORUM 201 TRESSER BLVD
STAMFORD PA 06901
3. ZYDUS PHARMACEUTICALS (USA), INC.
73 NJ-31
PENNINGTON NJ 08534
4. WALGREEN CO.
200 WILMOT ROAD
DEERFIELD IL 60015
5. TEVA PHARMACEUTICALS USA, INC.
1090 HORSHAM ROAD
NORTH WALES PA 19454
6. CURASCRIPT SD
255 TECHNOLOGY PARK
LAKE MARY FL 32746
7. ESI MAIL PHARMACY SERVICE, INC.
ONE EXPRESS WAY
ST. LOUIS MO 63121
8. EXPRESS SCRIPTS HOLDING COMPANY (NOW KNOWN AS EVERNORTH HEAL
ONE EXPRESS WAY
ST. LOUIS MO 63121
9. ASSERTIO THERAPEUTICS F/K/A DEPOMED, INC.
100 SOUTH SAUNDERS ROAD, SUITE
LAKE FORREST IL 60045
10. MCKESSON CORPORATION
ONE POST STREET
SAN FRANCISCO CA 94104
11. COSTCO WHOLESALE CORPORATION
999 LAKE DRIVE
ISSAQUAH WA 98027
12. JOHNSON & JOHNSON
1JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK NJ 08933
13. WALGREEN EASTERN CO. INC.
200 WILMOT ROAD
DEERFIELD IL 60015
14. EXPRESS SCRIPTS PHARMACY, INC.
ONE EXPRESS WAY

ST. LOUIS MO 63121

15. WATSON LABORATORIES, INC.
MORRIS CORPORATE CENTER III 400 INTERPACE PARKWAY
PARSIPPANY NJ 07054
16. SPIVAK INC. D/B/A VERREE PHARMACY
7960 VERREE ROAD
PHILADELPHIA PA 19106
17. JANSSEN PHARMACEUTICA, INC.
1125 TRENTON HARBOURTON ROAD
TITUSVILLE NJ 08560
18. PENNSYLVANIA CVS PHARMACY LLC
2200 CUMBERLAND STREET
LEBANON PA 17042
19. PURDUE PHARMA L.P.
ONE STAMFORD FORUM 201 TRESSER BLVD
STAMFORD CT 06901
20. ACTAVIS, LLC
MORRIS CORPORATE CENTER III 400 INTERPACE PARKWAY
PARSIPPANY NJ 07054
21. COLLEGIUM PHARMACEUTICALS, INC.
100 SOUTH SAUNDERS ROAD, SUITE
LAKE FORREST IL 60045
22. SUN PHARMACEUTICAL INDUSTRIES, INC.
2 INDEPENDENCE WAY
PRINCETOWN NJ 08540
23. AMERISOURCEBERGEN DRUG CORPORATION
1300 MORRIS DRIVE
CHESTERBROOK PA 19087
24. ESI MAIL PHARMACY SERVICE, INC.
ONE EXPRESS WAY
ST. LOUIS MO 63121
25. ABBOTT LABORATORIES, INC.
100 ABBOTT PARK ROAD
ABBOTT PARK IL 60054
26. WALMART STORES EAST, L.P.
702 SW 8TH STREET
BENTONVILLE AR 72712
27. CURASCRIPT, INC.
6272 LEE VISTA BOULEVARD
ORLANDO FL 32822
28. LEE B. KAMP
839 KENDRICK STREET
PHILADELPHIA PA 19111
29. CVS RX SERVICES, INC
ONE CVS DRIVE
WOONSOCKET RI 02895
30. TARGET CORPORATION
1000 NICOLLET MALL
MINNEAPOLIS MN 55403
31. WEGMANS FOOD MARKETS, INC.
100 WEGMANS MARKET STREET LEGAL DEPT.
ROCHESTER NY 14624
32. JANSSEN PHARMACEUTICALS, INC.
1125 TRENTON HARBOURTON ROAD
TITUSVILLE NJ 08560
33. ACTAVIS INC.
MORRIS CORPORATE CENTER III 400 INTERPACE PARKWAY
PARSIPPANY NJ 07054
34. CARDINAL HEALTH, INC.
7000 CARDINAL PLACE
DUBLIN OH 43017
35. WALGREENS BOOTS ALLIANCE
200 WILMOT ROAD
DEERFIELD IL 60015

36. MEDCO HEALTH SOLUTIONS, INC.
    ONE EXPRESS WAY
    ST. LOUIS MO 63121
37. PURDUE PHARMA INC.
    ONE STAMFORD FORUM 201 TRESSER BLVD
    STAMFORD CT 06901
38. ALLERGAN PLC
    MORRIS CORPORATE CENTER III 400 INTERPACE PARKWAY
    PARSIPPANY NJ 07054
39. ACTAVIS PHARMA, INC.
    MORRIS CORPORATE CENTER III 400 INTERPACE PARKWAY
    PARSIPPANY NJ 07054
40. NOVARTIS AG A/K/A NOVARTIS, INC. AND NOVARTIS PHARMACEUTICAL
    ONE HEALTH PLAZA
    EAST HANOVER NJ 07936
41. WALMART INC. F/K/A WAL-MART STORES, INC.
    702 SW 8TH STREET
    BENTONVILLE AR 72712
42. EXPRESS SCRIPTS PHARMACY, INC.
    ONE EXPRESS WAY
    ST. LOUIS MO 63121
43. ERIC W. PESTRACK
    1844 WEBSTER LANE
    MAPLE GLEN PA 19002
44. CEPHALON, INC.
    1090 HORSHAM ROAD
    HORSHAM PA 19454
45. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS INC.
    1125 TRENTON HARBOURTON ROAD
    TITUSVILLE NJ 08560
46. MYLAN LABORATORIES, INC., N/K/A MYLAN, INC.
    1000 MYLAN BLVD.
    CANNONSBURG PA 15317
47. CVS PHARMACY INC.
    ONE CVS DRIVE
    WOONSOCKET RI 02895
48. MICHELL SPIVAK
    318 CARSON TERRACE
    HUNTINGDON VALLEY PA 19006
49. TODD GOODMAN
    157 PHEASANT LANE
    HUNTINGDON VALLEY PA 19006

Donald E. Haviland, Jr., Esquire (PA I.D. No. 66615)
William H. Platt II, Esquire (PA I.D. No. 83585)
**HAVILAND HUGHES**
124 S. Maple Way, Suite 220
Ambler, Pennsylvania 19002

*Counsel for Plaintiffs*

Filed and Attested by the
Office of Judicial Records
27 JUL 2026 12:02 pm
L. BREWINGTON

| | |
|---|---|
| **PLUMBERS' LOCAL UNION NO. 690 INDUSTRY FUNDS**<br>2791 Southampton Road<br>Philadelphia, PA 19154<br><br>**IUOE WELFARE FUND**<br>1375 Virginia Dr., Suite 245<br>Fort Washington, PA 19034-3217<br><br>**IUPAT DISTRICT COUNCIL 21**<br>2980 Southampton Road<br>Philadelphia, PA 19154<br><br>**LAW ENFORCEMENT HEALTH BENEFITS, INC.**<br>2233 Spring Garden Street<br>Philadelphia, PA 19130<br><br>**TEAMSTERS LOCAL 830 HEALTH & WELFARE FUND**,<br>12298 Townsend Rd<br>Philadelphia, PA 19154<br><br>**LABORERS DISTRICT COUNCIL HEAVY & HIGHWAY FUND**<br>665 North Broad St, 2nd Floor<br>Philadelphia, PA 19123<br><br>**STEAMFITTERS LOCAL UNION NO. 420**<br>14420 Townsend Road<br>Philadelphia, PA 19154<br><br>**AFSCME DISTRICT COUNCIL 47 HEALTH & WELFARE FUND**<br>1606 Walnut Street<br>Philadelphia, PA 19103<br><br>**AFSCME HEALTH AND WELFARE FUND**<br>150 S. 143rd St, Suite 3<br>Harrisburg, PA 17111 | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY, PA<br>CIVIL ACTION - LAW<br>COMMERCE PROGRAM<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

**ASBESTOS WORKERS PHILADELPHIA WELFARE FUND**
2014 Hornig Rd.
Philadelphia, PA 19116

**CEMENT MASONS LOCAL 526**
1900 Andrew St.
Munhall, PA 15120

**CEMENT MASONS UNION LOCAL 592 WELFARE PLAN**
7821 Bartram Ave., Suite 102
Philadelphia, PA 19153

**CENTRAL PENNSYLVANIA TEAMSTERS**
1055 Spring Street
Wyomissing, PA 19610

**CHESTER COUNTY INTERMEDIATE UNIT**
455 Boot Rd.
Downingtown, PA 19335

**CHESTER WATER AUTHORITY**
415 Welsh St.
Chester, PA 19013

**DUNMORE BOROUGH**
400 S. Blakely St.
Dunmore, PA 18512

**GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND**
60 Boulevard of the Allies, 5th Floor
Pittsburgh, PA 15222

**IBEW 126 HEALTH AND WELFARE FUND**
3455 Germantown Pike
Collegeville, PA 19426

**IBEW 654 HEALTH AND WELFARE FUND**
3729 Chichester Ave.
Boothwyn, PA 19061
**LOCAL 274 HEALTH AND WELFARE FUND**
22 S. 22nd St.
Philadelphia, PA 19103

**PHILADELPHIA FIREFIGHTERS AND PARAMEDICS HEALTH PLAN LOCAL 22**
415 N. 15th St.
Philadelphia, PA 19123

**OPERATING ENGINEERS LOCAL 66**
111 Zeta Dr.
Pittsburgh, PA 15238-8682

**PSSU LOCAL UNIT HEALTH AND WELFARE FUND**
2589 Interstate Drive
Harrisburg, PA 17110

**SERVICE EMPLOYEES' INTERNATIONAL UNION 32 BJ, DISTRICT 36 BOLR WELFARE TRUST FUND**
1515 MARKET St., Suite 1020
Philadelphia, PA 19102

**SHEET METALS LOCAL 19**
1301 South Columbus Boulevard
Philadelphia, PA 19147

**TEAMSTERS HEALTH AND WELFARE FUND OF PHILADELPHIA**
12298 Townsend Road,
Philadelphia, Pa 19154

**USW LOCAL 10-00086 MERCK EMPLOYEES' HEALTH AND WELFARE PLAN**
601 Dresher Rd
Horsham, PA 19044

**WEST VIRGINIA PIPE TRADES HEALTH AND WELFARE FUND**
6500 Brooktree Rd., Suite 205
Wexford, PA 15090

**AVON GROVE SCHOOL DISTRICT**
375 S. Jennersville Rd.
West Grove, PA 19390-8401

**COATESVILLE AREA SCHOOL DISTRICT**
3030 C.G. Zinn Rd.
Thorndale, PA 19372

**DOWNINGTOWN AREA SCHOOL DISTRICT**
540 Trestle Place
Downingtown, PA 19335

**GREAT VALLEY SCHOOL DISTRICT**
100 Lindenwood Dr.
Malvern, PA 19355

**KENNETT CONSOLIDATED SCHOOL DISTRICT**
300 East South St.
Kennett Square, PA 19348

**LOWER MORELAND TOWNSHIP SCHOOL DISTRICT**
2551 Murray Ave.
Huntingdon Valley, PA 19006

**MARPLE NEWTOWN SCHOOL DISTRICT**
40 Media Line Road,
Newtown Square, PA 19073

**OCTORARA AREA SCHOOL DISTRICT**
228 Highland Road
Atglen, PA 19310

**OWEN J. ROBERTS SCHOOL DISTRICT**
901 Ridge Rd.
Pottstown, PA 19465

**PENN DELCO SCHOOL DISTRICT**
2821 Concord Road
Aston, PA 19014

**PHOENIXVILLE AREA SCHOOL DISTRICT**
836 City Line Ave.
Phoenixville, PA 19460

**QUAKERTOWN COMMUNITY SCHOOL DISTRICT**
100 Commerce Dr.
Quakertown, PA 18951

**SOUTHEAST DELCO SCHOOL DISTRICT**
1560 Delmar Dr.
Folcroft, PA 19032

**SPRING-FORD AREA SCHOOL DISTRICT**
857 South Lewis Rd.
Royersford, PA 19468

**TREDYFFRIN-EASTTOWN SCHOOL DISTRICT**
940 West Valley Rd., Suite 1700
Wayne, PA 19087

**UPPER DARBY SCHOOL DISTRICT**
8201 Lansdowne Ave.
Upper Darby, PA 19032

**UPPER DUBLIN SCHOOL DISTRICT**
1580 Fort Washington Ave.
Maple Glen, PA 19083

**WEST CHESTER AREA SCHOOL DISTRICT**
782 Springdale Dr.
Exton, PA 19341

**NECA LOCAL UNION 313 IBEW WELFARE FUND**
501 Carr Rd., Suite 220
Wilmington, DE 19809-2800

**ROOFERS LOCAL 30 COMBINED HEALTH AND WELFARE FUND**
1 Battery March Park, Suite 317
Quincy, MA 02169

**SCHOOL CAFETERIA EMPLOYEES' UNION 634**
911 Ridgebrook Rd.
Sparks, MD 21152

**HEALTH FUND NO. 917**
22 North Tyson Ave., 1st Floor
Floral Park, NY 11001

**AFSCME LOCAL 54**
425 Eagle Rock Ave., Suite 105
Roseland, NJ 07068

**AFSCME LOCAL 590 HEALTH AND WELFARE FUND**
425 Eagle Rock Ave., Suite 105
Roseland, NJ 07068

**IAM DISTRICT 15 HEALTH FUND**
140 Sylvan Ave., Suite 106
Englewood Cliffs, NJ 07632

**IBEW 81 HEALTH AND WELFARE FUND**
425 Eagle Rock Ave., Suite 105
Roseland, NJ 07068

**IBEW 607 HEALTH AND WELFARE FUND**
425 Eagle Rock Ave., Suite 105
Roseland, NJ 07068

**IRONWORKERS LOCAL 11 WELFARE FUND**
12 Edison Place
Springfield, NJ 07081

**TEAMSTERS HEALTH AND WELFARE OF PHILADELPHIA AND VICINITY**
2500 McClellan Ave., Suite 140
Pennsauken, NJ 08109

**TEAMSTERS INDUSTRIAL EMPLOYEES' WELFARE FUND**
303 Molnar Dr.
Elmwood Park, NJ 07407

**TEAMSTERS JOINT COUNCIL NO. 53 HEALTH AND WELFARE FUND**
2500 McClellan Ave., Suite 140
Pennsauken, NJ 08109

**TEAMSTERS LOCAL 641 WELFARE FUND**
714 Rahway Ave., 2nd Floor
Union, NJ 07083

**TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND**
303 Molnar Dr.
Elmwood Park, NJ 07407

**UAW LOCAL 259 SOCIAL SECURITY**
140 Sylvan Ave., Suite 106
Englewood Cliffs, NJ 07632

**UAW LOCAL 259N AND LOCAL 365 WELFARE FUND**
140 Sylvan Ave., Suite 106
Englewood Cliffs, NJ 07632

**UFCW LOCAL 152 HEALTH AND WELFARE FUND**
3120 Fire Rd., Suite 201
Egg Harbor Township, NJ 08234

**UFCW LOCAL 360 HEALTH FUND**
400 Commerce Lane
West Berlin, NJ 08091

**UFCW TRI-STATE HEALTH AND WELFARE FUND**
3120 Fire Rd., Suite 201
Egg Harbor Township, NJ 08234

**UNITED INDEPENDENT UNION WELFARE FUND**
22 W. Church St.
Blackwood, NJ 08012

**AFSCME CARE PLAN OF OHIO**
1603 East 27th St
Cleveland, OH 44114

**OHIO LABORERS' DISTRICT COUNCIL- OHIO CONTRACTORS**
800 Hillsdowne Rd.
Westerville, OH 43081-3302

**TOLEDO ELECTRICAL WELFARE FUND**
727 Lime City Rd., Suite 200
Rossford, OH 43460

**UFCW UNION-EMPLOYER HEALTH AND WELFARE FUND LOCAL 880 AND PFIE**
9199 Market Place, Suite 1
Broadview Heights, OH 44147

Plaintiffs,

v.

**PURDUE PHARMA L.P.**
One Stamford Forum
~~201 Tresser Boulevard~~
Stamford, Connecticut 06901

**PURDUE PHARMA INC.**
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901

**THE PURDUE FREDERICK COMPANY, INC**.
One Stamford Forum
201 Tresser Boulevard
Stamford, Connecticut 06901

**TEVA PHARMACEUTICALS USA, INC.**
1090 Horsham Road
North Wales, Pennsylvania 19454

**CEPHALON, INC.**
1090 Horsham Road
North Wales, Pennsylvania 19454

**JOHNSON & JOHNSON**
1 Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

**JANSSEN PHARMACEUTICALS, INC.**
1125 Trenton Harbourton Road
Titusville, New Jersey 08560

**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC.**
1125 Trenton Harbourton Road
Titusville, New Jersey 08560

**JANSSEN PHARMACEUTICA, INC., n/k/a JANSSEN PHARMACEUTICALS, INC.**
1125 Trenton Harbourton Road

Titusville, New Jersey 08560

**ALLERGAN, PLC f/k/a ACTAVIS, PLC**
Morris Corporate Center III
400 Interpace Parkway
Parsippany, New Jersey 07054

**ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.**
Morris Corporate Center III
400 Interpace Parkway
Parsippany, New Jersey 07054

**WATSON LABORATORIES, INC.**
Morris Corporate Center III
400 Interpace Parkway
Parsippany, New Jersey 07054

**ACTAVIS, LLC**
Morris Corporate Center III
400 Interpace Parkway
Parsippany, New Jersey 07054

**ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.**
Morris Corporate Center III
400 Interpace Parkway
Parsippany, New Jersey 07054

**ABBOTT LABORATORIES, INC.**
100 Abbott Park Road,
Abbott Park, IL 60054

**ASSERTIO THERAPEUTICS f/k/a DEPOMED, INC.**
100 South Saunders Road, Suite 300
Lake Forrest, IL 60045
**COLLEGIUM PHARMACEUTICALS, INC.**
100 Technology Center Drive, Suite 300
Stoughton, Massachusetts 02072

**MYLAN LABORATORIES, INC., n/k/a MYLAN, INC.**
1000 Mylan Blvd.
Canonsburg, Pennsylvania 15317

**NOVARTIS AG a/k/a NOVARTIS, INC. and NOVARTIS PHARMACEUTICALS CORPORATION**
One Health Plaza
East Hanover, NJ 07936-1080

**SUN PHARMACEUTICAL INDUSTRIES, INC.**
2 Independence Way
Princeton, NJ 08540

**ZYDUS PHARMACEUTICALS (USA), INC.**
73 NJ-31
Pennington, NJ 08534

**AMERISOURCEBERGEN DRUG CORPORATION**
1300 Morris Drive
Chesterbrook, Pennsylvania, 19087

**McKESSON CORPORATION**
One Post Street
San Francisco, California 94104

**CARDINAL HEALTH, INC.**
7000 Cardinal Place
Dublin, Ohio 43017

**CURASCRIPT, INC.**
6272 Lee Vista Boulevard
Orlando, FL 32822

**CURASCRIPT SD**
255 Technology Park
Lake Mary, FL 32746

**CVS PHARMACY INC.**
One CVS Drive
Woonsocket, Rhode Island 02895

**CVS RX SERVICES, INC**
One CVS Drive
Woonsocket, Rhode Island 02895

**PENNSYLVANIA CVS PHARMACY, LLC**
2200 Cumberland Street
Lebanon, Pennsylvania 17042

**WALGREENS BOOTS ALLIANCE**
200 Wilmot Rd.
Deerfield, Illinois 60015

**WALGREEN CO.**
200 Wilmot Rd.
Deerfield, Illinois 60015

**WALGREEN EASTERN CO. INC.**
200 Wilmot Rd.
Deerfield, Illinois 60015

**WALMART INC. f/k/a WAL-MART STORES, INC.**
702 SW 8th Street
Bentonville, Arkansas 72712

**WALMART STORES EAST, L.P.**
702 SW 8th Street
Bentonville, Arkansas 72712

**TARGET CORPORATION**
1000 Nicollet Mall
Minneapolis MN 55403

**WEGMANS FOOD MARKETS, INC.**
c/o Corporate Secretary
100 Wegmans Market Street, Legal Dept.,
Rochester, NY 14624

**COSTCO WHOLESALE CORPORATION**
999 Lake Drive
Issaquah, WA 98027

**ESI MAIL PHARMACY SERVICE, INC.**
One Express Way
St. Louis, Missouri 63121

**EXPRESS SCRIPTS PHARMACY, INC.**
One Express Way
St. Louis, Missouri 63121

**SPIVAK INC. d/b/a VERREE PHARMACY**
7960 Verree Road
Philadelphia, PA 19106

**EXPRESS SCRIPTS HOLDING COMPANY (now known as EverNorth Health, Inc.)**
One Express Way
St. Louis, Missouri 63121

**EXPRESS SCRIPTS, INC.**
One Express Way
St. Louis, Missouri 63121

**ESI MAIL PHARMACY SERVICE, INC.**
One Express Way
St. Louis, Missouri 63121

**EXPRESS SCRIPTS PHARMACY, INC.**
One Express Way
St. Louis, Missouri 63121

**MEDCO HEALTH SOLUTIONS, INC.**
One Express Way
St. Louis, Missouri 63121

**MICHELL SPIVAK**
328 Carson Terrace
Huntingdon Valley, PA 19006

**TODD GOODMAN**
157 Pheasant Lane
Huntingdon Valley, PA 19006

**ERIC W. PESTRACK**
1844 Webster Lane
Maple Glen, PA 19002, and

**LEE B. KAMP**
839 Kendrick Street
Philadelphia, PA 19111

Defendants.

**NOTICE TO DEFEND**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333 TTY (215) 451-6197

# COMPLAINT

Above-listed Plaintiffs, by and through their undersigned counsel, hereby file this Complaint against the above-listed Defendants, grouped below according to their respective roles in the opioid epidemic which caused harm to all the Plaintiffs:

**Manufacturer Defendants**

1. Manufacturer Defendants include the following manufacturers and sellers of opioids: Teva Pharmaceuticals USA, Inc., Cephalon, Inc. ("***Teva***"), Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc. ("***JnJ***"), Allergan PLC f/k/a Actavis PLC, Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc. ("***Allergan***"), Actavis, LLC, Actavis Pharma, Inc., f/k/a Watson Pharma, Inc. ("***Actavis***"), Abbott Laboratories, Inc. ("***Abbott***"), Assertio Therapeutics f/k/a Depomed, Inc. (***"Assertio"***), Collegium Pharmaceuticals, Inc. ("***Collegium***"), Mylan Laboratories, Inc. (***"Mylan"***), Novartis AG (***"Novartis"***), Sun Pharmaceuticals Industries, Inc. (***"Sun"***), and Zydus Pharmaceuticals (USA), Inc. (***"Zydus"***) (collectively, the "**Manufacturer Defendants**").

2. While named and described in this Complaint due to their wrongful acts or practices, both as co-conspirators and aiders and abettors of and with the Defendants, the following manufacturers (among others) have filed for bankruptcy protection and therefore cannot be sued for their pre-bankruptcy filing conduct as alleged herein: Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Inc. ("***Purdue***"), Mallinckrodt plc, Mallinckrodt LLC, and SpecGx ("***Mallinckrodt***"), and Endo Health Solutions, Inc., Endo

Pharmaceuticals, Inc. ("***Endo***")[1] and Insys Therapeutics, Inc ("***Insys***") (collectively, the "**Bankrupt Manufacturers**"). However, because the Bankrupt Manufacturers were-co-conspirators with the Manufacturers Defendants and aiders and abettors of, the unlawful conduct of the Distributor Defendants, Pharmacy Defendants and PBM Defendants, among others, and because these Defendants were co-conspirators with and aiders and abettors of the unlawful conduct of the Bankrupt Manufacturers, their inclusion in this Complaint is appropriate for purposes of the joint and several liability of the Defendants named herein.

**Distributor Defendants**

3. Distributor Defendants include the following distributors of opioids: AmerisourceBergen Drug Corporation ("***AmerisourceBergen***"), McKesson Corporation ("***McKesson***"), Cardinal Health, Inc. ("***Cardinal***") and CuraScript, Inc. and CuraScript S.D. ("***CuraScript***") (collectively the "**Distributor Defendants**").

**Pharmacy Defendants**

4. Pharmacy Defendants include the following retail pharmacies who have filled prescriptions of opioids in Pennsylvania and other states where the Plaintiff's members and beneficiaries have filled prescriptions of opioids during the relevant time period: CVS Pharmacy Inc., CVS RX Services, Inc., Pennsylvania CVS Pharmacy, LLC ("***CVS Pharmacy***"); Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., Inc. (collectively, ***"Walgreens"***), Walmart, Inc., Walmart Stores East, L.P., (collectively, ***"Walmart"***), Target Corporation (***"Target"***), Wegmans Food Markets, Inc. (***"Wegmans"***); Costco Wholesale Corporation (***"Costco"***), ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc., ("***Express Scripts Pharmacy***"), and Spivak Inc. d/b/a Verree Pharmacy

[1] It is noted that Mallinckrodt and Endo recently merged.



Case ID: 260703065

("*Verree*") (collectively, the ***"*****Pharmacy Defendants*****"***)

**PBM Defendant**

5. Defendants Express Scripts Holding Co. n/k/a Evernorth Health, Inc. and Express Scripts, Inc. n/k/a Evernorth Health, Inc. ("***Express Scripts***") and Medco Health Solutions, a subsidiary of Express Scripts (***"Medco"***) (collectively the ***"Express Scripts PBM"***). As discussed below, Express Scripts PBM served as the pharmacy benefits manager for most of the Plaintiffs in this case during the relevant time period.

**Individual Defendants**

6. Mitchell Spivak, Todd Goodman, Eric W. Pestrack and Lee B. Kamp are collectively referred to as the ***"Individual Defendants"***.

7. The Manufacturer Defendants, Distributor Defendants, Pharmacy Defendants, PBM Defendants and Individual Defendants are collectively referred to as "**Defendants**", only to the extent necessary and appropriate. Where appropriate, the conduct of the individual groups of Defendants, and the conduct of the individual defendants within each group, is broken out and described with the requisite particularity required by the Pennsylvania Rules.

8. Plaintiffs seek to obtain declaratory and injunctive relief, compensatory, punitive and other damages, and statutory, civil and equitable relief, as more fully set forth below.

## INTRODUCTION

9. As to all these Defendants, Plaintiffs hereby allege the following.

10. This case is brought by Plaintiffs who are third party payors ("**TPPs**") who have purchased or reimbursed the cost of the opioids manufactured, distributed, marketed and sold by Defendants (hereinafter "**Defendants' Opioids**"), and have had to bear the costs of the



Case ID: 260703065

opioid epidemic as more fully described herein.

11. Plaintiffs are all similarly-situated TPPs to Plumbers' Local Union No. 690 Health Plan n/k/a Plumbers' Local Union No. 690 Industry Funds ("Plumbers Local 690"), which filed suit a putative class action case in this Court on September 12, 2019 against Defendants J&J, Teva and Amerisource Bergen, as well as Bankrupt Manufacturer, Endo. *See Plumbers' Local Union No. 690 Health Plan v. Teva Pharm. et. al.*, Civil Action No. 2019-007625 (C.C.P. Del. Cty) (Coordinated Civil Actions Docket) (hereinafter, "***Plumbers Local 690 case***").

12. As discussed more fully herein, the filing of the *Plumbers Local 690 case* tolled the statute of limitations as to the claims of the Plaintiffs against J&J, Teva and Amerisource Bergen. Furthermore, all the Plaintiffs named herein are members of the putative Class in the *Plumbers Local 690* case by their respective decisions to *opt out* of the Distributor Settlement with a TPP Settlement Class in MDL 2804 and *opt in* to the Class in this case. Such opt in elections are available and will be produced to the Court at the appropriate time.

13. Plaintiffs herein (which include Plumbers Local 690, but only with respect to Defendants *other than* J&J and Amerisource Bergen)[2] bring this civil action to eliminate the hazard to the health and well-being of their current beneficiaries, including their retirees, caused by the opioid epidemic in Pennsylvania, as well as Delaware, Maryland, Massachusetts, New Jersey, New York, Ohio and Florida (hereinafter the "**Plaintiff States**"), to abate the nuisance caused thereby in Pennsylvania and Plaintiff States. Plaintiffs seek to recoup monies

[2] Because Plumbers Local 690 already sued J&J and Amerisource Bergen in the *Plumbers Local 690 case*, it only sues the other named Defendants in this case for all of the Subject Drugs. As for Teva, Plumbers sues for drugs *other than* Actiq and Fentora which are part of the class action case. This Complaint includes other Teva brands (like Vivitrol and Vivitrex) and Teva generic opioids which Plumbers purchased during the relevant time period as set forth herein.

they have expended for the costs of prescription opioids and the treatment of opioid use disorders ("**OUDs**") caused by the highly addictive Defendants' opioids.

**Subject Drugs on Exhibit A**

14. Plaintiffs' damages are based in part on the costs of the payment for and reimbursement of "Subject Opioids", a partial listing of which is attached hereto as **Exhibit "A".** The attached list of Subject Opioids includes the "national drug code" or "NDC" for each such opioid as well as the product name. This list is the same list that Distributor Defendants AmerisourceBergen, Cardinal and McKesson agreed to use as part of their nationwide, class action settlement in MDL and distribution of settlement payments. Accordingly, while it represents an accurate list of the drugs which the Distributor Defendants acknowledged were part of the TPP class case which Plaintiffs in this case opted out of in order to join the Plumbers Local 690 in this Court, it may not be a complete list of Subject Opioids at issue in this case. Discovery will be needed to confirm the final, complete list of Subject Opioids, including for Plaintiffs' claims conspiracy and aiding and abetting claims.

15. As discussed herein, each Manufacturer Defendant has its own "labeler code", as five-digit number which identifies that manufacturer. This unique identifier provides the requisite product identification for Defendants' Subject Opioids. The labeler is the first five digits of the eleven digit NDC. The labelers for certain of the Manufacturer Defendants named herein are as follows:

**Teva**: 0172, 0182, 0480, 0555, 0575, 16252, 42185, 43806, 46987, 50111, 51759, 51846, 57844, 59310, 63459 and 68546.

**J&J/Janssen**: 0045, 0062, 0081, 10380, 11084, 12578, 17314, 24653, 50458, 57894, 59397, 59676, 60123, 62579, 64763,65267, 66503, 67446, 83264, 83427 and 84539.



Case ID: 260703065

**Allergan:** 0023, 0430, 0456, 11980, 42865, 57970, 58914 and 61874

**Actavis:** 0228, 0472, 0591, 45963, 52152, 52544 and 62037

**Abbott:** 0044, 0048, 8074, 31156, 37731, 54809, 57599, 61178, 76194 and 99073

**Assertio:** 13913 and 82497

**Collegium:** 24510

**Mylan:** 0378, 42292, 47351, 51079, 51525, 57994, 59490, 59762, 63286, 65015, 66692, 67457, 72078 and 76126

**Novartis:** 0028, 0078, 0083, 17088, 44139, 46028, 52847, 58768, 62577, 66229, 66447, 66521, 66828, 66829 and 71894

**Sun:** 10631, 14508, 41616, 45567, 47335, 49708, 51672, 53489, 54907, 57664, 61360, 62756, 63304, 67308 and 70095

**Zydus:** 51023, 51780, 51956, 65841, 68382, 70710, 70771 and 87186

16. These labelers enable the parties and the court to easily identify the Subject Opioids belonging to each Manufacturer Defendant named in this case, as well as the Subject Opioids of the Bankruptcy Manufacturers and unnamed manufacturer co-conspirators.

17. For instance, the following **Teva** labelers identify the below-listed Teva Subject Opioids:

0172

| | |
|---|---|
| 00172216260 | MORPHINE SULFATE CR |
| 00172216360 | MORPHINE SULFATE CR |
| 00172216460 | MORPHINE SULFATE CR |
| 00172216560 | MORPHINE SULFATE CR |
| 00172216660 | MORPHINE SULFATE CR |
| 00172218660 | PROPOXYPHENE HCL |
| 00172218670 | PROPOXYPHENE HCL |
| 00172218680 | PROPOXYPHENE HCL |
| 00172390060 | APC W/ CODEINE TAB 60 MG |



Case ID: 260703065

| | |
|---|---|
| 00172390080 | APC W/ CODEINE TAB 60 MG |
| 00172390760 | APC W/ CODEINE TAB 60 MG |
| 00172390780 | APC W/ CODEINE TAB 60 MG |
| 00172391560 | ACETAMINOPHEN/CODEINE |
| 00172391570 | ACETAMINOPHEN/CODEINE |
| 00172391580 | ACETAMINOPHEN/CODEINE |
| 00172391660 | ACETAMINOPHEN/CODEINE |
| 00172391670 | ACETAMINOPHEN/CODEINE |
| 00172391680 | ACETAMINOPHEN/CODEINE |
| 00172396160 | PROPOXYPHENE HCL CPD 65 |
| 00172396170 | PROPOXYPHENE HCL CPD 65 |
| 00172396180 | PROPOXYPHENE HCL CPD 65 |
| 00172398160 | PROPOXYPHENE-N/ACETAMINOP |
| 00172398170 | PROPOXYPHENE-N/ACETAMINOP |
| 00172398360 | ASPIRIN W/CODEINE NO 2 |
| 00172398370 | ASPIRIN W/CODEINE NO 2 |
| 00172398380 | ASPIRIN W/CODEINE NO 2 |
| 00172398410 | ASPIRIN W/CODEINE NO 3 |
| 00172398460 | ASPIRIN/CODEINE |
| 00172398470 | ASPIRIN W/CODEINE NO 3 |
| 00172398480 | ASPIRIN/CODEINE |
| 00172398510 | ASPIRIN W/CODEINE NO 4 |
| 00172398560 | ASPIRIN/CODEINE |
| 00172398570 | ASPIRIN/CODEINE |
| 00172398580 | ASPIRIN/CODEINE |
| 00172399460 | DIHYDROCODEINE COMPOUND |
| 00172399470 | DIHYDROCODEINE COMPOUND |
| 00172480260 | ABC COMPOUND W/CODEINE |
| 00172480270 | ABC COMPOUND W/CODEINE |
| 00172481160 | PROPOXYPHENE COMPOUND |
| 00172481170 | PROPOXYPHENE COMPOUND |
| 00172481180 | PROPOXYPHENE COMPOUND |
| 00172498060 | PROPOXYPHENE-N/ACETAMINOP |
| 00172498070 | PROPOXYPHENE-N/ACETAMINOP |
| 00172498080 | PROPOXYPHENE-N/ACETAMINOP |
| 00172564260 | HYDROCODONE BITARTRATE-ACETAMINOPHEN |
| 00172564270 | HYDROCODONE BITARTRATE-ACETAMINOPHEN |
| 00172564360 | HYDROCODONE/ACETAMINOPHEN |
| 00172564370 | HYDROCODONE/ACETAMINOPHEN |
| 00172564460 | ALLAY |
| 00172635460 | OXYCODONE HCL CR |

| | |
|---|---|
| 00172635560 | OXYCODONE HCL CR |
| 00172635660 | OXYCODONE HCL CR |
| 00172635760 | OXYCODONE HCL CR |
| 00172635900 | TRAMADOL HYDROCHLORIDE/AC |
| 00172635910 | TRAMADOL HYDROCHLORIDE/AC |
| 00172635960 | TRAMADOL HYDROCHLORIDE/AC |
| 00172635970 | TRAMADOL HYDROCHLORIDE/AC |
| 00172651500 | TRAMADOL HCL |
| 00172651510 | TRAMADOL HCL |
| 00172651560 | TRAMADOL HCL |
| 00172651570 | TRAMADOL HCL |

0182

| | |
|---|---|
| 00182001737 | GUIATUSS AC |
| 00182001740 | GUIATUSS AC |
| 00182001741 | GUIATUSS AC |
| 00182003401 | HYDROCODONE/ACETAMINOPHEN |
| 00182003405 | HYDROCODONE/ACETAMINOPHEN |
| 00182003601 | BUTALBITAL/ASPIRIN/CAFFEI |
| 00182011101 | DIHYDROCODEINE/ASA/CAFF |
| 00182015101 | GUAIFENESIN/CODEINE |
| 00182015601 | HYDROCODONE/ACETAMINOPHEN |
| 00182015840 | HYDROCODONE/GUAIFENESIN |
| 00182015940 | HYDROCODONE/GUAIFENESIN |
| 00182031700 | PROPOXYPHEN-N/APAP |
| 00182031701 | PROPOXYPHENE-N/ACETAMINOP |
| 00182031705 | PROPOXYPHENE-N/ACETAMINOP |
| 00182031710 | PROPOXYPHENE-N/ACETAMINOPHEN |
| 00182031789 | PROPOXYPHENE-N/ACETAMINOP |
| 00182034537 | GUIATUSS AC |
| 00182034540 | GUIATUSS AC |
| 00182034541 | GUIATUSS AC |
| 00182034840 | PHENYLEPH-PPA-BROMPHEN W/ COD-GG SOLN 5-5-2-10-100 MG/5ML |
| 00182034841 | PHENYLEPH-PPA-BROMPHEN W/ COD-GG SOLN 5-5-2-10-100 MG/5ML |
| 00182034937 | TERPIN HYDRATE/CODEINE |
| 00182034940 | TERPIN HYDRATE/CODEINE |
| 00182034941 | TERPIN HYDRATE/CODEINE |
| 00182034943 | TERPIN HYDRATE/CODEINE |

| | |
|---|---|
| 00182049001 | PROPOXYPHENE COMPOUND |
| 00182049005 | PROPOXYPHENE COMPOUND |
| 00182049010 | PROPOXYPHENE COMPOUND |
| 00182068101 | HYDROCODONE/ACETAMINOPHEN |
| 00182068105 | HYDROCODONE/ACETAMINOPHEN |
| 00182069101 | HYDROCODONE/ACETAMINOPHEN |
| 00182069105 | HYDROCODONE/ACETAMINOPHEN |
| 00182069201 | HYDROCODONE/ACETAMINOPHEN |
| 00182069205 | HYDROCODONE/ACETAMINOPHEN |
| 00182069501 | APC W/ CODEINE TAB 60 MG |
| 00182069510 | APC W/ CODEINE TAB 60 MG |
| 00182069801 | PROPOXYPHENE HCL |
| 00182069805 | PROPOXYPHENE HCL |
| 00182069810 | PROPOXYPHENE HCL |
| 00182072741 | TERPIN HYDRATE W/CODEINE |
| 00182075740 | PAREGORIC |
| 00182075741 | PAREGORIC |
| 00182080001 | PROPOXYPHENE/ACETAMINOPHEN |
| 00182080005 | PROPOXYPHENE/ACETAMINOPHEN |
| 00182080010 | GENAGESIC |
| 00182093737 | TRIPROLIDINE & PSEUDOEPHEDRINE EXP W/ COD 2-30-10 MG/5ML |
| 00182093740 | TRIPROLIDINE & PSEUDOEPHEDRINE EXP W/ COD 2-30-10 MG/5ML |
| 00182093741 | TRIPROLIDINE & PSEUDOEPHEDRINE EXP W/ COD 2-30-10 MG/5ML |
| 00182094801 | ACETAMINOPHEN/CODEINE |
| 00182094810 | ACETAMINOPHEN/CODEINE |
| 00182094889 | ACETAMINOPHEN/CODEINE |
| 00182099037 | PROMETHAZINE-PE EXPECTORANT W/ COD |
| 00182099040 | PROMETHAZINE-PE EXPECTORANT W/ COD |
| 00182099041 | PROMETHAZINE-PE EXPECTORANT W/ COD |
| 00182099137 | PROMETHAZINE EXPECTORANT W/ COD SOLN (OLD FORMULA) |
| 00182099140 | PROMETHAZINE EXPECTORANT W/ COD SOLN (OLD FORMULA) |
| 00182099141 | PROMETHAZINE EXPECTORANT W/ COD SOLN (OLD FORMULA) |
| 00182104510 | APC W/ CODEINE TAB 60 MG |
| 00182104940 | BROMODIPHEN-DPH W/ COD-GUAIACOL SOLN 10-8.75-10-80 MG/5ML |
| 00182104941 | BROMODIPHEN-DPH W/ COD-GUAIACOL SOLN 10-8.75-10-80 MG/5ML |

| | |
|---|---|
| 00182107837 | ACETAMINOPHEN/CODEINE |
| 00182107840 | ACETAMINOPHEN/CODEINE |
| 00182107841 | ACETAMINOPHEN/CODEINE |
| 00182107874 | ACETAMINOPHEN/CODEINE |
| 00182109637 | PHENYLPROPANOLAMINE-CHLORPHEN W/ COD SOLN 18.75-2-10 MG/5ML |
| 00182109640 | PHENYLPROPANOLAMINE-CHLORPHEN W/ COD SOLN 18.75-2-10 MG/5ML |
| 00182109641 | PHENYLPROPANOLAMINE-CHLORPHEN W/ COD SOLN 18.75-2-10 MG/5ML |
| 00182110601 | APAP W/CODEINE |
| 00182110610 | APAP W/CODEINE |
| 00182122501 | ASPIRIN/CODEINE |
| 00182122510 | ASPIRIN/CODEINE |
| 00182122589 | ASPIRIN W/CODEINE |
| 00182122601 | ASPIRIN/CODEINE |
| 00182122610 | ASPIRIN/CODEINE |
| 00182126601 | PROPOXYPHENE-N/ACETAMINOP |
| 00182126605 | PROPOXYPHENE-N/ACETAMINOP |
| 00182126801 | ACETAMINOPHEN/CODEINE |
| 00182126810 | ACETAMINOPHEN/CODEINE |
| 00182126889 | ACETAMINOPHEN/CODEINE |
| 00182133801 | ACETAMINOPHEN/CODEINE |
| 00182133805 | ACETAMINOPHEN/CODEINE |
| 00182133810 | ACETAMINOPHEN/CODEINE |
| 00182133889 | ACETAMINOPHEN/CODEINE |
| 00182137040 | TUSSI-R-GEN |
| 00182140901 | PROMETHAZINE-ASA-CAFF-DIHYDROCODEINE CAP 6.25-356-30-16 MG |
| 00182140905 | PROMETHAZINE-ASA-CAFF-DIHYDROCODEINE CAP 6.25-356-30-16 MG |
| 00182146501 | OXYCODONE/ACETAMINOPHEN |
| 00182146505 | OXYCODONE/ACETAMINOPHEN |
| 00182150801 | OXYCODONE/ASPIRIN |
| 00182150805 | OXYCODONE/ASPIRIN |
| 00182156201 | APC W/ BUTALBITAL & CODEINE CAP 30 MG |
| 00182156205 | FIORGEN W/CODEINE |
| 00182162989 | APAP W/CODEINE |
| 00182164789 | APAP W/CODEINE |
| 00182165640 | TUSSI-R-GEN |
| 00182165641 | TUSSI-R-GEN |
| 00182165901 | DIHYDROCODEINE COMPOUND |

| | |
|---|---|
| 00182165905 | DIHYDROCODEINE COMPOUND |
| 00182167301 | PROPOXYPHENE COMPOUND |
| 00182167305 | PROPOXYPHENE COMPOUND |
| 00182167310 | PROPOXYPHENE COMPOUND |
| 00182172601 | ACETAMINOPHEN/CODEINE |
| 00182172605 | ACETAMINOPHEN/CODEINE |
| 00182172701 | ACETAMINOPHEN/CODEINE |
| 00182176501 | HYDROCODONE/ACETAMINOPHEN |
| 00182176505 | HYDROCODONE/ACETAMINOPHEN |
| 00182176589 | HYDROCODONE/ACETAMINOPHEN |
| 00182269301 | BUTALBITAL/APAP/CAFFEINE/ |
| 00182303763 | NALBUPHINE HCL |
| 00182305163 | NALOXONE HCL |
| 00182310085 | NALOXONE HCL SDV |
| 00182913066 | Meperidine HCl |
| 00182913165 | MEPERIDINE HCL |
| 00182913965 | MORPHINE SULFATE |
| 00182914001 | MEPERIDINE HCL |
| 00182914101 | MEPERIDINE HCL |
| 00182917201 | HYDROMORPHONE HCL |
| 00182917301 | HYDROMORPHONE HCL |
| 00182917501 | OXYCODONE/ACETAMINOPHEN |
| 00182917801 | HYDROMORPH |

63459

| | |
|---|---|
| 63459030042 | VIVITROL |
| 63459030224 | ACTIQ |
| 63459030424 | ACTIQ |
| 63459030624 | ACTIQ |
| 63459030824 | ACTIQ |
| 63459031224 | ACTIQ |
| 63459031624 | ACTIQ |
| 63459050201 | ACTIQ |
| 63459050230 | ACTIQ |
| 63459050401 | ACTIQ |
| 63459050430 | ACTIQ |
| 63459050601 | ACTIQ |
| 63459050630 | ACTIQ |
| 63459050801 | ACTIQ |
| 63459050830 | ACTIQ |

| | |
|---|---|
| 63459051201 | ACTIQ |
| 63459051230 | ACTIQ |
| 63459051601 | ACTIQ |
| 63459051630 | ACTIQ |
| 63459054104 | FENTORA |
| 63459054128 | FENTORA |
| 63459054204 | FENTORA |
| 63459054228 | FENTORA |
| 63459054328 | FENTORA |
| 63459054404 | FENTORA |
| 63459054428 | FENTORA |
| 63459054604 | FENTORA |
| 63459054628 | FENTORA |
| 63459054804 | FENTORA |
| 63459054828 | FENTORA |

18. The below listed J&J/Janssen labelers identify the listed J&J/Janssen Subject Opioids in this case:

0045

| | |
|---|---|
| 00451650016 | IOTUSS |
| 00456041500 | DURADYNE DHC |
| 00456041501 | DURADYNE DHC |
| 00456041600 | DURADYNE DHC |
| 00456041601 | DURADYNE DHC |
| 00456049200 | OPIUM-ATROPINE-SALICYLAMIDE-PHENACETIN CAP 2-0.13-130-100 MG |
| 00456049500 | CHLORPHEN-PPA W/ APAP & OPIUM CAP 4-25-325-2 MG |
| 00456049501 | CHLORPHEN-PPA W/ APAP & OPIUM CAP 4-25-325-2 MG |
| 00456054701 | ACETAMINOPHEN W/ BUTALBITAL & CODEINE CAP 325-50-30 MG |
| 00456054702 | ACETAMINOPHEN W/ BUTALBITAL & CODEINE CAP 325-50-30 MG |
| 00456057300 | BIS SUBCARBONATE-KAOLIN-PECTIN-OPIUM CAP 60-350-60-3 MG |
| 00456057301 | BIS SUBCARBONATE-KAOLIN-PECTIN-OPIUM CAP 60-350-60-3 MG |
| 00456060101 | BANCAP-HC |
| 00456060102 | BANCAP-HC |
| 00456061001 | BANCAP-HC |



Case ID: 260703065

| | |
|---|---|
| 00456061002 | BANCAP-HC |
| 00456061063 | BANCAP HC |
| 00456061700 | PHENYLPROP-CHLORPHEN W/ OPIUM-APAP CAP 25-4-2-325 MG |
| 00456061701 | PHENYLPROP-CHLORPHEN W/ OPIUM-APAP CAP 25-4-2-325 MG |
| 00456064101 | ANODYNOS-DHC |
| 00456067701 | ESGIC/CODEINE |
| 00456520001 | COMBUNOX |

0081

| | |
|---|---|
| 00813002501 | DOLPHEN |
| 00813002505 | DOLPHEN |
| 00813012501 | DOLFEN |
| 00813012505 | DOLFEN |
| 00813250001 | HYDROCODONE/ACETAMINOPHEN |
| 00813250005 | HYDROCODONE/ACETAMINOPHEN |
| 00813750001 | HYDROCODONE/ACETAMINOPHEN |
| 00813750005 | HYDROCODONE/ACETAMINOPHEN |
| 00814024614 | ACETAMINOPHEN/CODEINE |
| 00814024630 | ACETAMINOPHEN/CODEINE |
| 00814024814 | ACETAMINOPHEN/CODEINE |
| 00814024830 | ACETAMINOPHEN/CODEINE |
| 00814024982 | ACETAMINOPHEN/CODEINE |
| 00814025014 | ACETAMINOPHEN/CODEINE |
| 00814025028 | ACETAMINOPHEN/CODEINE |
| 00814025214 | ACETAMINOPHEN/CODEINE |
| 00814025314 | ACETAMINOPHEN/CODEINE |
| 00814025514 | HYDROCODONE/ACETAMINOPHEN |
| 00814025528 | HYDROCODONE/ACETAMINOPHEN |
| 00814092514 | ASPIRIN/CODEINE |
| 00814092614 | ASPIRIN/CODEINE |
| 00814092714 | ASPIRIN/CODEINE |
| 00814249014 | DIHYDROCODEINE COMPOUND |
| 00814249028 | DIHYDROCODEINE COMPOUND |
| 00814358076 | GUAIFENESIN/CODEINE |
| 00814358082 | GUAIFENESIN/CODEINE |
| 00814382414 | BUTALB/ASA/CAF/CD |
| 00814382428 | IDENAL (Aspirin/butalbital/caffeine/codeine Phosphate) |
| 00814382514 | IDENAL/CODEINE |

| | |
|---|---|
| 00814392882 | IOPHEN-C |
| 00814468014 | MEPERIDINE HCL |
| 00814468214 | MEPERIDINE HCL |
| 00814511834 | NALOXONE HCL |
| 00814511840 | NALOXONE HCL |
| 00814560014 | OXYCODONE W/APAP |
| 00814560214 | OXYCODONE W/ASPIRIN |
| 00814560228 | OXYCODONE W/ASPIRIN |
| 00814579082 | PAREGORIC |
| 00814579086 | PAREGORIC |
| 00814643282 | PROMETHAZINE EXPECTORANT W/ COD SOLN (OLD FORMULA) |
| 00814643286 | PROMETHAZINE EXPECTORANT W/ COD SOLN (OLD FORMULA) |
| 00814645214 | PROPOXYPHENE-N/ACETAMINOP |
| 00814645228 | PROPOXYPHENE-N/ACETAMINOP |
| 00814645314 | PROPOXYPHENE-N/ACETAMINOP |
| 00814645328 | PROPOXYPHENE NAPSYLATE |
| 00814645414 | PROPOXYPHENE-N/ACETAMINOP |
| 00814645428 | PROPOXYPHENE-N/ACETAMINOP |
| 00814645714 | PROPOXYPHENE HCL |
| 00814645728 | PROPOXYPHENE HCL |
| 00814646014 | PROPOXYPHENE COMPOUND |
| 00814646028 | PROPOXYPHENE COMPOUND |
| 00814646414 | PROPOXYPHENE/ACETAMINOPHE |
| 00814646428 | PROPOXYPHENE/ACETAMINOPHE |
| 00814765576 | TERPIN HYDRATE/CODEINE |
| 00814765582 | TERPIN HYDRATE/CODEINE |
| 00814765586 | TERPIN HYDRATE/CODEINE |

50458

| | |
|---|---|
| 50458003002 | SUBLIMAZE |
| 50458003005 | SUBLIMAZE |
| 50458003010 | SUBLIMAZE |
| 50458003020 | SUBLIMAZE |
| 50458003305 | DURAGESIC |
| 50458003405 | DURAGESIC |
| 50458003505 | DURAGESIC |
| 50458003605 | DURAGESIC |
| 50458003705 | DURAGESIC |

| | |
|---|---|
| 50458005001 | SUFENTA |
| 50458005002 | SUFENTA |
| 50458005005 | SUFENTA |
| 50458006002 | ALFENTA |
| 50458006005 | ALFENTA |
| 50458006010 | ALFENTA |
| 50458006020 | ALFENTA |
| 50458009005 | DURAGESIC |
| 50458009105 | DURAGESIC |
| 50458009205 | DURAGESIC |
| 50458009305 | DURAGESIC |
| 50458009405 | DURAGESIC |
| 50458010105 | DURAGESIC |
| 50458010205 | DURAGESIC |
| 50458010405 | DURAGESIC |
| 50458010505 | DURAGESIC |
| 50458010605 | DURAGESIC |
| 50458051360 | TYLENOL/CODEINE #3 |
| 50458051380 | TYLENOL/CODEINE #3 |
| 50458051560 | TYLENOL/CODEINE #4 |
| 50458051570 | TYLENOL/CODEINE #4 |
| 50458052660 | TYLOX |
| 50458052679 | TYLOX |
| 50458065010 | ULTRACET |
| 50458065060 | ULTRACET |
| 50458065330 | ULTRAM ER |
| 50458065530 | ULTRAM ER |
| 50458065730 | ULTRAM ER |
| 50458065960 | ULTRAM |
| 50458082002 | NUCYNTA |
| 50458082004 | NUCYNTA |
| 50458083002 | NUCYNTA |
| 50458083004 | NUCYNTA |
| 50458084002 | NUCYNTA |
| 50458084004 | NUCYNTA |
| 50458086001 | NUCYNTA ER |
| 50458086002 | Janssen Pharmaceuticals, Inc. - Nucynta ER |
| 50458086101 | NUCYNTA ER |
| 50458086102 | Janssen Pharmaceuticals, Inc. - Nucynta ER |
| 50458086201 | NUCYNTA ER |
| 50458086202 | Janssen Pharmaceuticals, Inc. - Nucynta ER |

| | |
|---|---|
| 50458086301 | NUCYNTA ER |
| 50458086302 | Janssen Pharmaceuticals, Inc. - Nucynta ER |
| 50458086401 | NUCYNTA ER |
| 50458086402 | Janssen Pharmaceuticals, Inc. - Nucynta ER |

19. In the interest of brevity for this Complaint, Plaintiffs do not repeat this exercise for all the opioids of Teva, J&J/Janssen, or the other manufacturers at issue, since the exercise can be done for each by each but would exponentially (and unnecessarily) expand the size of this Complaint.

20. Plaintiffs named herein purchased or reimbursed the costs of Subject Opioids. Claims data maintained by and for the benefit of Plaintiffs by PBMs, including the PBM Defendants, and other third party administrators ("TPAs") show such purchases.

21. For instance, such claims data already produced by Plaintiff Plumbers Local 690 reveals the following purchases of Teva Subject Opioids prior to 2012:

00172

| | | |
|---|---|---|
| 00172218660 | PROPOXYPHENE HCL 65 MG CAP | 8/18/2005 |
| 00172218660 | PROPOXYPHENE HCL 65 MG CAP | 8/22/2005 |
| 00172498060 | PROPOXY-N/APAP 100-650 TAB | 7/28/2003 |
| 00172498060 | PROPOXY-N/APAP 100-650 TAB | 5/24/2004 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 8/20/2003 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 10/20/2003 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 10/28/2003 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 1/6/2004 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 3/28/2004 |



Case ID: 260703065

| | | |
|---|---|---|
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 4/11/2005 |
| 00172498070 | PROPOXYPH-ACETAMINOPHN 100-650 | 10/11/2005 |
| 00172498080 | PROPOXY-N/APAP 100-650 TAB | 11/13/2003 |
| 00172498080 | PROPOXY-N/APAP 100-650 TAB | 2/7/2004 |
| 00172498080 | PROPOXY-N/APAP 100-650 TAB | 4/27/2004 |
| 00172498080 | PROPOXY-N/APAP 100-650 TAB | 5/17/2005 |
| 00172635460 | OXYCODONE HCL 10 MG TAB SA | 10/11/2005 |
| 00172635460 | OXYCODONE HCL 10 MG TAB SA | 11/11/2005 |
| 00172635460 | OXYCODONE HCL 10 MG TAB SA | 11/14/2005 |
| 00172635460 | OXYCODONE HCL 10 MG TAB SA | 12/17/2005 |
| 00172635460 | OXYCODONE HCL 10 MG TAB SA | 1/24/2006 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 7/9/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 7/12/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 7/18/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 8/15/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 8/17/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 8/18/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 9/9/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 9/12/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 10/1/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 10/13/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 10/24/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 11/9/2005 |



Case ID: 260703065

| | | |
|---|---|---|
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 11/15/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 12/13/2005 |
| 00172635560 | OXYCODONE HCL 20 MG TAB SA | 2/16/2006 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 7/9/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 8/17/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 9/9/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 9/9/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 10/1/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 10/10/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 10/24/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 11/9/2005 |
| 00172635660 | OXYCODONE HCL 40 MG TAB SA | 11/15/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/9/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/27/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/8/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/15/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/21/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/26/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/7/2005 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/11/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/13/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/26/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/19/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/20/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/29/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/2/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/10/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/31/2005 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/13/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/24/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/28/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/30/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 2/13/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 2/28/2006 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 3/13/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 3/18/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 4/3/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 4/17/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/1/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/2/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/16/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/30/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/2/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/6/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/15/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/5/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/24/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/7/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/24/2006 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/5/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/25/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/13/2006 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 4/5/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 4/13/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/2/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/25/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/10/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/18/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/25/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/29/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/9/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/6/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/4/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/6/2007 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/17/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/10/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/20/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/30/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/30/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/6/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/8/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/14/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/20/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/22/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/27/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/5/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/11/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/17/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/19/2007 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/27/2007 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/2/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/8/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/12/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/20/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/31/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 2/2/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 2/14/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 2/23/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 3/25/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/4/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/26/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/29/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/21/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/23/2008 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/27/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/11/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/11/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/5/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/29/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/12/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/18/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/6/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 11/15/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/2/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 12/29/2008 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/6/2009 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/15/2009 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/22/2009 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 1/29/2009 |

| | | |
|---|---|---|
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 10/9/2009 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 4/20/2010 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/22/2010 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 9/2/2010 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/26/2011 |
| 00172635960 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/2/2011 |
| 00172635970 | TRAMADOL-ACETAMINOPHN 37.5-325 | 5/21/2009 |
| 00172635970 | TRAMADOL-ACETAMINOPHN 37.5-325 | 7/22/2010 |
| 00172635970 | TRAMADOL-ACETAMINOPHN 37.5-325 | 8/2/2010 |
| 00172635970 | TRAMADOL-ACETAMINOPHN 37.5-325 | 6/29/2011 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 6/9/2003 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 7/29/2003 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 8/14/2003 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 9/8/2003 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 9/30/2003 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 5/12/2004 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 8/23/2004 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 10/31/2004 |



Case ID: 260703065

| | | |
|---|---|---|
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 1/24/2005 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 3/2/2005 |
| 00172651560 | TRAMADOL HCL 50 MG TABLET | 4/21/2005 |

00182

| | | |
|---|---|---|
| 00182001740 | GUIATUSS AC SYRUP | 1/12/2004 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 8/24/2004 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 9/13/2004 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 12/11/2004 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 3/4/2005 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 3/29/2005 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 4/26/2005 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 6/12/2005 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 8/14/2005 |
| 00182261401 | GUAIFENESIN 200 MG TABLET | 10/3/2005 |
| 00182265901 | BUTALB-ACETAMIN-CAFF 50-325-40 | 5/26/2005 |
| 00182265901 | BUTALB-ACETAMIN-CAFF 50-325-40 | 6/22/2006 |

22. The 3 drugs listed under labeler 63459 were distributed through specialty pharmacy, not retail or mail order through Express Scripts. According, data pertaining to such claims would not be part of any retail or mail pharmacy claims data produced by PBMs. As described more fully below, the distribution of such Subject Opioids through “specialty distribution” is a unique aspect of this case not previously litigated in any court to date (to the best of undersigned counsel’s knowledge).

23. As for J&J/Janssen, just two drugs purchased by Plumbers Local 690 for a few years during the relevant time period, i.e.. Duragesic (2004-2005) and Nucynta (2010-2012), should suffice for purposes of Plumbers Local 690’s standing to sue.

| | | |
|---|---|---|
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 4/15/2004 |



Case ID: 260703065

| | | |
|---|---|---|
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 5/16/2004 |
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 6/19/2004 |
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 8/24/2004 |
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 9/24/2004 |
| 50458003605 | DURAGESIC 100 MCG/HR PATCH | 2/2/2005 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 6/17/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 7/3/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 7/28/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 9/10/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 9/26/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 10/1/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 11/24/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 12/23/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 12/26/2003 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 1/6/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 1/23/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 2/23/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 3/25/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 4/3/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 4/8/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 4/23/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 4/24/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 5/12/2004 |

| | | |
|---|---|---|
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 6/9/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 6/11/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 6/29/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 7/1/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 7/9/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 7/27/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 8/2/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 8/5/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 9/8/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 9/13/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 9/18/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 10/1/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 10/5/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 10/29/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 11/9/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 11/11/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 12/7/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 12/20/2004 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 1/6/2005 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 1/28/2005 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 2/2/2005 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 2/8/2005 |
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 3/9/2005 |

| | | |
|---|---|---|
| 50458003305 | DURAGESIC 25 MCG/HR PATCH | 11/30/2005 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 7/29/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 8/25/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 9/18/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 10/3/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 10/23/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 11/19/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 11/20/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 12/1/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 12/19/2003 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 1/5/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 1/20/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 2/2/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 2/16/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 2/18/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 3/1/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 3/12/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 4/1/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 4/22/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 5/10/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 5/18/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 6/14/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 7/6/2004 |

| | | |
|---|---|---|
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 7/19/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 8/20/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 9/13/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 10/20/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 11/16/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 11/19/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 12/17/2004 |
| 50458003405 | DURAGESIC 50 MCG/HR PATCH | 1/14/2005 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 7/29/2003 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 9/26/2003 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 12/5/2003 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 1/14/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 1/15/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 1/22/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 5/9/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 6/7/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 6/26/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 7/20/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 8/27/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 9/22/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 10/19/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 11/20/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 12/16/2004 |

| | | |
|---|---|---|
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 12/20/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 12/31/2004 |
| 50458003505 | DURAGESIC 75 MCG/HR PATCH | 1/16/2005 |

| | | |
|---|---|---|
| 50458084004 | NUCYNTA 100 MG TABLET | 4/16/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 5/19/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 6/17/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 7/12/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 8/13/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 9/13/2010 |
| 50458084004 | NUCYNTA 100 MG TABLET | 4/4/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 2/3/2010 |
| 50458082004 | NUCYNTA 50 MG TABLET | 2/22/2010 |
| 50458082004 | NUCYNTA 50 MG TABLET | 4/4/2010 |
| 50458082004 | NUCYNTA 50 MG TABLET | 4/12/2010 |
| 50458082004 | NUCYNTA 50 MG TABLET | 1/5/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 1/13/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 1/28/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 2/8/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 4/8/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 4/19/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 4/29/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 7/9/2011 |

| | | |
|---|---|---|
| 50458082004 | NUCYNTA 50 MG TABLET | 9/6/2011 |
| 50458082004 | NUCYNTA 50 MG TABLET | 3/20/2012 |
| 50458082004 | NUCYNTA 50 MG TABLET | 7/20/2012 |
| 50458083004 | NUCYNTA 75 MG TABLET | 6/4/2010 |
| 50458086201 | NUCYNTA ER 150 MG TABLET | 2/9/2012 |

24. Plaintiffs reside in the Plaintiff States as more fully explained hereinbelow.

25. Plaintiffs named herein purchased and/or reimbursed the costs of one or more Subject Drugs of the named Manufacturer and Bankrupt Defendants, the details of which can be provided at the appropriate time in the appropriate manner.

26. Plumbers Local 690 resides in Pennsylvania and has been litigating its Pennsylvania class action claims in this Court for nearly 7 years as part of the coordinated cases in Pennsylvania. On September 23, 2021, Plumbers Local 690 filed various Motions for Class Certification against J&J, Teva and Amerisource Bergen, seeking the certification of an "opt in" class of purchasers of opioids. *See generally,* Omnibus Memo of Law in Support of Motion of Plaintiff Plumbers' Local Union No. 690 for Class Certification Against Pennsylvania Defendants at 18 ("Pa. R.C.P. 1711(b) provides that if the court finds individual claims are substantial and the claimants have the resources to pursue them, then the court may require all class members to acquire membership via opt-in.")

27. However, Plumbers Local 690's claims were stayed while the other individual plaintiffs in the Court-designated "test cases" proceeded. *See* Case Mgmt



Case ID: 260703065

Order No. 1 in *Delaware County, Pa. v. Purdue Pharm, L.P., et. al.*, No. 2017-008095 (Coordinated Civil Actions) (C.C.P. Del.) at 9(a) (establishing test cases). As a result, Plumbers Local 690's case was stayed. No decision on class certification was made by this Court, including Plaintiff's request to designate the case as an opt-in case for the benefit of all TPPs, including Plaintiffs named herein. No notice of the pending class claims has issued.

28. Similarly, and unbeknownst to Plaintiffs named herein prior to their receiving notice of the TPP Settlement by the certain Distributors in late 2024, several, Ohio-based TPPs in the federal MDL have been litigating their Ohio claims on behalf of a putative nationwide class action case (which included all the Plaintiffs named herein) in the Northern District of Ohio before the Honorable Dan Polster ("**Opioid MDL**"). These TPPs include the Cleveland Bakers and Teamsters Health and Welfare Fund ("**Cleveland Bakers**") and Pipe Fitters Local Union No. 120 Insurance Fund ("**Pipe Fitters Local 120**"). To date, no decision on class certification has issued.

29. On February 21, 2020, Judge Polster denied in large part the Motions to Dismiss filed by Defendants. See generally, Cleveland Bakers & Teamsters Health & Welfare Fund v. Purdue Pharma, L.P. (In re Nat'l Prescription Opiate Litig.) ("Cleveland Bakers case"), 440 F.Supp. 3d 773 (N.D. Ohio 2020) ("**Cleveland Bakers decision**"). Relatedly, Judge Polster denied the separate Motions to Dismiss by the PBM Defendants.

30. After the *Cleveland Bakers* decision, the Distributor Defendants (i.e.., AmerisourceBergen, McKesson and Cardinal, but not CuraScript) all settled with a certified, nationwide settlement class of TPPs for $300 million. The certified settlement

class included Plumbers Local 690 and all of the other Plaintiffs in this case. After receiving notice, Plaintiffs here elected to **opt out** of the settlement class and **opt in** to the Plumbers Local 690 in this Court. Judge Polster ordered the allowance of these opt outs, after initial objections by the MDL Plaintiffs. Accordingly, having been a part of the *Cleveland Bakers* class action case for years, but without their knowledge due to the lack of notice, Plaintiffs now seek to proceed individually as of right in this Court.

31. Plaintiffs bring causes of action under the consumer fraud laws and statutes of Pennsylvania and Plaintiff States because of Defendants' unfair and deceptive acts and practices in manufacturing, distributing, marketing, and selling prescription opioids. Such economic damages were foreseeable to Defendants and were sustained because of Defendants' unfair and deceptive actions and omissions.

32. Opioids are widely prescribed and distributed throughout Pennsylvania and Plaintiff States, and the widespread abuse of opioids in Pennsylvania and the Plaintiff States has resulted in a statewide epidemic of opioid overdose deaths and addictions. Plaintiffs bring this suit against the Defendants for their respective roles in the opioid crisis, jointly and severally, including their successors.

33. As described more fully herein, the Defendants aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. The Manufacturer Defendants aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous Defendants' opioids and turned patients into drug addicts for their own corporate profit. The Distributor Defendants distributed volumes of opioids that any reasonable distributor would know or should have known were suspicious and did so in dereliction

of their duties under federal law. The Pharmacy Defendants filled prescriptions of Defendants' opioids at levels far beyond those reasonably required to treat the pain of patients and repeatedly filled refill prescriptions at increasing levels to the same patients, over and over, in dereliction of their duties. The PBM Defendants – who contracted with TPPs, including the Plaintiffs herein, to control the cost of prescriptions and prevent abuses from prescriptions drug use, failed to take reasonable steps to prevent or reduce Plaintiffs' payments for Defendants' opioids which, in turn, led to OUDs by Plaintiffs' beneficiaries, in dereliction of their contractual obligations and legal duties to Plaintiffs. Finally the Individual Defendants were the chief actors involved in the business of Verree Pharmacy, and directly caused or contributed to the prescriptions and sales of Defendants' opioids and the OUDs suffered by certain Plaintiffs' beneficiaries who filled prescriptions at Verree.

34. Such actions by the Defendants were negligent, reckless, and at times, intentional, driven by profit motivations.

35. To redress and punish the Defendants' violations of the consumer fraud laws and common law of Pennsylvania and other Plaintiff States, and to redress their respective violations of the common laws of Pennsylvania and other Plaintiff States, Plaintiffs seek declaratory and injunctive relief, having Defendants' acts and practices declared unlawful and stopped. Specifically, Plaintiffs seek to hold Defendants accountable for their unlawful acts and practices pursuant to the following consumer fraud laws of the Plaintiff States:

- Pennsylvania' Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq*. ("UTPCPL");

- Delaware's Consumer Fraud Act, 6 Del. Code § 2511, *et seq*. ("DCFA");
- Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat., § 501.201, *et. seq*.;
- Maryland's Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.* ("MDCPA")
- Massachusetts' Consumer Protection Act, Mass. Gen. L. Ch. 93A § 9(1) ("MCPA");
- New Jersey's Consumer Fraud Act, N.J. Stat. § 56:8-1, et seq. ("NJCFA");
- New York's N.C. Gen. Stat. § 75-1.1, *et seq*.
- Ohio's Corrupt Practices Act, O.R.C. § 2923.31, *et seq*. ("OPCA"); and

36. The damages sought in this Complaint were foreseeable to Defendants and were sustained because of Defendants' unfair and deceptive actions, failures to act and omissions.

37. Opioids provide effective treatment for short-term post-surgical and trauma-related pain, and for palliative cancer or end-of-life care. Barring exceptional circumstances; however, opioids are too addictive[3] and too debilitating for long-term use for nonchronic, non-cancer pain lasting three months or longer ("chronic pain"). This is due in part because the effectiveness of opioids wanes with prolonged use, requiring ever higher doses to achieve pain relief. This markedly increases the risk of addiction.[4] Indeed, the U.S. Food and Drug

[3] Substance use disorders range from misuse and abuse of drugs to addiction. See Am. Psych. Ass'n, What is Addiction, Psychiatry, https://www.psychiatry.org/patients-families/addiction/what-is-addiction (last visited Mar. 23, 2018). Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder continuum.

[4] *See, e.g.*, Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 PROGRESS IN PAIN RES. & MGMT., 247287 (H.L. Fields and J.C. Liebeskind eds., 1994).

Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[5]

38. Opioids are widely prescribed and distributed, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.

39. As described herein, each Defendant bears culpability for the current national opioid crisis and is a necessary party to addressing the damage it has wreaked, including the costs of abatement, as felt throughout the Commonwealth of Pennsylvania and the other Plaintiff States. The Defendants collaborated with each other, and other manufacturers and distributors of opioids, pharmacies and consultants to promote sales of deadly and dangerous levels of opioids throughout Pennsylvania and the Plaintiff States. Such coordinated efforts included programs to give away free samples of opioids (through "patient assistance programs" or ("PAPs")), coupons to discount opioid products, and promotion of specific opioid products under the guise of education and patient assistance. These coordinated activities increased the population of opioid users, increased the dose and duration of opioid use, and increased the risk of opioid misuse, addiction, dependence, and death.

40. The Plaintiffs bring this suit against the Defendants for their respective involvement in the malfeasance, nonfeasance and other conduct in orchestrating or allowing the aggressive push of highly addictive, dangerous opioids, falsely representing that patients would only rarely succumb to drug addiction when using opioids for pain "maintenance". These Defendants are each and all responsible for the epidemic caused by the highly addictive, dangerous opioids and turned innocent victims into drug addicts for their own corporate and

[5] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).



Case ID: 260703065

individual profit. Such actions were negligent, reckless, and at times, intentional.

41. Plaintiffs seek a judgment requiring all Defendants to pay (a) restitution, (b) damages, including multipliers of damages, (c) disgorgement, (d) punitive damages (e) attorneys' fees, costs and expenses, and (f) any other relief to which the Plaintiffs may be entitled.

## JURISDICTION AND VENUE

42. This Court has jurisdiction to hear this matter pursuant to 42 Pa. C.S.A. §761 which grants this Court "unlimited original jurisdiction of all actions and proceedings."

43. This Court has personal jurisdiction over all of the Defendants pursuant to 42 Pa. C.S.A. §5322 in that Defendants, (a) are registered to do business in this Commonwealth, (b) have their principal places of business or are otherwise located in this Commonwealth, (c) are transacting business in this Commonwealth, as defined by 42 Pa. C.S.A. §5322(a)(1), (d) are causing harm to Pennsylvania citizens by acts occurring outside the Commonwealth, 42 Pa. C.S.A. §5322(a)(4), and/or (e) have maintained the most minimum contacts with this Commonwealth allowed under the United States Constitution, 42 Pa. C.S.A. §5322(b).

44. Venue is appropriate in this Court because many of the Plaintiffs are situated in the Commonwealth of Pennsylvania, have members who reside in Pennsylvania and/or reimbursed Subject Opioids prescribed in, distributed in, and sold in Pennsylvania. Some of Plaintiffs' beneficiaries are residents of the various counties throughout Pennsylvania, including Philadelphia County and have been harmed by the Defendants' conduct described herein. Pa. R. Civ. P. 1006(a). Moreover, various instrumentalities of the conduct described herein have been located in Pennsylvania, making the Commonwealth the state where "a transaction or occurrence took place out of which the cause of action arose."



Case ID: 260703065

45. This County has been the site of the Pennsylvania Coordinated Opioid Cases for years, as chosen by many of the Defendants sued here.

46. The Plaintiffs bring this action exclusively under the laws of the Commonwealth of Pennsylvania and the Plaintiff States. No federal claims are being asserted, and to the extent that any claim or factual assertion set forth herein may be construed to have stated any claim for relief arising under federal law, such claim is expressly disavowed and disclaimed by the Plaintiffs in this Complaint.

47. No aspect of the claims asserted herein is brought pursuant to any federal law, including either Medicare or ERISA, nor is any aspect of the claims asserted herein brought for the purpose of interpreting a federal contract, or the terms of an ERISA plan. To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery of benefits under an ERISA plan, such claim is expressly and undeniably disavowed and disclaimed by the Plaintiffs.

48. This Complaint does not challenge the creation of custom formularies for a federal officer, such as for any Federal Employees Health Benefits Act or TRICARE governed health benefits plan. Furthermore, it does not seek to recover moneys paid by the federal government pursuant to such plans, nor does it seek the recovery of federally mandated co-pays that were paid by such plans' patients. To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law, or a claim for recovery of benefits under any such federal law, such claim is expressly and undeniably disavowed and disclaimed by the Plaintiffs.

49. In addition, under no circumstances are the Plaintiffs bringing this action against, or bringing an action or claim of any kind directed to, any federal officer or person

acting under any office of the United States for or relating to any act under color of such office. Nothing in this Complaint raises such an action, and to the extent that anything stated herein could be interpreted as potentially bringing an action against or directed to any federal officer or person acting under any office of the United States for or relating to any act under color of such office, then all such claims, actions, or liability, in law or in equity, are denied and disavowed in their entirety.

50. Nor do the Plaintiffs bring this action on behalf of a class or any group of persons that can be construed as a class. The claims asserted herein are brought solely by the Plaintiffs and are wholly independent of any claims that individual users of opioids may have against the Defendants.

51. Since this case does not involve the distribution, marketing or sales of opioids by and through any federal governmental program, or to any present or former federal employee residing in the Commonwealth of Pennsylvania, including any veteran covered by programs administered by the Department of Defense ("DoD"), including TRICARE – as any such claim has been expressly and unequivocally disclaimed and disavowed – the reference to any applicable federal laws or regulations is inapplicable to this lawsuit and shall not be the basis for any claim or argument that this lawsuit should be adjudicated in any federal court in the United States.

52. Moreover, the Complaint could not have been originally filed in federal court and, thus, cannot be removed. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). The issues presented in the allegations of this Complaint do not implicate any substantial federal issues and do not turn on the necessary interpretation of federal law. No federal issue is important to the federal system as a whole under the criteria set by the Supreme Court in *Gunn*

*v. Minton*, 568 U.S. 251 (2013) (e.g., federal tax collection seizures, federal government bonds). Specifically, the causes of action asserted, and the remedies sought herein, are founded upon the positive statutory, common, and decisional laws of Pennsylvania and the Plaintiff States. Further, the assertion of federal jurisdiction over the claims made herein would improperly disturb the congressionally approved balance of federal and state responsibilities. Accordingly, any exercise of federal jurisdiction is without basis in law or fact.

53. The Complaint does not confer jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1442(a)(1). The Plaintiffs make no allegations against "[t]he United States or any agency thereof or any office (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

54. In this Complaint, the Plaintiffs' claims do not rely on any federal statutes and regulations. The Plaintiffs do so to state the duty owed under the statutes and tort law of the Plaintiff States only, not to allege an independent federal cause of action and not to allege any substantial federal question. To be clear, the Plaintiffs cite federal statutes and federal regulations for the sole purpose of stating the duty owed under state law by the Defendants. Thus, any attempted removal of this complaint based on a federal cause of action or substantial federal question is without merit.

## PARTIES

### PLAINTIFFS

Plumbers Local 690

55. Plumbers' Local Union No. 690 Health Plan ("Plumbers Local 690"), resides at 2791 Southampton Road, Philadelphia, Pennsylvania 19154, Plumbers Local

690 has members and beneficiaries throughout the Commonwealth of Pennsylvania, including Delaware County.

56. Plumbers Local 690 provide a wide range of services on behalf of its members and beneficiaries, including providing healthcare services for families.

57. Several members of Plumbers Local 690 had serious medical conditions, for which Subject Opioids were prescribed.

58. Throughout the relevant time period, Plumbers Local 690 contracted with Defendant Express Scripts PBM for PBM services including coverage for the prescriptions of Subject Opioids.

59. The sum total of the opioid prescriptions paid for by Plumbers Local 690 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by Plumbers Local 690 was hundreds of thousands of dollars.

60. Plumbers Local 690 is a member of the Delaware Valley Healthcare Coalition Incorporated ("**DVHCC**"), a non-profit, voluntary association of self-funded third party payors located at 2980 Southampton Road, Philadelphia, Pennsylvania. The DVHCC's mission is to control and reduce healthcare costs for its members through deep discount mass purchasing and other services.

61. For reference, this Court appointed as a Tier 1 Plaintiff, Eastern States Carpenters Benefits Funds ("Carpenters"), which is also a member of the DVHCC. While the work Carpenters did in the litigation in this Court was not shared with any DVHCC members, and has not provided any benefits to date to Plumbers Local 690 in its separate class action litigation, Plaintiffs contend that the work done in the *Carpenters* case should yield substantial litigation benefits for the Plaintiffs herein.

IUOE Welfare Fund

62. International Union of Operating Engineers Local 542 ("IUOE Local 542") is a Taft-Hartley union fund providing health and welfare benefits to its members and their families.

63. IUOE Local 542 resides at 1375 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

64. IUOE Local 542 has represented the interests of working men and women in Eastern Pennsylvania since 1935, including heavy equipment operators in the building and construction industry, along with C & D-Branch Division members who are employed at quarries, landfills, equipment dealers, shipyards, breweries, manufacturing plants, airports, bridges, and public works.

65. Several members of IUOE Local 542 had serious medical conditions, for which Subject Opioids were prescribed. For decades, IUOE Local 542 has had to pay for opioids prescribed to its members. It has also had to pay for the costs of treatment, as certain members have struggled with opioid addiction. Finally, IOUE Local 542 has had to pay for the costs of abatement of the opioid epidemic to address its impacts on the fund and its members

66. Throughout the relevant time period, IUOE Local 542 contracted with Defendant Express Scripts PBM for PBM services, including coverage for the prescriptions of Subject Opioids.

67. The sum total of the opioid prescriptions paid for by IUOE Local 542 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by IUOE Local 542 was hundreds of thousands of dollars.



Case ID: 260703065

68. The Plan Administrator of IUOE Local 542, John Heenan, has served as President of the DVHCC and a member of the Board of Directors.

IUPAT District Council 21

69. IUPAT District Council 21 (“DC 21”), a Taft Hartley union fund providing health and welfare benefits to its member painters, wall coverers, glazers, drywall finishers, paper hangers, decorators and their families.

70. DC 21 resides at 2980 Southampton Road, Philadelphia, Pennsylvania 19154.

71. Several members of DC 21 had serious medical conditions, for which Defendants Opioids were prescribed.

72. Throughout the relevant time period, DC 21 contracted with Defendant Express Scripts PBM for PBM services, including coverage for the prescriptions of Subject Opioids.

73. The sum total of the opioid prescriptions paid for by DC 21 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by DC 21 was hundreds of thousands of dollars.

74. DC 21 is a member of the DVHCC.

LEHB

75. Plaintiff, Law Enforcement Health Benefits, Inc. (“LEHB”), Taft-Hartley union fund providing health and welfare benefits to its member police officers and their families.

76. LEHB resides at 2233 Spring Garden Street, Philadelphia, Pennsylvania 19130.



Case ID: 260703065

77. LEHB is a non-profit organization, incorporated pursuant to the laws of Pennsylvania, which provides medical insurance coverage and prescription, dental and vision benefits to approximately 8,000 police officers and their families. According to Express Scripts, LEHB covered 21,603 "lives" under its plan as of 2017.

78. Several members of LEHB had serious medical conditions, for which opioids were prescribed.

79. For decades, LEHB has had to pay for opioids prescribed to its members. It has also had to pay for the costs of treatment, as certain members have struggled with opioid addiction. Finally, LEHB has had to pay for the costs of abatement of the opioid epidemic to address its impacts on the fund and its members.

80. LEHB contracted with Defendant Express Scripts PBM for PBM services, including coverage for the prescriptions of Subject Opioids.

81. The sum total of the opioid prescriptions paid for by LEHB was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by LEHB was hundreds of thousands of dollars.

82. LEHB is a member of the DVHCC.

Teamsters Local 830

83. Plaintiff Teamsters Local 830 Health & Welfare Fund ("Teamsters Local 830") is a Taft-Hartley union fund providing health and welfare benefits to its members and their families.

84. Teamsters Local 830 resides at 12298 Townsend Road, Philadelphia, Pennsylvania 19154.



Case ID: 260703065

85. Teamsters Local 830 has represented the interests of working men and women in Eastern Pennsylvania (including Montgomery County) since 1953, sponsoring and administering benefits to assist their members with the financial burdens associated with healthcare while also helping provide long-term financial security, access to legal representation and assistance with higher education.

86. Several members of Teamsters Local 830 had serious medical conditions, for which opioids were prescribed.

87. For decades, Teamsters Local 830 has had to pay for opioids prescribed to its members. It has also had to pay for the costs of treatment, as certain members have struggled with opioid addiction. Finally, Teamsters has had to pay for the costs of abatement of the opioid epidemic to address its impacts on the fund and its members.

88. Teamsters Local 830 has contracted with Defendant Express Scripts PBM for PBM services during the relevant time period. Such services included coverage for prescriptions of Subject Opioids.

89. The sum total of the opioid prescriptions paid for by Teamsters Local 830 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by Teamsters Local 830 was hundreds of thousands of dollars.

90. Teamsters Local 830 is a member of the DVHCC.

Laborers District Council Heavy & Highway Fund

91. Plaintiff, Laborers District Council Heavy & Highway Fund ("Laborers DC Fund"), provides health and welfare benefits to its beneficiaries, retirees and their families. Laborers DC Fund resides at 665 North Borad Street, 2nd floor, Philadelphia, PA 19123.



Case ID: 260703065

92. Several members of Laborers DC Fund had serious medical conditions, for which Defendants Opioids were prescribed. Such services included coverage for prescriptions of Subject Opioids.

93. Laborers DC Fund contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

94. The sum total of the opioid prescriptions paid for by Laborers DC Fund was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by Laborers DC Fund was hundreds of thousands of dollars.

95. Laborers DC Fund is a member of the DVHCC.

Steamfitters Local 420

96. Steamfitters Local 420 is a Taft-Hartley union fund providing health and welfare benefits to its members and their families. Local 420 has a business address at 14420 Townsend Road, Philadelphia, Pennsylvania 19154, which is situated in Philadelphia County, Pennsylvania.

97. Steamfitters Local 420 has represented the interests of working men and women in eastern Pennsylvania since 1935, including heavy equipment operators in the building and construction industry, along with C & D-Branch Division members who are employed at quarries, landfills, equipment dealers, shipyards, breweries, manufacturing plants, airports, bridges, and public works.

98. Several members of Steamfitters Local 420 had serious medical conditions, for which Defendants Opioids were prescribed.

99. Steamfitters Local 420 has contracted with Defendant Express Scripts PBM for PBM services during the relevant time period. Such services included coverage for prescriptions of Subject Opioids.

100. The sum total of the opioid prescriptions paid for by Steamfitters Local 420 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by Steamfitters Local 420 was hundreds of thousands of dollars.

101. Steamfitters Local 420 is a member of the DVHCC.

AFSCME District Council 47 Health & Welfare Fund

102. Plaintiff, the American Federation of State, County, and Municipal Employees (AFSCME) District Council 47 Health & Welfare Fund ("AFSCME DC 47"), provides health and welfare benefits to its beneficiaries, retirees and their families in the non-profit, higher education, cultural/arts, and government sectors of the greater Philadelphia area. AFSCME DC 47 resides at 1606 Walnut Street, Philadelphia, Pennsylvania 19103.

103. Several members of AFSCME DC 47 had serious medical conditions, for which Subject Opioids were prescribed.

104. AFSCME DC 47 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

105. The sum total of the opioid prescriptions paid for by AFSCME DC 47 was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by AFSCME DC 47 was hundreds of thousands of dollars.

106. AFSCME DC 47 is a member of the DVHCC.

AFSCME Health and Welfare Fund

107. Plaintiff, the American Federation of State, County, and Municipal Employees (AFSCME) Health & Welfare Fund ("AFSCME Health and Welfare Fund"), provides health and welfare benefits to its beneficiaries, retirees and their families in the non-profit, higher education, cultural/arts, and government sectors.

108. AFSCME Health and Welfare Fund resides at 150 S. 143rd Street, Harrisburg, Pennsylvania 19116.

109. Several members of AFSCME Health and Welfare Fund had serious medical conditions, for which Subject Opioids were prescribed.

110. The sum total of the opioid prescriptions paid for by AFSCME Health and Welfare Fund was hundreds of thousands of dollars. The costs of treatment for opioid abuse paid for by AFSCME Health and Welfare Fund was hundreds of thousands of dollars.

Asbestos Workers Philadelphia Welfare Fund

111. Plaintiff, Asbestos Workers of Philadelphia Welfare Fund ("Asbestos Workers")

112. Asbestos Workers resides at 2014 Hornig Road, Philadelphia, Pennsylvania 19116.

113. Several members of Asbestos Workers had serious medical conditions, for which Subject Opioids were prescribed.

114. The sum total of the opioid prescriptions paid for by Asbestos Workers was thousands of dollars. The costs of treatment for opioid abuse paid for by Asbestos Workers was thousands of dollars.

115. Asbestos Workers is a member of the DVHCC.



Case ID: 260703065

Cement Masons Local 526

116. Cement Masons Local 526 ("Cement Masons 526") resides at 1900 Andrew Street, Munhall, Pennsylvania 15120.

117. Several members of Cement Masons 526 had serious medical conditions, for which Subject Opioids were prescribed.

118. Cement Masons 526 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

119. The sum total of the opioid prescriptions paid for by Asbestos Workers was thousands of dollars. The costs of treatment for opioid abuse paid for by Asbestos Workers was thousands of dollars.

120. Cement Masons 526 is a member of the DVHCC.

Cement Masons Union Local 592 Welfare Plan

121. Cement Masons Union Local 592 Welfare Plan ("Cement Masons 592") resides at 7821 Bartram Ave., Suite 102, Philadelphia, Pennsylvania 19153.

122. Several members of Cement Masons 592 had serious medical conditions, for which Subject Opioids were prescribed.

123. Cement Masons 592 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

124. The sum total of the opioid prescriptions paid for by Cement Masons 592 was thousands of dollars. The costs of treatment for opioid abuse paid for by Cement Masons 592 was thousands of dollars.

125. Cement Masons 592 is a member of the DVHCC.

Central Pennsylvania Teamsters

126. Central Pennsylvania Teamsters ("Central PA Teamsters") resides at 1055 Spring Street, Wyomissing, Pennsylvania 19610.

127. Several members of Central Pa Teamsters had serious medical conditions, for which Subject Opioids were prescribed.

128. The sum total of the opioid prescriptions paid for by Central Pa Teamsters was thousands of dollars. The costs of treatment for opioid abuse paid for by Central Pa Teamsters was thousands of dollars.

129. Central PA Teamsters is a member of the DVHCC.

Chester County Intermediate Unit

130. Chester County Intermediate Unit ("CCIU") resides at 455 Boot Rd., Downingtown, Pennsylvania 19335.

131. Several members of CCIU had serious medical conditions, for which Subject Opioids were prescribed.

132. The sum total of the opioid prescriptions paid for by Asbestos Workers was thousands of dollars. The costs of treatment for opioid abuse paid for by Asbestos Workers was thousands of dollars.

133. CCIU is a member of the DVHCC.

Chester County Water Authority

134. Chester County Water Authority ("Chester Water") resides at 415 Welsh St., Chester, Pennsylvania 19013.

135. Several members of Chester Water had serious medical conditions, for which Subject Opioids were prescribed.

136. The sum total of the opioid prescriptions paid for by Chester Water was thousands of dollars. The costs of treatment for opioid abuse paid for by Chester Water Workers was thousands of dollars.

137. Chester Water is a member of the DVHCC.

Dunmore Borough

138. Dunmore Borough ("Dunmore") resides at 400 S. Blakely St., Dunmore, Pennsylvania 18512.

139. Several members of Dunmore had serious medical conditions, for which Subject Opioids were prescribed.

140. Dunmore contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

141. The sum total of the opioid prescriptions paid for by Dunmore was thousands of dollars. The costs of treatment for opioid abuse paid for by Dunmore was thousands of dollars.

142. Dunmore is a member of the DVHCC.

Graphic Communications National Health and Welfare Fund

143. Graphic Communications National Health and Welfare Fund ("Graphic Communications") resides at 60 Boulevard of the Allies, 5th Floor, Pittsburgh, Pennsylvania 15222.

144. Several members of Graphic Communications had serious medical conditions, for which Subject Opioids were prescribed.

145. Graphic Communications contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

146. The sum total of the opioid prescriptions paid for by Graphic Communications was thousands of dollars. The costs of treatment for opioid abuse paid for by Graphic Communications was thousands of dollars.

147. Graphic Communications is a member of the DVHCC.

IBEW 126 Health and Welfare Fund

148. IBEW 126 Health and Welfare Fund ("IBEW 126") resides at 3455 Germantown Pike, Collegeville, Pennsylvania 19426.

149. Several members of IBEW 126 had serious medical conditions, for which Subject Opioids were prescribed.

150. IBEW 126 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

151. The sum total of the opioid prescriptions paid for by IBEW 126 was thousands of dollars. The costs of treatment for opioid abuse paid for by IBEW 126 was thousands of dollars.

152. IBEW 126 is a member of the DVHCC.

IBEW 654 Health and Welfare Fund

153. IBEW 654 Health and Welfare Fund ("IBEW 654") resides at 3729 Chichester Ave., Boothwyn, Pennsylvania 19061.

154. Several members of IBEW 654 had serious medical conditions, for which Subject Opioids were prescribed.

155. IBEW 654 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

156. The sum total of the opioid prescriptions paid for by IBEW 654 was thousands of dollars. The costs of treatment for opioid abuse paid for by IBEW 654 was thousands of dollars.

157. IBEW 654 is a member of the DVHCC.

Local 274 Health and Welfare Fund

158. Local 274 Health and Welfare Fund ("Local 274") resides at 22 S. 22nd St., Philadelphia, Pennsylvania 19103.

159. Several members of Local 274 had serious medical conditions, for which Subject Opioids were prescribed.

160. Local 274 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

161. The sum total of the opioid prescriptions paid for by Local 274 was thousands of dollars. The costs of treatment for opioid abuse paid for by Local 274 was thousands of dollars.

162. Local 274 is a member of the DVHCC.

Philadelphia Firefighters and Paramedics Health Plan Local 22

163. Philadelphia Firefighters and Paramedics Health Plan Local 22 ("Philadelphia Firefighters") resides at 415 N. 15th St., Philadelphia, Pennsylvania 19123.

164. Several members of Philadelphia Firefighters had serious medical conditions, for which Subject Opioids were prescribed.



Case ID: 260703065

165. The sum total of the opioid prescriptions paid for by Philadelphia Firefighters was thousands of dollars. The costs of treatment for opioid abuse paid for by Philadelphia Firefighters was thousands of dollars.

166. Philadelphia Firefighters is a member of the DVHCC.

Operating Engineers Local 66

167. Operating Engineers Local 66 ("IUOE Local 66") resides at 111 Zeta Dr., Pittsburgh, Pennsylvania 15238-8682.

168. Several members of IUOE Local 66 had serious medical conditions, for which Subject Opioids were prescribed.

169. The sum total of the opioid prescriptions paid for by IUOE Local 66 was thousands of dollars. The costs of treatment for opioid abuse paid for by IUOE Local 66 was thousands of dollars.

170. IUOE Local 66 is a member of the DVHCC.

PSSU Local Unit Health and Welfare Fund

171. PSSU Local Unit Health and Welfare Fund ("PSSU Fund") resides at 2589 Interstate Drive, Harrisburg, Pennsylvania 17110.

172. Several members of PSSU Fund had serious medical conditions, for which Subject Opioids were prescribed.

173. PSSU Fund contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

174. The sum total of the opioid prescriptions paid for by PSSU Fund was thousands of dollars. The costs of treatment for opioid abuse paid for by PSSU Fund was thousands of dollars.



Case ID: 260703065

175. PSSU fund is a member of the DVHCC.

Service Employers' International Union 32 BJ, District 36 BOLR Welfare Trust Fund

176. Service Employees' International Union 32 BJ, District 36 BOLR Welfare Trust Fund ("32BJ") 1515 MARKET St., Suite 1020, Philadelphia, Pennsylvania 19102.

177. Several members of 32 BJ had serious medical conditions, for which Subject Opioids were prescribed.

178. 32 BJ contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

179. The sum total of the opioid prescriptions paid for by 32 BJ was thousands of dollars. The costs of treatment for opioid abuse paid for by 32 BJ was thousands of dollars.

180. 32 BJ is a member of the DVHCC.

Sheet Metals Local 19

181. Sheet Metals Local 19 ("SMW 19") resides at 1301 South Columbus Boulevard, Philadelphia, Pennsylvania 19147.

182. Several members of SMW 19 had serious medical conditions, for which Subject Opioids were prescribed.

183. SMW 19 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

184. The sum total of the opioid prescriptions paid for by SMW 19 was thousands of dollars. The costs of treatment for opioid abuse paid for by SMW 19 was thousands of dollars



Case ID: 260703065

185. SMW 19 is a member of the DVHCC.

Teamsters Health and Welfare Fund of Philadelphia

186. Teamsters Health and Welfare Fund of Philadelphia ("Teamsters of Philadelphia") resides at 12298 Townsend Road, Philadelphia, Pennsylvania 19154.

187. Several members of Teamsters of Philadelphia had serious medical conditions, for which Subject Opioids were prescribed.

188. Teamsters of Philadelphia contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

189. The sum total of the opioid prescriptions paid for by Teamsters of Philadelphia was thousands of dollars. The costs of treatment for opioid abuse paid for by Teamsters of Philadelphia was thousands of dollars.

190. Teamsters of Philadelphia is a member of the DVHCC.

USW Local 10-00086 Merck Employees' Health and Welfare Fund

191. USW Local 10-00086 Merck Employees Health and Welfare Plan ("USW Merck") resides at 601 Dresher Rd, Horsham, Pennsylvania 19044.

192. Several members of USW Merck had serious medical conditions, for which Subject Opioids were prescribed.

193. USW Merck contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

194. The sum total of the opioid prescriptions paid for by USW Merck was thousands of dollars. The costs of treatment for opioid abuse paid for by USW Merck was thousands of dollars.

195. USW Merck is a member of the DVHCC.

West Virginia Pipe Trades Health and Welfare Fund

196. West Virginia Pipe Trades Health and Welfare Fund ("West Virginia Pipes" resides at 6500 Brooktree Rd., Suite 205, Wexford, Pennsylvania 15090.

197. Several members of West Virginia Pipes had serious medical conditions, for which Subject Opioids were prescribed.

198. West Virginia Pipe contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

199. The sum total of the opioid prescriptions paid for by West Virgina Pipes was thousands of dollars. The costs of treatment for opioid abuse paid for by West Virginia Pipes was thousands of dollars.

Avon Grove School District

200. Avon Grove School District ("Avon Grove SD") resides at 375 S. Jennersville Rd., West Grove, Pennsylvania 19390-8401.

201. Several members of Avon Grove SD had serious medical conditions, for which Subject Opioids were prescribed.

202. The sum total of the opioid prescriptions paid for by Avon Grove SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Avon Grove SD was thousands of dollars.

203. Avon Grove SD is a member of the DVHCC.

Coatesville Area School District

204. Coatesville Area School District ("Coatesville SD") resides at 3030 C.G. Zinn Rd., Thorndale, Pennsylvania 19372.

205. Several members of Coatesville SD had serious medical conditions, for which Subject Opioids were prescribed

206. The sum total of the opioid prescriptions paid for by Coatesville SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Coatesville SD was thousands of dollars.

207. Coatesville SD is a member of the DVHCC.

Downingtown Area School District

208. Downingtown Area School District ("Downingtown SD") 540 Trestle Place, Downingtown, Pennsylvania 19335.

209. Several members of Downingtown SD had serious medical conditions, for which Subject Opioids were prescribed.

210. The sum total of the opioid prescriptions paid for by Downingtown SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Downingtown SD was thousands of dollars.

211. Downingtown SD is a member of the DVHCC.

Great Valley School District

212. Great Valley School District ("Great Valley SD") resides at 100 Lindenwood Dr., Malvern, Pennsylvania 19355.

213. Several members of Great Valley SD had serious medical conditions, for which Subject Opioids were prescribed.

214. The sum total of the opioid prescriptions paid for by Great Valley SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Great Valley SD was thousands of dollars.

215. Great Valley SD is a member of the DVHCC.

Kennett Consolidated School District

216. Kennett Consolidate School District ("Kennett SD") resides at 300 East South St., Kennett Square, Pennsylvania 19348.

217. Several members of Kennett SD had serious medical conditions, for which Subject Opioids were prescribed.

218. The sum total of the opioid prescriptions paid for by Kennett SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Kennett SD was thousands of dollars.

219. Kennett SD is a member of the DVHCC.

Lower Moreland Township School District

220. Lower Moreland Township School District ("Lower Moreland SD") resides at 2551 Murray Ave., Huntingdon Valley, Pennsylvania 19006.

221. Several members of Lower Moreland SD had serious medical conditions, for which Subject Opioids were prescribed.

222. The sum total of the opioid prescriptions paid for by Lower Moreland SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Lower Moreland SD was thousands of dollars.

223. Lower Moreland SD is a member of the DVHCC.

Marple Newtown School District

224. Marple Newtown School District ("Marple Newtown SD") resides at 40 Media Line Road, Newtown Square, Pennsylvania 19073.



Case ID: 260703065

225. Several members of Marple Newtown SD had serious medical conditions, for which Subject Opioids were prescribed.

226. Marple Newtown SD contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

227. Marple Newtown SD sum total of the opioid prescriptions paid for by Marple Newtown SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Marple Newtown SD was thousands of dollars.

228. Marple Newtown SD is a member of the DVHCC.

Octorara Area School District

229. Octorara Area School District ("Octorara SD") resides in 228 Highland Road, Atglen, Pennsylvania 19310.

230. Several members of Octorara SD had serious medical conditions, for which Subject Opioids were prescribed.

231. The sum total of the opioid prescriptions paid for by Octorara SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Octorara SD was thousands of dollars.

232. Octorara SD is a member of the DVHCC.

Owen J. Roberts School District

233. Owen J. Roberts School District ("Owen J. Roberts SD") resides at 901 Ridge Rd., Pottstown, Pennsylvania 19465.

234. Several members of Owen J. Roberts SD had serious medical conditions, for which Subject Opioids were prescribed.

235. The sum total of the opioid prescriptions paid for by Owen J. Robert SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Owen J. Roberts SD was thousands of dollars.

236. Owen J. Roberts SD is a member of the DVHCC.

Penn Delco School District

237. Penn Delco School District ("Penn Delco SD") resides at 2821 Concord Road, Aston, Pennsylvania 19014.

238. Several members of Penn Delco SD had serious medical conditions, for which Subject Opioids were prescribed.

239. The sum total of the opioid prescriptions paid for by Penn Delco SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Penn Delco SD was thousands of dollars.

Phoenixville Area School District

240. Phoenixville Area School District ("Phoenixville SD") resided at 836 City Line Ave., Phoenixville, Pennsylvania 19460.

241. Several members of Phoenixville SD had serious medical conditions, for which Subject Opioids were prescribed

242. The sum total of the opioid prescriptions paid for by Phoenixville SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Phoenixville SD was thousands of dollars.

243. Phoenixville SD is a member of the DVHCC.

Quakertown Community School District

244. Quakertown Community School District ("Quakertown SD") resides at 100 Commerce Drive, Quakertown, Pennsylvania 18951.

245. Several members of Quakertown SD had serious medical conditions, for which Subject Opioids were prescribed.

246. Quakertown SD contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

247. The sum total of the opioid prescriptions paid for by Quakertown SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Quakertown SD was thousands of dollars.

248. Quakertown SD is a member of the DVHCC.

Southeast Delco School District

249. Southeast Delco School District ("Southeast Delco SD") resides R 1560 Delmar Drive, Folcroft, Pennsylvania 19032.

250. Several members of Southeast Delco had serious medical conditions, for which Subject Opioids were prescribed.

251. Southeast Delco contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

252. The sum total of the opioid prescriptions paid for by Southeast Delco SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Southeast Delco SD was thousands of dollars.

253. Southeast Delco SD is a member of the DVHCC.

Spring-Ford Area School District

254. Spring-Ford Area School District ("Spring-Ford SD") resides at 857 South Lewis Rd., Royersford, Pennsylvania 19468.

255. Several members of Spring-Ford SD had serious medical conditions, for which Subject Opioids were prescribed.

256. The sum total of the opioid prescriptions paid for by Spring-Ford SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Spring-Ford SD was thousands of dollars.

257. Spring-Ford SD is a member of the DVHCC/

Tredyffrin-Easttown School District

258. Tredyffrin-Easttown School District ("Tredyffrin-Easttown SD") resides at 940 West Valley Rd., Suite 1700, Wayne, Pennsylvania 19087.

259. Several members of Tredyffrin-Easttown SD had serious medical conditions, for which Subject Opioids were prescribed.

260. The sum total of the opioid prescriptions paid for by Tredyffrin-Easttown SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Tredyffrin-Easttown SD was thousands of dollars.

261. Tredyffrin-Easttown SD is a member of the DVHCC.

Upper Darby School District

262. Upper Darby School District ("Upper Darby SD") resides at 8201 Lansdowne Ave., Upper Darby, Pennsylvania 19032.

263. Several members of Upper Darby SD had serious medical conditions, for which Subject Opioids were prescribed.

264. Upper Darby contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

265. The sum total of the opioid prescriptions paid for by Upper Darby SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Upper Darby SD was thousands of dollars.

266. Upper Darby SD is a member of the DVHCC.

Upper Dublin School District

267. Upper Dublin School District ("Upper Dublin SD") resides at 1580 Fort Washington Ave., Maple Glen, Pennsylvania 19083.

268. Several members of Upper Dublin SD had serious medical conditions, for which Subject Opioids were prescribed.

269. The sum total of the opioid prescriptions paid for by Upper Dublin SD was thousands of dollars. The costs of treatment for opioid abuse paid for by Upper Dublin SD was thousands of dollars.

270. Upper Dublin SD is a member of the DVHCC.

West Chester Area School District

271. West Chester Area School District ("West Chester SD") resides at 782 Springdale Dr., Exton, Pennsylvania 19341.

272. Several members of West Chester SD had serious medical conditions, for which Subject Opioids were prescribed.

273. Upper Dublin contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

274. The sum total of the opioid prescriptions paid for by West Chester SD was thousands of dollars. The costs of treatment for opioid abuse paid for by West Chester SD was thousands of dollars.

275. West Chester SD is a member of the DVHCC

NECA Local Union 313 IBEW Welfare Fund

276. NECA Local Union 313 Welfare Fund ("NECA 313 IBEW") resides at 501 Carr Rd., Suite 220, Wilmington, Delaware 19809-2800.

277. Several members of NECA 313 IBEW had serious medical conditions, for which Subject Opioids were prescribed.

278. NECA 313 IBEW contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

279. The sum total of the opioid prescriptions paid for by NECA 313 IBEW was thousands of dollars. The costs of treatment for opioid abuse paid for by NECA 313 IBEW was thousands of dollars.

280. NECA 313 IBEW is a member of the DVHCC.

Roofers Local 30 Combined Health and Welfare Fund

281. Roofers Local 30 Combined Health and Welfare Fund ("Roofers Local 30") resides at 1 Battery March Park, Suite 317, Quincy, Massachusetts 02169.

282. Several members of Roofers Local 30 had serious medical conditions, for which Subject Opioids were prescribed.

283. Roofers Local 30 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

284. The sum total of the opioid prescriptions paid for by Roofers Local 30 was thousands of dollars. The costs of treatment for opioid abuse paid for by Roofers Local 30 was thousands of dollars.

285. Roofers Local 30 is a member of the DVHCC.

School Cafeteria Employees' Union 634

286. School Cafeteria Workers Union 634 ("School Cafeteria 634") resides at 911 Ridgebrook Road, Sparks, Maryland 21152.

287. Several members of School Cafeteria 634 had serious medical conditions, for which Subject Opioids were prescribed.

288. The sum total of the opioid prescriptions paid for by School Cafeteria 634") was thousands of dollars. The costs of treatment for opioid abuse paid for by School Cafeteria 634 was thousands of dollars.

289. School Cafeteria 634 is a member of the DVHCC.

Health Fund No. 917

290. Health Fund No. 917 ("Health Fund 917") resides at 22 North Tyson Avenue, 1st Floor, Floral Park, New York 11001.

291. Several members of Health Fund 917 had serious medical conditions, for which Subject Opioids were prescribed.

292. Health Fund 917 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

293. The sum total of the opioid prescriptions paid for by Health Fund 917 was thousands of dollars. The costs of treatment for opioid abuse paid for by Health Fund 917 was thousands of dollars.

294. Health Fund 917 is a member of the DVHCC.

AFSCME Local 54

295. AFSCME Local 54 ("AFSCME 54") resides at 425 Eagle Rock Avenue, Suite 105, Roseland, New Jersey 07068.

296. Several members of AFSCME 54 had serious medical conditions, for which Subject Opioids were prescribed.

297. The sum total of the opioid prescriptions paid for by AFSCME 54 was thousands of dollars. The costs of treatment for opioid abuse paid for by AFSCME 54 was thousands of dollars.

298. AFSCME 54 is a member of the DVHCC.

AFSCME Local 590 Health and Welfare Fund

299. AFSCME Local 590 Health and Welfare Fund ("AFSCME 590") resides at 425 Eagle Rock Avenue, Suite 105, Roseland, New Jersey 07068.

300. Several members of AFSCME 590 had serious medical conditions, for which Subject Opioids were prescribed

301. The sum total of the opioid prescriptions paid for by AFSCME 590 was thousands of dollars. The costs of treatment for opioid abuse paid for by AFSCME 590 was thousands of dollars.

302. AFSCME 590 is a member of the DVHCC.

IAM District 15 Health Fund

303. IAM District 15 Health Fund ("IAM District 15") resides at 140 Sylvan Avenue, Suite 106, Englewood Cliffs, New Jersey 07632.

304. Several members of IAM District 15 had serious medical conditions, for which Subject Opioids were prescribed.

305. IAM District 15 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

306. The sum total of the opioid prescriptions paid for by IAM District 15 was thousands of dollars. The costs of treatment for opioid abuse paid for by IAM District 15 was thousands of dollars.

307. IAM District 15 is a member of the DVHCC.

IBEW 81 Health and Welfare Fund

308. IBEW 81 Health and Welfare Fund ("IBEW 81") resides at 425 Eagle Rock Avenue, Suite 105, Roseland, New Jersey 07068.

309. Several members of IBEW 81 had serious medical conditions, for which Subject Opioids were prescribed.

310. The sum total of the opioid prescriptions paid for by IBEW 81 was thousands of dollars. The costs of treatment for opioid abuse paid for by IBEW 81 was thousands of dollars.

311. IBEW 81 is a member of the DVHCC.

IBEW 607 Health and Welfare Fund

312. IBEW 607 Health and Welfare Fund ("IBEW 607") resides at 425 Eagle Rock Avenue, Suite 105, Roseland, New Jersey 07068.

313. Several members of IBEW 607 had serious medical conditions, for which Subject Opioids were prescribed.

314. The sum total of the opioid prescriptions paid for by IBEW 607 was thousands of dollars. The costs of treatment for opioid abuse paid for by IBEW 607 was thousands of dollars.

315. IBEW 607 is a member of the DVHCC.

Ironworkers Local 11 Welfare Fund

316. Ironworkers Local 11 Welfare fund ("Ironworkers 11") resides at 12 Edison Place, Springfield, New Jersey 07081.

317. Several members of Ironworkers 11 had serious medical conditions, for which Subject Opioids were prescribed.

318. The sum total of the opioid prescriptions paid for by Ironworkers 11 was thousands of dollars. The costs of treatment for opioid abuse paid for by Ironworkers 11 was thousands of dollars.

319. Ironworkers 11 is a member of the DVHCC.

Teamsters Health and Welfare of Philadelphia and Vicinity

320. Teamsters Health and Welfare of Philadelphia and Vicinity ("Philly Teamsters") resides at 2500 McClellan Ave., Suite 140, Pennsauken, New Jersey 08109.

321. Several members of Philly Teamsters had serious medical conditions, for which Subject Opioids were prescribed.

322. Philly Teamsters contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

323. The sum total of the opioid prescriptions paid for by Philly Teamsters was thousands of dollars. The costs of treatment for opioid abuse paid for by Philly Teamsters was thousands of dollars.

324. Philly Teamsters is a member of the DVHCC.

Teamsters Industrial Employees' Welfare Fund

325. Teamsters Industrial Employees; Welfare Fund ("Teamsters Industrial") resides at 303 Molnar Drive, Elmwood Park, New Jersey 07407.

326. Several members of Teamsters Industrial had serious medical conditions, for which Subject Opioids were prescribed.

327. Teamsters Industrial contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

328. The sum total of the opioid prescriptions paid for by Teamsters Industrial was thousands of dollars. The costs of treatment for opioid abuse paid for by Teamsters Industrial was thousands of dollars.

329. Teamsters Industrial is a member of the DVHCC.

Teamsters Joint Council No. 53 Health and Welfare Fund

330. Teamsters Joint Council No. 53 Health and Welfare Fund ("Teamsters Local 53") resides at 2500 McClellan Avenue, Suite 140, Pennsauken, New Jersey 08109.

331. Several members of Teamsters Local 53 had serious medical conditions, for which Subject Opioids were prescribed.

332. Teamsters Local 53 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

333. The sum total of the opioid prescriptions paid for by Teamsters Local 53 was thousands of dollars. The costs of treatment for opioid abuse paid for by Teamsters Local 53 was thousands of dollars.

334. Teamsters Local 53 is a member of the DVHCC.

Teamsters Local 641 Welfare Fund

335. Teamsters Local 641 Welfare Fund ("Teamsters Local 641") resides at 714 Rahway Avenue, 2nd Floor, Union, New Jersey 07083.

336. Several members of Teamsters Local 641 had serious medical conditions, for which Subject Opioids were prescribed.

337. Teamsters Local 641 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

338. The sum total of the opioid prescriptions paid for by Teamsters Local 641 was thousands of dollars. The costs of treatment for opioid abuse paid for by Teamsters Local 641 was thousands of dollars.

339. Teamsters Local 641 is a member of the DVHCC.

Trucking Employees of North Jersey Welfare Fund

340. Trucking Employees of North Jersey Welfare Fund ("Trucking Employees") resides at 303 Molnar Drive, Elmwood Park, New Jersey 07407.

341. Several members of Trucking Employees had serious medical conditions, for which Subject Opioids were prescribed.

342. Trucking Employees contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

343. The sum total of the opioid prescriptions paid for by Trucking Employees was thousands of dollars. The costs of treatment for opioid abuse paid for by Trucking Employees was thousands of dollars.

344. Trucking Employees is a member of the DVHCC.

UAW Local 259 Social Security

345. UAW Local 259 Social Security ("UAW 259") resides at 140 Sylvan Avenue, Suite 106, Englewood Cliffs, New Jersey 07632.

346. Several members of UAW 259 had serious medical conditions, for which Subject Opioids were prescribed.

347. The sum total of the opioid prescriptions paid for by UAW 259 was thousands of dollars. The costs of treatment for opioid abuse paid for by UAW 259 was thousands of dollars.

348. UAW 259 is a member of the DVHCC.

UAW Local 259N and Local 365 Welfare Fund

349. UAW Local 259N and Local 365 Welfare Fund ("UAW 259N/Local 365") resides at 140 Sylvan Avenue, Suite 106, Englewood Cliffs, New Jersey 07632.

350. Several members of UAW 259N/Local 365 had serious medical conditions, for which Subject Opioids were prescribed.

351. UAW 259N/Local 365 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

352. The sum total of the opioid prescriptions paid for by UAW 259N/Local 365 was thousands of dollars. The costs of treatment for opioid abuse paid for by UAW 259N/Local 365 was thousands of dollars.



Case ID: 260703065

353. UAW 259N/Local 365 is a member of the DVHCC.

UFCW Local 152 Health and Welfare Fund

354. UCFW Local 152 Health and Welfare Fund ("UFCW 152") resides at 3120 Fire Road, Suite 201, Egg Harbor Township, New Jersey 08234.

355. Several members of UFCW 152 had serious medical conditions, for which Subject Opioids were prescribed.

356. UFCW 152 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

357. The sum total of the opioid prescriptions paid for by UFCW 152 was thousands of dollars. The costs of treatment for opioid abuse paid for by UFCW 152 was thousands of dollars.

358. UFCW 152 is a member of the DVHCC.

UFCW Local 360 Health Fund

359. UFCW Local 360 Health Fund (UFCW 360") resides at 400 Commerce Lane, West Berlin, New Jersey 08091.

360. Several members of UFCW 360 had serious medical conditions, for which Subject Opioids were prescribed.

361. UFCW 360 contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

362. The sum total of the opioid prescriptions paid for by UFCW 360 was thousands of dollars. The costs of treatment for opioid abuse paid for by UFCW 360 was thousands of dollars.

363. UFCW 369 is a member of the DVHCC.

UFCW Tri-State Health and Welfare Fund

364. UFCW Tri-State Health and Welfare Fund ("UCFW Tri-State") resides at 3120 Fire Road, Suite 201, Egg Harbor Township, New Jersey 08234.

365. Several members of UFCW Tri-State had serious medical conditions, for which Subject Opioids were prescribed.

366. UFCW Tri-State contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

367. The sum total of the opioid prescriptions paid for UFCW Tri-State was thousands of dollars. The costs of treatment for opioid abuse paid for by UFCW Tri-State was thousands of dollars.

368. UFCW Tri-State is a member of the DVHCC.

United Independent Union Welfare Fund

369. United Independent Union Welfare Fund ("UIU Welfare Fund") resides at 22 W. Church Street, Blackwood, New Jersey 08012.

370. Several members of UIU Welfare Fund had serious medical conditions, for which Subject Opioids were prescribed and paid for by Plaintiff.

371. The sum total of the opioid prescriptions paid for by UIU Welfare Fund was thousands of dollars. The costs of treatment for opioid abuse paid for by UIU Welfare Fund was thousands of dollars.

372. UIU Welfare Fund is a member of the DVHCC.

AFSCME Care Plan of Ohio

373. AFSCME Care Plan of Ohio ("ASFCME Ohio") resides at 1603 East 27th Street, Cleveland, Ohio 44114.



Case ID: 260703065

374. Several members of AFSCME Ohio had serious medical conditions, for which Subject Opioids were prescribed and paid for by Plaintiff.

375. The sum total of the opioid prescriptions paid for by AFSCME Ohio was thousands of dollars. The costs of treatment for opioid abuse paid for by AFSCME Ohio was thousands of dollars.

376. AFSCME Ohio is a member of the DVHCC.

Ohio Laborers' District Council – Ohio Contractors

377. Ohio Laborers' District Council – Ohio Contractors ("Ohio Laborers") resides at 800 Hillsdowne Rd., Westerville, Ohio 43081-3302.

378. Several members of Ohio Laborers had serious medical conditions, for which Subject Opioids were prescribed and paid for by Plaintiff.

379. The sum total of the opioid prescriptions paid for by Ohio Laborers was thousands of dollars. The costs of treatment for opioid abuse paid for by Ohio Laborers was thousands of dollars.

Toledo Electrical Welfare Fund

380. Toledo Electrical Welfare Fund ("Toledo Electrical") resides at 727 Lime City Road, Suite 200, Rossford, Ohio 43460.

381. Several members of Toledo Electrical had serious medical conditions, for which Subject Opioids were prescribed and paid for by Plaintiff.

382. Toledo Electrical contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

383. The sum total of the opioid prescriptions paid for by Toledo Electrical was thousands of dollars. The costs of treatment for opioid abuse paid for by Toledo Electrical was thousands of dollars.

384. Toledo Electrical is a member of the DVHCC.

UFCW Union-Employer Health and Welfare Fund Local 880 and PFIE

385. UFCW Union-Employer Health and Welfare Fund Local 880 and PFIE ("UFCW Local 880/PFIE") resides at 9199 Market Place, Suite 1, Broadview Heights, Ohio 44147.

386. Several members of UFCW 880/PFIE had serious medical conditions, for which Subject Opioids were prescribed and paid for by Plaintiff.

387. UFCW Local 880/PFIE contracted with Defendant Express Scripts PBM for PBM services during the relevant time period.

388. The sum total of the opioid prescriptions paid for by UFCW Local 880/PFIE was thousands of dollars. The costs of treatment for opioid abuse paid for by UFCW Local 880/PFIE was thousands of dollars.

389. UFCW Local 880/PFIE is a member of the DVHCC.

GENERAL AVERMENTS AS TO ALL PLAINTIFFS

390. The distribution and diversion of opioids into and throughout Pennsylvania and the Plaintiff States created the foreseeable opioid crisis and opioid public nuisance for which Plaintiffs here seeks relief on behalf of itself and its beneficiaries.

391. Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the

Plaintiffs seek relief. Categories of past continuing sustained damages include, *inter alia:* (1) payment for opioid prescriptions which were not medically necessary or appropriate; (2) payment of the costs for providing medical care, additional therapeutic care, other prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (3) payment of the costs for providing treatment, counseling, and rehabilitation services; and (4) payment of the costs for providing treatment of infants born with opioid-related medical conditions. These damages were suffered, and continue to be suffered directly, by the Plaintiffs.

392. Plaintiffs also seek the means and monies to continue abate the epidemic created by Defendants' wrongful and/or unlawful conduct, which it has begun, on behalf of itself and all others similarly situated, by forcing Defendants to comply with their obligations under the law.

393. The distribution and diversion of opioids into and throughout Pennsylvania and the Plaintiff States created the foreseeable opioid crisis and opioid public nuisance for which the Plaintiffs seek relief.

394. The Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiffs seek relief. Categories of past continuing, sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic care, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths (including the costs of naloxone or Narcan and similar emergency medications); (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment

of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered, directly by the Plaintiffs and their beneficiaries.

395. The Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct, by forcing Defendants to comply with their obligations under the law.

## DEFENDANTS[6] [7]

## THE MANUFACTURER DEFENDANTS

### Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Inc., a Non-Defendant, Bankrupt Manufacturer

396. Defendant, Purdue Pharma L.P., is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.

397. Defendant Purdue Pharma Inc. is a New York corporation with its principal place of business in Stamford, Connecticut.

398. Defendant The Purdue Frederick Company, Inc. is a New York corporation with

its principal place of business in Stamford, Connecticut.

[6] All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

[7] Defendants include the above-referenced entities, as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.



Case ID: 260703065

399. Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc. (collectively, “Purdue”) are in the business of manufacturing, promoting, marketing, and distributing brand opioids in the United States and Pennsylvania.

400. No case involving opioids can be complete with describing the conduct of Purdue. Purdue has been at the heart of the opioid crisis for decades. However, Purdue has evaded liability for its conduct by filing for bankruptcy. For that reason alone, Purdue is included only as a Bankrupt Manufacturer, not a Defendant.

401. Purdue’s conduct is relevant to the Plaintiffs’ claims against Defendants for at least two reasons. First, Purdue’s conduct provides necessary detail, context and relevancy as to the conduct of the Defendants, as Defendants’ conspired and agreed with, and were aiders and abettors of, each other’s conduct, both directly and indirectly, in the scheme to ensure that opioids were sold throughout the country throughout the relevant time period, by and through the Distributor Defendants, Pharmacy Defendants and PBM Defendants under the circumstances described herein. As a result, Purdue’s conduct involves acts and practices for which the Defendants may be held jointly and severally liable, directly and indirectly as co-conspirators and aiders and abettors. Second, Defendants were materially involved in and aided and abetted Purdue’s unlawful conduct, for which they may be held jointly and severally liable, directly and as co-conspirators and aiders and abettors of Purdue.

402. Purdue’s opioid brands are well known. The generic opioids sold by Defendants Teva, Mylan and others, were generics of Purdue’s flagship brands.

403. Purdue’s opioids include, but are not limited to, the following:



Case ID: 260703065

a. **OxyContin** (oxycodone hydrochloride extended release), which is a Schedule II opioid agonist tablet first approved in 1995 and indicated for the "management of pain severe enough to require daily, around-the clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, OxyContin was indicated for the "management of moderate to severe pain when a continuous, around the clock opioid analgesic is needed for an extended period of time."

b. **MS Contin** (morphine sulfate extended release), which is a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, MS Contin was indicated for the "management of moderate to severe pain when a continuous, around-the clock opioid analgesic is needed for an extended period of time."

c. **Dilaudid** (hydromorphone hydrochloride), which is a Schedule II opioid agonist first approved in 1984 (injection) and 1992 (oral solution and tablet) and indicated for the "management of pain in patients where an opioid analgesic is appropriate."

d. **Dilaudid-HP** (hydromorphone hydrochloride), which is a Schedule II opioid agonist injection first approved in 1984 and indicated for the "relief of moderate-to-severe pain in opioid-tolerant patients who require larger than usual doses of opioids to provide adequate pain relief."

e. **Butrans** (buprenorphine), which is a Schedule II opioid partial agonist transdermal patch first approved in 2010 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Butrans was indicated for the "management of moderate to severe pain when a continuous, around-the clock opioid analgesic is needed for an extended period of time."

f. **Hysingla ER** (hydrocodone bitartrate), which is a Schedule II opioid agonist tablet first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

g. **Targiniq ER** (oxycodone hydrochloride and naloxone hydrochloride), which is a Schedule Il combination product of oxycodone, an opioid agonist, and naloxone, an opioid antagonist, first approved in 2014 and indicated for the management of pain severe enough to require daily, around-the-clock, long term opioid treatment and for which alternative treatment options are inadequate.



Case ID: 260703065

404. In May 2007, Purdue entered into a "Consent Judgment" in an action with the People of the State of Illinois. Plaintiffs do not seek to enforce the provisions of the Consent Judgment and do not seek relief against Purdue under state consumer protection laws based on conduct related to Purdue's promotional and marketing practices regarding OxyContin for any time up to and including the effective date of the Consent Judgment, May 8, 2007. Plaintiffs highlight, however, that the Consent Judgment did not shield Purdue, its affiliates, or its co-promoters from liability for future violations of the law, including violations of the UTPCPL. Plaintiffs also highlight that the Consent Judgment did not shield Purdue, its affiliates, or its co-promoters from liability for promotional and marketing practices, during any span of time, regarding controlled-release drugs which do not contain oxycodone as an active pharmaceutical ingredient. This would include, but would not be limited to, Purdue's MS Contin, Butrans and Hysingla drugs.

**The Teva Defendants.**

405. Defendant, Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") acquired Cephalon, Inc. Defendant, Teva Pharmaceuticals USA, Inc. ("Teva USA"), is a wholly-owned subsidiary of Teva Ltd., an Israeli corporation. Teva USA is a Delaware corporation with its principal place of business in Pennsylvania (collectively, these defendants are referred to herein as **"Teva"**).

406. Teva is in the business of manufacturing, promoting, selling, and distributing both brand and generic opioids in the United States and Pennsylvania.



Case ID: 260703065

407. Teva's opioid brands include the following:

a. **Actiq** (fentanyl citrate), which is a Schedule II opioid agonist lozenge (lollipop) first approved in 1998 and indicated for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

b. **Fentora** (fentanyl citrate), which is a Schedule II opioid agonist buccal tablet (similar to plugs of smokeless tobacco) first approved in 2006 and indicated for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

408. In addition to these brands, Teva has marketed and sold Vivitrex and Vivitrol.

409. Teva's generic opioids are listed hereinbelow under Subject Opioids.

410. USA and Cephalon work together closely to market and sell the Teva Defendants' products in the United States. Teva USA conducts Teva Ltd.'s sales and marketing activities for the Teva Defendants in the United States and has done so since Teva Ltd.'s October 2011 acquisition of Cephalon. Teva USA holds out Actiq, Fentora, Vivitrex, Vivitrol and generics as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The United States Food and Drug Administration ("FDA") approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Plaintiff's regions, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse effects.

411. As described below, Teva adopted the similar limited distribution strategy for its brands as was employed by Mallinckrodt for its branded drug, H.P. Acthar Gel.



Case ID: 260703065

412. In November 1998, the FDA granted restricted marketing approval for Actiq, limiting its lawful promotion to cancer patients experiencing pain. The FDA specified that Actiq should not be marketed for off-label uses, stating that the drug must be prescribed solely to cancer patients.

413. In 2008, Cephalon pleaded guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million in fines, damages, and penalties.

414. On September 29, 2008, one year after Purdue, Cephalon entered into a five-year Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services. Among other things, the agreement required Cephalon to send doctors a letter advising them of the settlement terms and giving them a means to report questionable conduct of its sales representatives; required disclosure of payments to doctors on its web site; and required regular certification that the company has an effective compliance program.

415. Like Purdue, however, despite the 2008 CIA, Teva/Cephalon did not end its illegal promotion to Teva opioids.

**The Johnson & Johnson Defendants.**

416. Defendant, Janssen Pharmaceuticals, Inc., ("Janssen") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Defendant, Johnson & Johnson ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Defendant, Ortho-McNeil- Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal, place of business in Titusville, New Jersey.

417. Defendant, Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., ("Janssen") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Collectively, J&J and Janssen are referred to herein as the "Johnson & Johnson Defendants.").

418. The Johnson & Johnson Defendants' are in the business of manufacturing, promoting, selling, and distributing brand opioids in the United States, including Pennsylvania and the Plaintiff States. The Johnson & Johnson Defendants' opioid brands include, or have included, the following:

a. **Duragesic** (fentanyl), which is a Schedule II opioid agonist transdermal patch first approved in 1990 and indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the clock, long-term opioid treatment and for which alternative treatment options are inadequate."

b. **Nucynta ER** (tapentadol extended release), which is a Schedule II opioid agonist tablet first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Nucynta ER was indicated for the "management of moderate to severe chronic pain in adults [and] neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." The DPN indication was added in August 2012.

c. **Nucynta** (tapentadol), which is a Schedule II opioid agonist tablet and oral solution first approved in 2008 and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older."

419. Another corporation, **Assertio** Therapeutics, Inc. f/k/a Depomed, Inc. (named as a Defendant herein), acquired the rights to Nucynta and Nucynta ER for

$1.05 billion from Janssen pursuant to a January 15, 2015 Asset Purchase Agreement, which closed on April 2, 2015.

420. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in sales.

**Allergan/Actavis/Watson.**

421. Defendant, Allergan plc, is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis plc, acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in March 2015. Prior to that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012. The combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis plc in October 2013.

422. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit (collectively, these defendants are referred to herein as "Actavis").

423. Actavis is in the business of marketing and selling brand opioids in the United States and the Plaintiffs' regions.. Actavis' opioid brands include, but are not necessarily limited to, the following:

> a. Kadian (morphine sulfate extended release), which is a Schedule II opioid agonist capsule first approved in 1996 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Kadian was indicated for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time.

424. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

Abbott

425. Defendant Abbott Laboratories, Inc. is a domestic BCA organized under the laws of Illinois.

426. Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois, and Abbott Laboratories, Inc. is a Illinois corporation with its principal place of business in Abbott Park, Illinois (collectively "***Abbott***").

427. Abbott was primarily engaged in the promotion, and distribution of opioids, nationally, and in Pennsylvania and the Plaintiff States, due to a co-promotional agreement with the now-infamous Purdue. Pursuant to that agreement between 1996 and 2006, Abbott actively promoted, marketed and distributed Purdue's opioid products.

428. With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.6 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

429. Abbott, as part of the co-promotional agreement, helped make OxyContin into the largest-selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received 25 to 30 percent of all net sales for prescriptions written by doctors its sales force called on. This agreement was in operation from 1996 to 2002, following which Abbott continued to receive a residual payment of 6 percent of net sales up through at least 2006.

430. Abbott heavily incentivized its sales staff to push OxyContin, offering $20,000 cash prizes and luxury vacations to top performers. Abbott used extravagant, medieval-themed titles to co-promote OxyContin with Purdue. Sales representatives were called “royal crusaders” and “knights” in the “Royal Court of OxyContin”, executives referred to in memos as the “Wizard of OxyContin”, “Supreme Sovereign of Pain Management” and the “Empress of Analgesia”. The head of pain care sales, Jerry Eichorn, was the “King of Pain” and signed memos simply “'King.”

431. In one particular memo to sales representatives, two Abbott sales reps received high accolades from “The Kingdom of Abbott Pain Management” for a “particularly outstanding Crusader success story.”

432. In this same memo, the ”Empress of Analgesia” pushed sales reps to hone their focus on 50 key surgeons and anesthesiologists, more specifically to “target those who have the potential to widely prescribe OxyContin and Vicoprofen on a consistent basis each month.” The “King of Pain” encouraged sales representatives to use emotion in their sales tactics, and then supplied examples, both based on vague science:

Did Doctor X have disruptive callbacks from Patient Y today, unhappy with his bread- through pain levels on Percocet? Explain how OxyContin smooth, sustained blood level throughout 12 hours should alleviate this problem by keeping patients comfo1table. Is Surgeon A concerned about the euphoria Patient Bis experiencing from Vicodin? Tell your doctor that, with its longer half-life, OxyContin has fewer such effects.

433. Abbott and Purdue sales representatives wooed doctors with food, gifts, and influence peddling, techniques which netted them both a huge portion of profits from opioid sales in Pennsylvania, Plaintiffs' States, and nationwide. The sales forces of Abbott and Purdue worked in tandem, holding regular strategy sessions.

Assertio

434. Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. (***"Assertio"*** or ***"Depomed"***) is a Delaware corporation with its principal place of business in Lake Forrest, Illinois. Depomed acquired Nucynta (tapentadol immediate-release oral tablets) and Nucynta ER (tapentadol extended-release tablets) from J&J in April of 2015 and began to manufacture, market, sell and distribute Nucynta® in the U.S., including in Pennsylvania. Depomed also manufactures, markets, sells and distributes Lazanda (fentanyl).

435. On information and belief, Depomed entered a Commercialization Agreement with Collegium Pharmaceutical, Inc. (Collegium) in January of 2018 that granted Collegium the right to commercialize Nucynta and Nucynta ER in the U.S. Collegium assumed all commercialization responsibilities for Nucynta effective January 9, 2018, including sales and marketing. Pursuant to the Commercialization

Agreement, Depomed received a royalty on all Nucynta and Nucynta ER revenues based on certain net sales thresholds, with a minimum royalty of $135 million per year during the first four years of the agreement. Additionally, Depomed retained certain rights to co-promote Nucynta products.

436. Depomed actively promoted and continues to promote the sale and use of its opioid products throughout the U.S., including Pennsylvania and the Plaintiff States. In 2015, Depomed paid over $2.11 million to physicians and hospitals across the U.S., including in Pennsylvania and the Plaintiff States, to promote widespread prescribing, sales and use of Nucynta and Nucynta ER. On information and belief, from 2013 through 2015, Depomed paid $1.07 million to physicians and hospitals across the U.S., including in Pennsylvania and the Plaintiff States, to promote the sale and use of Lazanda. Additionally, from 2012 to 2017, Depomed paid $1,071,000 to non-profit patient advocacy groups and medical societies to promote opioid prescribing and enhance the acceptance of opioids for non-cancer pain. Specifically, Depomed made payments to several industry front groups, including the Academy of Integrative Pain Management ($43,491.95), American Academy of Pain Medicine ($332,100.00), AAPM Foundation ($304,605.00), American Chronic Pain Association ($54,670.00), American Pain Society ($288,750.00), American Society of Pain Management Nursing ($25,500.00), and U.S. Pain Foundation ($22,000.00).

437. Depomed established a training module called the "Depomed Pain Medicine Education Program" with the American Academy of Pain Medicine, which can be found at the American Academy of Pain Medicine (AAPM) Education Center. The training module appears on the AAPM webpage and "was designed to further sales



Case ID: 260703065

specialists' knowledge of the fundamentals of pain medicine and gain confidence and credibility when interacting with health care clinicians."

438. The Pain Medicine Education Program promotes use of opioids for chronic pain in older adults and has modules entitled: "Strategies for Success with Chronic Opioid Therapy", "Pain Management with Older Adults," and "'Pain and Pathways: Understanding Chronic Low Back Pain."

**Mylan**

439. Defendant Mylan Laboratories, Inc. now known as Mylan Inc., is a Pennsylvania corporation with its headquarters located at 1500 Corporate Drive, Canonsburg, Pennsylvania.

440. Mylan is in the business of marketing and selling opioids in the United States and Northampton County. Mylan's opioid brands include, but are not necessarily limited to, the following:

a. Fentanyl (Fentanyl extended-release transdermal system), a Schedule II opioid patch indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that does not respond to other painkillers. (Equivalent to Duragesic made by Johnson & Johnson).

b. Buprenorphine Hydrochloride Sublingual, a generic, Schedule III analgesic tablet used in the treatment of chronic pain, opiate dependence and pain. (Equivalent to Subutex made by RB Pharmaceuticals Limited Corporation).

c. Butorphanol Tartrate (nasal spray), a generic, Schedule IV opiate agonist-antagonist which is indicated for the management of pain when an opioid analgesic is appropriate. (Equivalent to Stadol NS made by Bristol-Myers Squibb Company).

d. Morphine Sulfate (Morphine sulfate extended-release tablets), a generic, Schedule II opioid agonist, indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. Morphone

sulfate extended-release 100 mg and 200 mg tables are for use in opioid-tolerant patients only. These tablet strengths may cause fatal respiratory depression when administered to patients not previously exposed to opioids. (Equivalent to MS Contin made by Purdue Pharma L.P.).

e. Propoxyphene Hydrochloride, a generic, Schedule IV opioid analgesic which is indicated for the relief of mild to moderate pain.

f. Propoxyphene Hydrochloride and Acetaminophen, a generic, Schedule IV opiate analgesic structurally related to methadone that is indicated for the relief of moderate pain.

g. Propoxyphene Napsylate and Acetaminophen, a generic, Schedule IV narcotic analgesic combination.

h. Oxycodone and Acetaminophen, a generic, Schedule II opioid agonist whose principal therapeutic action is analgesia.

i. Oxycodone Hydrochloride, a generic, Schedule II opioid analgesic, indicated for the management of moderate to severe pain where the use of an opioid analgesic is appropriate.

j. Oxycodone Hydrochloride and Aspirin, a generic, Schedule II opioid agonist indicated for use of moderate to moderately severe pain.

Collegium

441. Defendant Collegium Pharmaceutical, Inc. is a Massachusetts corporation and is located at 100 Technology Center Drive, Suite 300, Stoughton, Massachusetts 02072.

442. Collegium entered the prescription opioid market after the addictive nature of long-term opioid therapy, widespread diversion, and the devastating public-health consequences of opioid overprescribing were already well documented.

443. Rather than distancing itself from those practices, Collegium acquired and aggressively marketed branded opioid products, including Nucynta, while employing promotional strategies that encouraged continued opioid prescribing and generated substantial revenues from chronic opioid therapy.

444. On information and belief, Collegium entered into a Commercialization Agreement with co-Depomed in January of 2018 that granted Collegium the right to commercialize Nucynta and Nucynta ER in the U.S.

445. Collegium assumed all commercialization responsibilities for Nucynta effective January 9, 2018, including sales and marketing. Pursuant to the Commercialization Agreement, Collegium paid Depomed a royalty on all Nucynta and Nucynta ER revenues based on certain net sales thresholds, with a minimum royalty of $135 million per year during the first four years of the agreement.

446. Through these activities, Collegium knowingly perpetuated and profited from the same market dynamics that had fueled the nationwide opioid epidemic for years.

447. Its conduct foreseeably increased opioid utilization, resulting in Third-Party Payors paying millions of dollars for unnecessary, excessive, and inappropriate opioid prescriptions.

Novartis

448. Defendant Novartis AG a/k/a Novartis Inc. and Novartis Pharmaceuticals Corporation (collectively ***"Novartis"***) is a Delaware corporation and is located at One Health Plaza, East Hanover, New Jersey, 07936-1080.

449. Novartis manufactures, promotes, markets, distributes and sells opioids in Plaintiffs' geographical area and throughout the nation. At all times relevant, Novartis manufactured, marketed, and sold opioids, including fentanyl and oxycodone products, throughout the United States and Plaintiffs' geographic area. Novartis manufactured, marketed, and sold opioids throughout Pennsylvania, in violation of the duties owed to the



Case ID: 260703065

Citizens of the Commonwealth of Pennsylvania in sufficient quantities to be a proximate cause of inordinate deaths and injuries throughout the Commonwealth.

450. As a generic manufacturer, Novartis failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users Novartis could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Novartis had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover , in the manufacture and sale of its opioid products, Novartis failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur.

Sun

451. Defendant Sun Pharmaceuticals ("Sun") is a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd. It manufactures, markets, and distributes drugs, including opioids, in the United States, including in Pennsylvania.

452. Sun's website states that its "US headquarters are in Cranbury, New Jersey," that it has "distribution and customer service teams at multiple locations across the country," and that "Sun Pharma's latest acquisition of a majority interest in Ranbaxy Laboratories Limited (Ranbaxy) and its Ohm Laboratories facilities in the [sic] New Jersey makes it the largest Indian pharma company in the US market . . . ." Sun Pharma USA, http://www.sunpharma.com/usa (last visited August 21, 2020).

453. Sun is a global generic pharmaceutical company that manufactures many pharmaceuticals, including opioids. On information and belief, Sun's principal place of business is Princeton, New Jersey. At all times relevant to this Complaint, Sun Pharmaceutical manufactured opioids that were sold in Plaintiffs' regions.

Zydus

454. Defendant Zydus Pharmaceuticals (USA) Inc. is a company located in New Jersey.

455. At all relevant times, Zydus manufactured, market ed, and sold generic opioids throughout the United States and Pennsylvania. Zydus manufactured, marketed, and sold opioids throughout Pennsylvania and Plaintiffs' locales, in violation of the duties owed to the Plaintiffs and their members and beneficiaries in sufficient quantities to be a proximate cause of inordinate injuries and deaths.

456. As a generic manufacturer, Zydus failed to effectively and adequately communicate warnings in the labels of their product-s to prescribers and users. Zydus could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Zydus had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Zydus failed to report suspicious orders in violation of its duties under the Controlled Substances Act and Pennsylvania law and knowingly allowed widespread diversion to occur.



Case ID: 260703065

## THE PHARMACY DEFENDANTS

**Walgreens**

457. WALGREENS BOOTS ALLIANCE, INC. was incorporated in September of 2014 under the laws of the State of Delaware, and has headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. On December 31, 2014, WALGREENS BOOTS ALLIANCE, INC. became the parent company of WALGREEN CO., pursuant to a merger and corporate reorganization into a holding company structure. WALGREEN CO. continues to be a subsidiary of WALGREENS BOOTS ALLIANCE, INC., and operates retail drug stores with pharmacies across the United States, including within Pennsylvania and the Plaintiff States, as it did before the merger. The WALGREEN EASTERN CO., INC., at all times relevant hereto, was involved in the regulated distribution of opioid medications to WALGREEN CO.'s retail pharmacies in Pennsylvania and the Plaintiff States. Hereinafter, the WALGREEN CO. and WALGREEN EASTERN CO., INC. are collectively referred to as "***WALGREENS***". WALGREENS is authorized to conduct business in Pennsylvania.

458. The WALGREENS Defendants are DEA registered entities licensed to distribute prescription opioids throughout the country, Pennsylvania and the Plaintiff States. At all relevant times, WALGREENS distributed opioids throughout Pennsylvania.

459. During all relevant times, WALGREENS has sold and continues to sell prescription opioids at locations within Pennsylvania and the Plaintiff States and in close proximity to hospitals, clinics, and other healthcare facilities serving patients of healthcare systems throughout Pennsylvania and the Plaintiff States.

460. WALGREENS has engaged in consensual commercial dealings with Plaintiff and Plaintiffs' beneficiaries and has purposefully availed itself of the advantages of conducting

business with and within Pennsylvania and the Plaintiff States.

**Walmart Inc.**

461. WALMART INC. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation that is authorized to do business in Pennsylvania with its principal place of business located in Bentonville, Arkansas.

462. Defendant WALMART STORES EAST, L.P. is a Delaware limited partnership that authorized to do business in Pennsylvania with its principal place of business located in Bentonville, Arkansas. The Defendants WALMART, INC. f/k/a Wal-Mart Stores, Inc., and WALMART STORES EAST, L.P. shall collectively be referred to as "WALMART".

463. WALMART, at all times relevant hereto, was involved in the regulated distribution of opioid medications to WALMART retail pharmacies located in Pennsylvania and the Plaintiff States.

464. WALMART, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, WALMART distributed prescription opioids throughout the United States, including Pennsylvania and the Plaintiff States.

465. At all relevant times, WALMART has sold and continues to sell prescription opioids at locations within Pennsylvania and the Plaintiff States, and in close proximity to hospitals, clinics, and other healthcare facilities serving patients of healthcare systems within Pennsylvania and the Plaintiff States.

466. WALMART has engaged in consensual commercial dealings with Pennsylvania and its citizens and has purposefully availed itself of the advantages of conducting business

with and within Pennsylvania.

**CVS Entities**

467. CVS Health Corporation is a Delaware corporation with its principal place of business in Rhode Island. Defendant CVS PHARMACY, INC. is a Rhode Island corporation that is authorized to do business in Pennsylvania with a principal place of business in Rhode Island and is a wholly owned subsidiary of CVS Health Corporation. CVS PHARMACY, INC., through its DEA registered parent company, is licensed to distribute prescription opioids throughout the United States, including Pennsylvania and the Plaintiff States.

468. Defendant CVS INDIANA, LLC is an Indiana limited liability corporation that is authorized to do business in Pennsylvania with a principal place of business in Indiana and a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS INDIANA, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the United States.

469. Defendant CVS RX SERVICES, INC. is a New York corporation that is authorized to do business in Pennsylvania with a principal place of business in Rhode Island and a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS RX SERVICES, INC., through its DEA registered parent company, is licensed to distribute prescription opioids throughout the United States.

470. Defendant CVS TN DISTRIBUTION CENTER, LLC is a Tennessee limited liability corporation that is authorized to do business in Pennsylvania and is a wholly owned or indirectly owned subsidiary of CVS Health Corporation. CVS TN DISTRIBUTION CENTER, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the United States.

471. Defendant PENNSYLVANIA CVS PHARMACY, LLC is a Pennsylvania limited liability company. It is a wholly owned or indirectly owned subsidiary of CVS Pharmacy, Inc. PENNSYLVANIA CVS PHARMACY, LLC, through its DEA registered parent company, is licensed to distribute prescription opioids throughout the United States, including Pennsylvania.

472. Defendants CVS PHARMACY, INC., CVS INDIANA, LLC, CVS RX SERVICES, INC., CVS TN DISTRIBUTION CENTER, LLC, PENNSYLVANIA CVS PHARMACY, LLC are collectively referred to herein as ***"CVS."*** CVS, including through its DEA registered parent company, subsidiaries, and affiliated entities, operates as a distributor and/or as a chain of retail pharmacies throughout Pennsylvania. CVS is among the top distributors of opioids in Pennsylvania. In addition to dispensing and distributing opioids, CVS has marketed opioids during the relevant times.

473. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Defendant CVS distributed prescription opioids throughout the United States, including Pennsylvania.

474. At all relevant times, Defendant CVS has sold and continues to sell prescription opioids at locations within Pennsylvania and the Plaintiff States, and in close proximity to hospitals, clinics, and other healthcare facilities serving patients of healthcare systems in Pennsylvania and the Plaintiff States. Defendant CVS has engaged in consensual commercial dealings with Pennsylvania and the Plaintiff States, and their citizens, and has purposefully availed itself of the advantages of conducting business within Pennsylvania and the Plaintiff States.

475. Defendant CVS sold and shipped unreasonable quantities of opioids into

Plaintiffs' communities and continued to do so despite extensive and blatant evidence of diversion at many facilities in Pennsylvania and the Plaintiff States. Defendant CVS also dispensed unreasonable quantities of opioids in Pennsylvania and the Plaintiff States from its own retail pharmacies in Pennsylvania and the Plaintiff States despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Pennsylvania law and the laws of the Plaintiff States. Defendant CVS has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores but continues to allow inappropriate and harmful distribution of opioids.

476. Defendant CVS is one of the top distributors of opioids in Pennsylvania. CVS also operates a vast network of Pennsylvania pharmacies which dispense opioids. CVS violated its obligations under Pennsylvania law as both a large-scale distributor and a chain pharmacy to prevent abuse.

477. The opioid crisis described herein is a direct and foreseeable result of Defendant CVS's actions. Plaintiffs were damaged by Defendant CVS's actions.

478. CVS's deceptive, unfair, and unconscionable actions are continuing and continue to harm Plaintiffs.

479. Defendant CVS's deceptive, unfair, and unconscionable actions and statements about opioids and about its efforts to comply with its duties under Pennsylvania law to prevent abuse and diversion were material, were false, were made with intent to deceive, were made with the intent that the recipient of the information or another party reasonably rely upon it and were made to further a scheme to defraud consumers and prescribers in violation of Pennsylvania Statutes.



Case ID: 260703065

**Target**

480. Defendant Target Corporation (***"Target"***) is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

481. At all times relevant to this Amended Complaint, Target dispensed prescription opioids and engaged in the retail sale of opioids throughout the United States, including in and around Pennsylvania and the Plaintiff States.

**Wegmans**

482. Defendant Wegmans is a New York corporation with its principal place of business in Rochester, New York. Wegmans' designated the following as service of process on the Secretary of State as Agent: Corporate Secretary, Wegmans Food Markets, Inc., 100 Wegmans Market Street, Legal Department, Rochester, New York, 14624.

483. At all times relevant to this Complaint, Wegmans dispensed prescription opioids and engaged in the retail sale of opioids throughout the United States, including in and around Pennsylvania and the Plaintiff States, additionally through the migration of opioids both within the Commonwealth and interstate.

484. Wegmans' main distributors for opioids are McKesson, Anda, Rochester Co-operative, and the Harvard DrugGroup.

**Costco**

485. Defendant Costco is a Washington corporation with its principal place of business in Washington. At all times relevant to this Complaint, Costco dispensed prescription opioids and engaged in the retail sale of opioids throughout the United States, including in and near Pennsylvania and the Plaintiff States.



Case ID: 260703065

486. On January 19, 2017, the Department of Justice issue a press release titled, "Costco Wholesale to Pay $11.75 Million to Settle Allegations of Lax Pharmacy Controls - Costco Pharmacies Filled Prescriptions that Were Improper or Incomplete."[8] Additionally, it provides, "Costco Wholesale will pay $11.75 million to settle allegations that its phamlacies violated the Controlled Substances Act when they improperly filled prescriptions for controlled substances. The settlement resolves allegations that Costco pharmacies filled prescriptions that were incomplete, lacked valid Drug Enforcement Administration (DEA) numbers or were for substances beyond various doctors' scope of practice. Additionally, the settlement resolves allegations that Costco failed to keep and maintain accurate records for controlled substances at its pharmacies and centralized fill locations."[9] Further, it provides, "'Under the settlement reached Jan. 18, 2017, Costco acknowledges that between Jan. 1, 2012 and Dec. 31, 2015, certain Costco Pharmacies dispensed controlled substances inconsistent with their compliance obligations under the Controlled Substances Act (CSA) and its implementing regulations. The violations include filling prescriptions from practitioners who did not have a valid DEA number; incorrectly recording the practitioner's DEA number; filling prescriptions outside the scope of a practitioner's DEA registration; filling prescriptions that did not contain all the required information;

---

[8] https://www.justice.gov/opa/pr/costco-wholesale-pay-1175-million-settle-allegations-lax-pharmacycontrols#:~:text=Costco%20Wholesale%20to%20Pay%20%2411.75%20Million%20to%20Settle%20Allegations%20of%20Lax%20Pharmacy%20Controls,-Thursday%2C%20January%2019&text=Costco%20Wholesale%20will%20pay%20%2411.75,filled%20prescriptions%20for%20controlled%20substances.

[9] *Id.*



Case ID: 260703065

failing to maintain accurate dispensing records; and failing to maintain records for their central fill locations in Sacramento, California, and Everett, Washington."[10]

Spivak Inc. d/b/a Verree Pharmacy and the Individual Defendants

487. Spivak Inc. d/b/a Verree Pharmacy (collectively, "**Verree**") is a Pennsylvania corporation. Verree was owned by Individual Defendant Mitchell Spivak.[11] Verree was registered with the Pennsylvania pharmacy licensing boards. The Drug Enforcement Administration (DEA) granted Verree a registration on September 8, 1987, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 7960 Verree Road, Philadelphia, Pennsylvania.

488. Individual Defendant Mitchell Spivack is an individual residing at 328 Carson Terrace, Huntingdon Valley, Montgomery County, Pennsylvania 19006. Spivack owned and managed Verree at all times relevant to this Complaint. He was registered with the Pennsylvania pharmacy licensing board as Verree's pharmacist-in-charge at all times relevant to this Complaint. He was registered as a pharmacist as of March 16, 1982.

489. Individual Defendant Todd Goodman is an individual residing at 157 Pheasant Lane, Huntingdon Valley, Montgomery County, Pennsylvania 19006. Goodman worked as a pharmacist at Verree Pharmacy at all times relevant to this Complaint. He was registered with the Pennsylvania pharmacy licensing board as licensed pharmacist as of August 15, 1986.[12]

---

[10] *Id.*
[11] State records indicate that Mitchell Spivak owns Spivack, Inc. However, another entity may now be using the d/b/a Verree Pharmacy. Nonetheless, at all times material hereto, Verree Pharmacy was the d/b/a trade name of Spivack, Inc. and was owned by Mitchell Spivack.
[12] While state records indicate that Goodman is also an attorney licensed in Pennsylvania, Plaintiffs are unaware if Goodman ever acted as counsel for Verree with respect to any of the

490. Individual Defendant Eric Pestrack is an individual residing at 1844 Webster Lane, Maple Glen, Montgomery County, Pennsylvania 19002. Pestrack worked as a pharmacy technician at Verree Pharmacy at all times relevant to this Complaint.

491. Individual Defendant Lee Kamp is an individual residing at 839 Kendrick Street, Philadelphia, Pennsylvania 19111. Kamp worked as a pharmacy technician at Verree Pharmacy at all times relevant to this Complaint.

492. Spivack, Goodman, Pestrack and Kamp are collectively referred to as the Individual Defendants.

493. The role of Verree and the Individual Defendants in the opioid epidemic in Pennsylvania, especially in Philadelphia and the suburbs, is detailed in the criminal prosecution of Verree and the Individual Defendants at *U.S. v. Spivak Inc. d/b/a Verree Pharmacy, Mitchell Spivack, Todd Goodman, Eric Pestrack and Lee Kamp*, Civil Action No. 22-343 (E.D.Pa.) Kearney, J.) (The "**Verree Case**")

**The Pharmacy Benefits Manager (PBM) Defendants**

494. The Pharmacy Benefit Manager Defendants (***"PBM Defendants"***) are defined below. At all relevant times the PBM Defendants acted as the gatekeepers of prescription drugs, including opioids. Pharmacy benefit managers (***"PBMs"***) establish formularies which govern which drugs are reimbursed and how they are prescribed and paid for. They determine quantity (refill) limits and pre-authorization requirements. They negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. They establish reimbursement rates for the drugs dispensed. PBMs earn

---

conduct or claims at issue.



Case ID: 260703065

revenue from at least the following sources: fees from health plans and employers, rebates and other incentives from drug manufacturers, including administrative fees and volume bonuses, and fees from maintaining pharmacy networks.

**Express Scripts**

495. Defendant, EXPRESS SCRIPTS HOLDING COMPANY n/k/a EVERNORTH HEALTH (***"EverNorth"***), is a Delaware corporation with its principal place of business at 1 Express Way, Saint Louis, MO 63121. EverNorth may be served in Pennsylvania through its registered agent: CT Corporation System, located at 600 n. 2nd Street, Suite 401 Harrisburg, PA 17101-1071.

496. Defendant, EXPRESS SCRIPTS, INC. (***"ESI"***), is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri, is a pharmacy benefit management company, and is a wholly-owned subsidiary of EverNorth. ESI has been registered to do business in Pennsylvania since at least 1987 and has an active license with the Pennsylvania Department of Health Professions (the original of which was applied for in 1991).

497. EverNorth and ESI are collectively referred to as ***"Express Scripts"***.

498. ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy Inc. are both located at One Express Way in St. Louis Missouri. They are wholly owned subsidiaries of Express Scripts conducting mail order pharmacy services, including the mailing of prescriptions of opioids to citizens of Pennsylvania.

499. For instance, during 2006-2012 time period, Express Scripts mail order pharmacies purchased over 951 million in opioids from Mylan. Express Scripts mail order

pharmacies purchased Mylan's opioids directly from Mylan, and indirectly through distributors.

500. Also, during the 2006-2012 time period, Express Scripts mail order pharmacies purchased over $1 billion in Indivior's opioids and Optum's mail order pharmacy purchased over $21 million.

501. Defendant CuraScript, Inc. is a Delaware corporation with its principal place of business at 6276 Lee Vista Blvd., Orlando, FL 32822, and is a wholly-owned subsidiary of ESI. CuraScript, Inc. was acquired by ESI in January 2004. At relevant times hereto, CuraScript, Inc. has operated a specialty pharmacy.

502. In October 2005, Express Scripts acquired the capital stock of Priority Healthcare Corporation ("Priority") for $1.3 billion. The acquisition was accomplished through the merger of wholly-owned CuraScript, Inc. with and into Priority. Priority is headquartered at 255 Technology Park, Lake Mary, Florida. Since the acquisition, Priority has done business as Priority Healthcare Distribution, Inc. d/b/a CuraScript SD Specialty Distribution ("CuraScript SD"). (CuraScript, Inc. and CuraScript SD are collectively referred to as "CuraScript".) The combined Priority and CuraScript became one of the nation's largest specialty pharmacy and distribution companies with more than $3 billion in annual revenue.

503. CuraScript SD's corporate headquarters are now located at 255 Technology Park, Lake Mary, Florida 32746, the address of Priority.

504. In 2012, ESI acquired its rival, Medco Health Solutions Inc. (***"Medco"***), in a $29.1 billion deal. As a result of the merger, EverNorth was formed and became the largest PBM in the nation, filing a combined 1.4 billion prescriptions for employers and insurers[13]. In

---

[13] Peter Frost, *Express Scripts closes $29.1 billion purchase of Medco,* Los Angeles Times (April 3, 2012), http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403



Case ID: 260703065

March of 2018, ESI made a $67 billion bid to purchase Cigna. After the companies merged, the clout of ESI has grown even more.

505. According to the Drug Channels Institute, Express Scripts was the second highest ranking PBM in 2017 with twenty-four (24%) of the industry market share.[14]

506. According to the Pharmacy Benefit Management Institute, in 2015, Express Scripts was the top ranking PBM nationwide with twenty-six percent (26%) of the industry market share.

507. Express Scripts "provides pharmacy benefits to 83 million members. Of these, more than 27 million obtain their pharmacy benefit coverage through one of Express Scripts' standard formularies and more people use the [Express Scripts'] National Preferred Formulary than any other formulary in the U.S."[15]

508. Express Scripts standard formularies are "governed by [its] National Pharmacy & Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[16] Express Scripts touts that the "the P&T Committee considers the drug's safety and efficacy," and the company "fully complies with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy."[17] Express Scripts "re-evaluates its National Preferred Formulary on an annual basis. It looks at the

---

[14] *Cigna-Express Scripts: Vertical Integration and PBM's Medical-Pharmacy Future, supra* note 34.

[15] Express Scripts, *The Value of Active Pharmacy Management: express Scripts 2018 National Preferred Formulary*, 2018, https://www.multivu.com/players/English/8149241-express-scripts-national-preferred-formulary-2018/, at 1.

[16] Express Scripts, *Express Scripts 2017 Annual Report,* https://expressscriptsholdingco.gcs-web.com/static-files/76a9c03e-2e6b-4f6b-80de-fe80d 4ebc826, at 11.

[17] *Id*



Case ID: 260703065

formulary first form a clinical perspective to ensure that it provides access to safe and effective medications in all therapy classes."[18]

509. At all relevant times hereto, Express Scripts offered pharmacy benefit management services, including mail-order pharmacy services, a nationwide retail pharmacy network, and maintained a national formulary or formularies that are used nationwide, including in the Counties. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for dispensing and reimbursement of such opioids in Pennsylvania.

510. Express Scripts derives substantial revenue managing pharmacy benefits in Pennsylvania through several different means, including, but not limited to, providing PBM services, formularies and pharmaceutical networks to the Counties.

511. Express Scripts has been the PBM for most, if not all, of the Plaintiffs during the relevant time period to the present.

512. Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom Express Scripts provides PBM services. Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product. Express Scripts sometimes pays a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. Express Scripts also receives administrative fees from pharmaceutical manufacturers participating in its rebate program. The administrative fees paid to Express

---

[18] Express Scripts, *Smart Formulary Management*, Jan. 2, 2014, http://la.express-scripts.com/lab/insights/drug-options/smart-formulary-management, at 2 (emphasis added).

Scripts by manufacturers for participation in the rebate program sometimes reach 3.5% of the average wholesale price ("AWP") of the rebated products, meaning that as prices of opioids increased so did the size of Express Scripts fees.

513. It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees. Express Scripts does not explain all of the services it claims to provide for which it receives administrative fees, nor does it explain how any of these payments actually influence its formulary design. Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which revenues are shared with its customers:

> [I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers]. ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues described in the Financial Disclosure and, accordingly, [customer] acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues.

**<u>Medco</u>**

514. Express Scripts, Inc. acquired Defendant Medco Health Solutions Inc. in 2012 in a $29.1 billion deal. As a result of the merger, Defendant Express Scripts Holding Company was formed and became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.



Case ID: 260703065

515. Medco can be served at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

516. Defendant Merck-Medco was established in mid-2002 by Merck & Co as its pharmacy benefits management subsidiary, as a separate, publicly traded company.

517. According to its SEC filing, in August 2003, Merck & Co. approved a spin-off, called Medco Health Solutions, Inc., a "wholly owned subsidiary of Merck that provides pharmacy benefit management se1vices to approximately 62 million members."

518. Upon information and belief, Merck-Medco is the corporate predecessor of Medco Health Solutions Inc., collectively referred to herein as "Medco".

519. Medco derives substantial revenue managing pharmacy benefits in Plaintiffs' geographic area through the services it provides and the formulary it maintains in its relationships with health plans.

520. Many of the Plaintiffs in this case originally contracted with Medco prior to its merger with Express Scripts in 2012. As a result, Medco managed the opioid prescriptions of Plaintiffs' beneficiaries which then were assumed by Express Scripts.

## FACTS COMMON TO ALL CLAIMS

### Background of the Opioid Industry

521. Since the Civil War, America has been exposed to opioids—first heroin and now heroin-like substitutes that are addicting and killing people throughout the country far too often.

522. Heroin was first introduced as a legal pharmaceutical product by the Bayer Company in 1898. Heroin was manufactured to treat pain, but because it is highly addictive



Case ID: 260703065

and deadly, by 1924, heroin was declared an illegal narcotic.

523. Opioids include brand-name drugs as well as generic drugs, and are all derived from or possess properties similar to heroin.

524. In 1916, two German scientists created a drug called oxycodone—an opioid—which was introduced as a substitute for heroin. Oxycodone is manufactured by modifying an organic compound called thebaine. In 1939, oxycodone was introduced in the United States of America. By 1970, oxycodone was listed as a Schedule II drug in the Controlled Substances Act. Every opioid drug included in this Complaint is a Schedule II drug, meaning, *inter alia*, it is designated as potentially leading to severe psychological or physical dependence and thus is considered extremely dangerous.

525. Oxycodone, Percocet and Vicodin are all opioids.

526. Today, as a result of the national crisis created by the over-prescription and abuse of opioids, and the publicity and attention it has generated, it is now known that these opioids are highly addictive to the degree that they should not be widely prescribed for chronic or casual pain, as have been due to the Defendants' acts and practices described in this Complaint. Internal employees of the Defendant companies agree, but their views have been overridden by corporate decisions to exalt profits over sensible health policies respecting opioids.

527. Initially, opioids were effective in treating short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care. These categories of pain are different from long-term pain or "chronic pain". This case concerns the acts and practices of the Defendants to cause their opioids to be widely prescribed for the treatment of chronic and casual pain, despite their highly addictive properties and dangerous propensities.



Case ID: 260703065

**The National Opioid Epidemic**

528. The past two decades have been characterized by increasing abuse and diversion of prescription drugs, including opioid medications, in the United States.[19]

529. Prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[20]

530. By 2011, the United States Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

- The death toll from overdoses of prescription painkillers has more than tripled in the past decade.
- More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).
- Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.
- The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—

[19] *See* Richard C. Dart *et al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[20] Katherine M. Keyers *et al.*, *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid use and Abuse in the United States,* 104 Am. J. Pub. Health e52 (2014).



Case ID: 260703065

reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

- Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.
- Almost 5,500 people start to misuse prescription painkillers every day.[21]

531. The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[22]

532. Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[23]

533. Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[24]

---

[21] *See* Press Release, Centers For Disease Control and Prevention, United States Department of Health and Human Services, Prescription Painkillers Overdoses at Epidemic Levels (November 1, 2011), at: https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html

[22] *See* Robert M. Califf *et al.*, *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016), at: http://www.nejm.org/doi/full/10.1056/NEJMsr1601307

[23] *See* Centers for Disease Control and Prevention, United States Department of Health and Human Services, Provisional Counts of Drug Overdose Deaths, (August 8, 2016), at: https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf

[24] *See* Centers for Disease Control and Prevention, United States Department of Health and Human Services, *Today's Heroin Epidemic*, at: https://www.cdc.gov/vitalsigns/heroin/index.html

534. Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[25]

535. The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. ***Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use,*** specifically among persons who report past-year dependence or abuse. The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[26]

536. The societal costs of prescription drug abuse are "huge."[27]

537. Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 115 Americans lose their lives after overdosing on opioids.[28]

---

[25] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[26] *See* Rose A. Rudd *et al.*, *Increases in Drug and Opioid Overdose Deaths – United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[27] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter, "Brief of HDMA"].

[28] Opioid Crisis, NIH, National Institute on Drug Abuse, at: https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis (citing at note 1, CDC/NCHS, National Vital Statistics System, Mortality. CDC Wonder, Atlanta, GA: United States Department of Health and Human Services, CDC; 2017, at: https://wonder.cdc.gov)



Case ID: 260703065

538. The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[29] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[30]

539. The United States opioid epidemic is continuing, and drug overdose nearly tripled during 1999-2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[31]

540. The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[32]

541. Every day brings a new revelation regarding the depth of the opioid plague. To name one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because pervasive, deadly opioids are "everywhere" and mistaken as candy.[33]

542. In 2016, the President of the United States declared an opioid and heroin epidemic.[34]

---

[29] *Id.*

[30] *Id.* (citing at note 2, Florence CS, Zhou C, Luo F, Xu L, *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States,* 2013. *Med Care.* 2016;54(10):901-906. doi:10.1097/MLR.0000000000000625).

[31] *See* Rose A. Rudd *et al.*, *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[32] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies,* 374 N. Eng. J. Med. 1253 (2016).

[33] Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[34] *See* Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription



Case ID: 260703065

543. The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[35] Meanwhile, the manufacturers and distributors of brand name prescription opioids extract billions of dollars of revenue from the addicted American public.

544. Such manufacturers and distributors could not succeed in their plans to sell opioids without the Defendants named in this Lawsuit. The defendants here are critical players in the chain of opioid distribution, who had the power to stop the opioid use and abuse complained of herein, but chose profits over public health and safety.

**The Opioid Epidemic in Pennsylvania and Plaintiff States**.

545. On January 10, 2018, the Governor of Pennsylvania signed an executive order declaring the opioid and heroin epidemic a statewide disaster emergency and the Governor has continued to renew the emergency since.

546. Plaintiffs' beneficiaries were and continue to be victims of the well documented opioid crisis. Seventy-eight percent (78%) of Pennsylvania counties had overdose death rates higher than the national average.

547. In 2016, 4,642 drug-related overdose deaths were reported by Pennsylvania coroners and medical examiners, an increase of 37 percent from 2015. In 2016, approximately 13 people died of a drug-related overdose each day.

---

Opioid and Heroin Epidemic Awareness Week").

[35] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), at: https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf



Case ID: 260703065

548. The Pennsylvania drug-related overdose death rate in 2016 was 36.5 per 100,000 people, an increase from 26.7 per 100,000 people in 2015. The national drug overdose death rate in 2015 was 16.3 per 100,000 people.

549. The presence of an opioid, illicit or prescribed by a doctor, was identified in 85 percent of drug-related overdose deaths in Pennsylvania in 2016.

550. Fentanyl and fentanyl–related substances (FRS) were the most frequently identified in decedents (52 percent of deaths), a significant increase from 2015 when fentanyl/FRS were noted in 27 percent of deaths.

551. The number of Pennsylvania adults who had friends or family members experiencing problems with opioid abuse also rose sharply from 2014 to 2023.

552. Opioids are dangerous narcotics that can be deadly because they can cause patients to stop breathing and suffocate.

553. Opioids are also highly addictive. Patients using opioids for more than a few days can experience severe withdrawal symptoms if they stop taking the drugs, including: anxiety, insomnia, pain, blurry vision, rapid heartbeat, chills, panic attacks, nausea, vomiting, and tremors. Withdrawal can last so long and be so painful that it is difficult to stop taking opioids.

554. Putting patients on opioids puts them at risk. Patients who take opioids at higher doses and for longer periods face higher and higher risk of addiction and death. According to a report issued by the Philadelphia Field Division (PFD) of the Drug Enforcement Administration (DEA), in September 2018, the following grim statistics and findings apply to the opioid epidemic in Pennsylvania:

- The high availability and corresponding demand leading to the

misuse of illicit and prescription opioids is a crisis without geographic, demographic, or socioeconomic boundaries in Pennsylvania.

- Implementation of legislation influencing prescription opioid has resulted in a decrease in availability; however, a corresponding decrease in demand is less certain.
- Pennsylvania experienced 5,456 drug-related overdose deaths in 2017. This number represents a rate of 43 deaths per 100,000, far exceeding the national average of 22 per 100,000 in 2017.
- Increased fentanyl availability and misuse contributed to a 65 percent overall increase in drug-related overdose deaths in Pennsylvania between 2015 and 2017.
- Interviews of drug users and treatment personnel indicate that users often experience multiple overdoses in the course of their drug use, and widespread naloxone availability has resulted in many lives saved; however, naloxone availability is one component of a continuum of care in a person with opioid use disorder's prevention, intervention, treatment and long term recovery.
- Multi-disciplinary efforts between public health and public safety have resulted in documented progress in some Pennsylvania counties, thereby establishing a model for implementing strategies and achieving success in combating the opioid crisis.



Case ID: 260703065

- Nationally, the overall opioid prescribing rate declined from 2012 to 2016, and in 2016, the prescribing rate fell to the lowest level in more than 10 years, at 66.5 prescriptions per 100 persons.
- According to data from the Centers for Disease Control (CDC), Pennsylvania practitioners wrote an average of 69.5 opioid prescriptions per 100 persons in 2016 (most recent data available, the 26th highest in the country. This ranking was a drop from Pennsylvania having the sixth highest rate in the country in both 2014 and 2015.
- The two most commonly prescribed opioid CPDs in Pennsylvania are oxycodone and hydrocodone. In 2017, Pennsylvania pharmacies filled more than 2.4 million prescriptions for almost 260 million dosage units of oxycodone products, and 1.6 million prescriptions for 146 million dosage units of hydrocodone products. The total dosage units of oxycodone and hydrocodone products dispensed in 2017 equates to approximately 32 dosage units for every Pennsylvanian.

555. The Defendants took advantage of addiction to make money. For decades, physicians reserved opioids for treating severe short-term pain, or for patients near the end of life. But the tradition of limiting opioids to short-term treatment ended after Purdue introduced OxyContin and began marketing it and other opioids with false and deceptive claims.

556. OxyContin's sole active ingredient is oxycodone, a molecule nearly identical to heroin. Purdue later introduced another dangerous drug, Butrans, which releases opioids

into thebody from a skin patch. Then Purdue introduced Hysingla, which contains yet another opioid. Almost all of Purdue's business is selling opioids.

557. The Defendants' deception imposed lasting hardship on the people who lost their loved ones. Because of the Defendants' conduct, misfeasance, malfeasance and non-feasance, too many children in Pennsylvania lost their parents. Too many parents in Pennsylvania buried their children. Too many grandparents in Pennsylvania are raising their grandchildren.

558. Patients who survive addiction need lengthy, difficult, and expensive treatment. People who are addicted to opioids are often unable to work. The addiction of parents can forcetheir children into foster care. Babies are born addicted to opioids, because they are exposed to the drugs in the womb.

559. The Defendants' misconduct has imposed heavy costs on the people of Pennsylvania and other Plaintiff States. Intensive care for a newborn who has been harmed by opioids can cost $200,000, even before the baby comes home from the hospital. The injuries from addiction and overdose are staggering. For example, the White House Council of Economic Advisers determined that a middle estimate of the cost of each death from opioid overdose is $9.6 million.

560. Defendants permitted, perpetuated and/or peddled falsehoods to keep patients away from safer alternatives.

561. Each part of the scheme earned the Defendants more money from Pennsylvania opioid sales and caused more addiction and death here in our Commonwealth. And each Defendant participated in and profited from the scheme in Pennsylvania, and other States, as set forth below.

## THE MANUFACTURER DEFENDANTS

### The Manufacturer Defendants' Unlawful Acts and Practices in Marketing and Selling Opioids for the Treatment of Chronic Pain

562. The Manufacturer Defendants named in this lawsuit manufacture, distribute, market, and/or sell some form of opioids. As identified herein, these drugs are collectively referred to as the Subject Drugs.

563. Throughout the 1980s, primary care professionals understood opioids to be dangerous as a result of their addictive qualities and were reluctant to prescribe them for long-term or chronic pain. As a result, the Manufacturer Defendants began a marketing campaign designed to "destigmatize" opioids as addictive, dangerous medicines. They created a false narrative designed to persuade primary care professionals that opioids were the best and most effective way of treating pain, while withholding information about the dangerous, addictive propensity of opioids.

564. In order to successfully "destigmatize" opioids, the Manufacturer Defendants spent hundreds of millions of dollars: (a) developing educational and advertising materials that misrepresented the risks and benefits of opioids when used to treat chronic pain; (b) widely disseminating such materials; (c) deploying sales representatives who visited medical providers and delivered misleading messages about the use of opioids; (d) recruiting prescribing physicians as paid speakers, as a means of both securing these physicians' future "brand loyalty" and extending their reach to these physicians' peers; (e) funding, assisting, encouraging, and directing certain doctors, known as "key opinion leaders" ("KOLs"), to deliver scripted talks, to present continuing medical education programs ("CMEs"), and to serve on the boards and committees of professional societies and patient advocacy groups in order to



Case ID: 260703065

deliver misleading messages and to develop guidelines supporting opioid use to treat chronic pain; and (f) funding, assisting, directing, and encouraging certain groups to develop educational materials and treatment guidelines to be distributed by Mylan in the above-described manner.

565. The Manufacturer Defendants seized upon any opportunity they could to "destigmatize" opioids for the treatment of chronic pain, going as far as relying on an irrelevant, one-paragraph Letter to the Editor in the New England Journal of Medicine as scientific proof that opioids were not addictive, and a group's warning that pain is the "Fifth Vital Sign" and that opioids were lifesaving drugs, among other things described herein.

566. The Manufacturer Defendants (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized and/or obscured opioid serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated opioid superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. These Defendants recruited certain doctors to assist them in their efforts.

567. There was and is today no reliable scientific evidence to support the Manufacturer Defendants' claims about opioids. To the contrary, there exists a body of evidence that the Manufacturer Defendants' and Bankrupt Manufacturers' claims misrepresented the truth about opioids.

568. Since the time of the launch of their Subject Opioids, as set forth herein, the Manufacturer Defendants and Bankrupt Manufacturers ignored and deliberately misrepresented the addictive potential of prescription opioids to encourage doctors throughout Pennsylvania and the Plaintiff States to prescribe to consumers opioids for the treatment of chronic and casual pain, and to take more opioids than is either necessary or appropriate, by:

- employing and/or encouraging their respective sales representatives to market and sell opioids as an appropriate medication for the treatment of pain, without informing their customers, healthcare providers, TPPs and their beneficiaries of the highly addictive nature of these drugs;
- promoting the use of opioids for chronic pain in general, despite knowing that these messages were inconsistent with the Manufacturer Defendants' respective marketing materials;
- advertising and promoting such messages through magazines, the media, and the internet, including on its own websites;
- hiring and paying doctors and KOLs whom prescribed opioids to promote and "destigmatize" opioid speaking engagements, misleading studies and other means described herein; and
- paying for, funding, aiding, abetting, assisting, incentivizing and directing trade groups, associations, patient advocacy groups (collectively referred to as, ***"Front Groups"***) to create and produce false and misleading educational materials and treatment guidelines to be distributed by the Manufacturer Defendants.



Case ID: 260703065

569. The Manufacturer Defendants ignored and deceptively portrayed the benefits of using opioids for chronic pain.

570. The Manufacturer Defendants' ads deceptively portrayed the benefits of using opioids for chronic pain. For example, Endo's website opana.com included a pamphlet promoting Opana ER for treatment of common pain associated with physically demanding jobs, like construction workers, teachers and restaurant workers.

571. Examples of the Manufacturer Defendants' misrepresentations about opioids include the abuse and promotion of the now-infamous New England Journal of Medicine publication's "Letter to the Editor".

572. On January 10, 1980, the New England Journal of Medicine (the "New England Journal") published the following one-paragraph Letter to the Editor:

> ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS
>
> To the Editor: Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients' who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had a history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients, Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.
>
> JANE PORTER/HERSHEL JICK, M.D. (the ***"Letter to the Editor"***)



Case ID: 260703065

573. After this Letter to the Editor was published, opioid prescriptions increased dramatically. The increase in prescriptions was caused by the Manufacturer Defendants and Bankrupt Manufacturers who directly, through their sales representatives, and through other direct and indirect marketing efforts, began to cite the Letter to the Editor as evidence that opioids were non-addictive and an appropriate means to treat common or chronic pain—not just pain associated with late-stage, terminal cancer.

574. Years later, Dr. Jick complained that the Letter to the Editor was misapplied and misused.

575. For decades after, the Manufacturer Defendants, along with other manufacturers who have already settled with the government, encouraged other consultants, medical professionals and doctors to publish and promote studies that favored and destigmatized opioids and their addictive qualities, based in part on the misleading Letter to the Editor.

576. For example, in 2001, the National Pharmaceutical Council ("NPC") sponsored the publication of the monograph entitled, "pain" Current Understanding of Assessment, Management, and Treatments." The monograph cited as one source the Letter to the Editor, among other questionable sources. The NPC counts as part of its executive leadership executives from J&J and Endo, among others.

577. Another example is Janssen-approved patient education guide entitled, *Finding Relief: Pain Management for Older Adults* (2009), misrepresented a "myth" that opioids are addictive, and claimed that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain.



Case ID: 260703065

Manufacturer Defendants and Bankrupt Manufacturers Paid Dr. Russell Portenoy, Committeeman of the American Pain Society, to Endorse the Letter to the Editor.

578. Four main vital signs are measurements of the body's most basic functions are (a) body temperature, (b) pulse rate, (c) respiration rate, and (d) blood pressure.

579. However, in the mid-1990s, the American Pain Society ("APS) added "pain" as a "fifth vital sign".

580. This was done in an effort to increase the perceived value of opioids in pain treatment and to misinform healthcare providers and professionals that opioids were not addictive, but were medically beneficial, and even life-saving.

581. Dr. Russell Portenoy, a renowned pain management specialist and eventual President of APS, perpetuated the inaccuracies in a Letter to the Editor and the "fifth vital sign" misrepresentation when he wrote that "opioid maintenance therapy can be a safe, salutary and more humane alternative" to surgery or to not treating a patient with chronic pain.

582. In 1994, Dr. Portenoy wrote:

> The traditional approach to chronic nonmalignant pain does not accept the long-term administration of opioid drugs. This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may

appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, but itself, return the patient to a normal life. Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuated reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.

583. It was unknown at the time that Dr. Portenoy was a paid consultant for Manufacturer Defendants Cephalon, Endo, Janssen and Purdue, among others.

584. Dr. Portenoy was also the Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York. On behalf of the Manufacturer Defendants, Dr. Portenoy and APS repeatedly endorsed the use of opioids as a humane means of treating chronic pain (perpetuating the destigmatization of opioids) in 1997 and again in 2009.

585. In 2011, Dr. Portenoy's publications were repeatedly cited as source materials by the NPC in the monograph "Pain: Current Understanding of Assessment, Management, and Treatments."

586. Dr. Portenoy made frequent public appearances promoting the Manufacturer Defendants' opioids. For instance, in 2010, he appeared on "Good Morning America" to discuss the use of opioids long-term to treat chronic pain. He

stated, "[a]ddiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."

587. It was not until 2011 that Dr. Portenoy admitted that he was wrong. In a published interview, Dr. Portenoy conceded:

> Clearly if I had an inkling of what I know now then, I wouldn't have spoken in the way that I spoke. It was clearly the wrong thing to do.

588. After Dr. Portenoy admitted what he had done for the Manufacturer Defendants was wrong, in just this past year, the New England Journal published the following statement criticizing the Letter to the Editor as follows:

> In conclusion, we found that a five-sentence letter published in the Journal in 1980 ***was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy***. In 2007, the manufacturer of OxyContin and three senior executives pleaded guilty to federal criminal charges that they misled regulators, doctors, and patients about the risk of addiction associated with the drug. Our findings highlight the potential consequences of inaccurate citation and underscore the need for diligence when citing previously published studies.

589. Dr. Portenoy was not the only doctor the Manufacturer Defendants employed to try to "destigmatize" the use of opioids for the treatment of pain. Dr. Lynn Webster, the founder and Chief Medical Director of Lifetree Clinical Research and a member of the American Academy of Pain Medicine ("AAPM"), authored



Case ID: 260703065

numerous CMEs sponsored by Teva and Endo. He also created a screening tool which purported to enable doctors to manage the risk that a patient will become addicted to or abuse opioids. Known as the "Opioid Risk Tool", several Manufacturer Defendants promoted the screening tool on their websites. It is averred that several of the Manufacturer Defendants paid Dr. Webster for his promotional and marketing services.

590. Both the APS and AAPM worked with the Manufacturer Defendants, along with the American Pain Foundation ("APF"), to promote the Manufacturer Defendants' misrepresentations about opioids. The APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed in May 2012. The APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks.

591. The United States Senate Finance Committee began investigating the APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The APF's board voted to dissolve the organization soon after. The AAPM issued treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy. Additionally, the AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. The AAPM maintained a corporate relations council, whose members paid $25,000 per year to participate, in addition to other funding. Endo and Teva were members of the council and presented deceptive programs to doctors who attended the AAPM's marquee annual meeting.



Case ID: 260703065

592. Other groups used by Teva, Endo, Janssen, and Purdue to disseminate their false and misleading messages were the American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

593. Each Manufacturer Defendant named herein knew that misrepresentations of the risks and benefits of opioid drugs were not supported by or were directly contrary to scientific evidence. Indeed, the falsity of the Manufacturer Defendants' misrepresentations has been confirmed by the FDA and the Centers for Disease Control and Prevention ("CDC"), including in the CDC's Guideline for Prescribing Opioids for Chronic Pain, issued in 2016 and approved by the FDA ("2016 CDC Guideline"). The 2016 CDC Guideline, which reinforces other previous findings by the FDA, includes the following excerpts in its review:

a. "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials 6 weeks in duration)."

b. "Opioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder[.]"

c. There is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain[.]"

d. "Clinicians should use additional caution when initiating opioids for patients aged 65 years."

e. Clinicians discussing potential opioid therapy with patients should "[b]e explicit and realistic about expected benefits of opioids, explaining that while opioids can reduce pain during short-term use, there is no good evidence that opioids improve pain or function with long-term use, and that complete relief of pain is unlikely."

f. "[E]vidence is limited or insufficient for improved pain or function with

long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

594. The CDC has declared that prescription painkiller overdoses are at epidemic levels. In support, it cited the following statistics:

a. The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b. More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c. Overdoses involving prescription painkillers now kill more Americans than heroin and cocaine combined.

d. Approximately 5,500 people start to misuse prescription painkillers every day.

595. The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin.

596. As a result, drug overdose deaths involving heroin have more than tripled in 4 years. This increase has been closely tied to opioid abuse and addiction.

597. Pennsylvania has been ranked in the top 10 states for opioid overdose deaths for years, with its rank rising from 9th place in 2013 to 6th place in 2015.

598. According to the Pocono Record, in 2015 more people in Pennsylvania died from drug overdoses than from automobile accidents.

Defendants Created an Abatable Public Nuisance.

599. Purdue created a market for the use of opioids for a range of common aches and pains by misrepresenting the risks and benefits of its opioids, but it was not alone. The Manufacturer Defendants named herein – already manufacturers of prescription opioids – positioned themselves to take advantage of the opportunity



Case ID: 260703065

Purdue created, developing both branded and generic opioids to compete with OxyContin, while, together with Purdue and each other, misrepresenting the safety and efficacy of their products. These misrepresentations are described in detail below.

600. Endo, which already sold Percocet and Percodan, was the first to submit an application for generic extended-release oxycodone to compete with OxyContin. At the same time, Endo sought FDA approval for another potent opioid, immediate-release and extended-release oxymorphone, branded as Opana and Opana ER. Oxymorphone, like OxyContin's active ingredient oxycodone, is not a new drug; it was first synthesized in Germany in 1914 and sold in the U.S. by Endo beginning in 1959 under the trade name Numorphan. But Numorphan tablets proved highly susceptible to abuse. Called "blues" after the light blue color of the 10 mg pills, Numorphan provoked, according to some users, a more euphoric high than heroin. As the National Institute on Drug Abuse observed in its 1974 report, "Drugs and Addict Lifestyle," Numorphan was extremely popular among addicts for its quick and sustained effect. Endo withdrew oral Numorphan from the market in 1979.

601. Two decades later, however, as communities around the U.S. were first sounding the alarm about prescription opioids and Purdue executives were being called to testify before Congress about the risks of OxyContin, Endo essentially reached back into its inventory, dusted off a product it had previously shelved after widespread abuse, and reintroduced it into the marketplace with a new trade name, Opana.

602. The clinical trials submitted with Endo's first application for approval of Opana were insufficient to demonstrate efficacy, and some subjects in the trials overdosed and had to be revived with naloxone. Endo then submitted new "enriched

enrollment" clinical trials, in which trial subjects who do not respond to the drug are excluded from the trial, and obtained approval. Endo began marketing Opana and Opana ER, an extended release formulation, in 2006.

603. Like Numorphan, Opana ER was highly susceptible to abuse. On June 8, 2017, the FDA sought removal of Opana ER. In its press release, the FDA indicated that this is the first time the agency has taken steps to remove a currently marketed opioid pain medication from sale due to the public health consequences of abuse. On July 6, 2017, Endo agreed to withdraw Opana ER from the market.

604. Janssen, which already marketed the Duragesic (fentanyl) patch for severe pain, also joined Purdue in pursuit of the broader chronic pain market. It sought to expand the use of Duragesic through, for example, advertisements proclaiming, "It's not just for end stage cancer anymore!" This claim earned Janssen a warning letter from the FDA, for representing that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence."

605. Janssen also developed a new opioid compound called tapentadol in 2009, marketed as Nucynta for the treatment of moderate to severe pain.

606. By adding additional opioids or expanding the use of their existing opioids products, the Manufacturing Defendants took advantage of the market created by Purdue's aggressive promotion of OxyContin and reaped enormous profits. For example, Opana ER alone generated more than $1 billion in revenue for Endo in 2010 and again in 2013. Janssen also passed the $1 billion mark in sales of Duragesic in 2009.



Case ID: 260703065

The Manufacturer Defendants' Multi-Pronged Scheme To Change Prescriber Habits and Public Perception and Increase Demand for Opioids

607. In order to accomplish the fundamental shift in perception that was key to successfully marketing their opioids, the Manufacturer Defendants designed and implemented a sophisticated and deceptive marketing strategy.

608. Lacking legitimate scientific research to support their claims, the Manufacturer Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

609. The Manufacturing Defendants promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Manufacturing Defendants of these risks. The Manufacturing Defendants had access to scientific studies, detailed prescription data and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

610. The marketing scheme to increase opioid prescriptions centered around nine categories of misrepresentations, which are discussed in detail below. The



Case ID: 260703065

Manufacturing Defendants disseminated these misrepresentations through various channels, including through advertising, sales representatives, purportedly independent organizations these defendants funded and controlled ("Front Groups"), KOLs, and CME programs discussed below.

**Defendants Knew or Should Have Known That Doctors Targeted and Deceived Patients to Get More People on Dangerous Drugs, at Higher Doses, for Longer Periods**

***Deception About Addiction***

611. In a pamphlet for doctors, *Providing Relief, Preventing Abuse: A Reference GuideTo Controlled Substance Prescribing Practices*, one opioid manufacturer wrote that addiction "is not caused by drugs." Instead, doctors were assured that addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a susceptible individual by exposure to drugs, most commonly through abuse."[36]

612. Opioids were marketed, prescribed and sold to Pennsylvania patients with marketing that was designed to obscure the risk of addiction. The defendants named herein are believed to have been fully aware of the manufacturers' misleading and deceptive marketing, yet they did nothing to counter or contradict such messages. To the contrary, they perpetuated the manufacturers marketing and sales schemes for their own gain.

613. For example, one manufacturer published the *Resource Guide for People with Pain*, and falsely assured patients and doctors that opioid medications are not addictive:

*"Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truthis that when properly prescribed by a healthcare professional andtaken as directed, these medications give relief – not a 'high.'"*[37]

[36] Providing Relief, Preventing Abuse (2008), pg. 12.
[37] Resource Guide for People with Pain (2009), pg. 8, PVT0037321.

614. The Defendants here agreed with this message, falsely denying the risk of addiction, falsely implying that addiction requires patients to get "high," and falsely promising that patients would not become addicted if they took opioids as prescribed.

615. Over and over, doctors and pharmacists in Pennsylvania and Plaintiff States gave opioids to "trusted" patients without risk of addiction, even though that was false. Without any reliable information, pharmacists and PBMs with mail order pharmacies pushed the myth that addiction is a character flaw, and "trustworthy" people don't get addicted to drugs.

616. And knowing that opioids were addictive, the Defendants allowed these drugs to be overprescribed without justification or necessity, all simply to generate profits.

**<u>Deception to Get Vulnerable Patients on Opioids</u>**

***Elderly Patients***

617. Prescribing and providing opioids to elderly patients increases their risk of death. Elderly patients are at greater risk of dangerous interactions between drugs. They are also at greater risk of respiratory depression — in which patients suffocate and die. But Defendants saw the opportunity to earn millions of dollars by getting elderly patients on opioids because the public would pay through Medicare.

618. Defendants disregarded and obscured the risks to elderly patients.

***Veterans***

619. Like the elderly, many veterans' prescriptions are paid for by the public, providing another source of revenue for Defendants when veterans were prescribed and sold opioids.



Case ID: 260703065

620. Compared to non-veterans, Pennsylvania veterans are three times more likely to die from opioid overdose.

***Osteoarthritis***

621. Defendants enabled third-parties and each other to mislead new patients with the deceptive claim that opioids should be used to treat the most common form of arthritis, osteoarthritis. Defendants knew that osteoarthritis would be a money-maker because it is widespread. According to one opioid manufacturer, more than 20 million Americans have osteoarthritis, including most people over 75.

622. Opioids are not approved to treat osteoarthritis.

623. Nevertheless, to meet their business goals and profit objective, Defendants allowed opioids to be overprescribed and sold to osteoarthritis patients.

624. The Manufacturer Defendants' misrepresentations fall into the following nine categories:

a. The risk of addiction from chronic opioid therapy is low

b. To the extent there is a risk of addiction, it can be easily identified and managed

c. Signs of addictive behavior are "pseudoaddiction," requiring more opioids

d. Opioid withdrawal can be avoided by tapering

e. Opioid doses can be increased without limit or greater risks

f. Long-term opioid use improves functioning

g. Alternative forms of pain relief pose greater risks than opioids

h. OxyContin provides twelve hours of pain relief

i. New formulations of certain opioids successfully deter abuse

625. Each of these propositions was false. The Manufacturing Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public



Case ID: 260703065

at large of the truth of each of these propositions in order to expand the market for their opioids.

626. The foregoing categories of misrepresentations are offered to organize the numerous statements the Manufacturing Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Manufacturing Defendant's liability. While each Manufacturing Defendant deceptively promoted their opioids specifically, and, together with other Manufacturing Defendants, opioids generally, not every Manufacturing Defendant propagated (or needed to propagate) each misrepresentation. Each Manufacturing Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed to—and did— mislead doctors, patients, and payors about the risks and benefits of opioids. While this Complaint endeavors to document examples of each Manufacturing Defendant's misrepresentations and the manner in which they were disseminated, they are just that—examples. The Complaint is not, especially prior to the completion of discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Manufacturer Defendant.

Falsehood No. 1: The risk of addiction from chronic opioid therapy is low.

627. Central to the Manufacturer Defendants' promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Manufacturer Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors

prescribed more opioids to more patients—thereby enriching the Manufacturer Defendants and substantially contributing to the opioid epidemic.

628. Each of the Manufacturing Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims. None of them have acknowledged, retracted, or corrected their false statements.

629. In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at recommended dose," and the risk substantially increases with more than three months of use. As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).

630. This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids. They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.



Case ID: 260703065

**ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

Jane Porter
Hershel Jick, M.D.
Boston Collaborative Drug Surveillance Program
Waltham, MA 02154 Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

---

631. As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.

632. Purdue nonetheless began repeatedly citing this letter in promotional and educational materials as evidence of the low risk of addiction, while failing to disclose that its source was a letter to the editor, not a peer-reviewed paper. Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of OxyContin. While first Purdue and then other Manufacturing Defendants used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

633. Purdue specifically used the Porter and Jick letter in its 1998 promotional video "I got my life back," in which Dr. Alan Spanos says "In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%." Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted. In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent, but that

finding was not included by Purdue in any of its advertising, marketing, or promotional or sales material; nor was it otherwise provided by Purdue to physicians.

634. The Manufacturer Defendants relied on and disseminated the distorted messaging involving the Letter. The enormous impact of the Manufacturer Defendants' misleading amplification of this Letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .

635. "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."

636. At a public hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing the medication, not patients with legitimate medical needs under the treatment of a healthcare professional."

637. Purdue spun this baseless "legitimate use" distinction out even further in a patient brochure about OxyContin, called "A Guide to Your New Pain Medicine and



Case ID: 260703065

How to Become a Partner Against Pain." In response to the question "Aren't opioid pain medications like OxyContin Tablets 'addicting'?," Purdue claimed that there was no need to worry about addiction if taking opioids for legitimate, "medical" purposes:

> Drug addiction means using a drug to get "high" rather than to relieve pain. You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful.

J&J/Janssen

638. Janssen likewise misrepresented the addiction risk of opioids. One website, Let's Talk Pain, states, among other things, that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding about addiction." The website carried Janssen's trademark and was copy approved and controlled by Janssen.

639. The Let's Talk Pain website also perpetuated the concept of pseudoaddiction, associating patient behaviors such as "drug seeking," "clock watching," and "even illicit drug use or deception" with undertreated pain which can be resolved with "effective pain management."

640. A Janssen unbranded website, PrescribeResponsibly.com, states that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."

641. Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults, which, as seen below, described as a "myth" the claim that opioids are addictive, and asserted as "fact" that "[m]any studies show that opioids are rarely addictive when used properly



Case ID: 260703065

for the management of chronic pain." Until recently, this guide was still available online.




642. Janssen's website for Duragesic included a section addressing "Your Right to Pain Relief" and a hypothetical patient's fear that "I'm afraid I'll become a drug addict." The website's response: "Addiction is relatively rare when patients take opioids appropriately."

Teva

643. Teva sponsored and facilitated the development of a guidebook, Opioid Medications and REMS: A Patient's Guide, which included claims that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Similarly, Teva sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

644. For example, a 2003 Cephalon-sponsored CME presentation titled Pharmacologic Management of Breakthrough or Incident Pain, posted on Medscape in February 2003, teaches:



Case ID: 260703065

> [C]hronic pain is often undertreated, particularly in the noncancer patient population …. The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.

Falsehood No. 2: To the extent there is a risk of addiction, it can be easily identified and managed

645. While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, the Manufacturer Defendants asserted that to the extent that some patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

646. Purdue provided to prescribers its Partners Against Pain "Pain Management Kit," which contains several screening tools, and catalogues of Purdue materials, which included these tools. Janssen, on its website

PrescribeResponsibly.com, states that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors. The website, which directly provides screening tools to prescribers for risk assessments, includes a "[f]our question screener" to purportedly help physicians identify and address possible opioid misuse.

647. Purdue and Teva's Cephalon sponsored the APF's Treatment Options: A Guide for People Living with Pain (2007), which also falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed."

648. Endo paid for a 2007 supplement available for continuing education credit in the Journal of Family Practice written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, (i) recommended screening patients using tools like (a) the Opioid Risk Tool ("ORT") created by Dr. Webster and linked to Janssen or (b) the Screener and Opioid Assessment for Patients with Pain, and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. The ORT was linked to by Endo-supported websites.

649. There are three fundamental flaws in the Manufacturer Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk patients identified through screening can take

opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

Falsehood No. 3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids.

650. The Manufacturing Defendants instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids. In 1989, Dr. Haddox, who later became a Senior Medical Director for Purdue, coined the term "pseudoaddiction," which he described as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management." In plain English, the notion underlying "pseudoaddiction" is that people on prescription opioids who exhibit classic signs of addiction—for example, asking for more and higher doses of opioids, self- escalating their doses, or claiming to have lost prescriptions in order to get more opioids—are not "addicted," but rather are simply suffering from undertreatment of their pain, which calls for more opioids.

651. In the materials and outreach they produced, sponsored, or controlled, Defendants made each of these misrepresentations and omissions, and have never acknowledged, retracted, or corrected them.

652. Cephalon, Endo, and Purdue sponsored the Federation of State Medical Boards' ("FSMB") Responsible Opioid Prescribing (2007) written by Dr. Scott Fishman ("Dr. Fishman"), a KOL discussed below, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than

one doctor to obtain opioids, and hoarding, which are signs of genuine addiction, are all really signs of "pseudoaddiction."

653. Similarly, Endo trained its sales representatives to promote the concept of pseudoaddiction. A training module taught sales representatives that addiction and pseudoaddiction were commonly confused. The module went on to state that: "The physician can differentiate addiction from pseudoaddiction by speaking to the patient about his/her pain and increasing the patient's opioid dose to increase pain relief."

654. Endo also sponsored a NIPC CME program in 2009 titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudoaddiction and listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered in awarding grants to CME providers.

655. The pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents. The New York Attorney General, in a 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Endo thereafter agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

656. Janssen sponsored, funded, and edited a website called Let's Talk Pain, which in 2009 stated "pseudoaddiction … refers to patient behaviors that may occur when pain is undertreated …. Pseudoaddiction is different from true addiction because



Case ID: 260703065

such behaviors can be resolved with effective pain management." This website was accessible online until at least May 2012.

657. Janssen also currently runs a website, Prescriberesponsibly.com, which claims that concerns about opioid addiction are "overestimated," and describes pseudoaddiction as "asyndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately the inappropriate behavior ceases."

658. The CDC Guideline nowhere recommends attempting to provide more opioids to patients exhibiting symptoms of addiction. Dr. Webster admitted that pseudoaddiction "is already something we are debunking as a concept" and became "too much of an excuse to give patients more medication. It led us down a path that caused harm."

<u>Falsehood No. 4</u>: Opioid withdrawal can be avoided by tapering.

659. In an effort to downplay the risk and impact of addiction, the Manufacturing Defendants falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering patients' dose to avoid the adverse effects of withdrawal. Defendants fail to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—adverse effects that also make it less likely that patients will be able to stop using the drugs. Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for a prolonged period.



Case ID: 260703065

660. A non-credit educational program sponsored by Endo, Persistent Pain in the Older Adult, claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days. However, this claim is at odds with the experience of patients addicted to opioids. Most patients who have been taking opioids regularly will, upon stopping treatment, experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea, headaches, and delirium, among others. The painful and arduous struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

661. To this day, the Manufacturer Defendants have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

<u>Falsehood No. 5</u>: Opioid doses can be increased without limit or greater risks.

662. In materials they produced, sponsored or controlled, Manufacturing Defendants instructed prescribers that they could safely increase patients' dose to achieve pain relief. Each of the Manufacturing Defendants' claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses, effects confirmed by scientific evidence.

663. These misrepresentations were integral to the Manufacturing Defendants' promotion of prescription opioids. As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose.

664. Endo sponsored a website, Painknowledge.com, which claimed that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

665. Endo also published on its website a patient education pamphlet entitled Understanding Your Pain: Taking Oral Opioid Analgesics. In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased …. You won't 'run out' of pain relief."

666. Purdue and Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught patients that opioids have "no ceiling dose" and therefore are safer than NSAIDs.

667. Manufacturer Defendants were aware of the greater dangers high dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to maximum daily dose.

<u>Falsehood No. 6</u>: Long-term opioid use improves functioning.

668. Despite the lack of evidence of improved function and the existence of evidence to the contrary, the Manufacturing Defendants consistently promoted opioids as capable of improving patients' function and quality of life because they viewed those claims as a critical part of their marketing strategies. In recalibrating the risk-

benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

669. Janssen, for example, promoted Duragesic as improving patients' functioning and work productivity through an ad campaign that included the following statements: "[w]ork, uninterrupted," "[l]ife, uninterrupted," "[g]ame, uninterrupted," "[c]hronic pain relief that supports functionality," and "[i]mprove[s] … physical and social functioning."

670. Since at least May of 2011, Endo has distributed and made available on its website, opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like those of a construction worker or chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

671. As noted above, Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which states as "a fact" that "opioids may make it easier for people to live normally." This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It assures patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'" Similarly, Responsible Opioid Prescribing (2007), sponsored and distributed by Teva, Endo, and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

672. In addition, Janssen's Let's Talk Pain, website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.

673. The APF's Treatment Options: A Guide for People Living with Pain (2007), sponsored by Purdue and Cephalon, counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in May 2012.

674. Endo's NIPC website Painknowledge.com claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," the website touted improved quality of life as a benefit of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

675. Endo was the sponsor, through NIPC, of a series of CMEs titled Persistent Pain in the Older Patient, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

676. The Manufacturing Defendants' claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for



Case ID: 260703065

years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life. Based upon a review of the existing scientific evidence, the CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."

677. Consistent with the CDC's findings, substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that opioids for chronic pain may actually worsen pain and functioning …" along with general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

678. The available evidence indicates opioids may worsen patients' health and pain. Increased duration of opioid use is strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that"[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant." According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."

679. As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally." In fact, research such as a 2008 study in the journal Spine has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work. Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all. Moreover, the first randomized clinical trial designed to make head-to-head comparisons between opioids and other kinds of pain medications was published on March 6, 2018, in the Journal of the American Medical Association. The study reported that "[t]here was no significant difference in pain-related function between the 2 groups"—those whose pain was treated with opioids and those whose pain was treated with non- opioids, including acetaminophen and other non-steroidal anti-inflammatory drugs ("NSAIDs") like ibuprofen. Accordingly, the study concluded: "Treatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."

<u>Falsehood No. 7</u>: Alternative forms of pain relief pose greater risks than opioids.

680. In materials they produced, sponsored or controlled, the Manufacturer Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor

opioids over other therapies such as over- the-counter acetaminophen or over-the-counter or prescription NSAIDs.

681. For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, the Manufacturing Defendants routinely ignored the risks of hyperalgesia (a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time"); hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth); and potentially fatal interactions with alcohol or with benzodiazepines (which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain).

682. The APF's Treatment Options: A Guide for People Living with Pain, sponsored by Purdue and Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdose, when the figure is closer to 3,200.

683. Janssen sponsored Finding Relief: Pain Management for Older Adults (2009), that listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased doses from opioids. Finding Relief described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at

high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness" (which the brochure claims will go away) and constipation. Endo's NIPC website, Painknowledge.com, contained a flyer called "Pain: Opioid Therapy." This publication listed opioids' adverse effects but with significant omissions, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

684. The Endo-sponsored CME put on by NIPC, Persistent Pain in the Older Adult, discussed above, counseled that acetaminophen should be used only short-term and includes five slides on the FDA's restrictions on acetaminophen and its adverse effects, including severe liver injury and anaphylaxis (shock). In contrast, the CME downplays the risk of opioids, claiming opioids have "possibly less potential for abuse than in younger patients," and does not list overdose among the adverse effects. Some of those misrepresentations are described above; others are laid out below.

685. In April 2007, Endo sponsored an article aimed at prescribers, published in Pain Medicine News, titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain." The article asserted:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose–and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.

686. To help allay these prescriber concerns, Endo emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on

the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids.

687. Additionally, Purdue acting with Endo sponsored Overview of Management Options, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

688. As a result of the Manufacturing Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.

Falsehood No. 8: New formulations of certain opioids successfully deter abuse.

689. Rather than take the widespread abuse of and addiction to opioids as reason to cease their untruthful marketing efforts, Bankrupt Manufacturers Purdue and Endo seized them as a competitive opportunity. These companies developed and oversold "abuse-deterrent formulations" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids. These Defendants' false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers thereby prolonging the opioid



Case ID: 260703065

epidemic. Other Manufacturing Defendants, including Actavis and Mallinckrodt, also promoted their branded opioids as formulated to be less addictive or less subject to abuse than other opioids.

690. The CDC Guideline confirms that "[n]o studies" support the notion that "abuse- deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."

**Distributor, Retail, PBM and Individual Defendants Ignored That Manufacturers Deceived Doctors and Patients to Use Higher and Higher Doses of Opioids, and Perpetuated the Scheme to Sell More Opioids at Higher Doses**

691. For patients, taking higher doses of opioids increases the risk of addiction and death. But for Defendants, higher doses mean higher profits. So Defendants allowed or did not take action to stop patients from getting higher and higher doses.

692. Each of the Defendants earn more money every time a patient moves to a higher dose. Higher doses cost more money, which generates significantly higher profits for Defendants.

**All Defendants Conspired to Keep Patients on Opioids Longer and Longer By Their Acts and Omissions**

693. Just as manufacturers and distributors made more money by pushing patients to higher doses, the Retail and PBM Defendants increased their profits by keeping patients on drugs for longer periods of time. In fact, many of the programs designed by the PBM Defendants were focused on adherence to long term drug therapies. Long-term opioid use



Case ID: 260703065

causes addiction and death. But for the Defendants, enabling manufacturers and distributors to keep patients on drugs longer meant more profits. So all Defendants ignored the fact that manufacturers, distributors, retailers and PBMs deceived doctors and patients to stay on the Subject Opioids longer.

694. According to Bankrupt Manufacturer Purdue's 2015 price list, for example, a patient taking Purdue's 80mg OxyContin pill twice a day for a week earned Purdue $210. If that same patient could be kept on the drug for a year, Purdue collected far more money: $10,959.[38] The same held true for generic oxycontin sold by Mallinckrodt, Teva and Mylan, among others. Naturally, these Defendants increased their profits on the sales of such drugs, in the form of spread profits on the drugs, dispensing fees, administrative fees and other revenues tied to the fulfillment of drug prescriptions.

695. Even compared to the most famous deadly and addictive products, these are extraordinary effects. Smoking increases the chance of lung cancer death by less than 51 times.

696. By getting patients addicted, Defendants greatly increased the patients' risk of harm from many drugs in the opioid class — including, heroin, fentanyl, and generic oxycodone — which share the same addictive chemistry as opioids.

**The Manufacturer Defendants Paid KOLs to Deceptively Promote Opioid Use**

697. To falsely promote their opioids, the Manufacturer Defendants paid and cultivated a select circle of doctors who were chosen and sponsored by the Manufacturer Defendants for their supportive messages. As set forth below, pro-opioid doctors have been at the hub of the Manufacturer Defendants' well-funded, pervasive

[38] 2015-01-12 Price Increase Notification, PWG000045843.



Case ID: 260703065

marketing scheme since its inception and were used to create the grave misperception science and legitimate medical professionals favored the wider and broader use of opioids. These doctors include Dr. Portenoy and Dr. Webster, as set forth in this section, as well as Dr. Fine and Dr. Fishman, as set forth further below.

698. Although these KOLs were funded by the Manufacturer Defendants, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

699. As the Manufacturer Defendants' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain. They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and they were placed on boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

700. Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Manufacturer Defendants were able to exert control of each of these modalities through which doctors receive their information. In return for their pro-opioid advocacy, the Manufacturer Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish. For example, Dr. Webster has received funding from Endo, Purdue, and Cephalon. Dr. Fine has received funding from Janssen, Cephalon, Endo, and Purdue.

701. The Manufacturer Defendants carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Manufacturer Defendants' agenda. The Manufacturer Defendants also kept close tabs on the content of the materials published by these KOLs. And, of course, the Manufacturer Defendants kept these KOLs well-funded to enable them to push the Manufacturer Defendants' deceptive message out to the medical community.

702. Once the Manufacturer Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Manufacturer Defendants' false position that opioids were safe and effective for treatment of chronic pain, the Manufacturer Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescription of opioids for chronic pain. The Manufacturer Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community. By contrast, the Manufacturer Defendants did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

703. In their promotion of the use of opioids to treat chronic pain, the Manufacturer Defendants' KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Manufacturer Defendants.

**Dr. Portenoy**

704. In 1986, Dr. Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at

the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."

705. Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long- term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*

(emphasis added). According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."

706. Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for Purdue and other Manufacturer Defendants, promoting the use of prescription opioids and minimizing their risks. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, cofounder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a

compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"

707. As one organizer of CME seminars who worked with Dr. Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."

708. Dr. Portenoy was also a critical component of the Manufacturer Defendants' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF. He was also the President of the APS.

709. In recent years, some of the Manufacturer Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature. Dr. Portenoy has now admitted that he minimized the risks of opioids, and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did …."

710. In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. *In essence this was education to destigmatize [opioids], and*



Case ID: 260703065

*because the primary goal was to destigmatize, we often left evidence behind.*

711. Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, Pain Killer, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."

**Dr. Webster**

712. Another KOL, Dr. Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy. He is a Senior Editor of Pain Medicine, the same journal that published Endo's special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

713. Dr. Webster created and promoted the Opioid Risk Tool, a five question, one- minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool ("ORT") appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, Managing Patient's Opioid Use: Balancing the Need and the Risk. Dr. Webster recommended use of risk screening tools, urine testing, and



Case ID: 260703065

patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in Cuyahoga County.

714. Dr. Webster was himself tied to numerous overdose deaths. He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses.

715. In keeping with the Manufacturer Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids: he prescribed staggering quantities of pills.

716. At an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Dr. Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain, yet no currently available pharmacologic agent is ideal for its treatment." The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP." This CME effectively amounted to off-label promotion of Cephalon's opioids—the only drugs in this category—for chronic pain, even though they were approved only for cancer pain.

717. Cephalon sponsored a CME written by Dr. Webster, Optimizing Opioid Treatment for Breakthrough Pain, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non- opioids such as aspirin and acetaminophen are



Case ID: 260703065

less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

**Dr. Fine**

718. Dr. Fine's ties to the Manufacturer Defendants have been well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescription for non-cancer patients. He has served on Purdue's advisory board, provided medical legal consulting for Janssen, and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was also on the board of directors of APF.

719. Multiple videos feature Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death of a drug overdose.

720. He has also acknowledged having failed to disclose numerous conflicts of interest. For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah—telling the university that he had received under $5,000 in 2010 from J&J for providing "educational" services, but J&J's website states that the company paid him $32,017 for consulting, promotional talks, meals and travel that year.



Case ID: 260703065

721. Dr. Fine and Dr. Portenoy co-wrote A Clinical Guide to Opioid Analgesia, in which they downplayed the risks of opioid treatment, such as respiratory depression and addiction:

> At clinically appropriate doses … respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.
>
> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.

722. In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study." In that article, Dr. Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for noncancer pain." The article acknowledged that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic noncancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus- based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."

723. The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in

most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."

724. Multiple videos feature Dr. Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain. He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events over the course of years." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat sleep apnea. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."

**Dr. Fishman**

725. Dr. Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member and as president of the AAPM, and has participated yearly innumerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Manufacturer Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter

in the Journal of the American Medical Association titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."

726. Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled "Responsible Opioid Prescribing," in 2007 which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

727. In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.

728. The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins."

729. In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict." The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

Dissemination of Misrepresentations through CME

730. Once the Manufacturer Defendants had assembled a group of physician promoters and built a false body of "literature," they needed to make sure their false marketing message was widely distributed. One way the Manufacturer Defendants did so was through CMEs.



Case ID: 260703065

731. A CME is a professional education program provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, online, and through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

732. The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Manufacturer Defendants' deceptions.

733. The Manufacturer Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.



Case ID: 260703065

734. Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

735. Another Cephalon-sponsored CME presentation titled Breakthrough Pain: Treatment Rationale with Opioids was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non- time-dependent continuum that requires a balanced analgesia approach using "targeted pharmacotherapeutics to affect multiple points in the pain-signaling pathway." The doctor lists fentanyl as one of the most effective opioids available for treating breakthrough pain, describing its use as an expected and normal part of the pain management process. Nowhere in the CME is cancer or cancer-related pain even mentioned, despite FDA restrictions that fentanyl use be limited to cancer-related pain.

736. Teva paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

737. Responsible Opioid Prescribing was sponsored by Purdue, Endo and Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications." Endo sales representatives distributed copies of Responsible Opioid Prescribing with a special introductory letter



Case ID: 260703065

from Dr. Fishman. In all, more than 163,000 copies of Responsible Opioid Prescribing were distributed nationally.

738. The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs creates; stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."

739. Physicians attended or reviewed CMEs sponsored by the Manufacturer Defendants during the relevant time period and were misled by them.

740. By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Manufacturer Defendants could expect instructors to deliver messages favorable to them, as these organizations were dependent on the Manufacturer Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Manufacturing Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids. Producers of CMEs and the Manufacturer Defendants both measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

Use of "Branded" Advertising to Promote Opioids to Doctors and Consumers



Case ID: 260703065

741. The Manufacturer Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Manufacturer Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the Journal of Pain and Clinical Journal of Pain, to journals with wider medical audiences, such as the Journal of the American Medical Association. The Manufacturer Defendants collectively spent more than $14 million on the medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

742. The Manufacturer Defendants also targeted consumers in their advertising. They knew that physicians are more likely to prescribe a drug if a patient specifically requests it. They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved. Endo's research, for example, also found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Manufacturer Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

Use of "Unbranded" Advertising to Promote Opioid Use for Chronic Pain without FDA Review.

743. The Manufacturer Defendants also aggressively promoted opioids through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug. Instead, unbranded advertising is usually framed as "disease awareness"—encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks. In contrast, a pharmaceutical company's "branded" advertisement that identifies a specific medication and its indication (i.e., the condition which the drug is approved to treat) must also include possible side effects and contraindications—what the FDA Guidance on pharmaceutical advertising refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label. Through unbranded materials, the Manufacturer Defendants expanded the overall acceptance of and demand for chronic opioid therapy without the restrictions imposed by regulations on branded advertising.

744. Many of the Manufacturer Defendants utilized unbranded websites to promote opioid use without promoting a specific branded drug, such as Purdue's pain-management website, www.inthefaceofpain.com. The website contained testimonials from several dozen "advocates," including health care providers, urging more pain treatment. The website presented the advocates as neutral and unbiased, but an investigation by the New York Attorney General later revealed that Purdue paid the advocates hundreds of thousands of dollars.

The Manufacturer Defendants Funded, Edited and Distributed Publications that <u>Supported their Misrepresentations about Opioids</u>.



Case ID: 260703065

745. The Manufacturer Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

746. To accomplish their goal, the Manufacturer Defendants—sometimes through third- party consultants and/or Front Groups—commissioned, edited, and arranged for the placement of favorable articles in academic journals.

747. The Manufacturer Defendants' plans for these materials did not originate in the departments within the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Manufacturer Defendants' marketing departments.

748. The Manufacturer Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Manufacturer Defendants knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick letter. The Manufacturer Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

749. The Manufacturer Defendants published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.

750. For example, in 2007 Cephalon sponsored the publication of an article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate," published in the nationally circulated journal Pain Medicine, to support its effort to expand the use of its branded fentanyl products. The article's authors (including Dr. Webster) stated that the "OTFC [fentanyl] has been shown to relieve BTP more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients." The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Dr. Portenoy and recommends fentanyl for non- cancer BTP patients:

> In summary, BTP appears to be a clinically important condition in patients with chronic noncancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP- specific therapy suggests several domains that may be helpful in developing BTP- specific, QoL assessment tools.

The Manufacturer Defendants Used Sale Representatives to Directly <u>Disseminate Misrepresentations to Prescribers</u>.



Case ID: 260703065

751. The Manufacturer Defendants' sales representatives executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors with centrally orchestrated messages. The Manufacturer Defendants' sales representatives also distributed third-party marketing material to their target audience that was deceptive.



Case ID: 260703065

752. Each Manufacturing Defendant promoted opioids through sales representatives (also called "detailers") and, upon information and belief, small group speaker programs to reach out to individual prescribers. By establishing close relationships with doctors, the Manufacturer Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

753. In accordance with common industry practice, the Manufacturer Defendants purchase and closely analyze prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management and analytics corporation. This data allows them to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above.

754. Manufacturer Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Manufacturer Defendants spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Manufacturer Defendants spent on detailing in 2000. The amount includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo.

755. Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a



Case ID: 260703065

peak, coinciding with the launch of Fentora, of more than $27 million in 2007, as shown below:




756. Endo's quarterly spending went from the $2 million to $4 million range in 2000- 2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year):



Case ID: 260703065




757. Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011), as shown below:



758. Purdue's quarterly spending notably decreased from 2000 to 2007—as Purdue came under investigation by the Department of Justice—but, as shown in the chart below, its spending increased dramatically after it settled with the DOJ in 2007, pleaded guilty to misleading doctors and patients about opioids, and paid a fine:




759. For its opioid, Actiq, Cephalon also engaged in direct marketing in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

760. Thousands of prescribers attended Cephalon speaking programs.

Manufacturer Defendants Used Speakers' Bureaus and Programs to Spread their <u>False and Deceptive Messages</u>

761. In addition to making sales calls, the Manufacturer Defendants' sales representatives also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by the Manufacturer Defendants. These speaker programs and associated speaker trainings serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; to qualify to be selected a forum in which to further market to the speaker himself or herself; and an opportunity to market to the speaker's peers. The Manufacturer Defendants grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage. Janssen, Endo and Cephalon each made thousands of payments to physicians nationwide, for activities including participating on speakers' bureaus, providing consulting services, and other services.

Manufacturer Defendants Targets Vulnerable Populations.

762. As set forth above, the Manufacturer Defendants specifically targeted their marketing at two vulnerable populations—the elderly and veterans.

763. Elderly patients taking opioids have been found to be exposed to elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression which occurs more frequently in elderly patients.

764. The Manufacturing Defendants promoted the notion—without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to opioids. The AGS 2009 Guidelines, for example, which Endo and Janssen publicized, described the risk of addiction as "exceedingly low in older patients with no current or



Case ID: 260703065

past history of substance abuse." (emphasis added). As another example, an Endo-sponsored CME put on by NIPC, Persistent Pain in the Older Adult, taught that prescribing opioids to older patients carried "possibly less potential for abuse than in younger patients." Contrary to these assertions, however, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

765. Similarly, Endo targeted marketing of Opana ER towards patients over 55 years old. Such documents show Endo treated Medicare part D patients among the "most valuable customer segments." However, in 2013, one pharmaceutical benefits management company recommended against the use of Opana ER for elderly patients and unequivocally concluded: "[f]or patients 65 and older these medications are not safe, so consult your doctor."

766. According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries. A 2008 survey showed that prescription drug misuse among military personnel doubled from 2002 to 2005, and then nearly tripled again over the next three years. Veterans are twice as likely as non- veterans to die from an opioid overdose.

767. Yet the Manufacturing Defendants deliberately targeted veterans with deceptive marketing. For example, a 2009 publication sponsored by Endo and Janssen, and distributed by APF with grants from Janssen and Endo, was written as a personal narrative of one veteran but was in fact another vehicle for opioid promotion. Called



Case ID: 260703065

Exit Wounds, the publication describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines. According to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines, despite the increased danger of respiratory depression from the two drugs together.

768. Opioid prescriptions have dramatically increased for veterans and the elderly. Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59. And in 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001.

The Opioid Scheme Succeed in Creating a Public Health Epidemic Paid for by TPPs like Plaintiffs

769. The Manufacturer Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and worked to measure and expand their success. Their own documents show that they knew they were influencing prescribers and increasing prescriptions. Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

770. Endo, for example directed the majority of its marketing budget to sales representatives—with good results: 84% of its prescriptions were from the doctors they detailed. Moreover, as of 2008, cancer and post-operative pain accounted for only 10% of Opana ER's uses; virtually all of Endo's opioid sales—and profits—were from a



Case ID: 260703065

market that did not exist ten years earlier. Internal emails from Endo staff attributed increases in Opana ER sales to the aggressiveness and persistence of sales representatives.

771. Cephalon also recognized the return of its efforts to market Actiq and Fentora off- label for chronic pain. In 2000, Actiq generated $15 million in sales. By 2002, Actiq sales had increased by 92%, which Cephalon attributed to “a dedicated sales force for ACTIQ” and “ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists.” Actiq became Cephalon’s second best-selling drug. By the end of 2006, Actiq’s sales had exceeded $500 million. Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that “more than 80 percent of patients who use[d] the drug don’t have cancer.”

772. Upon information and belief, each of the Manufacturer Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors’ perceptions and prescribing of their drugs. They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them. For instance, they monitored doctors’ prescribing before and after detailing visits, and at various levels of detailing intensity, and before and after speaker programs. Defendants invested in their aggressive and deceptive marketing for one reason: it worked. As described in this Complaint, both in specific instances and more generally, Defendants’ marketing changed prescribers’ willingness to prescribe



Case ID: 260703065

opioids, led them to prescribe more of their opioids, and persuaded them to continue prescribing opioids or to switch to supposedly "safer" opioids, such as ADF.

773. This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior. The effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

774. Manufacturing Defendants spent millions of dollars to market their drugs to prescribers and patients and meticulously tracked their return on that investment. In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain.

These results are directly due to the Manufacturing Defendants' fraudulent marketing campaign focused on several misrepresentations.

775. Thus, both independent studies and Manufacturer Defendants' own behavior confirm that Defendants' marketing scheme dramatically increased their sales.

776. Independent research demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse." It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

777. There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes. The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."

778. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

DISTRIBUTOR DEFENDANTS

779. The Defendants owe a duty under both federal law, Pennsylvania law and the laws of Plaintiff States to monitor, detect, investigate, refuse to fill, and report

suspicious orders of prescription opioids originating from Plaintiffs' community as well as those orders which the Defendants knew, or should have known were likely to be diverted into Plaintiffs' communities.

780. The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

781. Manufacturers rely upon distributors to distribute their drugs. The distributors serve as middlemen, sending billions of doses of opioid pain pills to pharmacists, hospitals, nursing homes and pain clinics.

782. According to the United States Center for Disease Control ("CDC"), the increased distribution of opioids directly correlates to increased overdose death rates.

783. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015). Neither the DEA, nor the manufacturers or wholesale distributors will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein.

784. Consequently, in addition to the Brand Manufacturers Defendants, Plaintiffs have named the three (3) wholesale distributors, Cardinal Health, McKesson, and AmerisourceBergen, also known as the "Big 3", which collectively dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12F.Supp.2d 34, 37 (D.D.C. 1998) (describing Cardinal Health,

Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders, as described in more detail herein. Plaintiffs have reason to believe each of the "Big 3" engaged in unlawful conduct which resulted in the diversion of prescription opioids into Pennsylvania and the Plaintiff States, and that discovery will reveal their unlawful conduct. Plaintiffs naming of each of the "Big 3" herein as Distributor Defendants in this matter places the industry on notice that the Plaintiffs are acting to abate the public nuisance plaguing their communities at the expense of Plaintiffs.

785. Plaintiffs have also named Curascript for its role described below.

786. Each Distributor Defendant repeatedly and purposefully breached its duties under Pennsylvania and federal law, as well as the laws of Plaintiff States. Such breaches are the direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Lehigh County and its community.

787. The unlawful diversion of prescription opioids is a direct and proximate cause and/or substantial contributing factor to the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Pennsylvania and Plaintiff States. This diversion and the epidemic are direct causes of harm for which Plaintiffs seek to recover here.

788. The opioid epidemic in Pennsylvania and Plaintiff States remains an immediate hazard to public health and safety.

789. The opioid epidemic in Pennsylvania and Plaintiff States is a temporary and continuous public nuisance and remains unabated.

790. The Distributor Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

Distributor Duties

791. The Distributor Defendants purchased opioids from manufacturers, including the named Manufacturer Defendants and Bankrupt Manufacturers herein, and sold them to pharmacies throughout Pennsylvania and the Plaintiff States.

792. The Distributor Defendants played an integral role in the chain of opioids being distributed throughout Pennsylvania and the Plaintiff States.

793. Pennsylvania law and the laws of Plaintiff States incorporate federal requirements set out under the Controlled Substance Act and related controlled substance laws and regulations.

794. The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-112(c), incorporates 21 C.F.R. § 1301.74(b), which requires wholesalers and distributors of controlled substances, including the Distributor Defendants, to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." These requirements were



Case ID: 260703065

intentionally and willfully ignored by the Distributor Defendants. Specifically, the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act requires:

> (c) Persons registered or licensed to manufacture or distribute or dispense a controlled substance, other drug or device under this act shall keep records and maintain inventories in conformity with the record-keeping, order form and inventory requirements of Federal law and with any additional regulations the secretary issues. Controlled substances in Schedules I and II shall be distributed by a registrant to another registrant only pursuant to an order form.

35 P.S. § 780-112.

795. The Pennsylvania Wholesale Prescription Drug Distributors License Act, 63 P.S. § 391.6(k), also incorporates by 21 C.F.R. § 1301.74(b), which requires wholesalers and distributors of controlled substances, including the Distributor Defendants, to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." These requirements were intentionally and willfully ignored by the Distributor Defendants. Specifically, the Wholesale Prescription Drug Distributors License Act requires:

> (k) COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAW— The licensee shall operate in compliance with applicable Federal, State and local laws and regulations. The licensee shall permit the department and authorized Federal, State and local law enforcement officials to enter and inspect its premises and delivery vehicles and to audit its records and written operating procedures, at reasonable times and in a reasonable manner, to the extent authorized by law. The licensee that deals in controlled substances shall register with the Drug Enforcement Administration (DEA) and shall comply with all applicable DEA, State and local regulations.

63 P.S. § 391.6.



Case ID: 260703065

796. The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-112(c), and the Pennsylvania Wholesale Prescription Drug Distributors License Act, 63 P.S. § 391.6(k), both additionally incorporate 21 U.S.C. § 823, requiring the Distributor Defendants to establish effective controls against orders which the Distributor Defendants knew or should have known were likely to be diverted into Lehigh County.

797. Opioids are a controlled substance and are categorized as "dangerous drugs" under Pennsylvania law. See 35 P.S. § 780-104(2). These "Schedule II" drugs are controlled substances with a "high potential for abuse." 21 U.S.C. §§ 812(b), 812(2)(A)-(C).

798. Each Manufacturer and Distributor Defendant was required under Pennsylvania law to register as distributors of controlled substances with the Secretary of Health of the Commonwealth of Pennsylvania. 35 P.S. § 780-106.

799. Each Manufacturer and Distributor Defendant was required under Pennsylvania law to obtain a license from the Pennsylvania Department of Health as a manufacturer and/or wholesale distributor of prescription drugs. 63 P.S. § 391.4.

800. Each Defendant herein is licensed by the Pennsylvania Department of Health and is a "registrant" with the Secretary of Health of the Commonwealth of Pennsylvania either as a manufacturer or a wholesale distributor in the chain of distribution of Schedule II controlled substances and assumed a duty to comply with all security requirements imposed under the regulations adopted by Pennsylvania Legislature and Department of Health.

801. As wholesale drug distributors, each Distributor Defendant was required under Pennsylvania law to register with the Drug Enforcement Agency (DEA), pursuant to the federal Controlled Substance Act. See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed by that statutory scheme. Those requirements are adopted and incorporated into Pennsylvania law, as indicated above.

802. Each Defendant has an affirmative duty under Pennsylvania and federal law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that manufacturers and distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1). Those requirements are adopted and incorporated into Pennsylvania law, as indicated above. Specifically, Pennsylvania incorporates these requirements through its Controlled Substance, Drug, Device and Cosmetic Act, which mandates that "Persons registered . . . to . . . distribute . . . a controlled substance, other drug or device under this act shall keep records and maintain inventories in conformity with the recordkeeping, order form and inventory requirements of Federal law and with any additional regulations the secretary issues." 35 P.S. § 780-112. Pennsylvania additionally incorporates these requirements through its Wholesale Prescription Drug Distributors License Act, which mandates that licensees 1.) establish, maintain and adhere to written policies and procedures that conform to "any action initiated at the request of the department, the Unites States

Food and Drug Administration or other Federal, State or local law enforcement or other government agency" and 2.) "operate in compliance with applicable Federal, State and local laws and regulations." 63 P.S. § 391.6(h)(2)(i); 63 P.S. § 391.6(k).

803. Federal regulations, incorporated by Pennsylvania law, similarly impose a non-delegable duty upon manufacturers and wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

804. "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. See 21 C.F.R. 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the manufacturer's and wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.



Case ID: 260703065

805. In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. *See, Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, No. 15-11355 (D.C. Cir. June 30, 2017). Regardless, all flagged orders must be reported. Id.

806. These prescription drugs are regulated for the purpose of providing a "closed" system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. See, 1970 U.S.C.C.A.N. 4566, 4571-72.

807. Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.

808. As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly…distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as…the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people." See Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin.,

U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) (hereinafter, "Rannazzisi Letter") ("This letter is being sent to every commercial entity in the United States registered with the DEA to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), filed in *Cardinal Health, Inc. v. Holde*r, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

809. The Distributor Defendants have admitted that they are responsible for reporting suspicious orders. See Brief for Healthcare Distribution Management Association ("HDMA") and NACDS, supra note 85, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

810. The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels." See, Rannazzisi Letter, supra note 83, at 2.

811. The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes." Id. at 1.



Case ID: 260703065

812. The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm." Id. at 2.

813. The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007. See Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in Cardinal Health, Inc. v. Holder, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8. This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances." Id. The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (*e.g.*, "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.
>
> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated

> industry.
>
> Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the norm al pattern of what pharmacies generally order.
>
> When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."
>
> Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.

*Id.* Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious." *Id.*

814. The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription

drugs, but undertake such efforts as responsible members of society." See Brief of HDMA, supra note 19, 2012 WL 1637016, at *2.

815. The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the HDMA, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines created by the HDMA, "Industry Compliance Guidelines," set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest. See, Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

816. Each of the Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Lehigh County and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Lehigh County's communities.



Case ID: 260703065

817. Each Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

818. Each Defendant owes a duty under federal and Pennsylvania law to investigate and refuse suspicious orders of prescription opioids.

819. Each Defendant owes a duty under federal and Pennsylvania law to report suspicious orders of prescription opioids.

820. Each Defendant owes a duty under federal and Pennsylvania law to prevent the diversion of prescription opioids into illicit markets in Pennsylvania and the Plaintiff States.

821. The Defendants were each on notice that the controlled substances they distributed or prescribed were the kinds that were susceptible to diversion for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy and problematic purposes.

822. The Defendants were each on notice that there was an alarming and suspicious rise in distributing opioids within Pennsylvania and the Plaintiff States during the relevant time period of this claim.

823. The Defendants knew or should have known that they were supplying vast amounts of dangerous drugs in Pennsylvania and the Plaintiff States that was already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic.

824. The Defendants intentionally failed in their duty to take any action to prevent or reduce the distribution of these drugs for the purpose of their own massive profits.

825. The Defendants were in a unique position and had a duty to inspect, report, or otherwise limit the flow of opioid drugs into Pennsylvania and the Plaintiff States.

826. The Defendants have displayed a continuing pattern of failing to submit suspicious order reports.

827. The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

828. The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Pennsylvania and the Plaintiff States, and the damages caused thereby.

Distributor Defendants Breached Their Duties

829. Because distributors handle such large volumes of controlled substances and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses. See Rannazzisi Decl. ¶ 10, filed in Cardinal Health, Inc. v. Holder, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

830. The sheer volume of prescription opioids distributed to pharmacies in Lehigh County, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Lehigh County, is excessive for the medical need of the community and patently suspicious. Some red flags are so obvious that no



Case ID: 260703065

one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them. See, Masters Pharmaceuticals, Inc., 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195, 77 Fed. Reg. 62,316, 62,322 (2012)).

831. Additionally, the Distributor Defendants' grossly negligent distribution to pharmacies outside Pennsylvania also caused an influx of illicit diversion of opioids within Pennsylvania.

832. The Distributor Defendants failed to report "suspicious orders" originating from Pennsylvania and Plaintiff States, or which the Distributor Defendants knew or should have known were likely to be diverted to Lehigh County and its community, to the federal and state authorities, including the DEA and/or Pennsylvania's Board of Pharmacy and related authorities.

833. The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, and/or orders of unusual frequency in Pennsylvania and Plaintiff States, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Pennsylvania and Plaintiff States.

834. All Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Pennsylvania and Plaintiff States, and/or in areas from which the Defendants knew opioids were likely to be diverted to Pennsylvania and Plaintiff States.

835. The Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

836. The Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and Pennsylvania law.

837. The Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels. See Cardinal Health, Inc. v. Holder, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

838. The federal and Pennsylvania laws at issue here are public safety laws.

839. The Defendants' violations of public safety statutes constitute prima facie evidence of negligence and negligence per se under Pennsylvania law.

840. The Defendants supplied prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

841. The unlawful conduct by the Defendants is purposeful and intentional. The Defendants refuse to abide by the duties imposed by federal and Pennsylvania law which are required to legally acquire and maintain a license to distribute prescription opiates.

842. The Defendants acted with actual malice in breaching their duties, i.e., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

843. The Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

Defendants Failed to Comply with Pennsylvania and Federal Law and Misrepresented Their Compliance with their Legal Duties.

844. The Defendants have repeatedly misrepresented their compliance with their legal duties under Pennsylvania and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Defendants' compliance with their legal duties.

845. Further, the Defendants have refused to recognize any duty beyond reporting suspicious orders. For instance, in Masters Pharmaceuticals, the HDMA, a trade association run by the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors. Inaccurately denying the legal

duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

a. The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to investigate orders (*e.g.*, by interrogating pharmacies and physicians) and take action to halt suspicious orders before they are filled." *See*, Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4–5.

b. The Associations argued that, "DEA now appears to have changed its position to require that distributors not only report suspicious orders, but investigate and halt suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it is changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications." *Id.* at *8

c. The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious." *Id.* at *14.

d. The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties." *Id.* at *22.

e. The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to report suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders." *Id.* at *24–25.

f. Also inaccurately, the Associations argued that, "[i]mposing a duty on expertise – to investigate and halt orders m ay force distributors to take a shot-in-the-dark approach to com plying with DEA 's demands." *Id.* at 26.

846. The positions taken by the trade groups are representative of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to

prevent diversion of the dangerous drugs. See Brief of HDMA, supra note 19, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

847. The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. Masters Pharm., Inc. v. Drug Enf't Admin., 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and— if it is able to determine that the order is not likely to be diverted into illegal channels— ship the order." Id. at 212. Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. Id. at 218–19, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. Id. at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. Id. at 220.

848. Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders

placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." See Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Administration, and McKesson Corporation, January 17, 2017, available at: https://www.justice.gov/opa/press-release/file/928476/download

849. Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice , as required by 21 C.F.R § 1306.04(a)." Id. at 4.

850. McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers" including the McKesson Distribution Centers located in 12 different locations, and of which could have foreseeably caused the diversion of opioids into Lehigh County. Id.

851. Due to these violations, McKesson agreed that its authority to distribute controlled substances from the 12 facilities would be partially suspended. Id. at 6.



Case ID: 260703065

852. As punishment for its wrongdoing, McKesson agreed to pay a $150 million fine and suspended the sale of controlled substances from distribution centers in several states. Id. at 8.

853. The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted its failure to report suspicious orders of controlled substances to the DEA. Id. at 4.

854. In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed in its obligations to do so. Id.

855. The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations." Id; see also, Settlement Agreement and Release between the United States and McKesson Corporation, at 5 (January 17, 2017) (hereinafter, "2017 Settlement Agreement and Release") ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA"), at: https://www.justice.gov/opa/press-release/file/928471/download

856. As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000. Id. at 6.



Case ID: 260703065

857. On January 17, 2017, the DEA announced that McKesson had agreed to pay a record $150 million fine and suspend the sale of controlled substances from distribution centers in several states.

858. Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

859. Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012. See, Evaluation and Inspections Division, Office of the Inspector General, United States Department of Justice, The Drug Enforcement Administration's Adjudication of Registrant Actions 6 (2014), at: https://oig.justice.gov/reports/2014/e1403.pdf

860. The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders. Id. These actions include the following:

a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its



Case ID: 260703065

DEA registration;

b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health

Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora, Colorado, Aurora, Illinois, Delran, New Jersey, LaCrosse, Wisconsin, Lakeland, Florida, Landover, Maryland, La Vista, Nebraska, Livonia, Michigan, Methuen, Massachusetts, Sante Fe Springs, California, Washington Courthouse, Ohio, West Sacramento, California.

861. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the United States Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued. See Lenny Bernstein & Scott Higham, Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control, Wash. Post, October 22, 2016, at: https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.c0e6a44e920b; see also, Lenny Bernstein &

Scott Higham, Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, Wash. Post, March 6, 2017, at: https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html?utm_term=.cd4ba03fb447; Eric Eyre, DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills, Charleston Gazette-Mail, February 18, 2017, at: https://www.wvgazettemail.com/news/health/dea-agent-we-had-no-leadership-in-wv-amid-flood/article_928e9bcd-e28e-58b1-8e3f-f08288f539fd.html

862. In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants fraudulently convinced the public that they were complying with their legal obligations, including those imposed by licensing regulations, though they were not in compliance. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

863. For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity." See, Lenny Bernstein et al., How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job," Wash. Post, October 22, 2016, at: https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-



Case ID: 260703065

job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.42947b406a35

864. Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results in favor of profits.

865. Similarly, Defendant McKesson publicly stated that it had a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country." See, Scott Higham et al., Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse, Wash. Post, December 22, 2016, at: https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html?utm_term=.9aac30165395

866. Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program in favor of profits.

867. By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. The Plaintiffs did not know of the existence or scope of the Distributor Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

868. Meanwhile, the opioid epidemic rages unabated in the United States, Pennsylvania and the Plaintiff States.



Case ID: 260703065

869. The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

870. Despite the charges, fines, and penalties brought against and imposed upon the Defendants in the past, they continued to fail to report suspicious orders or prevent the flow of prescription opioids, including into Pennsylvania and the Plaintiff States, harming Plaintiffs.

871. The wrongful actions and omissions of the Defendants which have caused the diversion of opioids has been a substantial contributing factor to and/or proximate cause of the opioid crisis.

872. During the relevant time period, the Defendants have shipped millions of doses of highly addictive controlled opioid pain killers into Pennsylvania and the Plaintiff States and elsewhere, causing diversion of opioid pain killers within Pennsylvania and the Plaintiff States.

873. Many of these orders should have been stopped, or at the very least, investigated by the Defendants as potential suspicious orders.

874. The sheer volume of the increase in opioid pain medications, including but not limited to OxyCodone, being distributed to retailers, should have put the Defendants on notice to investigate and report such orders.

875. The Defendants delivered an excessive and unreasonable amount of opioid pain medications to retailers in Pennsylvania and the Plaintiff States.

876. The Distributors knew or should have known that they were distributing levels of opioid medications that far exceeded the legitimate needs of Plaintiffs and their beneficiaries.

877. The Defendants made substantial profits from the opioids sold in Pennsylvania and the Plaintiff States.

878. By the actions and inactions described above, the Defendants showed a reckless disregard for the safety of Plaintiffs and their beneficiaries.

879. By the actions and inactions described above, the Defendants caused great harm to Plaintiff.

880. The Defendants abandoned their duties imposed under federal and Pennsylvania law, took advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in Pennsylvania and the Plaintiff States.

881. The Defendants have continued to unlawfully ship massive quantities of opioids into communities like Pennsylvania and the Plaintiff States, fueling the epidemic.

882. There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes." See Richard C. Dart et al., Trends in Opioid Analgesic Abuse and Mortality in the United States, 372 New Eng. J. Med. 241 (2015), at: http://www.nejm.org/doi/full/10.1056/NEJMsa1406143

883. Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions. See Nora D. Volkow & A. Thomas McLellan, Opioid Abuse in

Chronic Pain—Misconceptions and Mitigation Strategies, 374 N. Eng. J. Med. 1253 (2016), at: http://www.nejm.org/doi/full/10.1056/NEJMra1507771

884. The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications." See Robert M. Califf et al., A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016), at: http://www.nejm.org/doi/full/10.1056/NEJMsr1601307

885. The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths. See Press Release, Centers for Disease Control and Prevention, United States Department of Health and Human Services, Prescription Painkiller Overdoses at Epidemic Levels (November 1, 2011), at: https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

886. The Defendants repeatedly and purposefully breached their duties under Pennsylvania and federal law, and such breaches are the direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into Pennsylvania and the Plaintiff States.

887. The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Pennsylvania and the Plaintiff States. This diversion and the epidemic are direct causes of foreseeable harms incurred by Plaintiffs.

888. The Defendants intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiffs seek relief, as

alleged herein. Plaintiffs also seek the means to abate the epidemic created by the Distributor Defendants' wrongful and/or unlawful conduct.

889. Plaintiffs seek economic damages from the Defendants as reimbursement for the costs associated with efforts to eliminate the hazards to public health and safety to them in their communities.

890. Plaintiffs seek economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

891. To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed." See Rose A. Rudd et al., Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014, Morbidity & Mortality Wkly. Rep. 1378 (November 2015), at: https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.html.

892. A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain. See Johns Hopkins Bloomberg School of Public Health, The Prescription Opioid Epidemic: An Evidence-Based Approach (G. Caleb Alexander, et al., 2015), at: https://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.



Case ID: 260703065

893. These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels." See Office of National Drug Control Policy, Executive Office of the President of the United States, Epidemic: Responding to America's Prescription Drug Abuse Crisis (2011), at: https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

894. It is believed that the Defendants did not refuse to ship or supply any opioid medications to any pharmacy in Pennsylvania or Plaintiff States during the relevant time period.

895. The Defendants knew or should have known that they were distributing levels of opioid medications that far exceeded the legitimate needs of Plaintiffs and their beneficiaries.

896. The Defendants made substantial profits from the opioids sold in Pennsylvania and the Plaintiff States.

897. The Defendants violated the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act and related Federal Regulations for distributors, including the aforementioned sections, by failing to properly report suspicious orders.

898. By the actions and inactions described above, the Defendants showed a reckless disregard for the safety of the residents of Pennsylvania and Plaintiff States, including the beneficiaries of Plaintiffs.

899. By the actions and inactions described above, the Defendants caused great harm to Plaintiffs and their communities.

900. Having profited enormously through the aggressive and irresponsible distribution of opiates, the Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon Plaintiffs and their communities.

901. In the case of Curascript, it directly shipped opioids to pharmacies located in Pennsylvania and Plaintiff States to dispense directly to patients.

902. As of at least October 2007, Curascript had contracts with opioid manufacturers to distribute their opioid products. These contracts continued for more than a decade, well into the period when prescription drug distributors like Curascript knew or should have known of the problem of suspicious ordering patterns by pharmacies.

903. Curascript also held a role as an exclusive or limited distributor of certain Subject Opioids, which gave Curascript a unique vantage and role in the opioid epidemic.

**MANUFACTURING DEFENDANTS TURN TO EXCLUSIVE DISTRIBUTION THROUGH SPECIALTY PHARMACIES TO EXPAND THEIR CONTROL OVER THE DISTRIBUTION, PRICE AND PRESCRIPTION FULFILLMENT OF OPIOIDS.**

904. Recently released documents to the public reveal as aspect of the opioid scheme not addressed in other litigation: the decision of Defendants to remove certain prescription opioids from widespread retail distribution and granting exclusive rights to limited distribution through "specialty pharmacy" channels wherein manufacturers employed specialty "hubs" to control the flow of opioids.

905. As described more fully below, in 2006 – one year prior to Purdue's Consent Judgment – Teva worked with a company called "Biosolutia" to move Actiq and Fentora from open retail distribution to "specialty" distribution to ensure that the



Case ID: 260703065

company could track patient prescriptions and ensure that such prescriptions were filled, including refill prescriptions.

906. The principal of BioSolutia who devised this scheme is Dan Demarais and his partner Jim Long.

907. This is the same scheme Desmarais and Long presented to Mallinckrodt for its flagship drug H.P. Acthar Gel. The scheme drove sales of Acthar from $15 million in 2007 to over $1 billion in 2014.

908. It was presented to Teva which adopted that same model for at least Vivitrol, Vivitrex and Fentora, Teva had a complete "overview" of the Acthar scheme. *See* TEVA_MDL_A_02457279 available at https://www/industrydocuments.ucsf/docs.

909. In a December 20, 2005 presentation by BioSolutia regarding Vivitrex, a new "distribution strategy" was presented. Curascript was identified as a "finalist".

910. Thereafter, Desmarais and Long communicated with Cephalon's Deborah Bearer, Joe Duarte, Jeffrey Rydell, Howie McKibbon, Marketing Manager, Karen Boyce, Sr. Manager, Public Relations, about the launch of Vivitrex through exclusive specialty distribution.

911. In September 2006, BioSolutia's Long congratulated Cephalon's McKibbon, Bob Bellucci Charles Stevens and CJ Okafor on the approval of Fentora, and working with Cephalon on Fentora distribution.

912. By November 2006, BioSolutia was providing monthly account updates on the distribution and sales of Fentora and Vivitrol through specialty distribution.

913. Teva was fully aware of the move to specialty being undertaken by companies looking to maximize the sales of their products through specialty pharmacies. In an

August 2007 edition of "Specialty Pharmacy News in Teva's files it was reported that specialty pharmacies "work to … bring[] payers, providers together". TEVA_MDL_A_09462982 available at https://www/industrydocuments.ucsf/docs.

914. In June 2008 email from Jim Long to Cephalon's Dan Winkelman, Long wrote about "how going thru a hub services and limited distribution SPP network, might work best for Fentora." "As discussed, we have worked on other drugs that were in broad/open distribution and changed the services and distribution model to a closed hub services and SPP network, so this type of work is routine for us." TEVA_MDL_A_02276325 available at https://www/industrydocuments.ucsf/docs.

915. By 2013, Cephalon recognized that "collaboration with existing trade and channel partners" like Curascript and Biosolutia was "critical to success" of Cephalon brands. https://www/industrydocuments.ucsf/docs/fkkw0360.

916. The impact of such limited distribution through specialty distributors and pharmacies captive to PBMs, like Curascript is to Express Scripts, has been the subject of an investigation and settlement by the Federal Trade Commission (FTC).

917. As the FTC points out,[39] beginning in 2004, Express Scripts began to vertically integrate, in order create a new business model for prescription drug distribution – one which gave Express Scripts exclusive rights to so-called "specialty

[39] FTC Report at 5 ("Over the past 20 years, pharmacy benefit services have become increasingly concentrated. … PBMs have become vertically integrated within massive conglomerates that provide a broad range of services across the pharmaceutical supply chain…. PBMs [like Express Scripts] are now vertically integrated with upstream suppliers of goods and services [and] with midstream distributors, including retail, mail order, and specialty pharmacies."

pharmaceuticals" like Acthar, insulin and branded opioids in order to extract higher prices of such drugs in order increase their profits.

918. This model was finally been exposed in July 2024 when the FTC issued a scathing report on the impact of Express Scripts' vertical integration on the prices of insulin products.[40] The FTC specifically called out Express Scripts acquisition of Curascript in 2004 as part of its vertical integration to raise drug prices. FTC Report at 8. One of the effects of Express Scripts' vertical integration is its ability to steer prescriptions of high-priced drugs to its captive specialty pharmacy, Accredo, because it realized greater profits. *See generally*, FTC Report at 30-47.

919. The FTC followed its FTC Report by suing Express Scripts in September 2024.[41] Express Scripts had the audacity to sue the FTC to prevent the truth from coming out about Express Scripts' unlawful acts and practices which increased the prices of Acthar. Indeed, Acthar was the first such drug to be subject to Express Scripts' new model. It was the initial test case but became the backbone of Express Scripts' marketing to drug companies: give Express Scripts control of drug distribution and Express Scripts will agree to exorbitant price increases. Express Scripts then can sell potential "solutions" to third party payors (TPPs) like the Plaintiffs, in the form of utilization arrangement (UM) tools like step therapy and prior authorization.

920. That same model was sold to Cephalon and likely other Manufacturers.

---

[40] *See* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf. ("**FTC Report**")

[41] *See* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ https://www.ftc.gov/system/files/ftc_gov/pdf/d9437_caremark_rx_zinc_health_services_et_al_part_3_complaint_corrected_public.pdf..



Case ID: 260703065

921. Express Scripts – through its Curascript subsidiary -- creates the problem of high-priced, specialty drugs only to sell the solution to payors like Plaintiffs. Express Scripts makes billions of dollars through such scheme as it is the "powerful middleman inflating drug costs". FTC Report, title at p. 1.

922. In 2007, Bankrupt Manufacturer Mallinckrodt and Curascript embarked on a self-described "new strategy" with respect to the distribution, pricing, marketing and sales of Acthar. The new strategy was originally developed and recommended by Express Scripts/Curascript's head of business development, Rob Osborne. Osborne first presented the idea to Mallinckrodt's head of sale, Arnie Arenas, in the summer of 2006 at the same time Desmarais was speaking with both Mallinckrodt and Cephalon about such model and strategy.

923. Earlier this year, Express Scripts settled with the FTC and agreed to make "fundamental changes" to its vertical integration of operations through Curascript and Accredo, its specialty pharmacy.

**SUN**

924. Defendant Sun Pharmaceuticals is a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd. It manufactures, markets, and distributes drugs, including opioids, in the United States, including in Pennsylvania and the Plaintiff States.

925. By the time Sun Pharmaceutical Industries Ltd. and its United States affiliates entered and expanded their participation in the prescription opioid market, the addictive nature of long-term opioid therapy, the widespread diversion of prescription opioids, and the devastating public-health consequences of excessive opioid prescribing were no longer matters of legitimate scientific debate.



Case ID: 260703065

926. Rather, those risks had become well known throughout the pharmaceutical industry, to federal and state regulators, to prescribing physicians, and to opioid manufacturers themselves. Despite this knowledge, Sun elected to continue manufacturing, marketing, promoting, and profiting from prescription opioid products in the United States.

927. Rather than distancing itself from the deceptive marketing practices that had fueled the opioid epidemic, Sun continued to participate in a marketplace that depended upon expanding opioid utilization for chronic, non-cancer pain, increasing prescription volume, and encouraging long-term opioid therapy.

928. Sun marketed opioid products into a healthcare system already distorted by years of misleading industry representations concerning the safety, efficacy, and addiction risks associated with prescription opioids. Sun knowingly benefited from those market conditions while continuing to promote and sell opioid medications for which Third-Party Payors, including Plaintiffs, were expected to provide reimbursement.

929. Sun's participation in the opioid market was not isolated or incidental. Through its manufacture, marketing, sale, and distribution of prescription opioid products, Sun contributed to the continued oversupply of opioids in the United States and profited from increased opioid utilization. Sun knew, or at a minimum recklessly disregarded, that increased opioid prescribing predictably resulted in greater addiction, dependence, diversion, overdose, and healthcare expenditures borne by Third-Party Payors like Plaintiffs..

930. As evidence concerning the pharmaceutical industry's role in the opioid epidemic continued to emerge through governmental investigations, civil litigation, and regulatory proceedings, Sun nevertheless continued its opioid business.

931. Ultimately, Sun became a defendant in nationwide opioid litigation and



Case ID: 260703065

agreed to resolve claims asserted by states and political subdivisions arising from its alleged role in contributing to the opioid epidemic.

932. Although Sun denied liability, its participation in those proceedings reflects that its conduct was among that alleged to have contributed to the nationwide opioid crisis.

933. As a direct and foreseeable result of Sun's conduct, Plaintiffs paid thousands of dollars to reimburse prescriptions for opioid medications that were unnecessary, excessive, inappropriate, or procured through marketing practices that distorted legitimate medical decision-making. Those payments, together with the downstream healthcare costs associated with opioid addiction, dependence, abuse, and overdose, constitute injuries directly caused by Sun's unlawful conduct.

934. Sun ultimately resolved nationwide opioid litigation by agreeing to a multistate settlement with states and political subdivisions, while expressly denying liability. The settlement itself reflects that Sun faced claims arising from its alleged role in contributing to the opioid crisis.

**ZYDUS**

935. Defendant Zydus Pharmaceuticals (USA) Inc. is a company located in New Jersey.

936. At all relevant times, Zydus manufactured, marketed, and sold generic opioids throughout the United States and Pennsylvania and the Plaintiff States. Zydus manufactured, marketed, and sold opioids throughout Pennsylvania and the Plaintiff States, in violation of the duties owed to Plaintiffs in sufficient quantities to be a proximate cause of inordinate injuries and deaths to the Plaintiffs and their beneficiaries.

937. As a generic manufacturer, Zydus failed to effectively and adequately



Case ID: 260703065

communicate warnings in the labels of their product-s to prescribers and users. Zydus could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Zydus had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Zydus failed to report suspicious orders in violation of its duties under the Controlled Substances Act, Pennsylvania law and the laws of the Plaintiff States, and knowingly allowed widespread diversion to occur.

938. By the time Zydus entered and expanded its participation in the United States prescription opioid market, the risks associated with long-term opioid therapy, opioid addiction, diversion, abuse, and overdose had become widely known throughout the pharmaceutical industry.

939. Federal regulators, state officials, healthcare providers, and opioid manufacturers were all aware that excessive opioid prescribing had contributed to a nationwide public-health crisis. Despite this knowledge, Zydus continued manufacturing, marketing, selling, and distributing generic opioid medications throughout the United States.

940. Although Zydus did not introduce the original branded opioid products that fueled the epidemic, it knowingly entered and profited from a market that had already been distorted by years of deceptive opioid promotion and excessive prescribing. Rather than adopting practices designed to reduce unnecessary opioid utilization, Zydus continued to manufacture and distribute opioid products into a marketplace where demand had been artificially expanded through misleading representations concerning the risks and benefits of

chronic opioid therapy.

941. In doing so, Zydus knowingly benefited from the increased prescribing of opioid medications while continuing to profit from the sale of those products.

942. Through its manufacture, sale, and distribution of opioid medications, Zydus contributed to the continued oversupply of prescription opioids in the United States. Zydus knew, or at a minimum recklessly disregarded, that increased opioid availability and utilization would predictably result in addiction, dependence, diversion, overdose, and substantial healthcare expenditures borne by Third-Party Payors like Plaintiffs.

943. Nevertheless, Zydus continued to participate in and profit from the opioid marketplace despite the mounting evidence demonstrating the devastating consequences of excessive opioid prescribing.

944. As governmental investigations and civil litigation increasingly exposed the pharmaceutical industry's role in the opioid epidemic, Zydus remained a defendant in nationwide opioid litigation and ultimately entered into a nationwide settlement resolving claims asserted by states and political subdivisions arising from its alleged role in contributing to the opioid crisis. Although Zydus denied liability, the settlement reflects that governmental entities alleged Zydus participated in conduct that contributed to the nationwide opioid epidemic.

945. As a direct and foreseeable result of Zydus's conduct, Plaintiffs reimbursed thousands of dollars for opioid prescriptions that were unnecessary, excessive, inappropriate, or the product of a marketplace distorted by years of unlawful opioid promotion and oversupply. Plaintiffs also incurred substantial downstream healthcare costs associated with opioid dependence, addiction, abuse, overdose, and related medical treatment. These injuries

were the direct and foreseeable consequence of Zydus's participation in and profit from the unlawful opioid marketplace.

## THE PHARMACY DEFENDANTS

### Pharmacy Defendants' Acts and Omissions Expanded the Unsafe Unapproved "Black Market for the Opioid Drugs

946. The expansion of the prescription market for Subject Opioids was only one aspect of the Defendants' scheme to increase their financial gain from the sale of Subject Opioids. All Defendants intentionally flouted regulations and concealed evidence of drug diversion in a concerted effort to nurture the expansion of the market for opioid drugs.

947. Though all Defendants collected information relating to suspicious prescribing and pharmacy dispensing patterns, they did not (as they were required to do by law) provide such information to federal or state agencies. Defendants also encouraged others involved in the scheme to conceal this information from regulatory agencies.

948. Defendants' concealment efforts were not merely aimed at the government. Rather, Defendants knew that TPPs like Plaintiff would re-evaluate formulary placement by the PBM Defendants for Subject Opioids if provided evidence of massive drug diversion. For sales not to plummet, it was thus critical to maintain favorable formulary access. To accomplish that, Defendants could not let TPPs like Plaintiffs know about the rampant diversion underway. But Defendants did not merely conceal such data; rather, they shared this information with one another to coordinate micro-targeting opportunities and drive higher opioid sales. In other words, they not only identified where and how the market for opioid drugs flourished, but worked to help such markets thrive and expand, thus creating the engine for "black market" diversion.

949. Defendants even continued to supply opioid drugs to fulfill demand generated

by physicians and pharmacies that their own employees had red-flagged as highly suspicious. Employees who were not "on board" with this scheme were pressured to suppress or even change their opinions.

950. Defendants were thus part of a scheme to protect and nurture the market for opioid drugs, which in tum would spin out of control into rampant black-market diversion. The drug diversion concealment enterprises are discussed in greater detail, infra.

951. The black market for Subject Opioids expanded greatly as a result of Defendants' illegal and profit-driven conduct. Much of the data regarding opioid distribution, sales, and consumption is in the hands of Defendants or others. But some publicly available data shows that Pennsylvania as a whole, and certain parts in particular, consume a number of opioid drug that can be explained only by the diversion of opioids for criminal and non-medically appropriate uses.

**Pharmacy Defendants Breached Their Duties by Failing to Identify, Monitor, and Report Suspicious Sales of Opioid Drugs and Participated <u>in A Drug Diversion Concealment Enterprise</u>.**

952. Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient. Pharmacies purchase drugs from wholesalers, and occasionally directly from manufacturers, and then take physical possession of the drug products.

953. Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies generate the data that manufacturers as well as wholesale distributors rely upon to measure consumer activity for sales purposes.

954. The Pharmacy Defendants had knowledge of not just the widespread public coverage of the prescription opioid epidemic, but also had industry-specific knowledge of the particular risks and harms from filling prescriptions for non-medical purposes and the resulting

widespread opioid abuse.

955. The DEA, state pharmacy boards, and national industry associations, have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient.[42] The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are irresolvable.

956. For instance, the industry guidance tells pharmacists how to recognize (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

957. The Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

958. In 2017, the Pharmacy Defendants issued a press release titled "Express Scripts To Place New Limits on Opioid Prescriptions, Drawing Criticism From AMA".[43]

959. Despite knowing and even warning of these risks, the Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to

[42] 364 Va. Bd of Pharmacy, Prescription Drug Abuse: Red flags for pharmacists and pharmacy technicians ( Aug. 6, 20/4), ht1ps:llyo11tu.belj5CkhirlZk8; Philip W. Brummond et al., American Society of Health-Systems Pharmacists
Guidelines on Preventing Diversion of Controlled Substances, 74 Am. J. of Health-System Pharmacy e/0 (Jan. 2017), http://www. ajhp.orglco11te11tlearly/2016/ 12122/ajhpl 609 I 9.
[43] https://www.fiercehealthcare.com/payer/express-scripts-country-s-largest-pbm-will-limit-opioids-drawing-concerns-from
doctors#:~:text=Express%20Scripts%20to%20place%20new,prescriptions%2C%20drawing%20criticism%20from%20AMA&text=Express%20Scripts%2C%20the%20country's%20largest,prescribe%20to%20first%2Dtime%20users.



Case ID: 260703065

prevent substantial opioid-related injuries to Plaintiffs, the Pharmacy Defendants have breached their common law duties under the "reasonable care" standard (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions}, professional duties under the relevant standards of professional practice, and requirements established state and federal laws and regulations.

960. The Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the Plaintiffs in part because of the well-known and well-publicized history of Pharmacies being penalized for violating their duties and legal requirements.

961. Pharmacies have the most accurate data on individual health care professionals' prescribing habits. The Pharmacy Defendants provided the manufacturers with prescribing data regarding individual health care professionals in exchange for rebates, or other forms of consideration.

962. The Pharmacy Defendants all participate in the pharmacy networks established by managed health care plans, and as such had a duty to submit only non-fraudulent claims.

963. The Pharmacy Defendants have an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not participate in the "violation of any applicable law, rule and/or regulation."

964. Managed health care plans and third-party payors rely on the Pharmacy Defendants to identify fraudulent claims and deter potential diversion.

965. The Pharmacy Defendants' role in facilitating access to formulary drugs (i.e., access to drugs on third party payors' formularies) for long-term opioid use - coupled with their failure to prevent, monitor, identify, and report drug diversion - all contributed to a vast

increase in opioid overuse and addiction.

966. The Pharmacy Defendants' conduct thus directly contributed to the public-health crisis, increasing costs for excessive prescribing and addiction-related treatment costs for Plaintiffs.

967. Most pharmacies purchase their drug supply from a wholesale distributor, although some retailers are large institutional and retail chain pharmacies that obtain drugs directly from a manufacturer.

968. These organizations can deal directly with manufacturers because they already possess the operational infrastructure necessary to bypass wholesalers - warehousing facilities, distribution vehicles, and inventory control systems. Once a pharmacy takes possession of the drug products it distributes the products to physicians or directly to consumers.

969. The Pharmacy Defendants' policies of speed over accuracy were negligent. Adopting performance metrics and quotas placed significant and unrealistic time pressures on pharmacists. Many Pharmacy Defendants required pharmacists to fill one prescription every three minutes or more than 600 prescriptions per work shift. All measurements focus on productivity with the end goal of maximizing the Pharmacy Defendants' profits. Meeting such unrealistic goals would violate the law regarding professional responsibilities and governing practice rules. To satisfy these increased productivity demands with decreased staffing required pharmacists employed by the Pharmacy.

970. Defendants to cut corners in their performance of due diligence obligations and violated their legal obligations under federal and state laws. The Pharmacy Defendants' high-volume-and-increased profits business model also led to a greater number of errors in dispensing, which can result in significant harm to pharmacy customers.

971. The Pharmacy Defendants failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioids, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal.

972. The Pharmacy Defendants failed to instruct their pharmacists and pharmacy techs on how to address situations in which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

973. The Pharmacy Defendants have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment and intuition with respect to determinations about whether a prescription is one that should be filled, or whether, under the applicable laws, the pharmacist should refuse to fill it.

974. The Pharmacy Defendants failed to adequately use data available to them to identify health care professionals that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

975. The Pharmacy Defendants failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. The

976. Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual

sales of other drugs.

977. The Pharmacy Defendants failed to conduct internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly. The Pharmacy Defendants failed to have trained personnel monitoring media and journal publications regarding issues with all drugs being sold, including opioids.

978. The Pharmacy Defendants failed to heed communications from government agencies, and to the public and to take action.

979. The Pharmacy Defendants failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures and regarding the filling of opioid prescriptions.

980. The Pharmacy Defendants' own pharmacists, agents, employees, contractors, and other persons who rendered services in furtherance of selling more of the opioids, raised a significant number of complaints, statements of concern, and observations of regarding suspicious prescriptions, which the Pharmacy Defendants failed to investigate, act upon, and in some cases even acknowledge or create records of.

981. The Pharmacy Defendants knew, reasonably should have known, or, if they did not know, intentionally remained willfully blind to the fact of the media and journal attention published about the opioid epidemic. They intentionally remained willfully blind to the fact that pill diversion and pill mills were increasing at an alarming rate. And the Pharmacy Defendants failed to act.

982. The Pharmacy Defendants failed to track or observe increases in antidote sales, like sales of Narcan, which would have triggered suspicion in a reasonable person or a

reasonable sales representative that levels of prescription drug abuse were rampant. The Pharmacy Defendants failed to observe, take notice of, or take into account, government communications to the public and to those involved in the opioid supply chain, such as the Pharmacy Defendants, and take action.

983. The Pharmacy Defendants failed to track profit changes for opioids, which skyrocketed once the epidemic was truly underway and would have signaled to any reasonable person, pharmacist, or executive that a crisis involving narcotic drugs was underway.

984. The Pharmacy Defendants in fact knew of massive sales and negotiated purchase contracts more favorable to them, which in turn created further pressure on pharmacists to fill more opioid prescriptions.

985. The Pharmacy Defendants knew that supply procedures had to change to address the ever-increasing volume of drugs being sold, which was so patently obvious that it required an update to a larger physical storage space for the volume of pills being moved.

986. The Pharmacy Defendants intentionally, maliciously, and repeatedly failed to investigate or act upon complaints, statements of concern and observations of employees.

987. The Pharmacy Defendants clearly knew that an opioid epidemic existed as that they considered and/or implemented changes to their security procedures to address retail outlet concerns regarding customers who were, may have been, or had the potential to become addicts.

**Walgreens Failed to Track and Report Suspicious Sales of Opioid Drugs**

988. Walgreens is a "registrant" under the federal CSA, 21 C.F.R. § 1300.02(b ), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to



Case ID: 260703065

register with the DEA.

989. Such registration also required Walgreens to identify "fraudulent prescription drug claims or any information in support thereof," and states the agreement is terminable if the provider is in "violation of any applicable law, rule and/or regulation."

990. Contrary to its duties as a registrant and under the Agreements under the CSA, in 2013, as a result of a multi-jurisdictional investigation by the DOJ, Walgreens was fined $80 million for its violations of the CSA.

991. According to the investigation, Walgreens committed an unprecedented number of record-keeping and dispensing violations under the CSA. According to documents filed in the underlying administrative actions, Walgreens negligently allowed controlled substances listed in Schedules II - V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black-market sales.

992. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000)[44] and Massachusetts ($200,000).[45] The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of patients who were considered high-risk. Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use. Some

[44] Caleb Stewart, Kroger, CVS, and Walgreens Settle Lawsuit with West Virginia for $3 Million, WHSV (Aug. 16, 20/6), http://www. whsv. comlcontentlnews/Kroger-CVS-and-Walgreens-settle-/aws11it- with-West-Virginia-for- 3-mil/ion-390332992. html.

[45] FeliceJ. Freyer, Walgreens to Pay $200,000 Settlement for Lapses with Opioids, The Boston Globe (Jan. 19, 2017), https:/lwww. bostong/obe.comlmetro/201710 1 I/ 8/walgreens-agrees-better-monitor-opioiddispensinglq0B3 FbMo2 k3wPt4hvmTQrM/story. html.

of the state's 160 Walgreens accepted cash for controlled substances from patients in MassHealth (the state's combined program for Medicaid and Children's Health Insurance), rather than seeking approval from the agency. In some cases, MassHealth had rejected the prescription; at other times, MassHealth was never billed. In response, Walgreens simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and not accept cash payments from patients deemed high-risk.

993. On September 20, 2017, Walgreens announced that the pharmacy was launching its "#ItEndsWithUs" campaign to educate teens about the opioid epidemic. As part of that initiative, the company created a website that serves as an online "#ItEndsWithUs" hub and resource center aimed at disseminating the risks of opioid abuse, guides on how to properly dispose of unused opioids, and even testimonials from individuals who personally overcame opioid addictions. Additionally, the "#ItEndsWithUs" hub provided the locations of free-to-use medication-disposal kiosks where individuals can deposit their unused medication into a safe box, the contents of which would be later disposed of in a safe and proper manner.

994. In the wake of a recent $500,000 fine, Walgreens adopted a "good faith dispensing" policy that allows a pharmacist to refuse to dispense pain relievers if the pharmacist feels that the prescriber failed to write a prescription for a legitimate medical purpose.

995. In a letter issued to prescribing physicians, Walgreens stated: "According to 21 C.F.R. 1306.04, pharmacists are required to ensure that prescriptions for controlled substances are issued for a legitimate medical purpose." The precise text of the regulation to which Walgreens ' letter referred, in pertinent part, is as follows:

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding

> responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

996. While Walgreens took additional steps to combat the opioid crisis, such efforts were admittedly late in the game, including launching a safe medication disposal program in which the company installed drug disposal kiosks in more than 500 Walgreen drugstores in states and Washington D.C., as well as eliminating the requirement persons present a prescription before being permitted to obtain the life-saving medication, Naloxone (in 35 states including Washington, D.C.). When a patient receives naloxone, Walgreens provides mandatory counseling on the risks of opioids, risk factors for and how to avoid overdose, how to identify and respond to an overdose, and how to use and administer Naloxone.

997. In addition to the measures set forth above, Walgreens could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; ( c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

998. Having knowledge and/or notice of the damages that Walgreens conduct had caused to Plaintiffs, Walgreens failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Walgreens, could have: (a) donated medication disposal units to community police departments across the country to ensure



Case ID: 260703065

unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) ran public education campaigns in which Walgreens ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

999. Walgreens could have and should have implemented these measures at any point in the last 15 years.

1000. And the failure to take such steps that Walgreens should have taken was negligent and did result in significant damages to Plaintiffs.

1001. Walgreens had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

1002. Any and all allegations against the Pharmacy Defendants in this Complaint shall also hereinafter specifically include and be asserted against Defendant Walgreens, and their DEA registered subsidiaries and affiliates.

1003. Walmart Failed to Track and Report Suspicious Sales of Opioid Drugs



Case ID: 260703065

1004. Walmart has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1005. Other Pharmacy Defendants, including Walmart, have engaged in similar conduct in violation of their responsibilities to prevent diversion. In 2009, Walmart paid $637,000 to resolve allegations of numerous record-keeping violations at its pharmacies in Texas. Those allegations included that Walmart had failed to timely file records indicating loss or theft of drugs to the DEA, in violation of the CSA.[46]

1006. Walmart's actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

1007. Furthermore, Walmart could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a} limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d} limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e} required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

1008. Having knowledge and/or notice of the damages that Walmart's conduct had caused to Plaintiffs and their beneficiaries, Walmart failed to take other steps to help curb the

[46] See generally Emma Perez-Trevino, Walmart Fined for Alleged Recording Keeping Violations, Brownsville Herald,
Jan. 7, 2009, Walmart Fined for Pharmacy Record-Keeping Violations, Ozarks First, Jan. 7, 2009,
http://www. ozarksfirst. com/11ewslhea/th-and-medica/lW ALMA RT-fined-for-pharmacy-record-keeping-violations.



Case ID: 260703065

damages already incurred by the Plaintiffs due to Defendants, including Walmart, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b} implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Walmart ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (t) enhanced pharmacist counseling for new opioid patients; (g} limited the daily dosage of opioids dispensed based on the strength of the opioid; and h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1009. Walmart could have and should have implemented these measures at any point in the last 15 years.

1010. And the failure to take such steps that Walmart should have taken was negligent, and upon information and belief, resulted in significant damages to Plaintiffs.

1011. Walmart had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

1012. Any and all allegations against the other named Pharmacy Defendants in this Complaint shall also hereinafter specifically include and be asserted against Defendant



Case ID: 260703065

Walmart, and their registered subsidiaries and affiliates.

**CVS Failed to Track and Report Suspicious Sales of Opioid Drugs**

1013. Defendant CVS is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

1014. Defendant CVS has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1015. In 2015, Defendant CVS agreed to pay $22 million to resolve DEA allegations that Pharmacy stores in Florida distributed controlled substances including opioids based on prescriptions that had not been issued for legitimate medical purposes. The DEA described the settlement as part of a "crackdown on pill mills in Florida," in which "[p]rescription drug addicts were travelling to Florida for access to physicians who were prescribing pain medication without regard to medical need and to pharmacies that were filling the prescriptions despite red flags that they were illegitimate."

1016. Defendant CVS has settled numerous other opioid-related investigations. In 2016, Defendant CVS agreed to pay $3.5 million to settle allegations that its pharmacists were filling fake prescriptions for addictive painkillers in Defendant CVS's stores in Massachusetts and New Hampshire. The same year, Defendant CVS agreed to pay $8 million to settle allegations that its Maryland pharmacies had dispensed controlled substances for prescriptions that did not serve a legitimate medical purpose.

1017. In 2017, Defendant CVS agreed to pay $5 million to settle allegations that it had



Case ID: 260703065

failed to maintain adequate records regarding controlled substances at its stores in California.

1018. As recently as June 2018, Defendant CVS agreed to pay $1.5 million to resolve allegations that it had failed to timely report loss or theft of substances including the opioid hydrocodone.

1019. Upon information and belief, CVS has done nothing to compensate Plaintiffs for the damages caused by its conduct.

1020. Defendant CVS was aware of its obligations to serve as a safeguard against abuse. In 2015, CVS publicly stated that, *"the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals. Families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."*

1021. However, the implication that Defendant CVS was actually complying with its obligations under Pennsylvania law and the laws of Plaintiff States was false, and Defendant CVS continued to pay fines to resolve numerous diversion-related violations in the ensuing years.

1022. Notwithstanding these repeated investigations into its failure to prevent diversion, Defendant CVS claims, misleadingly, that its *"utilization management program" "ensure[s] that opioids are being prescribed and used appropriately.* "

1023. Defendant CVS's public statements were intended to mislead the public including Plaintiffs to believe that Defendant CVS was taking effective steps to fight the opioid epidemic.

1024. In addition to measures alleged above, Defendant CVS could and should have



Case ID: 260703065

unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1025. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant CVS failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Defendant CVS, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant CVS ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1026. Defendant CVS could have and should have implemented these measures at any point in the last 15 years.

1027. And the failure to take such steps that Defendant CVS should have taken was negligent and did result in significant damages to Plaintiffs.

1028. Any and all allegations against the Pharmacy Defendants in this Complaint shall also hereinafter specifically include and be asserted against Defendant CVS, and their registered subsidiaries and affiliates.

1029. Defendant CVS had knowledge and/or notice of the damages caused and continuing to be caused by its conduct and could and should have taken measures, including but not limited to those set forth herein, to curb opioid expansion of opioid use and to prevent or minimize the cascading damages caused by its wrongful conduct.

**Target Failed to Track and Report Suspicious Sales of Subject Opioids**

1030. Defendant Target is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

1031. Target has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1032. Target's actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

1033. Target could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended



Case ID: 260703065

release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1034. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant Target failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Defendant Target, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant Target ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

**<u>Wegman's Failed to Track and Report Suspicious Sales of Subject Opioids</u>**

1035. Defendant is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.



Case ID: 260703065

1036. Wegman's has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1037. Wegman's actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

1038. Wegman's could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1039. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant Wegman's failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Defendant Wegman's, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant Wegman's ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain

acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

**Costco Failed to Track and Report Suspicious Sales of Subject Opioids**

1040. Defendant is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

1041. Costco has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1042. Costco's actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

1043. Costco could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1044. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant Costco failed to take other steps to help curb the



Case ID: 260703065

damages already incurred by Plaintiffs due to Defendants, including Defendant Costco, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant Costco ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

**VERREE PHARMACY AND THE INDIVIDUAL DEFENDANTS**

1045. Defendant Verree is a “registrant” under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

1046. Verree has an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation.”

1047. Verree’s actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of



Case ID: 260703065

opioid drugs.

1048. Verree could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1049. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant Verree failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Defendant Verree, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendant Verree ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1050. Verree and the Individual Defendants sit in a unique position, having been



Case ID: 260703065

prosecuted and pled guilty to their unlawful conduct in Philadelphia federal court.

1051. Specifically, in a Complaint filed in 2022 by the U.S. Attorney, the government sought to "hold Verree Pharmacy and it's the owner/pharmacist, Mitchell Spivack, accountable for the illegal dispensing of controlled substances, including opioids, and fraud on Medicare and other federal health care programs. Spivack and Verree Pharmacy, which was the top retail pharmacy purchaser of oxycodone in the entire state of Pennsylvania, pictured here, created a destructive enterprise that illegally dispensed unparalleled quantities of opioids and other controlled substances into the Philadelphia community and this District." *U.S. v. Spivak, Inc. d/b/a Verree Pharmacy and Mitchell Spivak*, Case No. 2:22-cv-00343 (E.D.Pa.) at Dkt. 1, p. 1.

1052. The government further alleged as follows:

> [T]he pharmacy had a responsibility to dispense these risky and addictive drugs only when appropriate. Instead, the pharmacy prioritized profits over patients, dispensing the drugs as long as the patients paid, despite numerous red flags suggestive of diversion—such as opioids in extreme doses, dangerous combinations of opioids and other "cocktail" drugs preferred by those addicted, excessive cash payments for the drugs, and other signs that the pills were being diverted for illegal purposes. To avoid scrutiny from the drug distributors that sold the pills, Verree, through Spivack, made false statements to maintain the façade of legitimacy in order to keep the pharmacy stocked with these pills. Tragically, patients suffered the severe consequences of this illegal scheme, including at least one patient who overdosed and died, found next to Verree Pharmacy bottles Spivack dispensed.
>
> At the same time, Verree and Spivack were also orchestrating an expansive health care fraud scheme involving fraudulent billings for drugs not actually dispensed. The cornerstone of the scheme was a code used by the pharmacy employees in their internal computer system: BBDF or "Bill But Don't Fill." This fraud—which one of the employees admitted to investigators—resulted in significant damages to Medicare and other federal programs.
>
> Verree and Spivack's schemes—maintained for years with sophisticated means and multiple participants—had a devastating impact on the community and on federal health care programs.

*Id*. at 2.

1053. Because Verree is situate just miles away from the location of many of the

Philadelphia-based Plaintiffs, including Plumbers Local 690, it was a popular pharmacy for Philadelphia-based union beneficiaries to fill their opioid prescriptions.

1054. Accordingly, the "devastating impact" described by the government was felt directly by many of the Plaintiffs in this case as a direct and proximate result of the Defendants' unlawful conduct alleged herein.

1055. The government further alleged against the Individual Defendants

> Verree and Spivack employed, among others, three other individuals who were involved in the pharmacy: T.G., a pharmacist and a lawyer with an active license in Pennsylvania; E.P., a pharmacy technician; and L.K., another pharmacy technician or assistant. Prescriptions that were dispensed by Verree were almost always listed in their computer system as being handled by one of these two pharmacists, Spivack or T.G., and one of these two pharmacy technicians, E.P. or L.K.
>
> *Id*. at 20.

1056. T.G. is Individual Defendant Todd Goodman, E.P. is Individual Defendant Eri Pestrack and L.K. is Individual Defendant Lee Kamp. All of these Individual Defendants were involved in the opioid scheme perpetrated by Spivak and Verree.

1057. The government alleged, and the Verree and Individual Defendants agreed, they were a "nationwide and regional outlier in [their] deviant purchasing, dispensing, and billing" of opioids. *Id*. at 22. " Such "deviant" practices were demonstrated as follows:

> The DEA conducted analyses of Verree and its purchasing through its Automated Reports and Consolidated Orders System (ARCOS). ARCOS is designed to track the delivery of certain controlled substances from the manufacturer all the way through its purchase by a pharmacy or other dispenser. ARCOS allows the DEA to track the quantity and types of purchases that pharmacies are making and compare those purchases to other pharmacies.
>
> First, a comparison was made by the DEA of the ARCOS ordering patterns for Verree of oxycodone 30mg for pharmacies in their area and across the country. For example, in 2017, Verree purchased 159,100 dosage units of oxycodone 30mg, which sharply exceeded the average purchasing of pharmacies in its zip code, in Pennsylvania, and even across the country.



Case ID: 260703065




1058. These "deviant" opioid prescriptions were paid, in part, by Plaintiffs.

1059. For example, data produced by Plumbers Local 690 shows the following purchases between just 2017 and January 2020:

| | | | |
|---|---|---|---|
| VERREE PHARMACY | 11/2/2017 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 11/17/2017 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 11/17/2017 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 11/30/2017 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 12/12/2017 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 12/12/2017 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 12/28/2017 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 1/5/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 1/5/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 1/25/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 2/2/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 2/2/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 2/22/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |

| | | | |
|---|---|---|---|
| VERREE PHARMACY | 3/1/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 3/1/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 3/15/2018 | 59385002260 | BELBUCA 150 MCG FILM |
| VERREE PHARMACY | 3/22/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 3/26/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 3/26/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 4/19/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 4/20/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 4/20/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 5/15/2018 | 59385002360 | BELBUCA 300 MCG FILM |
| VERREE PHARMACY | 5/15/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 5/15/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 5/17/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 5/31/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 6/11/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 6/11/2018 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 6/14/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 6/19/2018 | 59385002760 | BELBUCA 900 MCG FILM |
| VERREE PHARMACY | 6/22/2018 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 6/26/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 7/6/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 7/6/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 7/12/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 7/16/2018 | 59385002760 | BELBUCA 900 MCG FILM |
| VERREE PHARMACY | 8/2/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 8/3/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 8/9/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 8/13/2018 | 59385002760 | BELBUCA 900 MCG FILM |
| VERREE PHARMACY | 8/28/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 8/31/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 8/31/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 9/6/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 9/26/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 9/26/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 10/4/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 10/22/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 10/22/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 10/24/2018 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 10/26/2018 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 11/1/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 11/16/2018 | 59385002760 | BELBUCA 900 MCG FILM |
| VERREE PHARMACY | 11/19/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 11/19/2018 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |

| | | | |
|---|---|---|---|
| VERREE PHARMACY | 11/19/2018 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 11/21/2018 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 11/29/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 12/14/2018 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 12/14/2018 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 12/14/2018 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 12/27/2018 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 1/2/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 1/9/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 1/9/2019 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 1/9/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 1/9/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 1/15/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 1/19/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 1/24/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 2/1/2019 | 59011048010 | OXYCONTIN ER 80 MG TABLET |
| VERREE PHARMACY | 2/5/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 2/5/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 2/5/2019 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 2/10/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 2/12/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 2/21/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 2/22/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 3/1/2019 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 3/1/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 3/1/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 3/12/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 3/21/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 3/21/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 3/26/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 3/26/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 3/26/2019 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 4/5/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 4/8/2019 | 69543013611 | TRAMADOL HCL 50 MG TABLET |
| VERREE PHARMACY | 4/17/2019 | 00054023525 | MORPHINE SULFATE IR 15 MG TAB |
| VERREE PHARMACY | 4/18/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 4/22/2019 | 24510014010 | XTAMPZA ER 36 MG CAPSULE |
| VERREE PHARMACY | 4/22/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 4/22/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 5/3/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 5/16/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 5/17/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 5/17/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |

| | | | |
|---|---|---|---|
| VERREE PHARMACY | 5/20/2019 | 00603107558 | CHERATUSSIN AC SYRUP |
| VERREE PHARMACY | 5/29/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 6/11/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 6/11/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 6/13/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 6/14/2019 | 69547035302 | NARCAN 4 MG NASAL SPRAY |
| VERREE PHARMACY | 7/5/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 7/5/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 7/18/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 7/24/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 7/30/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 7/30/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 8/22/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 8/22/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 8/23/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 8/23/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 9/17/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 9/17/2019 | 00406853001 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 9/19/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 9/25/2019 | 12496120803 | SUBOXONE 8 MG-2 MG SL FILM |
| VERREE PHARMACY | 10/22/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 10/29/2019 | 00781723864 | BUPRENORPHINE-NALOX 8-2MG FILM |
| VERREE PHARMACY | 11/13/2019 | 00406051205 | OXYCODONE-ACETAMINOPHEN 5-325 |
| VERREE PHARMACY | 11/22/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 11/22/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 11/26/2019 | 00781723864 | BUPRENORPHINE-NALOX 8-2MG FILM |
| VERREE PHARMACY | 12/4/2019 | 10702000801 | OXYCODONE HCL (IR) 15 MG TAB |
| VERREE PHARMACY | 12/17/2019 | 10702000901 | OXYCODONE HCL (IR) 30 MG TAB |
| VERREE PHARMACY | 12/17/2019 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 12/23/2019 | 00781723864 | BUPRENORPHINE-NALOX 8-2MG FILM |
| VERREE PHARMACY | 1/10/2020 | 24510013010 | XTAMPZA ER 27 MG CAPSULE |
| VERREE PHARMACY | 1/10/2020 | 42806000801 | OXYCODONE HCL (IR) 30 MG TAB |

1060. Claims data of the other Plaintiffs will demonstrate that the Philadelphia-based unions paid for hundreds of thousands of dollars of Subject Opioids dispensed by Verree and the Individual Defendants.

**ESI Mail and Express Scripts Pharmacy Failed to Track and Report Suspicious Sales of Subject Opioids**

1061. Defendants ESI Mail and Express Scripts Pharmacy are "registrants" under the

federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

1062. These Defendants have an obligation to identify "fraudulent prescription drug claims or any information in support thereof," and to not be in "violation of any applicable law, rule and/or regulation."

1063. Defendants ESI Mail Pharmacy's and Express Scripts Pharmacy's actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioid drugs.

1064. Indeed, as captive pharmacies of one of the largest PBMs in America, these Defendants had unique access to information about drug diversion, overprescription and other conduct alleged herein by which to prevent such conduct having a material adverse effect on Plaintiffs, who contracted with Express Scripts for pharmacy benefit services to lower the costs of prescription drugs.

1065. As a result, these Defendants could and should have unilaterally taken action that and/or offered a program to third party payors to accept that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

1066. Having knowledge and/or notice of prescription opioid abuse, and the damages it was causing to Plaintiffs, Defendant ESI Mail Pharmacy and Express Scripts Pharmacy



Case ID: 260703065

failed to take other steps to help curb the damages already incurred by Plaintiffs due to Defendants, including Defendants ESI Mail Pharmacy and Express Scripts Pharmacy, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Defendants ESI Mail Pharmacy and Express Scripts Pharmacy ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; ( e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

## THE PBM DEFENDANTS

### Role of PBMs in Causing or Contributing to the Opioid Epidemic

1067. The opioid epidemic was created and sustained by a wide array of actors in the opioid supply-and-payment chain: the opioid manufacturers, distributors, pharmacies, and PBM Defendants.

1068. For at least the last two decades, PBM Defendants had a central role in facilitating the oversupply of opioids. PBM Defendants ignored the necessary safeguards in order to ensure increased opioid prescriptions and sales. These defendants intentionally



Case ID: 260703065

inserted themselves into the chain of distribution and dispensing of prescription opioids, thereby assuming duties to act reasonably.

1069. This chart[47] illustrates the central role the PBM Defendants play in the prescription- drug market:




1070. PBMs are the middlemen between the defendant drug manufacturers and the availability of opioids. The PBM plan designs determine what drugs (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what beneficial drugs or treatments will not be available.

1071. PBMs collude with manufacturers who pay fees in the form of rebates, administrative fees and other incentives in order to maximize utilization to the financial benefit

---

[47] *Pharmacy Benefit Managers and Their Role in Drug Spending*, THE COMMONWEALTH FUND (Apr. 22, 2019), https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending.



Case ID: 260703065

of the PBMs and manufacturers. This leads to more prescriptions and more pills being available to the general public, many of which find their way to the black market.

1072. The PBM Defendants sit at the center of prescription-drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies who dispense them, and the third- party payors who pay for them. Defendants' specific conduct that drove the increases and led to oversupply included:

- colluding with, and aiding and abetting, Purdue Pharma and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids;
- colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees;
- colluding with Purdue Pharma and other opioid manufacturers to eliminate or limit utilization management measures on national formularies that would have restricted opioid prescriptions;
- representing that they would diligently implement effective drug utilization review measures and deliberately failing to do so.
- electing not to act on the vast stores of information they had about the epidemic to limit the flood of opioids into communities across the Unites States, including in Pennsylvania and the Plaintiff States; and
- dispensing huge quantities of prescription opioids through their mail-order pharmacies without proper controls against diversion.

1073. The PBM Defendants are legally responsible for their role in causing, contributing to, and maintaining the opioid epidemic because, among other things:

- their conduct in colluding with the opioid manufacturers to increase the supply of opioids through false and fraudulent misrepresentations was intentional and negligent, and unlawful;
- they represented that they would offer formularies, utilization management protocols, and drug utilization review measures that would ensure safe and appropriate use of opioid medications, but instead, worked with the opioid manufacturers to increase the supply of opioids without regard to the safety or appropriateness of the drugs;
- they intentionally and negligently decided, acted, and continued to offer only formularies, utilization management protocols, and drug utilization measures that placed no meaningful restrictions on the prescribing and use of opioids despite knowing, through the vast stores of data they had, that: (i) such unrestricted access to opioids was causing, and foreseeably would continue to cause, harm (including the foreseeable harm of diversion) to communities in Pennsylvania and the Plaintiff States; and, (ii) those harms could be addressed through measures that Defendants intentionally decided not to make available; and,
- their conduct with respect to opioid prescribing and dispensing was unlawful as well as intentional and negligent because they failed to comply with the laws of Pennsylvania and the Plaintiff States, both in their own dispensing through their

mail order pharmacies and in their other activities that increased the risks of diversion.

1074. The PBM Defendants' role in the opioid epidemic was made possible by their unique combination of knowledge and power that gave them an extraordinary ability to control the opioid supply throughout the United States.

1075. No other actor in the nation's healthcare system was in a better position to deliver more immediate and more impactful changes to the opioid epidemic than the PBMs.

1076. PBMs have the ability to limit the number of pills available. PBMs were well aware that benefit plan design, formulary placement, and drug utilization management would result in more addictive opioids entering the marketplace and more addicts being created. Yet, notwithstanding their contractually bound commitment to their customers, whose public and private plans cover over 90% of Americans, they chose to place profits over their professional and ethical duties.

1077. PBMs not only control the majority of this country's prescriptions through their benefit plan design and formulary management, they generate massive profits from that work. PBMs are paid by drug companies to move product. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And most of these rebates directly benefited the PBM."[48] In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving usage, including formulary development, plan design and utilization management

---

[48] Wayne Winegarden, *To Improve Pharmaceutical Pricing, Reform PBMs And Fix Health Care's Systemic Problems*, FORBES, Apr. 4, 2017, https://www.forbes.com/sites/econostats/2017/04/04/to-improve-pharmaceuticalpricing-reform-pbms-and-fix-health-cares-systemic problems/#4da58c5a3322



Case ID: 260703065

programs.

1078. The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending. They also tout their ability to enhance the health benefits for end-users. Drug manufacturers recognize the power of the PBMs to drive utilization.

1079. The PBMs' powerful position is highlighted not only from an information perspective ("robust point-of-dispensing screening and intervention"), but also as "an intermediary between the physician, pharmacist, patient, pharmaceutical manufacturer, health systems, and other components of the industry," which situates Defendants "in an ideal position to drive improvements in education and awareness of the dangers of opioid therapy[.]"

1080. PBMs provide services to prescription drug benefit plans sponsored by health insurers, self-insured employers, and state and federal government agencies. Defendants collect and maintain (and sell) unprecedented amounts of data about the extent of opioid prescribing, far exceeding what any individual manufacturer, distributor, or pharmacy chain has access to. For as long as they have existed as PBMs, Defendants have received, analyzed, and tracked detailed claims data for the billions of prescriptions they process each year, including opioid prescriptions. Controlling prescription drug benefits for 160+ million Americans, Defendants are in possession of detailed information about every prescription they process, regardless of which company manufactured the drug, which doctor prescribed it, what pharmacy it was filled at, or which state it was dispensed in. Defendants know when patients whose benefits they manage fill opioid prescriptions written by multiple doctors, and when

they fill them at multiple pharmacies. They know how many times every opioid prescription they cover is refilled, and they know when a patient who was prescribed opioids is later treated for substance use disorder. They know if one of their covered individuals is having the lethal "Holy Trinity" of prescriptions (opioids, benzodiazepines, and sleep aids) filled concurrently. In short, Defendants have had a unique vantage point that allowed them access to the entire landscape of the unfolding opioid epidemic for two decades. The PBM Defendants were able to follow each pill from manufacturer to patient, observing in real time the abusive prescribing patterns and associated misuse.

1081. The PBM Defendants encouraged and influenced prescribing, dispensing, and sales primarily through the national formularies they offer to pharmacy benefit plans and through what they chose to offer in terms of standard "utilization management" (***"UM"***) rules.

1082. Formularies are lists of drugs covered by a pharmacy benefit plan and control which drugs are available to the plan participants. They are often constructed in tiers, where drugs listed on higher tiers require larger copays, or as so-called exclusionary formularies, where preferred brand drugs are included and nonpreferred drugs are not included.

1083. Standard UM programs include various protocols for managing access and use of particular drugs, including: (i) step therapy, where a beneficiary is required to try a different drug or therapy first before trying the restricted drug; (ii) quantity limits, which are limits on the dosage or days' supply that a patient may receive for any given prescription(s); and, (iii) prior authorizations, which are rules that require a



Case ID: 260703065

physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed. Data shows that, when implemented, disfavored formulary placement and UM reduce inappropriate prescribing by making non- preferred drugs and those drugs subject to UM restrictions more difficult and more costly to obtain.

1084. By contrast, the PBM Defendants and the opioid manufacturers, several of whom have agreed to settlements with States throughout the County, knew that favorable formulary placement and the absence of UM restrictions created a scenario where prescriptions were written and dispensed with ease and frequency, at the expense of public safety.

1085. Through their formulary and UM tools, the PBM Defendants, in conjunction with opioid manufacturers, are and have been uniquely situated to influence and control the prescribing and dispensing of opioids to their 160+ million covered individuals. Indeed, opioids that received preferred status on PBM formularies had significantly greater sales than drugs that were either excluded or disadvantaged. In this sense, the PBM Defendants function as the gatekeepers to the opioid market.

1086. The PBM Defendants used their hugely profitable roles to grow into vertically-integrated colossuses that have come to dominate access to prescription drugs. The current Fortune 500 list ranking of the largest corporations in America by revenue has healthcare conglomerates UnitedHealth Group (OptumRx) and Cigna (Express Scripts) sitting at fourth and sixteenth, respectively. Defendant Express Scripts surpassed $100 billion in annual revenue as early as 2017. Defendant OptumRx has also seen its revenue grow, reaching nearly $100 billion in 2022.

1087. These two corporate leviathans are: (1) two of the three largest PBMs in the United States, collectively managing prescription drug coverage for 160+ million covered individuals and processing more than 1.5 billion claims per year; (2) two of the top five dispensing pharmacies in the United States; (3) owned by two of the largest insurance companies in the world (UnitedHealth Group and Cigna); and, (4) among the largest healthcare data, consulting, and analytics companies in the United States.

1088. The PBM Defendants interact with patients, pharmacies, prescribers, and payers. Thus, they are uniquely situated to collect data when patients receive and fill opioid prescriptions under their pharmacy benefits. Instead of using their vast stores of information and extensive power to manage the floodgates of opioid prescriptions and limit abuse of these dangerous drugs, Defendants worked together and with the opioid manufacturers to negotiate contracts and structure formulary and UM offerings that encouraged opioid prescribing, while facilitating easy and inexpensive dispensing and sales of those drugs. The result is that the market for prescription opioids grew as prescribing, dispensing, and sales increased, and Defendants and opioid manufacturers reaped the profits of their contracts and relationships. For Defendants, the profits came from rebates and fees they earned from the branded opioid manufacturers by making opioids freely available and from pricing spreads and fees they captured from generic opioid sales.

1089. PBM Defendants also contributed substantially to the opioid crisis by knowingly promoting prescription opioid use and dispensing far greater quantities of prescription opioids than could be necessary for legitimate medical uses through their mail-order pharmacies, while failing to take any steps to monitor orders or report

suspicious orders. This oversupply thereby directly contributed to the fueling of an illegal secondary market.

1090. PBM Defendants have not been mere bystanders in the opioid crisis. Rather, they colluded with the opioid manufacturers, placed profits over safety, and engaged in a scheme to increase the sale of prescription opioids, despite the known dangers of these drugs.

1091. PBM Defendants' conduct has exacted, and foreseeably so, a financial burden on the Plaintiffs. Categories of damages sustained by the State include, but are not limited to, prospective damages associated with abating the nuisance PBM Defendants created

1092. PBMs quietly became an integral part of the pharmaceutical supply chain – that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet – following the passage of the Medicare Modernization Act in 2003.

1093. Today, the big three PBMs manage the drug benefits for nearly 95% of the population.[49] They drive what drugs are covered by virtually all health insurance providers for over 260 million people. PBMs made almost $260 billion last year.[50] In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States.[51] They are key participants and play a crucial role in the administration and reimbursement of prescription drugs.[52]

---

[49] Hoffman-Eubanks, *supra* note 15.
[50] John Breslin, *Health care experts call for more transparency into PBMs*, PATIENTDAILY, Dec. 20, 2017, https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms
[51] Lydia Ramsey and Skye Gould, *A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works*, BUSINESS INSIDER, Apr. 25, 2017, http://www.businessinsider.com/express-scripts-esrx-anthemnot- renewing-pbm-2017-4
[52] Health Policy Brief, *supra* note 36.

1094. PBM influence results from the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.[53]

1095. In this environment, the top three PBMs have substantial if not exclusive control over the dissemination of opioids. In concert with drug manufacturers who provide them with assorted complicated payments as incentives,[54] PBMs design benefit plans determining which drugs will be paid for, reimbursed, or covered by public and private pharmacy benefit plans, allowing the drugs to enter the marketplace to be abused. For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto,"[55] OptumRx proceeds to define its formulary as follows:

> A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary')… [T]he drugs included on the PBM's Formulary may be modified by PBM, with prior approval by [client], from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations.[56][emphasis added]

1096. Notably, OptumRx does not explain how "manufacturer rebate arrangements"

---

[53] Neeraj Sood, Tiffany Shih, Karen Van Nuys, Dana Goldman, *Follow the Money: The Flow of Funds In the Pharmaceutical Distribution System*, HEALTH AFFAIRs, Jun. 13, 2017, https://www.healthaffairs. org/do/10.1377/hblog20170613.060557/full/

[54] Health Policy Brief, *supra* note 36.

[55] United Healthcare Services, Inc. and Employees Retirement System of Texas, *Pharmacy Benefit Management Services Executed Contract*, Section 2.3 (2016), https://ers.texas.gov/Doing-Business-with-ERS/PDFs/Contract-for-Pharmacy-Benefit-Management-Services-for-the-HealthSelect-Prescription-Drug-Program.pdf

[56] *Id.* at Section 4.1(h)(i).

impact its formulary design.

1097. Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above. *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.[57]

1098. It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees. Nor does it explain all of the services for which it receives the administrative fees. Nor does it explain how any of these payments actually influence its formulary design. Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any Express Scripts customer pays for any drug.

---

[57] Express Scripts, Inc. and Oklahoma City Municipal Facility Authority, Pharmacy Benefit Management Agreement, pg. 30, Exhibit E (2008), http://nationalprescriptioncoveragecoalition.com/wp-content/uploads/2017/ 07/WebPage-2.pdf

1099. Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> [I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers]. *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, *[customer] acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues.*[58]

1100. The harm caused by the PBMs is not just monetary: "[t]he PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[59] PBMs also fail to control quantities, or numbers of refills for highly addictive drugs and ignore or neglect their assorted contractual undertakings to ensure patient wellness.

1101. PBMs also provide discount drug cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic. PBMs allow this loophole because they are paid for every prescription filled in this manner.

1102. MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes the PBMs' complicity in the

---

[58] *Id*. at pp. 8-9, Section 6.4.
[59] Jonathan Wilcox, *PBMs Must Put Patients First*, HUFFINGTON POST, Feb. 28, 2017, https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc



Case ID: 260703065

opioid crisis this way:

> We live in a world where payers -- not physicians -- determine what drugs and treatments patients receive. If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway.
>
> What happens if the patient doesn't respond to the cheap drug? Often, the physician continues to prescribe it, because -- to gain access to the more effective drug -- physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it.
>
> So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason. Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[60]

1103. Thus, people with pain are at the mercy of PBMs, yet PBMs make it easier to get opioids than to get other pain medication that is less addictive, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives, as described above. According to a study by the New York Times and ProPublica of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.[61]

1104. Even when they were asked to limit accessibility to opioids, PBMs refused. The seeds of the opioid epidemic were sown with early over prescription of OxyContin. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused.[62] Using the financial

---

[60] Milton Packer MD, *Are Payers the Leading Cause of Death in the United States?,* MEDPAGETODAY, Nov. 1, 2017,https://www.medpagetoday.com/blogs/revolutionandrevelation/68935
[61] Thomas and Ornstein, *supra* note 48.
[62] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, STAT,Oct. 26, 2016, https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/



Case ID: 260703065

*quid pro quo* it had with the West Virginia PBM, it paid Merck Medco (now Express Scripts) to prevent insurers from limiting access to the drug. This practice was consistent nationwide.

> The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.
>
> "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."[63]

1105. PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies."[64]

1106. Not only do PBMs place roadblocks in the way of limiting excessive opioid prescriptions, they also make it more difficult to obtain ADF opioids. These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.[65] The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids.[66] A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.[67]

---

[63] *Id.*
[64] Charles L. Bennett MD PhD MPP, *Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses,* COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctorillnesses/
[65] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SW News Media, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managersare-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-,61d29d25c84b.html
[66] Bennett, *supra* note 139.
[67] Pitts, *supra* note 140.



Case ID: 260703065

1107. Making matters worse, in addition to making it easy to obtain generic highly addictive opioids, PBMs make it ***harder*** to obtain ***treatment***. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves.[68] Only after being subject to much public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

1108. A 2008 study by the Mayo Clinic[69] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but other do not.[70]

1109. In addition to their role designing prescription drug benefit programs, one responsibility of all PBMs and their employed pharmacists is to properly monitor and control the distribution of prescription opioids. PBMs market their abilities to ensure that the medications they dispense are appropriately dosed, and monitored for drug interactions, therapeutic duplications, and possible misuse or abuse.

1110. PBMs also market their ability to manage and oversee the quality of the retail pharmacies that are contracted to be in their network. At critical times, PBMs were – at best – asleep at the switch when it came to auditing pharmacies that were dispensing huge quantities of opioids. The fact that very few if any "pill-mill" pharmacies or over-prescribing physicians were reported by PBMs to the State Boards of Pharmacies or State Medical Boards is testament to the PBMs' lack of oversight of opioids.

1111. There have always been steps the PBMs could take to abate the flow of opioids.

---

[68] Thomas and Ornstein, *supra* note 48.
[69] Available at https://www.ncbi.nlm.nih.gov/pubmed/18804915
[70] Barry Meier and Abby Goodnough, *New Ways To Treat Pain Meet Resistance*, THE NEW YORK TIMES, Jun. 22, 2016, https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html?mcubz=1,

They could make it easier to access other non-addictive forms of pain relief. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could cover alternative, non-medication treatments for pain. They could make addiction treatment more accessible. They could monitor prescriptions. They could forbid 90-day supplies of opioids. They could audit pharmacies. They could require doctors and pharmacies in their networks to use PDMPs. They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons. No single actor is to blame for this epidemic, and PBMs play a unique role.

1112. As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[71]

1113. In sum, because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies influence everything from pharmacy reimbursements, to what drugs are covered under formularies. In these ways, the PBMs drive which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

1114. PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. A review of the defendant PBM

[71] Pitts, *supra* note 140.



Case ID: 260703065

formularies confirms that they include all of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

1115. As with the other defendants sued herein and elsewhere by the District Attorneys, PBMs must contribute to the damage their intentional and purposeful conduct has foreseeably caused the Counties and Pennsylvania.

**Express Scripts Opioid "Management" Programs**

1116. Unlike other PBMs, Express Scripts set about early to profit from the sale of opioids by directly engaging with opioid manufacturers to manage opioids.

1117. For instance, as of at least March of 2008, Express Scripts adopted a "Drug Quantity Management Policy" for Purdue's oxycodone products that permitted prescriptions of oxycodone to be dispenses at quantities of up to 90 tablets per 30 days without prior authorization. This Policy was ostensibly to prevent the stockpiling, misuse and/or overuse of controlled-release oxycodone. However, it had the opposite effect.

1118. Additional quantities of oxycodone were permitted if one of several criteria were met, including if patients had intractable pain, acute pain and even addiction. If a patients was in a treatment program for addiction, Express Scripts' Policy authorized a quantity limit override to allow such patients to get more opioids than was otherwise limited.

1119. As of at least 2021, Express Scripts convened monthly meetings of executives to optimize the sales of opioids through its direct relationships with Purdue, Endo and others.

1120. Express Scripts managed patient assistance programs for opioid manufacturers like Purdue and Endo that allowed free quantities of oxycodone to be dispensed to patients.

**COUNT I**
**PLAINTIFFS v. ALL DEFENDANTS**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW,**
**73 P.S. § 201-1 – 201-9.3, *et seq.***

1121. The Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1122. The Pennsylvania UTPCPL, 73 P.S. § 201-1 – 201-9.3, *et seq*., (or "UTPCPL") makes it unlawful for a person or business to, among other things, employ "[u]nfair methods of competition" and "unfair or deceptive acts or practices" by representing that goods or services "have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," or by "causing likelihood of confusion or misunderstanding as to the 'approval or certification of goods or services.'" 73 P.S. § 201-2(4)(ii), (v).

1123. The Defendants have engaged in unfair or deceptive acts or practices as set forth herein which violated the UTPCPL.

1124. In numerous instances, in the course of manufacturing, marketing, offering for sale, and selling Subject Opioids, the Defendants represent or represented, expressly or by implication, through a variety of means, including telephone calls, seminars, written communications, sales calls and internet communications, as set forth above that opioids were, among other things, safe, life-saving, and non-addictive.

1125. In truth and in fact, opioids were highly addictive, dangerous, and non-life-saving.

1126. Therefore, the Defendants' representations are and were confusing, misleading, or are and were not substantiated at the time they were made and thus constitute unfair or deceptive acts and practices in violation of 73 P.S. § 201-2(4)(xv) and (xxi).

1127. In distributing, marketing, distributing and selling Subject Opioids to Plaintiffs, and in engaging in the unlawful conduct more fully described herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed consumers in the Counties and the Commonwealth of Pennsylvania within the meaning of 73 P.S. § 201-2(3).

1128. At all times relevant to this Complaint, the Defendants, directly and indirectly through third parties, including their co-conspirators and aiders and abettors, violated the UTPCPL, and/or conspired and agreed, or aided and abetted others to violate the UTPCPL, by making and disseminating untrue, false, and misleading statements to medical providers and consumers in Pennsylvania to promote the sale and use of opioids to treat chronic pain, and by causing untrue, false, and misleading statements about opioids to be made or disseminated to medical providers and consumers in Pennsylvania in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements included, but were not limited to:

a. Misrepresenting or concealing the truth about how opioids lead to addiction;

b. Misrepresenting that opioids improve function or ignoring that these misrepresentations were made to consumers and others, including the government;

c. Misrepresenting that addiction risk can be managed or ignoring that these misrepresentations were made to consumers and others, including the government;

d. Misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction" or ignoring that these misrepresentations were made to consumers and others, including the government;

e. Falsely claiming that withdrawal is simply managed or ignoring that these false claims were made to consumers and others, including the government;



Case ID: 260703065

f. Misrepresenting that increased doses pose no significant additional risks or ignoring that these misrepresentations were made to consumers and others, including the government;

g. Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment or ignoring that these falsehoods, omissions and misrepresentation were made to consumers and others, including the government; and,

h. Misrepresenting compliance with federal and Pennsylvania law with regard to the required monitoring, reporting, and related obligations with suspicious orders of controlled substances or ignoring that these misrepresentations were made to consumers and others, including the government.

1129. The Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair or deceptive acts or practices within the meaning of 73 P.S. § 201-2(4), including, but not limited to, the following:

a. causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services, within the meaning of 73 P.S. § 201-2(4)(ii);

b. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, within the meaning of 73 P.S. §201-2(4)(v);

c. advertising goods or services with the intent not to sell them as advertised, within the meaning of 73 P.S. § 201-3(4)(ix);

d. making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, within the meaning of 73 P.S. § 201-2(4)(xi); and

e. engaging in any other deceptive conduct which creates a likelihood of confusion or of misunderstanding, within the meaning of 73 P.S. § 201-2(4)(xxi).

1130. The Defendants' conduct more fully described herein is proscribed and unlawful pursuant to 73 P.S. §201-9.2.

1131. At all times relevant to this Complaint, the Defendants, directly and/or indirectly through third parties by conspiring and agreeing with or aiding and abetting such third parties, also violated the UTPCPL by making (or ignoring) statements that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain. The Defendants and their third-party (opioid manufacturer and distributor) co-conspirators repeatedly failed to disclose and/or suppressed material facts about the risks of opioids, including the risk of addiction, and their risks compared to alternative treatments for pain. Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

1132. At all times relevant to this Complaint, the Defendants, directly and/or indirectly, through third parties, and by conspiring and agreeing with or aiding and abetting third parties, made and disseminated the foregoing untrue, false and misleading statements, and material omissions, through an array of marketing channels, including but not limited to: in-person and other forms of direct detailing; speaker events, including paid for meals, conferences, and teleconferences, and continuing medical education; studies and journal articles, and supplements thereto; advertisements and brochures; and patient education materials.

1133. The Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false or misleading and therefore likely to deceive the public. In addition, the Defendants knew or should have known that their



Case ID: 260703065

marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

1134. The Defendants – including and especially the Distributor Defendants, Retail Defendants and PBM Defendants -- knew but took no action when opioid manufacturers also held themselves out as law-abiding distributors and manufacturers of drugs, but instead withheld from law enforcement the names of prescribers they knew to be facilitating the diversion and over-prescribing of opioids, while simultaneously marketing opioids, or aware of marketing opioids, to these doctors, and by disseminating, or being aware of the dissemination of, patient and prescriber education materials, advertisements, and CMEs the opioid manufacturers knew would reach these same prescribers, violating Pennsylvania and Federal law by not reporting these doctors.

1135. The Retailer PBM Defendants also held themselves out as law-abiding distributors and sellers of drugs, but instead withheld from law enforcement "suspicious orders" of controlled substances, as describe more fully above, in violation of Pennsylvania and Federal law, by not reporting these "suspicious orders". These Defendants also failed to set up a monitoring system and/or report the results of a monitoring system with regard to "suspicious orders" in violation of Pennsylvania and federal law. This deceptive conduct created a likelihood of confusion and of misunderstanding to the Counties. The Defendants were aware of the opioid manufacturers' conduct, but did nothing to stop it—and took steps to encourage it for their own profit.

1136. Similarly, the PBM Defendants, who contracted with the Manufacturer Defendants and Bankrupt Manufacturers for coverage of Subject Opioids on their formularies, and for distribution of Subject Opioids through their captive specialty pharmacies and mail



Case ID: 260703065

order pharmacies, were aware of these manufacturers unlawful conduct in the marketing, distribution and sale of Subject Opioids. However, rather than use their power and direct influence to stop such conduct, or steer their client TPPs away from such conduct, they facilitated such conduct for their own benefit at the expense of Plaintiffs.

1137. The PBM Defendants also contracted with the Retail Defendants for the prescription coverage and fulfillment of Subject Opioids, for which Plaintiffs were required to pay under their contracts with the PBM Defendants. As a result of their direct interactions with the Retail Defendants, the PBM Defendants were aware of these defendants' unlawful conduct in the marketing, distribution and sale of Subject Opioids. However, rather than use their power and direct influence to stop such conduct, or steer their client TPPs away from such conduct, they facilitated such conduct for their own benefit at the expense of Plaintiffs

1138. The Plaintiffs and their beneficiaries reasonably relied on the Defendants to uphold their legal requirements and not commit intentional, material omissions to law enforcement for the sake of their own profits.

1139. In sum, the Defendants either took action to, or conspired and aided and abetted to: (a) directly engage in untrue, false, and misleading marketing; (b) disseminate the untrue, false, and misleading marketing through third parties; (c) agree to cause, or aided and abetted the untrue, false and misleading marketing through third parties; and (d) create a likelihood of confusion and misunderstanding in choosing to benefit from those untrue, false, and misleading marketing to profit rather than report those activities and suspicious orders.

1140. All of this conduct, separately and collectively, was intended to deceive Pennsylvania consumers who used or paid for opioids for chronic pain; Pennsylvania physicians who prescribed opioids to consumers to treat chronic pain; and Pennsylvania TPPs

who purchased or reimbursed the purchase of opioids for chronic pain and otherwise paid for the services related to opioid addiction. As a direct and proximate result of the foregoing acts and practices, the Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UTPCPL as described in this Complaint.

1141. The Defendants are liable for their actions and inactions, and are jointly and severally liable for the actions of their co-conspirators and aiders and abettors, for each of these violations as independent, unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive act or practice in violation of the UTPCPL.

1142. As a result of the Defendants' unfair and deceptive acts and practices, the Plaintiffs suffered and will continue to suffer ascertainable losses and damages in an amount to be determined at trial, which amounts should be awarded pursuant to 73 P.S. §201-9.2. These amounts should be trebled, in this Court's discretion, as appropriate, with an appropriate award of fees and costs incurred in bringing these Defendants to justice.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.



Case ID: 260703065

**COUNT II**
**PLAINTIFFS v. ALL DEFENDANTS**
**STATUTORY CONSUMER FRAUD IN THE PLAINTIFF STATES**

1143. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1144. Defendants' acts, practices and omissions violate the consumer fraud laws of various states in which Plaintiffs and/or their members reside.

1145. These states, called the Plaintiff States, include the following: Delaware, Maryland, Massachusetts, New Jersey, New York, Ohio and Florida.

1146. Defendants acts, practices and omissions alleged herein violated the consumer fraud laws of the Plaintiff States.

Delaware

1147. The Delaware Consumer Fraud Act 6 Del. C. §§2511-2528 protects against unlawful practices in, among other things, the advertisement of goods, intangibles, and/or services. Under the Consumer Fraud Act, the advertisement includes any attempt by publication, dissemination, solicitation, and or circulation to induce, directly or indirectly, any person to enter into any obligation or acquire any title or interest in such goods, intangibles, and/or services.

1148. As defined in Section 2513 of the Delaware Consumer Fraud Act, unlawful practices include any deception, fraud, false pretense, false promise, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission.

1149. Plaintiffs and their beneficiaries in Delaware are consumers within the meaning of the Delaware Consumer Fraud Act.

1150. Defendants attempted by publication, dissemination, solicitation, and/or circulation to induce Plaintiffs and their beneficiaries to pay for prescriptions of opioids. Plaintiffs, their beneficiaries and their medical prescribers relied upon Defendants' publication, dissemination, solicitation, and/or circulation about opioids to their detriment.

1151. As a direct and proximate result of Defendants' conduct in violation of the Delaware Consumer Fraud Act, Delaware Plaintiffs have suffered and will continue to suffer material harm, including without limitation the accrual of legal fees, expenses, and time to investigate claims against Defendants.

Maryland

1152. Plaintiffs and their beneficiaries in Maryland are consumers within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, et seq ("MCPA") who transacted with Defendants through their receipt and payment for Subject Opioids. See Md. Code. Ann., Com. Law § 13-101(c).

1153. Defendants are all persons and merchants within the meaning of Md. Code Ann., Com. Law § 13-101(g), (h).

1154. At all times relevant hereto, Defendants have maintained businesses and substantial business operations in the State of Maryland, and have regularly conducted business throughout the State of Maryland.

1155. The Consumer Protection Act, codified at Maryland Code (1975, 2005 Replacement Volume) §§ 13-101 et seq. of the Commercial Law Article ("MCPA") was "intended to provide minimum standards for the protection of consumers in the State." § 13-101.



Case ID: 260703065

1156. As the Maryland Court of Appeals has explained:

> The General Assembly enacted the Consumer Protection Act . . . in response to "mounting concern over the increase of deceptive trade practices in connection with sales of merchandise, real property, and services and the extension of credit." . . . The Legislature was concerned that these deceptive practices were undermining public confidence in merchants . . . . It found existing federal and State laws to be "inadequate, poorly coordinated and not widely known or adequately enforced," and found "that improved enforcement procedures [were] necessary to help alleviate the growing problem of deceptive consumer practices." . . . With the Act, therefore, the General Assembly intended "to set certain minimum statewide standards for the protection of consumers across the State" and to "take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland."

*Morris v. Osmose Wood Preserving*, 340 Md. 519, 536-37, 667 A.2d at 624 (1994) (citations omitted).

1157. Among other things, the MCPA prohibits unfair and deceptive trade practices "in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, consumer services…" MCPA § 13-303(1).

1158. Deceptive trade practices include the following:

> (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers;
>
> (2) Representation that:
>
> (i) Consumer goods . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;
>
> * * * *
>
> (iv) Consumer goods, consumer realty, or consumer services are a particular standard, quality, grade, style or model which they are not;
>
> (3) Failure to state a material fact if the failure deceives or tends to deceive;
>
> * * * *
>
> (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that

> the consumer relies on the same in connection with:
>
> (i) the promotion or sale of any consumer goods… or consumer service[.] MCPA § 13-301.

1159. Common Law section 13-105 declares it to be "the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission [FTC] and the federal courts."

1160. Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), prohibits "unfair or deceptive acts or practices." Nearly forty years ago the FTC first indicated in dicta that a seller of a product violated § 5 of the FTC Act if advertised claims for a product lacked adequate substantiation. See In re Heinz W. Kirchner, 63 F.T.C. 1282 (1963), aff'd, 337 F.2d 751 (9th Cir. 1964). The Court in In re Heinz:

> "We are inclined to think that an advertiser is under a duty, before he makes any representation which, if false, could cause injury to the health or personal safety of the user of the advertised product, to make reasonable inquiry into the truth or falsity of the representation."

*Id*. at 1294. In 1972, the FTC held that "it is an unfair practice in violation of the [FTC] Act to make an affirmative product claim without a reasonable basis for making that claim." In re Pfizer, Inc., 81 F.T.C. 23, 62 (1972). The Commission, in Pfizer, indicated how the interpretation would be applied, saying:

> "The question of what constitutes a reasonable basis is essentially a factual issue which will be affected by the interplay of overlapping considerations such as (1) the type and specificity of the claim made–e.g., safety, efficacy, dietary, health, medical; (2) the type of product–e.g., food, drug, potentially hazardous consumer product, other consumer product; (3) the possible consequences of a false claim–e.g., personal injury, property damage; (4) the degree of reliance by consumers on the claims; (5) the type, and accessibility, of evidence adequate to form a reasonable basis for making the particular claims. More specifically, there may be some types of claims for some types of products for which the only reasonable

> basis, in fairness and in the expectations of consumers, would be a valid scientific or medical basis. The precise formulation of the "reasonable basis" standard, however, is an issue to be determined at this time on a case-by-case basis. This standard is determined by the circumstances at the time the claim was made, and further depends on both those facts known to the advertiser, and those which a reasonably prudent advertiser should have discovered."

*Id.* at 64.

1161. Defendants have engaged in unfair, abusive or deceptive trade practices within the meaning of, and in violation of, the MCPA in that: (2) Defendants' wrongful actions and practices, inaction, omissions, want of ordinary care, misrepresentations, and non-disclosures are substantially injurious to Plaintiffs, offend public policy, and/or are unfair, deceptive, abusive, immoral, unethical, oppressive and/or unscrupulous; (2) any justification for Defendants' conduct would be outweighed by the gravity of the injury and harm to Plaintiffs; (3) there were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct; and (4) Defendants' conduct violates common law and statutory law as alleged herein.

1162. Defendants violated MCPA § 13-301(3) by failing to state a material fact, a failure which deceives to tends to deceive. As alleged herein, Defendants' conduct, nondisclosures were false, misleading and likely to deceive Plaintiffs in violation of the MCPA.

1163. Defendants violated MCPA § 13-301(9)(i) by deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts relating to the appropriate, medically-approved uses and benefits of opioids for the treatment of disease, especially medical conditions for which opioids were not approved especially as long term maintenance therapy.

1164. Plaintiff would not have paid for the Subject Opioids that they did, or the treatments related thereto, had Defendants not engaged in deception, fraud, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts in their marketing, promotion and sale of opioids.

1165. Defendants' misrepresentations and fraudulent omissions were material to Plaintiffs. Had Defendants disclosed the truth about opioids, including their limited uses and benefits, addiction potential and the real reasons behind their prescription by doctors, Plaintiffs would not have paid the prices they it did for the Subject Opioids.

1166. As a direct and proximate result of Defendants' unlawful, unfair, deceptive and fraudulent conduct in violation of the MCPA, Plaintiffs have suffered injury in fact and will continue to be injured by having to pay Subject Opioids prescribed to their Maryland beneficiaries. Further, as a direct and proximate result of Defendants' violation of the MCPA, Plaintiffs incurred actual damages, including the cost of Subject Opioids and opioid treatment, among other costs.

1167. As a result of Defendants' unfair and deceptive trade practices, Plaintiffs demand judgment against Defendants for declaratory and injunctive relief, including a declaration that the Defendants' conduct has violated, and continues to violate the MCPA, and an appropriate court order prohibiting Defendants from further unfair and deceptive acts and practices described in this complaint.

<u>Massachusetts</u>

1168. Massachusetts' unfair and deceptive trade practices statute declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws, c. 93A, § 2(a).



Case ID: 260703065

Massachusetts law allows both consumers and participants in trade or commerce to bring claims for actual damages, multiple recovery for willful violations and attorneys' fees for a prevailing plaintiffs. *See* Mass. Gen. Laws, c. 93A, §§ 9, 11. The Massachusetts Supreme Court "read[s] the language of G.L. c. 93A as a clear statement of legislative policy to" allow indirect purchasers to seek relief for antitrust conduct. *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 66-67 (2002).

1169. Massachusetts TPPs and their beneficiaries qualify as consumers or participants in trade in commerce within the meaning of Mass. Gen. Laws, c. 93A.

1170. Within respect to the injuries suffered by Massachusetts TPPs and their beneficiaries, the majority of the injurious conduct occurred within Massachusetts.

1171. As alleged in this Complaint, the facts and circumstances demonstrate that Defendants acted willfully within the meaning of Mass. G.L. c. 93A entitling Massachusetts TPPs and their beneficiaries to multiple damages for the maintenance of the opioid scheme. Therefore, Massachusetts TPPs and their beneficiaries are entitled to relief under Massachusetts law.

1172. Plaintiffs were injured as a result of Defendants' conduct in violation of Massachusetts law, and hereby seek damages.

<u>New Jersey</u>

1173. The New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1, et seq. ("NJCFA"), provides that the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or



Case ID: 260703065

omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

1174. The unconscionable and deceptive acts and practices described herein are declared unlawful under the NJCFA.

1175. The NJCFA authorizes any person, including "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof" to seek an injunction, damages, costs, and reasonable attorneys' fees to prevent and ameliorate the unfair and deceptive conduct described herein.

1176. Plaintiffs in New Jersey are persons pursuant to the NJCFA. They have been injured as a result of the Defendants' unconscionable, unfair, and deceptive conduct in violation of the NJCFA, and hereby seek damages.

1177. The acts and circumstances described herein demonstrate that Defendants acted unlawfully within the meaning of the NJCFA such that Plaintiffs in New Jersey and their New Jersey-based beneficiaries or purchasers of Subject Opioids may be awarded up to three times the actual damages sustained, and such additional relief as deemed necessary or proper.

1178. Plaintiffs seek relief against all Defendants for their unconscionable commercial practices with regard their roles in the opioid scheme

1179. Defendants are engaging in unconscionable commercial practices in trade or commerce that directly or indirectly harmed consumers in New Jersey, like Plaintiffs and their beneficiaries, within the meaning of the NJCFA.

1180. By engaging in the acts and practices set forth above, Defendants' conduct constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing, concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise, in violation of the NJCFA.

1181. Defendants willfully engaged in such practices, knowing them to be unconscionable, unfair, and deceptive or with reckless disregard for how their deception would impact Plaintiffs. Defendants intended and/or expected that payors, including Plaintiffs, would pay for prescriptions Subject Opioids that were unnecessary, inappropriate, harmful or otherwise improper, as well as the treatments for opioid disorders.

1182. The wrongful conduct and unconscionable, unfair, and deceptive commercial practices alleged in this Complaint have occurred, and continue to occur, in the ordinary course of Defendants' businesses or occupations, and have caused great harm to payors like Plaintiffs who were foreseeable and direct victims of their scheme.

1183. Plaintiffs in New Jersey and their New Jersey based beneficiaries were injured as a direct and proximate result of Defendants' conduct in violation of New Jersey law and hereby seek declaratory and junctive relief and damages.

New York

1184. New York's Deceptive Acts and Practices Statute, N.Y. Gen. Bus. Law. §§ 349-350, to recover damages that resulted from Defendants' acts, practices and omissions in violation of N.Y. Gen. Bus. Law. § 349.

1185. New York TPPs have standing to sue under the New York Act because they are persons within the meaning of N.Y. Gen. Bus. Law because they have been harmed and suffered injury in New York during the relevant time period as a result of Defendants' conduct.

1186. The alleged conduct is unfair, deceptive, unconscionable, unlawful and fraudulent, and otherwise is a violation of the policy or spirit of the New York Deceptive Acts and Practices Statute.

1187. As a direct and proximate result of such conduct, Plaintiffs have been injured in their businesses or property by paying for Subject Opioids and opioid treatments which payments they would not have made in the absence of Defendants' scheme and conspiracy involving opioids.

1188. Plaintiffs were injured as a result of Defendants' conduct in violation of New York law, and hereby seek damages.

Ohio

1189. The Ohio Consumer Sales Protection Act (the "Act") provides that "[n]o person shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Revised Code § 1345.02(A). "Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." *Id.*



Case ID: 260703065

1190. Having engaged in multiple consumer transactions with the Defendants over the course of several years, Cleveland Bakers is a consumer within the meaning of the Ohio Consumer Sales Protection Act (the "Act"), Ohio Revised Code § 1345.01(D). A consumer is any "person who engages in a consumer transaction with a supplier". "Persons" include "an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative, or other legal entity."

1191. Defendants have agreed to settled with Cleveland Bakers, recognizing the viability of claims for opioids under Ohio law.

1192. Defendants named herein are "suppliers" under the Act, as suppliers include "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." Ohio Revised Code § 1345.01(C).

1193. "Consumer transactions" include "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." Ohio Revised Code § 1345.01(A).

1194. Here, the Defendants engaged in consumer transactions with multiple Ohio based Plaintiffs actionable under the Act.

1195. The Act defines the following relevant acts or practices of the Defendants as deceptive:

- "That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have";

- "That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not";
- "That the subject of a consumer transaction is available to the consumer for a reason that does not exist';
- "That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;"
- "That a specific price advantage exists, if it does not;"
- "That the supplier has a sponsorship, approval, or affiliation that the supplier does not have."

Ohio Revised Code § 1345.02(B), (1), (2), (4), (5), (8) and (9).

1196. Importantly, for purposes of the instant Complaint, the Act provides that, "[i]n construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the 'Federal Trade Commission Act,' 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended." Ohio Revised Code § 1345.02(C).

1197. The Ohio Court in the MDL has already denied certain Defendants' Motions to Dismiss claims under the Act.

1198. The Act further provides that "[n]o supplier shall offer to a consumer or represent that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers, or otherwise helping the supplier to enter into other consumer transactions, if earning the benefit is contingent upon an event



Case ID: 260703065

occurring after the consumer enters into the transaction." Ohio Revised Code § 1345.02(D).

1199. Separately, the Act prohibits "unconscionable acts or practices" in connection with consumer transactions. Ohio Revised Code § 1345.03.

1200. The Act provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Revised Code § 1345.03(A).

1201. "In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:"

- "Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities…; "
- "Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;"
- "Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;"
- "Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;"

- "Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;"
- "Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment."

Ohio Revised Code § 1345.03(B)(1), (2), (3), (4), (5) and (6).

1202. The Act provides for private remedies by consumers for violations of Sections 1345.02 or 1345.03. "Where the violation was an act prohibited by section 1345.02 [or] 1345.03, … the consumer may, in an individual action, rescind the transaction or recover the consumer's actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages.

1203. The facts and circumstances described herein demonstrate that Defendants acted unlawfully within the meaning of the Act such that their actual economic damages plus up to $5,000 of non-economic damages, may be awarded, and such additional, equitable relief as deemed necessary or proper. Ohio Revised Code § 1345.09(A). Specifically, "[a]ny consumer may seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter." Ohio Revised Code § 1345.09(D).

1204. "Actual economic damages" means "damages for direct, incidental, or consequential pecuniary losses resulting from a violation of Chapter 1345. of the Revised Code." Ohio Revised Code § 1345.09(G).

1205. Ohio based Plaintiffs here seek relief against Defendants for their unconscionable, unfair, and deceptive commercial practices in promoting and selling



Case ID: 260703065

Subject Opioids to patients through doctors by the unfair and deceptive scheme described herein.

1206. To accomplish their scheme, the Defendants undertook an unconscionable, unfair, and deceptive scheme involving commercial practices in trade or commerce that directly or indirectly harmed consumers in Ohio within the meaning of the Act, including Ohio based Plaintiffs and their beneficiaries.

1207. The acts and practices set forth above, constitute unconscionable, unfair and deceptive commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing, concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise, in violation of the Act.

1208. The Defendants willfully engaged in such practices, knowing them to be unconscionable, unfair, and deceptive or with reckless disregard for how their deception would impact Plaintiffs. The Defendants intended and/or expected that payors, including Plaintiffs, would rely upon their misrepresentations and omissions to their detriment, which it did, by paying for opioids that they would not have paid for if Defendants had not engaged in such conduct.

1209. Defendants violated the Act and caused harm to Plaintiffs each time they promoted, distributed and sold Subject Opioids charged to Plaintiffs pursuant to the alleged acts, practices and omissions.

1210. Plaintiffs reasonably relied upon Defendants' direct and indirect representations concerning, among other things, the appropriateness of opioids to treat their indicated conditions.



Case ID: 260703065

1211. Defendants' conduct as more fully described herein constitutes unfair methods of competition and unfair, deceptive or unconscionable acts or practices within the meaning of the Act.

1212. Defendants are liable for their actions and are jointly and severally liable for the actions of their co-conspirators, for each of these violations as independent, unfair and deceptive acts in violation of the Act, and for their course of conduct comprising an unfair and deceptive act or practice in violation of the Act.

1213. As a result of the Defendants' unfair and deceptive acts and practices, Plaintiffs have and will continue to suffer ascertainable losses and damages in an amount to be determined at trial, which amounts should be awarded pursuant to the Act. These amounts should be trebled, in this Court's discretion, as appropriate.

1214. The wrongful conduct and unconscionable, unfair, and deceptive commercial practices alleged in this Complaint have occurred, and continue to occur, in the ordinary course of the Defendants' business or occupation and have caused great harm to payors like Plaintiffs who were foreseeable and direct victims.

1215. Plaintiffs were injured as a direct and proximate result of the Defendants' conduct in violation of Ohio law and hereby seek declaratory and junctive relief and damages.

<u>Florida</u>

1216. The Florida Deceptive and Unfair Trade Practices Act is designed to protect "the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and mandates that the act be liberally construed to promote



Case ID: 260703065

that policy. F.S.A. § 501.202. Florida courts have interpreted this law "as a clear statement of legislative policy to protect consumers through the authorization of [] indirect purchaser actions." *Mack v. Bristol Meyers Squibb*, 673 So. 2d 100, 108 (Fla. 1st D.C.A. 1996).

1217. As set forth herein, Florida TPPs act as fiduciaries for their employees who receive prescription and health benefits through the TPP or municipality . As such, they are consumers within the meaning of Fla. Stat. § 501.203(7).

1218. Moreover, many Plaintiffs' beneficiaries retire to Florida and become residents of and consumers in Florida.

1219. As consumers, Florida TPPs and their beneficiaries have suffered losses as a result of the unlawful conduct of Defendants as described herein. Therefore, Florida TPPs and their beneficiaries may recover their actual damages and their attorneys' fees and costs.

1220. Plaintiffs were injured as a result of Defendants' conduct in violation of Florida law, and hereby seek damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.



Case ID: 260703065

**COUNT III**
**PLAINTIFFS v. ALL DEFENDANTS**
**NEGLIGENCE PER SE**

1221. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1222. As described elsewhere in this Complaint in language expressly incorporated herein, each Defendant had a duty under Pennsylvania law and the laws of other Plaintiff States to maintain effective controls against the diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids.

1223. Pennsylvania and the Plaintiff States recognize that a violation of a statute or ordinance may serve as the basis for negligence per se.

1224. Defendants' actions and omissions in violation of the law constitute negligence *per se*.

1225. Defendants' actions and omissions were intentional and/or unlawful.

1226. It was foreseeable that the breach of duty described herein would result in the economic damages for which Plaintiffs seeks recovery.

1227. Plaintiffs seek economic damages which were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

1228. The existence of a duty depends on the foreseeability of the injury. Each Defendant owed a duty to the Plaintiffs because the injuries alleged herein were foreseeable, and in fact foreseen, by the Defendants.

1229. Reasonably prudent manufacturers of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, like Plaintiffs', and the significant costs which would be imposed upon the



Case ID: 260703065

governmental entities associated with those communities, like Plaintiffs. The "closed system" of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances like opioids and preventing their diversion and abuse.

1230. Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Defendants.

1231. Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

1232. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

1233. As described elsewhere in the Complaint in language expressly incorporated herein, the Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for nonmedical



Case ID: 260703065

purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

1234. As described elsewhere in the Complaint in language expressly incorporated herein, the Defendants breached their duties to exercise due care in the business of pharmaceutical s of dangerous opioids, which are Schedule II Controlled Substances, and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

1235. The Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

1236. In misrepresenting the characteristics, uses and benefits of their Subject Drugs as set forth herein, the Defendants were making representations about their drugs that were not truthful.

1237. These representations were material to the transactions at hand in that beneficiaries of the Plaintiffs used opioids in reliance on these representations, and Plaintiffs paid for both the cost of the drugs and the services related to the addiction caused by the drugs.

1238. The Defendants made these misrepresentations about opioids for the purpose of generating revenue, thus constituting false representations which they knew or, in the absence of recklessness, should have known, to be false.

1239. The Defendants made these misrepresentations with the intent of misleading Plaintiffs and their beneficiaries.

1240. Plaintiffs and their beneficiaries justifiably relied upon these misrepresentations in purchasing and/or reimbursing for the Defendants' opioids and in treating opioid addiction, in an amount to be determined at trial.

1241. All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

1242. Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

1243. The causal connection between the Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

1244. As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bear a causal connection with, and/or proximately resulted in the damages sought herein.

1245. Defendants were selling and distributing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

1246. Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under Pennsylvania law and the laws of the Plaintiff States.

1247. As a direct and proximate result of the Defendants' actions and omissions as set forth herein, Plaintiffs and their beneficiaries were harmed in that they were unaware of the Defendants' misconduct and would not have had to pay for opioids, and the treatment of opioid addiction and related conditions, at the levels and of the amount they did, had they known the truth about Defendants' opioids.

1248. Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from the Defendants' actions and omissions. Plaintiffs do not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by the Defendants' actions. However, they do seek damages for "opioid use disorder" and the treatment of other medical conditions which were caused by opioids distributed and sold by Defendants.

1249. Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including, *inter alia*, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

**COUNT IV**
**PLAINTIFFS v. ALL DEFENDANTS**
**AIDING AND ABETTING**

1250. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1251. Defendants knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote the use of opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations, and material omissions, to prescribers and consumers. Defendants enlisted various KOLs and groups to make and disseminate these statements in furtherance of their common strategy to increase opioids sales, and Defendants—along with the groups with whom each of them conspired—knew that the statements they made and disseminated served this purpose.

1252. By engaging in the conduct described in this Complaint, the Defendants agreed with the above-described groups that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with those groups, Defendants provided financial support for groups' deceptive statements promoting opioids, and the groups used that support to more broadly disseminate deceptive messaging promoting opioids, which resulted in increased drug sales.

1253. Each of the participants to the coordinated conduct outlined herein was aware of the misleading nature of the statements issued, and of the role they played in the scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. Defendants and such third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to Plaintiffs and its Members in return for



Case ID: 260703065

increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

1254. Defendants either knowingly benefited from or played an active role in determining the substance of the misleading messages issued by the groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated, by both distributing the misstatements themselves and providing their co-conspirators with funding and other assistance with distribution. The result was an unrelenting stream of misleading information about the risks, benefits, and superiority of using opioids to treat chronic pain from sources all Defendants knew were trusted by prescribers.

1255. Defendants participated in unlawful acts or lawful acts in an unlawful manner and took substantial steps in furtherance thereof, by:

a. Violating, aiding and abetting in the violation, or causing the violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the consumer fraud laws of the Plaintiff States;

b. Creating and disseminating misrepresentations about opioids, and concealing the truth about opioids and their conduct;

c. Perpetrating a public nuisance; and

d. Committing common law unjust enrichment.

1256. By reason of the foregoing, Plaintiffs and their beneficiaries have been injured and continue to be injured by Defendants' ongoing concerted actions in marketing and distributing Subject Opioids, which caused doctors and other health care providers to prescribe and the Plaintiffs to pay for long-term opioid treatment using

opioids manufactured by Defendants or by other drug makers. Defendants are responsible for such costs.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

**COUNT V**
**PLAINTIFFS v. ALL DEFENDANTS**
**CONSPIRACY**

1257. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1258. "In order to state a cause of action for civil conspiracy, a plaintiff must show 'that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.'" *Marion*, 288 A.3d at 89.

1259. Here, all Defendants combined and agreed with each other, and with the Bankrupt Manufacturers, to do an unlawful act and/or a lawful act by unlawful means.

1260. All Defendants agreed orally and in writings with themselves and with the Bankrupt Manufacturers to participate in the opioid scheme in the manner described herein. In other words, their roles and involvement were agreed to.

1261. The opioid scheme was unlawful. Most recently, the U.S. FTC prosecuted Express Scripts for aspects of such unlawful scheme involving the specialty distribution of drugs, and the U.S. Congress and States have investigated and sued the



Case ID: 260703065

Defendants named herein and the Bankrupt Manufacturers for their roles in the opioid scheme.

1262. In the absence of Defendants' unlawful agreement and scheme, Plaintiffs would not have paid for the Subject Opioids that they did, would not have paid for the frequency and number of opioid prescriptions that they did, and would not have had to pay for the treatment of opioid related disease and disorders which they did.

1263. Pursuant to the unconscionable, unfair and deceptive scheme to distribute, market and sell Subject Opioids to derive substantial profits, Defendants engaged in a wide range of activities, the purpose and effect of which was to deceive TPPs, like Plaintiffs, and acted by aiding and abetting each other to raise prices, increase prescriptions and increase profits at the expense of payors like Plaintiffs. Those acts in furtherance of the conspiracy include at least the following:

a. discussing and agreeing among themselves, with the Bankrupt Manufacturers and others, that they would directly control messaging about opioids, the distribution of opioids, the marketing of opioids, the sale of opioids, through the acts, practices and omissions described herein;

b. discussing and agreeing among themselves, and with the Bankrupt Defendants and others, that they would participate in the promotion of Subject Opioids through the marketing alleged herein;

c. discussing and agreeing among themselves, and with Bankrupt Manufacturers and others, that they would participate in the affairs of the marketing and sales programs and initiatives, through KOLs and others, by using a fraudulent scheme to market and sell Subject Opioids; and

d. discussing and agreeing among themselves, and with the Bankrupt Manufacturers and others, that they would conceal and suppress the truth about the opioid scheme, the unlawful uses and doses being marketed, the monies being earned from payors like Plaintiffs and their arrangement to maintain the ongoing scheme.



Case ID: 260703065

1264. In addition to the specific facts set forth above, it is alleged the Defendants engaged in meetings, among the purposes of which were to discuss the importance of controlling marketing, promotion, sales, distribution and administration of opioids to payors like Plaintiff and their beneficiaries and treating physicians, and aiding and abetting each other to derive substantial profits from these activities.

1265. Defendants knowingly provided substantial assistance and encouragement to each other and aided and abetted each other to derive substantial profits by causing payors like Plaintiffs to pay for opioids and opioid disorder treatments.

1266. Defendants performed the acts set forth herein intending to injure payors of opioids, like Plaintiffs, by causing them to pay for unnecessary and improper prescriptions of opioids so that they could derive substantial profits.

1267. Defendants performed the acts alleged herein in furtherance of their agreement with intent and/or with knowledge of the injury and damage it would cause economic harm to payors like Plaintiffs and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

1268. As a direct and proximate result of Defendants' aiding and abetting as alleged herein, Plaintiffs have been injured and damaged, and Defendants are liable for such injuries and damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including

attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

**COUNT VI**
**PLAINTIFFS v. ALL DEFENDANTS**
**PUBLIC NUISANCE**

1269. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1270. Defendants' wrongful and illegal actions and conduct have created, and constitute, a public nuisance.

1271. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the Plaintiffs and the general public.

1272. The Defendants have intentionally and/or unlawfully created an absolute nuisance.

1273. Plaintiffs have a common law right to be free from conduct that creates an unreasonable jeopardy to public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

1274. Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, unlawfully, recklessly, and negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of Plaintiffs by their untrue, false, and misleading promotion, and marketing of opioids for use by beneficiaries of Plaintiffs.

1275. Defendants' marketing conduct and subsequent sale of its opioid products is not only unlawful, but has also resulted in substantial and unreasonable interference with the public health, and the public's enjoyment of its right not to be defrauded or negligently injured.

1276. Defendants intentionally, unlawfully, recklessly, and negligently manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiffs' beneficiaries' communities, resulting in addiction and abuse, an elevated level of crime, death and injuries to the Plaintiffs, and their beneficiaries, a higher level of fear, discomfort and inconvenience to the Plaintiffs, and direct costs to it.

1277. Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure Plaintiffs.

1278. Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

1279. Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

1280. Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or

reasonably should know, such opioids will be diverted and possessed and/or used illegally in Pennsylvania is of a continuing nature.

1281. Defendants' conduct is not insubstantial or fleeting. Indeed, Defendants' unlawful conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by Defendants' conduct is commonly referred to as a "crisis" or an "epidemic." Defendants' conduct has caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

1282. A violation of any rule or law controlling the distribution of a drug of abuse in Pennsylvania is a public nuisance. It is also a public nuisance under the related laws of the Plaintiff States.

1283. Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

1284. Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiffs' communities will be diverted, leading to abuse, addiction, crime, and public health costs.

1285. Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

1286. Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the

public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

1287. Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

1288. Defendants are aware, or reasonably should have been aware, of the unreasonable interference that their conduct has caused Plaintiffs. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law. *See, e.g.*, 21 U.S.C. § 812 (b)(2).

1289. Defendants' conduct in marketing, distributing, and selling prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to beneficiaries of Plaintiffs, and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

1290. Defendants know, or reasonably should know, that their conduct has caused, and will continue to cause, deaths and injuries to beneficiaries of Plaintiffs, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

1291. The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes not only causes deaths and injuries, but also creates a palpable climate of fear among Plaintiffs and its beneficiaries.

1292. Defendants' actions were a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

1293. The presence of diverted prescription opioids in Plaintiffs' communities, and the consequence of prescription opioids having been diverted in Plaintiffs' communities, proximately resulted, and continues to result, in significant costs to the Plaintiffs in order to treat the victims of opioid abuse and addiction.

1294. Defendants' conduct is a direct and proximate cause of Plaintiffs' injuries.

1295. Defendants' conduct constitutes a public nuisance.

1296. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of



Case ID: 260703065

opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

1297. Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance that harmed Plaintiffs.

1298. Defendants' actions also created a qualified nuisance. Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

1299. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

1300. Plaintiffs seeks all damages flowing from Defendants' conduct.

1301. As a direct result of Defendants' conduct, the Plaintiffs suffered actual injury and damages including, but not limited to, significant expenses for police,



Case ID: 260703065

emergency, health, prosecution, corrections and other services. The Plaintiffs here seeks recovery the harm caused by Defendants.

1302. The Plaintiffs, and the communities in which its members and beneficiaries reside, have sustained specific and special injuries because their damages include, *inter alia*, health services and costs related to opioid addiction treatment and overdose prevention.

1303. The Plaintiffs further seek to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and interference with a right common to the public.

1304. Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

1305. Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

1306. Defendants are aware, or reasonably should have been aware, of the unreasonable interference that their conduct has caused the Plaintiffs and its beneficiaries. Defendants are in the business of manufacturing generic prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because, *inter alia*, these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction.

1307. The public nuisance created by the Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to Plaintiffs, and

the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Distributor Defendant's abandonment of its gate-keeping and diversion prevention duties, and the Defendants' fraudulent marketing activities, have caused harm to the entire community that includes, but is not limited to:

a. The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b. Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c. Even those residents of Plaintiffs' communities who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gatekeeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family Members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d. The opioid epidemic has increased health care costs.

e. Employers have lost the value of productive and healthy employees.

f. Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g. Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h. The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services (as paid for by Plaintiffs) and law enforcement.

i. The significant and unreasonable interference with the public rights caused by the Defendants' conduct taxed the human, medical, and public health, law enforcement, and financial resources of the Plaintiffs' communities.

j. Defendants' interference with the comfortable enjoyment of life in the Plaintiffs' communities is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

1308. The Plaintiffs have sustained specific and special injuries because their damages include health services, as described in this Complaint.

1309. Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations and omissions.

1310. Plaintiffs do not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

1311. Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including, *inter alia*, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

**COUNT VII**
**PLAINTIFFS v. ALL DEFENDANTS**
**UNJUST ENRICHMENT**

1312. Plaintiffs incorporate the allegations within all preceding and following paragraphs within this Complaint as if they were fully set forth herein.

1313. Defendants have unjustly retained a benefit to the detriment of Plaintiffs, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

1314. By illegally and deceptively promoting opioids to treat chronic pain, directly, through their control of third parties, and by acting in concert with third parties, Defendants have unjustly enriched themselves at the expense of Plaintiffs. Plaintiffs have made payments for Defendants' opioid prescriptions, and Defendants benefited from those payments. Because of their deceptive promotion of Defendants' opioids, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Plaintiffs lack a remedy provided by law.

1315. In addition, and by reason of the foregoing, Plaintiffs were injured and continue to be injured in that the Defendants' concerted actions in illegally and deceptively marketing opioids caused doctors and other healthcare providers to prescribe and Plaintiffs to pay for long-term opioid treatment using opioids manufactured and sold by Defendants (or by other drug makers in addition thereto). Defendants caused and are responsible for those costs. As a direct and proximate result, Plaintiffs suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order (a) awarding judgment in their favor, and against Defendants, (b) awarding Plaintiffs their actual or compensatory damages; (c) compelling Defendants to pay the costs of the suit, including attorneys' fees; and (d) awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

## VII. AD DAMNUM

WHEREFORE, Plaintiffs demand the following:

a. Judgment in their favor, and against all Defendants;

b. The entry of an Order permanently enjoining each and every Defendant from continuing the deceptive and/or unfair acts or practices complained of herein, and requiring corrective measures;

c. An award of statutory damages, including treble damages;

d. An award of compensatory damages;

e. An award of exemplary and punitive damages in an amount to be determined at trial;

f. All elements of interest, including but not limited to pre- and post-judgment interest;

g. Attorney fees, expert witness fees, costs of investigation, and other reasonably related costs, including court costs, litigation expenses, and fees; and

i. Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

The Plaintiffs demand a trial by jury on all issues properly so tried.

Respectfully submitted,

Dated: June 30, 2026

*s/ Donald E. Haviland, Jr.*

Donald E. Haviland, Jr., Esquire
(PA Bar # 66615)
*haviland@havilandhughes.com*

William H. Platt II, Esquire
(PA Bar # 83585)
*platt@hailandhughes.com*
**HAVILAND HUGHES**
124 S. Maple Way, Suite 220
Ambler, PA 19002
Ph: (215) 609-4661

*Counsel for the Plaintiffs*



Case ID: 260703065

**VERIFICATION**

I, Kevin Dean, hereby verify that I am the Fund Administrator for Plumbers' Local Union No. 690 Industry Funds [the "Fund"], that I am authorized to make this Verification and that the facts set forth in the foregoing Complaint relating to the Fund are true and correct to the best of my knowledge, information and belief. The Fund has relied upon the investigation of its counsel for this Complaint and facts concerning the conduct of the Defendants. I understand that this Verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities.

Dated: June 30, 2026

Kevin Dean

Kevin Dean
Fund Administrator for
Plumbers' Local Union No. 690 Industry Funds